UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | |
| | § | Civil Action No. |
| | § | 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| | § | |
| Defendants | § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

| Exhibit | Description | Appendix | Binder |
|---|---|---|---|
| 1 | Pilot Station Surveillance Video | 001 | 1 |
| 2 | Police SUV Dash Video | 002 | 1 |
| 3 | McHugh Body Camera Video | 003 | 1 |
| 4 | Deposition of R. Coborn | 004-079 | 1 |
| 5 | Deposition of M. McHugh | 080-127 | 1 |
| 6 | Deposition of G. Dees | 128-170 | 1 |
| 7 | Autopsy of D. Baker | 171-177 | 1 |
| 8 | Department of Public Safety Firearms Laboratory Report | 178-184 | 1 |
| 9 | Crime Scene Photos | 185-193 | 1 |
| 10 | Stratford Police Incident Report (R. Alvarez) | 194-198 | 1 |
| 11 | Stratford Police Incident Report (C. Marks) | 199-207 | 1 |
| 12 | Texas Commission on Law Enforcement, Curriculum for Intermediate Use of Force | 208-287 | 1 |
| 13 | Texas Commission on Law Enforcement, "Basic" Force Options Curriculum | 288-312 | 2 |
| 14 | Stratford Police Policy – Use of Force | 313-318 | 2 |
| 15 | Report of Dr. Nizam Peerwani, M.D | 319-337 | 2 |
| 16 | Report of Dep. Chief Jeff Noble (ret.) | 338-371 | 2 |

| 17 | Still Images from Pilot Surveillance | 372-373 | 2 |
| 18 | Still Images from Police SUV Dash Video | 374-380 | 2 |
| 19 | Deposition of City of Stratford | 381-499 | 2 |
| 20 | Stratford Police Department Use of Force Incidents | 500-503 | 2 |

Plaintiffs respectfully submit the attached Appendix in Support of their Response to Defendant's Motion for Summary Judgment. *See* Doc. 51.

EDWARDS LAW
1101 East Eleventh Street
Austin, Texas 78702
Tel.  (512) 623-7727
Fax. (512) 623-7729

By      /s/ Jeff Edwards
        JEFF EDWARDS
        State Bar No. 24014406
        jeff@edwards-law.com
        SCOTT MEDLOCK
        State Bar No. 24044783
        scott@edwards-law.com
        MIKE SINGLEY
        State Bar No. 00794642
        mike@edwards-law.com
        DAVID JAMES
        State Bar No. 24092572
        david@edwards-law.com

**ATTORNEYS FOR PLAINTIFFS**

CERTIFICATE OF SERVICE

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Northern District of Texas.

By      /s/ Jeff Edwards
        Jeff Edwards

3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | Civil Action No. 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| Defendants | § § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 1
# Pilot Station Surveillance Video
# (excerpted from D00026)

# Filed Traditionally

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | Civil Action No. 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| Defendants | § § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 2
# Police SUV Dash Video
# (excerpted from D00002)

# Filed Traditionally

002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| | § | Civil Action No. |
| | § | 2:19-cv-77 |
| Plaintiffs | §<br>§ | |
| v. | §<br>§ | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | §<br>§<br>§<br>§<br>§ | |
| Defendants | §<br>§ | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR**
**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 3
# McHugh Body Camera Video
# (excerpted from D00001)

# Filed Traditionally

003

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | Civil Action No. |
| | § | 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| Defendants | § § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 4
# Deposition of R. Coburn

Richard Keith Coborn – 2/11/2020

```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
                  AMARILLO DIVISION

IRA DARLINA BAKER,           )
individually, and as the     )
administratrix of the ESTATE )
OF DARION DE'VON BAKER and   )
MARIO BAKER, individually,   )
and on behalf of all         )
wrongful death beneficiaries )
Of DARION DE'VON BAKER       )
                             )
            Plaintiffs,       )
                             )
VS.                          )   Civil action no.
                             )    2:19-cv-77
RICHARD KEITH COBURN, and    )
MICHAEL JOSEPH MCHUGH in     )
their individual capacities  )
                             )
            Defendants.      }
```

************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

RICHARD KEITH COBORN

FEBRUARY 11, 2020

************************************************************

        ORAL AND VIDEOTAPED DEPOSITION of RICHARD KEITH

COBORN, produced as a witness at the instance of the

Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 11th of February,

2020, from 9:50 a.m. to 12:54 p.m., before Gay Richey,

CSR, in and for the State of Texas, reported by

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

**005**

Richard Keith Coborn - 2/11/2020

1    stenograph, at the Law Offices of Sprouse, Shrader,

2    Smith, located at 701 S. Taylor, Suite 500, Amarillo,

3    Texas, pursuant to the Federal Rules of Civil Procedure

4    and the provisions stated on the record or attached

5    hereto.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

006

Richard Keith Coborn - 2/11/2020

```
 1              A P P E A R A N C E S

 2   COUNSEL FOR THE PLAINTIFFS:

 3         Scott Medlock
           EDWARDS LAW
 4         Haehnel Building
           1101 East 11th Street
 5         Austin, Texas 78702
           Phone No.: (512) 623-7727
 6         E-Mail: scott@edwards-law.com

 7
     COUNSEL FOR THE DEFENDANTS:
 8
           Blair Saylor Oscarsson
 9         SPROUSE SHRADER SMITH
           701 S. Taylor, Suite 500
10         Amarillo, Texas 79105
           Phone No.: (806) 373-3454
11         E-Mail: blair.oscarsson@sprouselaw.com

12
     ALSO PRESENT:
13
           Officer Michael McHugh
14         Brad, Videographer
           Gay Richey, Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

007

Richard Keith Coborn – 2/11/2020

```
 1              I N D E X

 2                                       PAGE

 3  Appearances.....................................  02

 4  Exhibits........................................  05

 5  RICHARD KEITH COBORN

 6  Examination by Ms. Medlock......................  06

 7  Changes and Signature..........................  136

 8  Reporter's Certificate.........................  138

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

**008**

Richard Keith Coborn - 2/11/2020

```
1              E X H I B I T S

2    NO.    DESCRIPTION                    PAGE

3    1      Google Earth image              66

4    2      Hand-drawn diagram              72

5    3      Photograph of crime scene       95

6    4      Photograph taken by Rangers    100

7    5      Photograph, rear of Infinity   102

8    6      Document                       102

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

Richard Keith Coborn - 2/11/2020

```
 1              P R O C E E D I N G S
 2          (Per agreement of all counsel, Federal
 3  Rule 30(b)(5) Read-On was waived).
 4              THE VIDEOGRAPHER:  All right.  Today is
 5  February 11th, 2020.  This is the videotaped deposition
 6  of Richard Coborn, in the case of Baker, et al, vs.
 7  Coborn, et al.
 8          Counsel, please state your appearances for
 9  the record.
10          MR. MEDLOCK:  Scott Medlock for the
11  Plaintiff.
12          MS. OSCARSSON:  Blair Oscarsson for the
13  Defendants.
14          THE VIDEOGRAPHER:  The hour is 9:50.  We are
15  now on the record.
16          Court Reporter, please swear the witness.
17          THE COURT REPORTER:  Would you raise your
18  right hand, please.
19          (Witness Sworn).
20          THE WITNESS:  I do.
21              RICHARD KEITH COBORN,
22  the witness, being duly cautioned and sworn to tell the
23  truth, the whole truth and nothing but the truth,
24  testified as follows:
25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

**010**

Richard Keith Coborn – 2/11/2020

| | |
|---|---|
| 1 | EXAMINATION |
| 2 | BY MR. MEDLOCK: |
| 3 | Q.  Good morning, Officer. |
| 4 | A.  Good morning. |
| 5 | Q.  Could you please state your name for the record? |
| 6 | A.  Richard Keith Coborn. |
| 7 | Q.  And, Officer Coborn, have you ever been deposed |
| 8 | or testified before? |
| 9 | A.  No, sir. |
| 10 | Q.  Okay.  Well, let's just go over some ground |
| 11 | rules.  We met just a minute ago.  My name is Scott |
| 12 | Medlock. |
| 13 | Do you understand that I represent the family of |
| 14 | Darion Baker? |
| 15 | A.  Yes, sir. |
| 16 | Q.  Okay.  I want to just go over some things that |
| 17 | will hopefully make things go a little easier today. |
| 18 | If you don't hear my question, will you let me |
| 19 | know? |
| 20 | A.  Yes, sir. |
| 21 | Q.  If you don't understand my question, will you let |
| 22 | me know? |
| 23 | A.  Yes, sir. |
| 24 | Q.  If you don't know the answer to my question, will |
| 25 | you let me know? |

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

011

Richard Keith Coborn – 2/11/2020

1    Q.   Okay.   Do you recall if -- after you did that --
2    if you reloaded your magazine, or if you just left it as
3    is?
4        A.   I reloaded, but I don't remember if I put all 15
5    back in, or if I put 14.
6        Q.   Okay.   So you think -- would it be fair, then,
7    that you had either a total of 15 or 16 rounds in your
8    weapon that evening?
9        A.   I would not be able to answer that.   I don't
10   know.
11       Q.   Okay.   You're not sure one way or the other?
12       A.   I'm not sure, yes, sir.
13       Q.   Okay.   What was your standard practice after you
14   took the dog out to train, as far as --
15       A.   I --
16       Q.   -- reloading the weapon?
17       A.   I usually have a box of ammo in my patrol
18   vehicle.   And so I don't sit there and shoot an entire
19   magazine; I just open up the back of the hatch where
20   the -- of the Tahoe, and just shoot a couple of rounds,
21   just to keep the dog accustomed to the sound of gunfire,
22   and then go back to the front of the Tahoe and load
23   however many rounds I shot back in.   Sometimes if -- a
24   box holds 25 rounds.   So after doing that for maybe a
25   week, or a month, at the end of it, of the box, you may

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

012

Richard Keith Coborn - 2/11/2020

1   have three or four rounds.  And if you've shot five,

2   then you don't have the amount to -- to replace, so.

3        I don't remember that day if I shot five times

4   and only replaced three, or -- or how many I had left in

5   that box when I reloaded.

6        Q.  Okay.  So if the -- if the box had had enough to

7   reload, would you have reloaded the entire magazine --

8        A.  Correct --

9        Q.  -- at that point?

10       A.  -- yes, sir.

11       Q.  All right.  You would have reloaded the entire

12   magazine, and then would you have also put one in the

13   chamber?

14       A.  Correct, yes, sir.

15       Q.  Okay.  So if it was kind of a normal day where

16   you had enough ground left -- excuse me.  If it was a

17   normal day and you had enough rounds to reload, you

18   would have loaded up to 16 rounds into the gun?

19       A.  Correct.

20       Q.  Okay.  And you don't remember anything about not

21   having enough rounds to fill up the gun that day?

22       A.  I -- not to my recollection, no, sir.

23       Q.  Okay.  So that would mean that -- if you'd been

24   able to load all 16 rounds, that means you could fire 16

25   times without reloading, correct?

Richard Keith Coborn - 2/11/2020

1    A.  If the weapon was fully loaded with 16 rounds,
2    correct, I would have been able to fire 16 times.
3    Q.  Okay.  And you did not reload during the
4    shooting, correct?
5    A.  Correct, I did not reload.
6    Q.  Okay.  So the most that you could have shot would
7    have been --
8         And I believe there was one round found left in
9    your gun after the shooting ended?
10   A.  I don't know.
11   Q.  Okay.  I'll represent for you that there was one
12   round left in the gun.
13   A.  Okay.
14   Q.  If the gun was fully loaded with 16 rounds, that
15   would mean you fired 15 shots, right?
16   A.  Yes, sir, if it had been fully loaded.
17   Q.  Okay.  And you gave that gun to the investigators
18   immediately after the shooting, right?
19   A.  We gave it to Deputy Alfonso Garay --
20   Q.  And --
21   A.  -- Sherman County Sheriff's Office.
22   Q.  And do you know what he did with it?
23   A.  No, sir.
24   Q.  Why did you give it to --
25        You said Deputy Gray?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

014

Richard Keith Coborn - 2/11/2020

1    Q.   -- correct?

2    A.   Yes, sir.

3    Q.   When he's talking -- I'll represent for you, that

4    when he's talking to you after the shooting and you're

5    at the Toot'n Totum parking lot, you can see there's a

6    little green light glowing on your body camera.

7         Do you recall that?

8    A.   Correct, yes, sir.

9    Q.   What does that green light mean?

10   A.   The green means that the camera is powered on.

11   Q.   So then you would have needed to also hit the

12   center button to turn it on --

13   A.   Correct.

14   Q.   -- to get it to record?

15   A.   Correct.  And then there would have been a red

16   light beside the green one for record.

17   Q.   Okay.  So red means recording?

18   A.   Yes, sir.

19   Q.   Okay.  So it seems that during this incident you

20   remember to turn it on -- power it on, but not to start

21   recording; is that right?

22   A.   I guess so.

23   Q.   When are you supposed to turn your body camera

24   on?

25   A.   When we go on duty, we turn them on; however,

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

015

Richard Keith Coborn - 2/11/2020

1   these body cameras, if they aren't activated or active,

2   they shut themselves off to conserve battery.

3       Q.  Okay.  Let me -- I -- a -- probably a better way

4   for me to answer that -- ask that -- when are you

5   supposed to "power" them on?  Is that when you start on

6   duty?

7       A.  When we start on duty, we "power" them on.

8       Q.  Okay.  And then when -- does it shut off at some

9   point like you described from the "powered" on?

10      A.  If it's "powered on," which is standby --

11      Q.  Uh-huh.

12      A.  -- if it's not used or activated then it will

13  turn itself off to conserve power.

14      Q.  Okay.  And do you know how long the battery runs?

15      A.  No, sir.  I don't know how long the battery

16  lasts.

17      Q.  Okay.  You've never noticed while you were --

18      A.  No, sir.

19      Q.  Okay.  So when there's a -- what -- what types of

20  incidents are you supposed to make sure that the

21  battery -- the body camera is recording?

22      A.  Any contact with anybody that we have, we try to

23  make sure that the body camera is running.

24      Q.  Okay.  So should you have turned the body camera

25  on before you entered the Pilot station to talk to the

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

016

Richard Keith Coborn - 2/11/2020

1   folks that you spoke to in there?

2       A.   I -- yes, sir.

3       Q.   Okay.  So that would be the time you should have

4   turned it on?

5       A.   Correct.

6       Q.   Okay.  And are -- are you supposed to just make

7   sure it's powered on and recording before you start

8   talking to folks?  Is that the kind of policy --

9       A.   "Powered on," yes, sir.

10      Q.   And when do you -- when are you supposed to hit

11  the -- the record button?

12      A.   At that time, our policy didn't dictate when we

13  were supposed to power or "turn on" the recording.  If

14  it was a traffic stop, or something like that, then we

15  typically would turn it on for the record.

16      Q.   Were you trained on when to turn the recording

17  on?

18      A.   Yes, sir.

19      Q.   And what were you trained on when to turn the

20  recording on?

21      A.   That when we made traffic stops, to -- to turn

22  them on.

23      Q.   And I think you -- you indicated something

24  that -- "at that time, the instructions were this..."

25  Have those instructions changed since --

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

017

Richard Keith Coborn - 2/11/2020

1    A.  Yes, sir.

2    Q.  -- the shooting?

3         Tell me what your -- when you're supposed to turn

4    the body camera on now.

5    A.  Any time we have any kind of encounter with

6    anybody, we turn our body cameras on and ensure that

7    they are recording.

8    Q.  Okay.  So at the time, because you're not making

9    a traffic stop when you go into the Pilot, you -- the

10   instructions at the time would have been you didn't have

11   to turn it on then, right?

12   A.  Correct.  Since it was not a traffic stop when I

13   entered Pilot, the recording was not on.

14   Q.  Okay.  So at that time, ==at the time of the==

15   ==shooting, what you should have done is turn the body==

16   ==camera on when you-guys decide that you're going to stop==

17   ==the Infinity, right?==

18   ==A.  Correct.==

19   Q.  Okay.  How long had you had the body camera

20   before this shooting?

21   A.  I couldn't give you an exact time.  I want to say

22   a few weeks.

23   Q.  The shooting happened in -- towards the end of

24   February.  Was this like a -- a new for-2018 thing, that

25   you got the body cameras to start the new year, did you

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

018

Richard Keith Coborn - 2/11/2020

1   get them before that; do you remember?

2       A.  No, sir.  I don't remember exactly when.  They

3   didn't come as a capital outlay, which would have been

4   in October, we just got them because of seizure funds.

5   And I don't remember when our Chief, at the time, had

6   purchased the cameras and issued them out.  They were

7   fairly new during this incident.

8       Q.  Was -- and I believe Chief Hooks was the Chief

9   during this --

10      A.  Correct.

11      Q.  -- shooting?

12      A.  Yes, sir.

13      Q.  Okay.  Is he still the Chief?

14      A.  No, sir.

15      Q.  Who's the Chief now?

16      A.  I am now.

17      Q.  You're the Chief now?

18      A.  Correct, yes, sir.

19      Q.  When did you become the Chief?

20      A.  November 23rd of 2019.

21      Q.  Okay.  So this is relatively recent?

22      A.  Yes, sir.

23      Q.  Okay.  Well, congratulations.

24      A.  Thank you.

25      Q.  Tell me a little bit about the -- the structure

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

019

Richard Keith Coborn - 2/11/2020

1    of the Stratford Police Department at the time; how many

2    officers are on the force, what was the supervision

3    structure.

4        A.    The structure of the force is 3-man police

5    department; two patrol officers, and the Chief of

6    Police.    On certain days--and I wouldn't be able to tell

7    you how, it's just a rotating schedule--two officers

8    will work together, and then both officers report to the

9    Chief of Police.

10        Q.    Okay.    So it's three men, including the Chief.

11        A.    Correct.

12        Q.    Okay.    Now, you'd agree that body cameras can

13    actually be -- protect police officers, correct?

14        A.    Yes, sir.

15        Q.    Okay.    I believe even after the shooting

16    occurred, you told Officer McHugh that you'd hoped that

17    the body camera was -- your body camera was turned on,

18    right?

19        A.    I don't recollect that.

20        Q.    Okay.    You didn't watch far enough on Officer

21    McHugh's body camera to see --

22        A.    No, sir.    As I stated earlier, I only watched a

23    few minutes of his body camera.

24        Q.    Okay.    Tell the jury why using a body camera can

25    protect police officers.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

020

Richard Keith Coborn - 2/11/2020

1    A.  It gives a point of view from the officer, and
2  gives what happened, so.
3    Q.  So it can be -- if -- if you -- for example, the
4  shooting was justified, it would help to show that from
5  the officer's point of view, right?
6    A.  It would show the incident from the officer's
7  point of view.
8    Q.  Okay.  The body cameras can also be useful
9  evidence in a criminal prosecution, correct?
10    A.  Correct.
11    Q.  Okay.  It's part of why you turn them on when you
12  conduct a traffic stop, right?
13    A.  Yes, sir.
14    Q.  Okay.  You'd agree that if a police officer is
15  doing his job correctly, he has nothing to fear from the
16  body camera, right?
17    A.  Correct, yes, sir.
18    Q.  Right.
19       Have you made any revisions to the policies of
20  the Stratford Police Department since you became the
21  Chief?
22    A.  I'm currently working on that as we speak.
23    Q.  Okay.  What policies are you revising?
24    A.  Facial profiling to include some of the Sandra
25  Bland stuff.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

021

Richard Keith Coborn - 2/11/2020

1  incident?

2      A.  As of this time, no, sir.  I'm -- I'm not aware

3  of anything.

4      Q.  Okay.  Do you believe that you followed the

5  policies of the City of Stratford during the shooting?

6      A.  Yes, sir.

7      Q.  Okay.  And you said that you -- you reviewed the

8  -- you said you reviewed the policy, the Use of Force

9  policy, for your deposition today.  Had you reviewed the

10 Use of Force policy anytime before your deposition

11 today?

12     A.  Before my deposition today?

13     Q.  Yeah.

14     A.  Yes, sir; last week I did.

15     Q.  Okay.  Was that in preparations for the

16 deposition or was --

17     A.  No, sir.  That was for the new Chief development

18 course at Huntsville through LEMA.  We had an entire

19 block of instruction on policies, so I reviewed that

20 part of the policy last week.

21     Q.  Okay.  So that was some sort of training you went

22 to in Huntsville --

23     A.  Yes, sir.

24     Q.  -- this year?

25         Okay.  And that was just last week?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

022

Richard Keith Coborn - 2/11/2020

1    A.  Yes, sir.

2    Q.  Okay.  And in that review of the policy from last

3  week, you didn't see anything that concerned you about

4  the shooting, correct?

5    A.  Well, it wasn't a formal review, so I haven't

6  reviewed it yet.  We just went over our policy

7  development and how policies are supposed to be

8  established, like the body of a policy.  At this time, I

9  have not reviewed the policy for change.

10    Q.  I see.

11        So you didn't look over the -- like, read over

12  the policy carefully.  You just kind of checked, okay,

13  we've got element A, element B, element --

14    A.  Correct.

15    Q.  -- C?

16    A.  Yes, sir.

17    Q.  Okay.  Kind of made sure that you hit all the --

18  the points that the Chiefs of Police Association suggest

19  that you should have?

20    A.  Correct.  We just looked over our policies to

21  make sure they were formulated like a policy should.

22    Q.  Oh.

23    A.  Not that it was just some memo thrown into a

24  book.  We made sure that they were policy-outlined.

25    Q.  Was there anything in your policy about shooting

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

023

Richard Keith Coborn - 2/11/2020

1    at moving vehicles?

2        A.  Yes, sir.

3        Q.  What is the policy of the City of Stratford on

4    shooting at vehicles?

5        A.  It states that we're not to shoot at vehicles to

6    disable; however, for use of deadly force -- if the

7    driver of the vehicle is using it for a weapon, we may

8    shoot at the driver.

9        Q.  Is it addressed when you should stop shooting at

10   a moving vehicle?

11       A.  When it's no longer a threat.

12       Q.  Okay.  And you'd agree that you followed the

13   policy in this instance because you continued shooting

14   until you believed the vehicle was no longer a threat?

15       A.  Correct.

16       Q.  What does that mean that the vehicle is "no

17   longer a threat"?

18       A.  Until I'm no longer in fear that that vehicle's

19   going to -- or, the driver is going to hit me.

20       Q.  All right.  Would you agree, then, that once

21   the jar -- the car has driven past you, that you should

22   stop shooting?  If you're no longer afraid that the

23   driver is going to hit you because he's past you and

24   going the other way?

25       A.  I guess I don't understand the question.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

024

Richard Keith Coborn - 2/11/2020

1    Q.  Sure.

2         You -- I -- I believe you said that you should

3    stop shooting when you're no longer concerned that the

4    car is going to hit you, right?

5    A.  Correct.

6    Q.  Okay.  So if the car has passed you, and is

7    continuing on, you should stop shooting at that point,

8    correct?

9    A.  If the vehicle is no longer a threat.

10   Q.  Okay.  How would the vehicle be a threat if it's

11   driven past you, and is continuing on?

12   A.  If it's continued on, then at that point it would

13   not be a threat if it's not coming back towards the

14   officer.

15   Q.  Okay.  So as long as the car is going straight

16   ahead, you should stop shooting.

17   A.  Correct.

18   Q.  Okay.  As long as the car is not turning back to

19   circle back to try and ram you-guys, you should stop

20   shooting.

21   A.  I -- correct.

22   Q.  Okay.  And you'd agree that when you are making

23   the decision to use deadly force, you have to be able to

24   justify using deadly force every time you pull the

25   trigger, correct?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

025

44

Richard Keith Coburn - 2/11/2020

1    A.  Absolutely.

2    Q.  Okay.  So if there's no longer a threat, you're

3    no longer authorized to use deadly force, correct?

4    A.  Correct.

5    Q.  Now, when you first encountered these young men

6    driving the Infinity, you were doing traffic, what --

7    what exactly were you-guys doing?

8    A.  When we first observed the vehicle?

9    Q.  Yeah, when you first observe the vehicle.

10   A.  When we first observed the vehicle, we were

11   sitting on U.S. Highway 54 just watching traffic as it

12   passed by.

13   Q.  And, for the jury, why were you-guys doing that?

14   A.  One of the things that we do on Highway 54 is we

15   do criminal and drug interdiction; so, vehicles that

16   pass by can usually contain individuals that have felony

17   warrants, fleeing suspects from those warrants,

18   concealing contraband such as narcotics or cash, just

19   the entire element that -- that we deal with in law

20   enforcement.

21   Q.  Okay.  Is that kind of the -- the major function

22   that you-guys do as police officers for the City of

23   Stratford?

24   A.  No, sir.  That's just something that we are

25   fortunate enough to partake in, in our city.  We don't

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

**026**

Richard Keith Coborn - 2/11/2020

1    Q.  Yeah.

2    A.  I would say 200 yards, 250 yards, maybe.

3    Q.  Okay.  So, like, two football fields?

4    A.  Correct, maybe less.

5    Q.  Okay.

6         So pretty close.  You would have been able to

7    kind of see them pull into the Pilot if you hadn't moved

8    at all?

9    A.  If there was no other traffic, we would have been

10   able to.

11   Q.  Okay.

12        Okay.  That's -- so you -- you see the cars

13   parked there.  That's when you pull through the Pilot,

14   and Officer McHugh observes the plate, and runs it?

15   A.  Correct.  The vehicle was parked stationary

16   underneath the pumps.  And we just drove past it,

17   collected the information on the license plate, and then

18   pulled onto U.S. Highway 287.

19   Q.  Okay.  And then at that point, you suspect the --

20   once he -- once that he gets his information back,

21   Officer McHugh gets the information back, that's when

22   you guys suspect the -- the young men of car theft?

23   A.  Correct.  Once we ran the information through our

24   NDT system, we got what's called a "hit" for the vehicle

25   being stolen.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

027

Richard Keith Coborn - 2/11/2020

1    Q.  Okay.  And then what do you-guys -- and then
2    that's the only crime that you ever suspected these
3    young men of, right, is car theft?
4    A.  We had no suspect at this time; we just had a
5    vehicle with a stolen plate.
6    Q.  Okay.
7    A.  And then we suspected the individuals -- or,
8    individual in the vehicle -- to be in possession of a
9    stolen vehicle.
10    Q.  Okay.  And you had no other -- you didn't suspect
11    them of anything other than being in possession of a
12    stolen vehicle?
13    A.  Correct.
14    Q.  Okay.  You certainly had no evidence that they
15    had committed any violent crimes, or done anything like
16    that, correct?
17    A.  Not at that time, no, sir.
18    Q.  Okay.  Did you ever have any evidence that they
19    had committed any violent crimes?
20    A.  I would have to know what you mean by "violent" I
21    guess.
22    Q.  A crime where they were suspected of harming
23    another person.
24    A.  No, sir.  At that time, no, sir.
25    Q.  Okay.  At no time before the shooting did you

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

028

Richard Keith Coborn - 2/11/2020

1    Q.  Uh-huh.

2    A.  -- you would say, we decided to go pull across

3    the -- the street and we called Inglewood, I believe --

4    Inglewood, California -- ourselves to confirm that the

5    vehicle was still entered in the system as stolen.

6    Q.  And when you guys were parked across the street,

7    you were at the Toot'n Totum, right?

8    A.  Correct, Toot'n Totum.

9    Q.  Okay.  I mean, you could see where the -- the

10   Infinity was parked at the Pilot from the Toot'n Totum?

11   A.  We had a very obscured view of it because traffic

12   was still passing on 54.

13   Q.  Uh-huh.

14   A.  But, yes, sir.  When the traffic was clear, we

15   could see the vehicle.

16   Q.  Okay.  And did you talk to the Inglewood PD, or

17   did Officer McHugh have them on speakerphone, or did he

18   just talk to them?

19   A.  I did not speak to them myself; however, I don't

20   remember if it was on speakerphone or not.

21   Q.  Okay.  You can't remember if you heard --

22   actually heard that conversation, or if Officer McHugh

23   just relayed the substance of it?

24   A.  I don't recall, no, sir.

25   Q.  Okay.  After Officer McHugh talks to the

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

029

Richard Keith Coborn - 2/11/2020

1    Inglewood PD, did you learn that they suspected the car

2    had been stolen when the driver in Inglewood had left

3    the keys in the ignition and gone into, I think it was,

4    a CVS?

5        A.  Correct.  Once we confirmed that the vehicle was

6    still entered into the system as stolen, he then asked

7    about the circumstances of it being taken.  And then

8    that made us have concerns about our local citizens

9    having their vehicles stolen from Pilot in the same

10   situation.

11       Q.  Okay.  So you, at that point, knew that there was

12   no allegation that this was like a violent carjacking,

13   or anything like that; it was kind of a crime of

14   opportunity, that the keys were in the ignition so they

15   took the car?

16       A.  I -- yes, sir.

17       Q.  Okay.  You had no suspicion that the young men

18   had done anything violent to take the car?

19       A.  Correct.  At this time we still had no suspects,

20   either.

21       Q.  Okay.  Because you didn't actually see who was in

22   the car until later.

23       A.  We never saw who was in the car, or Inglewood

24   never confirmed how many or who took the vehicle.  They

25   just said that the keys were left in the ignition and

Richard Keith Coborn - 2/11/2020

1    A.  No dangerous driving, no, sir, at that time.

2    Q.  You had no reason to stop the car for driving

3  unsafely, correct?

4    A.  Your question is, is did we have probable cause

5  to stop it for reckless driving?

6    Q.  Or -- or anything that would -- you would have

7  considered unsafe; like, not just reckless driving, but

8  like speeding or --

9    A.  In the --

10    Q.  -- any --

11    A.  -- hundred or 300 feet that it traveled, no, we

12  weren't able to observe any --

13    Q.  Okay.

14    A.  -- reckless or -- driving -- as you would

15  describe, no.

16    Q.  And, in fact, you didn't see it doing anything --

17  the car doing anything illegal on the highway, correct?

18  You might have seen something suspicious, but nothing

19  illegal.

20    A.  In the short distance we observed it before it

21  pulled in to Pilot, we really didn't get to observe the

22  driving of the vehicle.

23    Q.  You'd agree what you saw -- what you were able to

24  observe, you didn't see anything dangerous?

25    A.  In just the few seconds of observing it, no, sir,

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

031

Richard Keith Coborn - 2/11/2020

1    I didn't see anything dangerous.

2        Q.  Okay.  And you also didn't see anything illegal,
3    correct?

4        A.  Illegal, as in?

5        Q.  Speeding, drive -- anything you would indicate to
6    you that -- if they were driving while impaired,
7    reckless driving?

8        A.  As the lane merged into two lanes, and the
9    vehicle was in the left lane --

10       Q.  Uh-huh.

11       A.  -- when it cut across the right lane into Pilot,
12   it -- that was a Class C misdemeanor; failed to change
13   lanes safely.

14       Q.  Okay.

15               MR. MEDLOCK:  Let's take a quick break.
16   I've got --

17               THE VIDEOGRAPHER:  Going off record.  End of
18   Tape Number 1.  It's 10:42.

19               THE VIDEOGRAPHER:  Going back on the record.
20   Tape Number 2, at 10:55.

21   BY MR. MEDLOCK:

22       Q.  Tell me why you and Officer McHugh stopped at the
23   Toot'n Totum to observe the car.

24       A.  We pulled over there just so we could see if
25   anybody exited the vehicle, so we could identify them;

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

**032**

Richard Keith Coborn - 2/11/2020

1    Q.  -- correct?

2    A.  -- correct, yes, sir.

3    Q.  Okay.  And before Mr. Baker and Mr. Dees get back

4    into the Infinity you don't see them doing anything

5    threatening, correct?

6    A.  No, sir.

7    Q.  Okay.  The people -- you spoke to some of the

8    people inside the Pilot station, correct?

9    A.  I spoke to -- to a -- a group of three

10   individuals that were leaving Pilot, yes, sir.

11   Q.  Okay.  And they don't tell you that they had seen

12   Mr. Baker and Dees -- Mr. Dees -- doing anything

13   threatening, correct?

14   A.  Correct, not threatening.

15   Q.  Okay.  They thought there might be something

16   suspicious about their behavior, but nothing violent or

17   dangerous, correct?

18   A.  Correct.

19   Q.  I believe that when you were speaking to Ranger

20   Galvan you told him that there were no other cars at the

21   gas pumps; is that right?

22   A.  I don't recall that.

23   Q.  Okay.  Are you aware of any other cars at the gas

24   pumps while this incident was taking place?

25   A.  I do remember that there was other vehicles at

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

033

Richard Keith Coborn – 2/11/2020

1  the gas pump.

2     Q.  Okay.  The -- where were those vehicles in

3  relation to Mr. Baker's --

4     A.  When they --

5     Q.  -- infinity?

6     A.  They would have been parked whatever the distance

7  is between the gas pumps -- what, 10, 15, feet -- parked

8  parallel along the gas pumps.  There was no other

9  vehicle using the same pump, I don't believe, but I

10  don't recall.

11     Q.  Okay.  And would you agree that there were no

12  other vehicles to the driver's side of the Infinity at

13  the Pilot station?

14     A.  I'm sorry.  I don't recall that.

15     Q.  Okay.

16     A.  I don't know.

17     Q.  If the video and the photographs all show that

18  there were no other vehicles to the driver's side, you

19  wouldn't have any reason to disagree with that, right?

20     A.  No, sir.  If that's what the video showed, then

21  that would be correct.

22     Q.  Okay.  And at the time of the shooting, you

23  weren't aware of any other people being out in the

24  parking lot of the Pilot, correct?

25     A.  That's incorrect.  I was very aware where Officer

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

034

Richard Keith Coborn - 2/11/2020

1  McHugh was standing, and I was aware of where other

2  individuals that were at the entrance of the Pilot

3  were -- were at.

4      Q.  Okay.  That's -- that's a good way to put it.

5  Other than -- you were aware of some people at the

6  entrance of the Pilot station, right?

7      A.  Correct.

8      Q.  And you were aware of, obviously, where Officer

9  McHugh was, right?

10     A.  Correct.

11     Q.  And other than Officer McHugh and those people at

12  the entrance to the Pilot, were you aware of any other

13  people in the parking lot at the time of the shooting?

14     A.  As of anybody else physically being in the

15  parking lot, no; but I was very mindful that Pilot has

16  big glass panes --

17     Q.  Uh-huh.

18     A.  -- and you've got to be mindful of what's behind

19  that, as well, so -- take all that into -- to account.

20     Q.  Okay.  So you were being careful not to shoot so

21  that your bullets could hit the glass panes of where the

22  Pilot was located?  {Sic}.

23     A.  Correct.

24     Q.  Okay.  You'd agree that Mr. Baker and Mr. Dees

25  were never any danger to anyone who was inside the Pilot

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

035

Richard Keith Coborn - 2/11/2020

1  station, correct, once they'd returned to the car?

2      A.  Can you rephrase that, I guess?

3      Q.  Yeah.

4          Once Mr. Baker and Mr. Dees were back in the

5  Infinity, you didn't think that they were a danger to

6  anyone inside the Pilot station, correct?

7      A.  I would have to disagree.  While at the Infinity,

8  no; but once they got into the car, yes.

9      Q.  Why -- what in -- what are the facts that you're

10 aware of that made them a danger to people inside the

11 Pilot station?

12     A.  Because of the driving behavior towards myself.

13 I didn't know which way they were going to go.  I

14 don't -- I don't know what their intentions were, so.  I

15 don't know what they were going to do to -- at -- you

16 know, at Pilot.

17     Q.  But you never saw them, like, swing the car

18 around and drive towards the --

19     A.  Correct.  I never observed that.

20     Q.  Okay.  You didn't know what they were going to

21 do, but you had no facts to indicate to you that they

22 were actually menacing anyone inside the Pilot station,

23 right?

24     A.  Correct.

25     Q.  Okay.  The same with the people who were standing

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

036

Richard Keith Coborn - 2/11/2020

1   by the entrance of the Pilot station.  They never did

2   anything to actively menace those people, correct?

3       A.  Correct.

4       Q.  Okay.  The only person who -- or, the only people

5   who you thought were actively endangered by Mr. Baker

6   and Mr. Dees were yourself and Officer McHugh, correct?

7       A.  Correct.

8       Q.  And as far as Officer McHugh, he was standing to

9   the passenger side of the car, correct, the Infinity --

10      A.  Correct; would have been my left, the vehicle's

11  passenger side.

12      Q.  Okay.  And I'm going to try use "driver" and

13  "passenger" side --

14      A.  Yes, sir, I understand.

15      Q.  -- make -- make things a little clearer.

16          You would agree that Officer McHugh was

17  never in the path of the Infinity, correct?

18      A.  I would agree, yes, sir.

19      Q.  You don't remember him ever being in front of the

20  Infinity, like you were briefly, correct?

21      A.  Correct.

22      Q.  Okay.  Do you -- are there any facts that you can

23  articulate that would put Officer McHugh, as opposed to

24  just yourself, in danger from the Infinity -- actively

25  in danger from the infinity?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

037

Richard Keith Coborn - 2/11/2020

1    A.  No, sir.

2    Q.  Okay.  I am going to show you -- let's mark this

3    Exhibit 1.

4            (Exhibit No. 1 marked for identification).

5    BY MR. MEDLOCK:

6    Q.  Take a look at that, Officer, and orient yourself

7    for a moment with it.  Let me know when you're ready to

8    continue.

9    A.  Yes, sir.

10   Q.  Are you ready?

11   A.  Yes, sir.

12   Q.  All right.  I'll represent for you that this is a

13   Google Earth image of the intersection.

14           Does that look correct to you?

15   A.  Yes, sir.

16   Q.  Okay.  I -- we kind of got the Pilot station at

17   the bottom middle of the image, and then the Toot'n

18   Totum in the upper left corner, right?

19   A.  Correct, yes, sir.

20   Q.  Okay.  I'm -- I'm going to hand you a pen.  Would

21   you please indicate on there where the Infinity was

22   stopped at the -- the -- the Pilot?

23   A.  Just make a mark there?

24   Q.  Why don't you put like an "I" for Infinity.

25   A.  (Complied).

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

038

Richard Keith Coborn - 2/11/2020

1   A.  It was approximately there.  I don't know exactly
2   which space.
3   Q.  Okay.  It was somewhere just to the left of the
4   Pilot station, right?
5   A.  Or the right, depending on which way you're
6   looking at it.  (Laughing).
7   Q.  (Laughing).  Yeah, on -- on the -- as far as
8   Exhibit 1 goes, it's to the left.
9   A.  Correct, yes, sir.
10  Q.  Okay.
11      All right.  Now, would you then draw for me the
12  path that your Tahoe took from where you parked it to
13  behind the Infinity?
14  A.  Yes, sir.  We backed our vehicle out and then
15  pulled it behind, this way.  (Indicating).
16  Q.  Okay.
17      All right.  Thank you.  Hold onto that --
18  A.  Yes, sir.
19  Q.  -- we'll come back to that in a minute.
20      Now, at that point, once you've pulled behind the
21  Infinity, you get out of the police vehicle, right?
22  A.  Correct.
23  Q.  And you have your gun drawn at that point,
24  correct?
25  A.  Correct.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

039

Richard Keith Coborn - 2/11/2020

1    Q.  Why do you draw your gun as you exit the vehicle

2  at that point?

3    A.  As we turned our overhead lights on, or our red

4  and blue lights on, both suspects ran to the vehicle.

5  We don't know if there's any weapons or anything at the

6  vehicle, and this would be considered a high-risk

7  traffic stop, and during -- or high-risk encounter;

8  and -- and during those high-risk encounters, to protect

9  ourselves that -- you know, of the unknown.  They're --

10  like I said, they're going into a -- a vehicle.  We

11  don't know what they're -- have in that vehicle.

12    Q.  Oh.  So that was kind of the practice of the

13  Stratford Police Department; was when they are entering

14  the vehicle, and you don't know what's in the vehicle,

15  you pull your guns as you exit?

16    A.  Correct.

17    Q.  Okay.  When you exit the car, where is

18  Mr. Baker -- the Tahoe?

19    A.  Where is he in --

20    Q.  Let me ask that one again.

21      When you exit the Tahoe, where is Mr. Baker?  Is

22  he still -- is he outside the Infinity?  Is he inside

23  the Infinity?

24    A.  When I exited the Tahoe from the driver's seat,

25  he had just shut his driver's door and was sitting in

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

040

Richard Keith Coborn - 2/11/2020

1  the vehicle.

2      Q.  Where is Mr. Dees?

3      A.  At that time, I couldn't -- I -- I did not know.

4  Officer McHugh -- that was -- that was the individual

5  that he was focused on, so I don't know where he was at.

6      Q.  Okay.  You're dealing with Mr. Baker because

7  you're dealing with the driver's side of the car.

8      A.  Correct, yes, sir.

9      Q.  And, first, you go to the driver's side window,

10  correct?

11      A.  Correct.

12      Q.  Now, those windows are tinted, right?

13      A.  Correct.

14      Q.  Could you see in through the tinted window on --

15      A.  No, sir --

16      Q.  -- the driver's side?

17      A.  I'm sorry.

18          No, sir, I could not because of the tent, and the

19  lights that are hanging from the gas station.  So as you

20  can see in the photo, there's of course the -- the

21  partition for the gas station -- (indicating), and

22  there's several LED-type lights that -- that were having

23  a glare off the window.

24      Q.  Okay.  So you would agree that the only way you

25  could see into the Infinity was when you were standing

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

041

Richard Keith Coborn - 2/11/2020

1  where you did end up?

2      A.  (Nodding head).

3      Q.  A little bit to the driver's side off of the line

4  of the Infinity?

5      A.  Correct, I believe so, yeah.  Somewhere in

6  between the headlights.

7      Q.  Okay.  And indicate for me where you thought

8  Officer McHugh was when you reach the front of the

9  Infinity, that point where your line stops there.

10     A.  Okay.  Officer McHugh was right --

11     Q.  Why don't you put like an "M" for McHugh.

12     A.  Okay.  So it would be upside down here.

13  (Laughing).

14     Q.  Start over.

15     A.  Officer McHugh was right here --

16     Q.  Okay.

17     A.  -- of the line underneath.

18     Q.  So he's about even with the passenger-side

19  window, right?

20     A.  Correct, yes, sir.

21     Q.  Okay.  And as far as you knew, Officer McHugh was

22  always on the passenger side of the car, correct?

23     A.  Correct, yes, sir.

24     Q.  Okay.  I believe we covered before, he was never

25  in front of the car with you, right?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

042

Richard Keith Coborn - 2/11/2020

1   A.  Correct.

2   Q.  And you knew where Officer McHugh was at all

3   times because you needed to make sure that you didn't

4   fire any bullets in his direction, right?

5   A.  Correct.

6   Q.  You do agree the car never moved in the direction

7   of Officer McHugh, right?

8   A.  I would agree with that, yes, sir.

9   Q.  Okay.  And this entire time, from when you exit

10  the Tahoe to where you were stopped in front of the --

11  in front of the Infinity, your gun is drawn, correct?

12  A.  Correct.

13  Q.  Okay.  So you're pointing it at Mr. Baker, the

14  driver, that entire time, correct?

15  A.  Correct, yes, sir.

16  Q.  Okay.  Did Mr. Baker ever say anything to you?

17  A.  Not to my recollection, no, sir.

18  Q.  How about Mr. Dees?

19  A.  No, sir.

20  Q.  You'd agree, then, that they were not making any

21  verbal threats to you or Officer McHugh, correct?

22  A.  I don't recall them saying anything.

23  Q.  Including, you don't recall any threats?

24  A.  Correct, no threats that I could rec -- recall

25  hearing.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

043

Richard Keith Coborn - 2/11/2020

1    Q.   Okay.  Now, once you're in front of the car you
2    can see inside through the windshield, right?
3    A.   Portions of the vehicle, yes, sir.
4    Q.   Okay.  And then --
5         Well, you can see Mr. Baker, right?
6    A.   Correct, yes, sir.
7    Q.   Okay.  And then you saw him put the car in
8    "Drive," right?
9    A.   I saw his hand go from the ignition to the center
10   area of the vehicle, which I assumed was where the
11   gearshift was, correct.
12   Q.   Okay.  And when do you start firing?
13   A.   I started firing when he drove towards me, when
14   he lunged towards me.
15   Q.   Okay.  So you -- when he's just reaching down to
16   shift the car into "Drive," that's not when you start
17   shooting, right?
18   A.   It all happened together, so.  Yes, I -- I did
19   fire when he did that, but the motion of the vehicle
20   lunged forward as soon as it got put into gear.
21   Q.   Okay.  So you started -- you didn't recall --
22   it's your testimony that you did not fire any shots
23   until the vehicle moves forward?
24   A.   Correct.
25   Q.   Okay.  And you'd agree that if you had been

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

044

Richard Keith Coborn - 2/11/2020

1    shooting before the vehicle moved forward, that would be

2    an unjustified use of deadly force, right?

3        A.  Correct.

4    Q.  Tell the jury why.

5        A.  Because at that point, before the vehicle was

6    moving, there was no threat of immediate bodily harm or

7    injury.

8        Q.  Okay.  And that's kind of the standard that you,

9    as a police officer, have to follow when using deadly

10   force, right?

11           There has to be an immediate threat of bodily

12   harms or injury, right?

13       A.  Correct.

14   Q.  And until that immediate threat exists, you would

15   agree that it is objectively unreasonable for an officer

16   to use deadly force, correct?

17       A.  Correct, until that is met.

18       Q.  And, similarly, you would agree that once that

19   threat is over, you have to stop using deadly force,

20   correct?

21       A.  Correct.

22   Q.  Okay.  Now, I believe you told Officer -- or, I'm

23   sorry.  I believe you told Ranger Galvan that as soon as

24   Mr. Baker put the car into "Drive" he also started

25   turning the wheel to the left; is that correct?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

045

Richard Keith Coborn - 2/11/2020

1  make it completely clear.
2      If -- you'd agree that if Mr. Baker is turning
3  the wheel to the driver's side, the left of the vehicle,
4  that that should mean the vehicle should turn to the
5  left, to the driver's side of the vehicle?
6      A.  From the perspective of the driver of the
7  vehicle, yes, sir.
8      Q.  Okay.  If you're standing behind the car watching
9  it, it should be turning left, correct?
10      A.  Corr -- I -- I -- can you rephrase that?
11      Q.  Yeah.
12      A.  I -- I think we're getting misconstrued --
13      Q.  I -- I think --
14      A.  -- on the driver's side.
15      Q.  I think we're being -- I -- and I apologize.
16          Your -- you agree that when you saw
17  Mr. Baker turning the vehicle, he was turning it to the
18  driver's side, right?
19      A.  That's not correct.  I stated, that he was
20  turning his wheel to the left, which would have been "my
21  left," so -- (indicating) -- which would have been
22  backwards from the driver's perspective of the vehicle;
23  so that would have been the driver's right.  As --
24      Q.  So --
25      A.  -- as I'm looking at you --

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

046

Richard Keith Coborn - 2/11/2020

1    Q.  Did the Infinity ever go straight ahead?

2    A.  Yes.

3    Q.  How long did it go straight ahead for?

4    A.  Time-wise, distance-wise, I wouldn't be able to

5  say either one.

6    Q.  I believe you said that when he put the car in

7  "Drive" the Infinity lunged forward, right?

8    A.  When he put the vehicle in "Drive," the engine

9  revved --

10   Q.  Uh-huh.

11   A.  -- and he -- the vehicle -- he aimed the vehicle

12  towards me.  And it was all a split-second --

13  (Snapped) -- thing.  It all happened at once.

14   Q.  Other than when the car was put into "Drive," did

15  the car ever move forward, directly forward, straight

16  ahead?

17   A.  It would not have been able to move forward if it

18  was not in "Drive."

19   Q.  And that's -- that's not my question, though.

20       My question is, other than when the car kind of

21  lurched forward when put in "Drive," did it ever move

22  straight ahead?

23   A.  Not to my recollection.

24   Q.  Okay.  How far in front of the vehicle were you

25  standing when you finally stopped in front of the

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

047

Richard Keith Coborn - 2/11/2020

1   vehicle, where you have indicated on Exhibit 2?

2       A.   I would say six inches from the vehicle, trying

3   to get the driver's attention.

4       Q.   Now, the vehicle never touched you, correct?

5       A.   No, sir.

6       Q.   What else did you see Mr. Baker doing in the

7   driver's seat?

8       A.   As I stated a while ago, all this happened in a

9   split second.  But he had his left hand on the steering

10  wheel; had his hand down where, you know, most common

11  vehicles ignition would be.  And then after the engine

12  started, his entire body and everything went to the

13  center console area, of the vehicle, where he put the --

14  the vehicle in gear.  (Indicating).  And then his body

15  just leaned forward over the -- the center area of the

16  vehicle.

17      Q.   Okay.  And you just kind of indicated right now

18  what you remember Mr. Baker doing -- for the video --

19  correct?

20      A.   Correct.

21      Q.   Okay.  So it looked like you were kind of

22  indicating Mr. Baker kind of ducked down to his right,

23  after the car went into gear, right?

24      A.   Correct.

25      Q.   Okay.  And you never saw Mr. Baker come back up

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

048

Richard Keith Coborn - 2/11/2020

1    from that position, correct?

2        A.   To my recollection, no, sir.

3        Q.   Okay.  He was kind of moving down, like he might

4    have been ducking, because someone was pointing a gun at

5    him, right?

6        A.   Correct.

7        Q.   Okay.  Now, you started shooting as the car was

8    turning left, correct?  Left from the driver's --

9        A.   Driver's perspective?

10       Q.   -- perspective?

11       A.   I believe so, yes, sir.

12       Q.   Okay.  On Exhibit 2, this point where you stopped

13   drawing your path to the front of the driver of -- of

14   the car, is that where you were standing when you

15   started shooting?

16       A.   Yes, sir.

17       Q.   Now, did you shoot first, or did Officer McHugh?

18       A.   I have no idea.

19       Q.   Okay.  You have no recollection at all?

20       A.   No, sir.

21       Q.   Now, you run after the car as it's driving away,

22   right?

23       A.   Yes, sir.

24       Q.   And you continue firing as you're running after

25   the car, correct?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

049

Richard Keith Coborn - 2/11/2020

```
 1    A.  No, sir.  I moved out of the way of the
 2  passenger, because the passenger was between me and the
 3  driver.  (Indicating).  And then I reengaged the
 4  vehicle; continued to fire, once it was safe to.
 5    Q.  Okay.  You -- so as the car was driving away you
 6  were continuing to shoot, correct?
 7    A.  Yes, sir.
 8    Q.  So as you can see the rear of the car pulling
 9  away from you, you're continuing to pull the trigger,
10  right?
11    A.  Yes, sir.
12    Q.  Okay.  Why do you continue to pull the trigger at
13  that point?
14    A.  Did not know if the vehicle was still a threat to
15  myself or Officer McHugh.
16    Q.  Okay.  What was the immediate threat that you saw
17  from -- that the car posed as it is driving away?
18    A.  I -- can you rephrase that I guess?
19    Q.  Yeah.
20        What -- who is the car immediately threatening as
21  it is driving away from you while you continue firing?
22    A.  Potentially us, if he turned back around towards
23  us.
24    Q.  Okay.  But that's the only threat that there was,
25  even potentially, correct?  There wasn't anybody in
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

050

Richard Keith Coborn - 2/11/2020

1  front of the car or -- that you noticed, that you were
2  concerned about, correct?
3      A.  No, sir.
4      Q.  Okay.  The only people that you were concerned
5  about were yourself and Officer McHugh?
6      A.  Correct.
7      Q.  Okay.  And after he's driving away, he would of
8  had to turn the car back around and start driving
9  towards you for him to actually be a threat to you --
10     A.  Correct.
11     Q.  -- at that point?
12     A.  Correct.
13     Q.  Now, as you run after the car are you continuing
14 to fire as you're running, or are you just running after
15 the car at that point?
16     A.  I don't recall.
17     Q.  Okay.  You don't know where you stopped pulling
18 the trigger, correct?
19     A.  Once the vehicle entered the roadway of U.S. 54,
20 I stopped firing.
21     Q.  Okay.  So sometime between, when the car was
22 directly in front of you and when the Infinity went over
23 the curb into 54, is where you stopped firing?
24     A.  I don't know anything about a curb.  But once the
25 vehicle entered into the proper easement of U.S. 54,

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

051

Richard Keith Coborn - 2/11/2020

1          Over here to Toot'n Totum.  And that's where its
2   final resting place was for the vehicle.
3      Q.  Okay.  I'm sorry.  You -- you put another "X"
4   there --
5      A.  I'm sorry.
6      Q.  -- so I'm just trying to think -- why don't you
7   put a circle around that --
8      A.  I'll put a circle on that "X."
9      Q.  Okay, perfect.
10         So the "X" with no circle, is where you stop
11  shooting; "X" with the circle, is where the Infinity
12  stops.
13     A.  Correct.
14     Q.  Okay.  And it kind of runs into, like, a pilon at
15  the station at --
16     A.  Metal concrete pole-type thing, yes, sir.
17     Q.  Okay.  And at some point, the -- the car
18  starts -- the Infinity is moving very slowly, right?
19     A.  Correct, yes, sir.
20     Q.  As if someone had, like, put it in "Drive," but
21  wasn't actually pressing the gas, right?
22     A.  "Rolling," I would call it, yes, sir.
23     Q.  Okay.  At what point does it start to roll, as
24  opposed to move like someone is depressing the gas?
25     A.  As it's crossing 54.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

052

Richard Keith Coborn - 2/11/2020

1    Q.   Okay.  So it's kind of moving like a -- a vehicle
2    normally would as it's driving through the Pilot lot.
3    Once you get to 54, then it kind of slows way down as if
4    it's just engaged in "Drive," right?
5    A.   I -- I -- I don't know, because I don't recall
6    where the vehicle started to -- to roll.  Again, as
7    stated, it happened so quick I don't -- I don't remember
8    where the vehicle slowed its -- its travel.
9    Q.   Okay.  So do you remember it going -- I -- I --
10   "fast" is a relative term, because it's not really ever
11   going fast-fast, right?  It's not ever going, like, 50
12   miles an hour?
13   A.   In the parking lot, correct.  It was never going
14   50 miles an hour --
15   Q.   Okay.
16   A.   -- yes, sir.
17   Q.   At what point does -- do you notice that it's
18   slowing, like it's rolling, as opposed to driving more
19   quickly?
20   A.   After our initial gunshots.
21   Q.   Okay.  When, after the initial gunshots?  Is it
22   still in the Pilot lot, or is it -- as it's moving into
23   54, where?
24   A.   I -- I would say after it -- {indicated} -- came
25   out from the easement, or this deal.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

053

Richard Keith Coborn – 2/11/2020

```
 1      A.   It's -- it's hard to say, but I believe I was

 2  somewhere in this area.  (Indicating).  And it's a very

 3  vague area.

 4      Q.   That's fine.  That -- that's helpful, actually.

 5      A.   (Complied).

 6      Q.   And you'd agree that the car is ahead of you at

 7  all times while you were in that area where you believe

 8  you stop shooting?

 9      A.   Correct; in this area, yes, sir.

10      Q.   Okay.  And why do you stop shooting?

11      A.   For two reasons:  Is that, no longer felt that

12  the vehicle was a threat, and it was entering an area

13  that it was unsafe to engage.

14      Q.   And why do you believe the car was no longer a

15  threat when you stopped shooting at it?

16      A.   Because of the driving behavior of the vehicle.

17  It wasn't headed towards us anymore at that time; just

18  all of those things accumulative said that it was no

19  longer a threat.

20      Q.   Okay.  So kind of one it's -- once it's clear

21  it's driving away from you-guys, it's no longer a threat

22  to you and Officer McHugh, correct?

23      A.   Correct.

24      Q.   Okay.  And then you said also because it was

25  unsafe to engage.  What do you mean by that?
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

054

Richard Keith Coborn - 2/11/2020

1      A.   The unknown of the highway.   You don't know who's
2   coming through, driving through.
3      Q.   Okay.
4      A.   Vehicles may not have known what had happened, so
5   they may have traveled through.   It's just unsafe to --
6   to engage there.
7      Q.   Okay.   Do you remember seeing any cars coming or
8   going along 54 while you were --
9      A.   I do not --
10      Q.   -- chasing --
11      A.   I do not.
12      Q.   I'm sorry.   Let me -- let me just finish asking
13   the question --
14      A.   I'm sorry.
15      Q.   -- out.
16          Do you recall seeing any vehicles going either
17   direction on 54 as you are chasing after the Infinity?
18      A.   No, sir.   I don't believe any vehicles passed
19   through that time.
20      Q.   Okay.   Do you have any opinion on whether you
21   shot Mr. Baker, or whether Officer McHugh shot
22   Mr. Baker?
23      A.   I have no opinion of the -- the matter.   I --
24   I -- I have no idea.
25      Q.   Okay.   Have you ever thought about it, like if

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

055

Richard Keith Coborn - 2/11/2020

1    he's -- if Mr. Baker was shot from behind, who must have

2    fired those shots?

3        A.   I -- I have no idea.

4        Q.   Okay.  You have no idea -- you have -- you'll

5    have no position on which of you shot Mr. Baker?

6        A.   Correct.  I have no position on it.

7        Q.   Okay.  You do realize Mr. Baker was shot twice in

8    the back, correct?

9        A.   That --

10       Q.   -- the -- the bullets that hit him?

11       A.   That -- that's what the Ranger had told us.

12       Q.   Okay.  So you'd agree that you couldn't have shot

13   Mr. Baker when you were standing in front of the car,

14   correct?

15            MS. OSCARSSON:  Objection; asked and

16   answered.

17       A.   I have no idea.

18   BY MR. MEDLOCK:

19       Q.   How could you have shot Mr. Baker in the back if

20   you're standing in the front of him when you start

21   shooting?

22       A.   I wouldn't have been able to.

23       Q.   Okay.  That's just kind of logic, correct?

24       A.   Correct.

25       Q.   Now, you could have shot Mr. Baker when you were

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

056

Richard Keith Coborn - 2/11/2020

1   chasing after the car, firing at the car from behind,

2   correct?

3       A.   Correct.

4       Q.   Okay.   You'd agree that the car would have had to

5   have driven past you for the shots to hit Mr. Baker from

6   behind, correct?

7       A.   From my weapon --

8       Q.   Correct.

9       A.   -- correct.

10      Q.   Okay.   If you were the one who fired the shots

11  that killed Mr. Baker, you would have to be behind the

12  car for --

13      A.   Correct, yes, sir.

14      Q.   -- your shots -- for your shots to have killed

15  him?

16      A.   Correct.

17      Q.   And I -- I just want to make sure that I've -- I

18  may have already asked you this, but I want to make sure

19  that I've got the answer correctly.

20           The only people who you believe were in immediate

21  danger from Mr. Baker and Mr. Dees at any point was you

22  and Officer McHugh, correct?

23      A.   Yes, sir.

24      Q.   There were never any bystanders that you were

25  concerned that the car would injure, correct?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

057

Richard Keith Coborn - 2/11/2020

1    A.  No, sir.

2    Q.  You'd agree that your backup arrived very

3 quickly, right?

4    A.  Yes, sir.

5    Q.  And as soon as your backup arrived, the entire

6 scene was closed off, right?

7    A.  I don't know what they did when they got --

8 arrived on scene.

9    Q.  Okay.  Would you agree as the -- as, now, the

10 Chief of the Police Department of the City of Stratford

11 that they should have closed off the entire scene as

12 soon as your backup arrived?

13    A.  Correct.

14    Q.  And who was your backup that arrived?

15    A.  Sherman County Sheriff's Office and, I want to

16 say, some DPS Troopers.

17    Q.  Okay.  Now, was it -- do you recall who arrived

18 first?  Was it Sherman County, or DPS, or do you have

19 any recollection?

20    A.  I have no idea, no, sir.

21    Q.  Okay.  You'd agree that that would be very good

22 police work, to close down the scene as soon as you

23 could -- had enough manpower to do so, right?

24    A.  Manpower given, yes, sir.

25    Q.  Okay.  And you'd agree that the -- the entire

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

058

Richard Keith Coborn - 2/11/2020

```
1              (Exhibit Nos. 5 and 6 marked for
2    identification).
3    BY MR. MEDLOCK:
4       Q.  I'll hand you Exhibit 5, Officer.  I'll represent
5    for you that this is a photo taken by the Rangers that
6    shows the rear of the Infinity.
7              Do you see those two gunshots in the trunk,
8    Officer?
9       A.  Correct, yes, sir.
10      Q.  And then it also looks like some bullets went
11   through the -- the rear windshield or the rear window, I
12   guess?
13      A.  Yes, sir.
14      Q.  Okay.  You would have seen the car from this
15   angle while you were shooting at it, correct, from
16   behind the car?
17      A.  Yes, sir.
18      Q.  Do you believe that Officer McHugh was ever
19   positioned at this angle directly behind the car when he
20   was shooting at it?
21      A.  After the vehicle passed him, he would have been.
22      Q.  Okay.  Do you believe that he was still firing --
23   do you believe he was still firing as the car was
24   turning away and moving away from the two of you?
25      A.  I don't know.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

**059**

Richard Keith Coborn - 2/11/2020

1   right?

2        A.  Yes, sir.

3        Q.  Okay.  Have you ever received any training about

4   when it's legally permissible for a police officer to

5   shoot at a moving vehicle?

6        A.  No, sir.

7        Q.  That wasn't covered in any of the use of force

8   courses you took to -- to get your peace officer's

9   license?

10       A.  No, sir.

11       Q.  Okay.

12       A.  Not that I recall.

13       Q.  Okay.  That wasn't covered in any of your

14  training on -- on high-risk traffic stops?

15       A.  I don't believe there's any training for

16  high-risk traffic stops.

17       Q.  That wasn't covered in any of your drug

18  interdiction courses?

19       A.  No, sir.  Those courses are mainly about

20  indicators, driving behavior -- once you get a person

21  pulled over, the things that they say, the way that they

22  act -- those are what those courses are -- are over.

23       Q.  Okay.  Those kind of cover what we discussed

24  earlier today, why you kind of were first drawn to the

25  Infinity?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

060

Richard Keith Coborn – 2/11/2020

1    A.  Yes, sir.

2    Q.  Okay.  They don't really cover when you can use

3    force after you've decided to stop the car?

4    A.  No, sir.  Those courses are strictly designed for

5    the indicators of somebody that would be concealing

6    contraband.

7    Q.  Okay.  Were you ever trained about the -- the

8    Fifth circuit Court of Appeals decision in Lytle vs.

9    Bexar County?

10   A.  No, sir.

11   Q.  How about the case of -- the Supreme Court case

12   of Tennessee vs. Garner?  Do you remember being trained

13   on Tennessee vs. Garner?

14   A.  (Nodding head).

15       Yes, sir.

16   Q.  What's your understanding of what Tennessee vs.

17   Garner says?

18   A.  It's about shooting a fleeing felony.

19   Q.  What do you remember about the -- the rule from

20   Tennessee vs. Garner?

21   A.  The federal rule, I don't recall.  I know that

22   Texas has taken that, and squeezed it down --

23   (Indicating), that you have to shoot -- or, you're

24   authorized to shoot in the fear of imminent death or

25   bodily harm.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

061

Richard Keith Coborn - 2/11/2020

1    Q.   Okay.  What you know about Tennessee vs. Garner,

2    is kind of that standard we talked about earlier; that

3    immediate belief that you're in danger, right?

4    A.   Correct.

5    Q.   Okay.  Now, did the -- as the car was driving

6    away from you, it never did anything to indicate to you

7    that you were in immediate danger from the car, right?

8    A.   Can you rephrase that?  I'm sorry.

9    Q.   Yeah.  As you -- as the car was driving away

10   after it had passed you, there's nothing in the behavior

11   of the car that indicates you -- you were in immediate

12   danger from the car, correct?

13   A.   Correct.

14   Q.   So you'd agree that as the car is pulling away,

15   there was no immediate danger to you or Officer McHugh,

16   correct?

17   A.   As the car was pulling away, it was -- as it was

18   pulling away, it was headed towards me.

19   Q.   Well, let me -- let me put it another way.

20        After the car had passed you, after it's made the

21   turn to the left or -- left from the car's perspective,

22   right from your perspective -- and it's pulling past

23   you, the car doesn't do anything that indicates an

24   immediate danger to you or Officer McHugh, correct?

25   A.   I wouldn't be able to answer that.  It was all

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

062

Richard Keith Coborn - 2/11/2020

1  within a second.  And I don't know what the driver's

2  intentions were at that time.  And at that time, it was

3  still a threat.

4     Q.  Well, you don't know -- you never know what the

5  driver's intentions are, correct?  You can't get inside

6  his head, right?

7     A.  Correct, I can't get inside his head.

8     Q.  Okay.  You have to look at what the behavior of

9  the vehicle is doing, correct?

10    A.  Correct.

11    Q.  After the car passes you, you don't see any

12  behavior of the car that indicates it's still an

13  immediate threat to you or Officer McHugh, correct?

14    A.  Correct.

15    Q.  And you'd agree that it's obvious that someone

16  could be injured or killed if you're shooting at a

17  moving vehicle, right?

18    A.  Correct.

19    Q.  I mean, you could kill the driver, I mean?

20    A.  Correct.

21    Q.  You could kill the passenger?

22    A.  Correct.

23    Q.  You could kill innocent bystanders?

24    A.  Correct.

25    Q.  All right.  You'd agree that if you don't have

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

063

Richard Keith Coborn - 2/11/2020

1    any training on when it's legally permissible to shoot
2    at a moving vehicle, that you could shoot someone in a
3    moving vehicle without legal justification, correct?
4        A.   Correct.
5        Q.   Now, you said that Tennessee vs. Garner was about
6    shooting at a fleeing felon, right?
7        A.   From my recollection, yes, sir.
8        Q.   Okay.  And your understanding of that case is
9    that if the fleeing felon doesn't -- doesn't pose any
10   immediate danger to anyone, that you can't shoot at a
11   fleeing felon, correct?
12       A.   Correct.  That if it poses no danger to anyone,
13   you cannot shoot, correct.
14       Q.   Okay.  When do you remember being trained about
15   Tennessee vs. Garner?  Was it before, or after, the
16   shooting involving Mr. Baker?
17       A.   It was before, during my initial police academy
18   training.
19       Q.   Okay.  Where did you do the academy training?
20       A.   Lone Star College, I think, is the name of it.
21       Q.   And where is that?
22       A.   It's in Houston, Texas.
23       Q.   And I think you said that you were living in
24   Houston for a while?
25       A.   Correct, yes, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

064

Richard Keith Coborn - 2/11/2020

1  nature, that kind of stuff.

2      Q.  Okay.  Some of the -- you were doing some of the

3  things the chief would have been doing, but not all of

4  them.  Is that a fair way to put it?

5      A.  That's a fair way to put it, yes, sir.

6      Q.  Okay.  Like, you weren't reviewing the policies

7  to make sure they were all up to snuff while you were --

8  before you officially became the chief?

9      A.  Correct.

10     Q.  Okay.  Have you ever received shoot/don't shoot

11  training?

12     A.  Does -- does it go by any different names?

13     Q.  That's how I know it.  It's a scenario-based

14  training where you're given a scenario, and put into the

15  scenario.  You know, you're supposed to decide do you

16  shoot, or do you not shoot.

17         Have you ever had that type of training?

18     A.  That type of training, no, sir.

19     Q.  Okay.  You'd agree that kind of training would be

20  helpful, right?

21     A.  Correct, yes, sir.

22     Q.  Just like you'd agree that training about when

23  it's legally permissible to shoot at a moving vehicle

24  would be, right?

25     A.  Yes, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

065

Richard Keith Coborn - 2/11/2020

1  rules of engagement were.  It's not a cut and dry line

2  of -- of what.  It just -- it's all mission dictated.

3       Q.  Okay.  So would there -- if there's a vehicle

4  trying to ram the convoy, depending on what the mission

5  was would dictate when you could shoot at that vehicle

6  trying to ram the convoy?

7       A.  Correct.

8       Q.  Okay.  So there would be some instances where a

9  vehicle is trying to ram the convoy, and the rules of

10 engagement say "no, I can't shoot at it in the

11 circumstance"?

12      A.  Correct.

13      Q.  Okay.  Are you aware of any other incidents where

14 Stratford Police Department officers had fired their

15 weapons, not just as training, but like while they're

16 out on duty?

17      A.  Like, being on duty and -- discharging a firearm?

18      Q.  Yeah.  But I don't want to -- I know that you're

19 on duty when you're training the dog and firing --

20      A.  Well, correct.  Yes, sir, I understand that.

21      Q.  Yeah.  So exclude those, like, training-based

22 activities.  Are you aware of any other circumstances

23 where Stratford Police Department officers shot at a

24 person?

25      A.  Yes.

Richard Keith Coborn - 2/11/2020

1    Q.  How many other times are you aware of that?

2    A.  I have no idea the amount of number.

3    Q.  Okay.

4    A.  I would say two, three.

5    Q.  Two or three?

6        What do you recall about those situations?

7    A.  Chief Hooks discharging his firearm I believe

8    during a pursuit.  I wasn't in town and I don't know the

9    details of that, though.

10   Q.  Okay.  You know that Chief Hooks did that, but

11   you know nothing about the details of it?

12   A.  Correct.

13   Q.  Okay.  Do you know if that incident happened

14   before, or after, the incident with Mr. Baker?

15   A.  I don't remember.  I'm sorry.  I don't.

16   Q.  What are the other incidents that you recall

17   where a police officer from Stratford shot at a person?

18   A.  The other incidence was mine when an individual

19   was trying to ram a deputy off the road.

20   Q.  So you fired a shot in that instance?

21   A.  Correct.

22   Q.  What happened there?  Describe that for me.

23   A.  A vehicle pursuit.  The vehicle was attempting to

24   run a deputy off the road, and we attempted to shoot the

25   vehicle -- or, shoot the driver of the vehicle.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

067

Richard Keith Coborn - 2/11/2020

1    Q.  Okay.  And so it's like you and the deputy both
2  chasing the vehicle?
3    A.  No, sir.  This was Oklahoma State Troopers,
4  Goodwell Police Department, Texhoma Police Department,
5  Texas Highway Patrol, Sherman County Sheriff's Office,
6  Stratford Police Department, Dallam County Sheriff's
7  Office, Dalhart Police Department, Dallam County -- or,
8  Hartley County Sheriff's Office.
9    Q.  So there's a lot of different agencies chasing
10  this particular individual?
11    A.  Correct.
12    Q.  Okay.  And you only start in -- where were --
13       Were you driving?  Were you a passenger when --
14  where are you when you start shooting at this other
15  vehicle?
16       A.  I was the driver.
17    Q.  Okay.  So you're kind of, like, leaning out the
18  window, and shooting at it as you're driving?
19       A.  No, sir.  (Laughing).
20       Q.  What are you doing?
21       A.  Attempting to get up next to the vehicle so we
22  can shoot the driver of the vehicle.  It's --
23    Q.  I see.
24    A.  -- attempting to run a deputy off the road during
25  this pursuit.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

068

Richard Keith Coborn – 2/11/2020

1    Q.  So you're kind of, like, driving while trying to

2  shoot at the other vehicle?

3    A.  Correct.

4    Q.  Okay.  Did you hit the other guy?

5    A.  I fired two rounds that were in effective, and at

6  that time I stopped shooting.

7    Q.  Okay.  Did you know if anyone during that

8  pursuit --

9        What happened to the -- the guy that you were

10  chasing?  Was he shot, or --

11    A.  No.  He was not shot.  I'm unaware of anybody

12  else in any of those agencies shot.  The vehicle finally

13  got into the next town that we were going into --

14    Q.  Uh-huh.

15    A.  -- and got in a situation where he was going to

16  go off of a firearm; so at that time he came out of the

17  vehicle, and gave up.

18    Q.  Okay.  Did that incident happen before or after

19  the incident with Mr. Baker?

20    A.  It happened after.

21    Q.  Happened after.

22        Do you call -- recall approximately when?

23    A.  Two, three, months -- maybe -- before the summer

24  started.

25    Q.  So sometime before the summer of 2018?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

069

Richard Keith Coborn - 2/11/2020

```
1      Q.   Okay.  In thinking about what happened with

2    Mr. Baker, is there anything you would have done --

3    you'd do differently if you were presented with the same

4    situation today?

5      A.   I don't know.

6      Q.   You're not sure about that?

7      A.   I don't know.

8      Q.   Okay.

9           Okay.  Officer, this is my only opportunity to

10   talk to you before the trial, so I just need to go over

11   my notes, make sure that I hit everything that I needed

12   to hit with you.

13     A.   (Nodding head).

14     Q.   We are almost done.  I just need to make sure

15   that I've covered every base that I need to cover.  So

16   why don't we take a little break, and we'll finish up

17   pretty quickly after that, okay?

18     A.   Yes, sir.

19     Q.   All right.

20          THE VIDEOGRAPHER:  Going off the record at

21   12:19.

22          (Recess taken).

23          THE VIDEOGRAPHER:  Going back on record at

24   loop 12:27.

25   BY MR. MEDLOCK:
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

070

Richard Keith Coborn - 2/11/2020

1   9:00 -- were you working 5 days a week, or --

2       A.  (Laughing).  Earlier I answered that it was -- it

3   would be hard to tell about --

4       Q.  Sure.

5       A.  -- when officers would -- would work together

6   because we're rotating schedule.  So being a 3-man

7   police department, we had staggering shifts that would

8   rotate.  And depending on what's going on for the

9   community, or -- or what calls for service would -- came

10  in, it could dictate what -- what time we came out.

11  Typically, did not work a day shift; typically Chief

12  Hooks worked that.  So I could come out anywhere from

13  1:00 in the afternoon till 4:00 in the afternoon.

14      Q.  Okay.  And did Chief Hooks kind of set that

15  schedule?

16      A.  Yes.  He made it fluid.  That way we could, you

17  know, fit the needs of the -- the town.

18      Q.  Okay.  And do you recall what time you went on

19  duty the night Mr. Baker was shot?

20      A.  No, sir.  I don't recall.

21      Q.  All right.  If you were shooting at the car

22  before it started moving, you'd agree that would be

23  unlawful, correct?

24      A.  Before it started moving, correct.

25      Q.  Would you agree that if your training doesn't

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

071

Richard Keith Coborn - 2/11/2020

1  include when you can legally shoot at a moving vehicle,

2  that that's a defect in the training?

3      A.  Can you clarify that?

4      Q.  Sure.

5          There's some topics that you'd agree about are

6  absolutely essential in how to perform your duties as a

7  police officer, right?

8      A.  Correct.

9      Q.  Okay.  Like, how to use handcuffs, that's

10  something you probably do all the time.  You need to

11  know how to do that, right?

12      A.  Yes, sir.

13      Q.  Okay.  How to -- when you can legally use deadly

14  force, that's an essential part of training as a police

15  officer, right?

16      A.  Correct.

17      Q.  Okay.  You'd agree that if training did not

18  include when you can permissibly use deadly force, that

19  that would be an obvious defect in that training, right?

20      A.  For that training, if that's what it was tailored

21  for, correct.

22      Q.  Okay.  You'd also agree, then, that if use of

23  force training didn't train you on when you could shoot

24  at a moving vehicle, that that's a defect in that

25  training, right?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

072

Richard Keith Coborn - 2/11/2020

1    A.   If that's what it was tailored for, correct.

2    Q.   Okay.   And you'd agree that that's training that
3 you should receive especially someone who spends a lot
4 of time doing traffic interdiction, right?

5    A.   Yes, sir.

6    Q.   Okay.  And you'd agree that if you don't have
7 training on a particular topic, it's likely that you
8 would not follow the law if you haven't been trained
9 about it, right?

10    A.   No, sir.  I don't agree with that, because policy
11 will dictate some of it.

12    Q.   Okay.  When you started with the Stratford
13 Police Department, how were you introduced to the
14 policies?  Were they just kind of given to you, or did
15 the Chief sit down and go over them with you, or -- what
16 happened?

17    A.   I don't recall, sir, honestly.  I was hired under
18 Chief Sheehan.  And Chief Sheehan was putting the
19 policies together at that time for him.  So I wouldn't
20 be able to give you an -- an answer on how I was given
21 the policies.

22    Q.   Did you recall if Chief Hooks made any revisions
23 to the policies when he became the chief?

24    A.   He did make some, yes, sir.

25    Q.   And did he sit you down and go through those

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

073

Richard Keith Coborn - 2/11/2020

1    Q.  Okay.  You'd agree that this policy doesn't say

2  anything about when you were to stop shooting at a

3  moving vehicle, correct?

4    A.  Without reviewing this entire policy, no, sir.

5    Q.  Okay.  Why don't you read the -- the -- the -- 2

6  and 3 under "deadly force" of C -- let me start again.

7         On Page 3, why don't you review C2 and 3 which I

8  believe are the only portions of the policy that discuss

9  using force against a vehicle.

10    A.  Yes, sir.

11    Q.  And you'd agree that in that portion of the

12  policy, which I'll represent to you is the only portion

13  that discusses using force against the vehicle, it says

14  nothing about when you were to stop shooting at the

15  vehicle, correct?

16    A.  Correct.

17    Q.  Okay.  Similarly, under Roman Numeral 5,

18  "Limitations on Force," it has certain types of force

19  that you're not ever supposed to use, like choke holds,

20  or hitting suspects with your flashlight, right?

21    A.  You reference it as "could never use."  This

22  says -- has an exception --

23    Q.  Okay.

24    A.  -- under A.

25    Q.  General --  the general rule is you shouldn't use?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

074

Richard Keith Coborn - 2/11/2020

1    A.  Generally you shouldn't unless certain absec --
2  exceptions are presented.
3    Q.  Okay.  Under this section, Limitations on Force,
4  there's nothing about deadly force against a vehicle,
5  correct?
6    A.  Can I have just a second?
7    Q.  Yeah, take your time.
8    A.  Correct.  Under Limitations, there's no reference
9  to vehicles.
10   Q.  Okay.  I believe that's all the questions I
11 have -- or, I'm sorry, one more thing.
12       Page 4, Roman Numeral 8, Departmental Review.
13 Now, this says that the chief is supposed to review all
14 reported uses of force, correct?
15   A.  Correct.
16   Q.  Is that a duty that you are taking on now that
17 you are the Chief of the Stratford Police Department?
18   A.  Correct.
19   Q.  Okay.  So the -- the Chief should have reviewed
20 your use of force against Mr. Baker, correct?
21   A.  Under the policy, correct.
22   Q.  Okay.  Are you aware of the Chief doing any such
23 review of your actions with the -- as they involve
24 Mr. Baker?
25   A.  If so, that information wasn't shared with me.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

075

Richard Keith Coborn – 2/11/2020

| | |
|---|---|
| 1 | CHANGES AND SIGNATURE |
| 2 | WITNESS NAME:  RICHARD KEITH COBORN |
| 3 | DATE OF DEPOSITION: 2-11-20 |
| 4 | PAGE/LINE        CHANGE                    REASON |
| 5 | _____ |
| 6 | _____ |
| 7 | _____ |
| 8 | _____ |
| 9 | _____ |
| 10 | _____ |
| 11 | _____ |
| 12 | _____ |
| 13 | _____ |
| 14 | _____ |
| 15 | _____ |
| 16 | _____ |
| 17 | _____ |
| 18 | _____ |
| 19 | _____ |
| 20 | _____ |
| 21 | _____ |
| 22 | _____ |
| 23 | _____ |
| 24 | _____ |
| 25 | _____ |

**WRIGHT WATSON & ASSOCIATES**

1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

812900f8-4ecd-44bb-a744-dce3b1e508f0

**076**

Richard Keith Coborn – 2/11/2020

```
1        I, RICHARD KEITH COBORN, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4
5
6                      _____
                       RICHARD KEITH COBORN
7
8   THE STATE OF TEXAS)
9   COUNTY OF SHERMAN )
10       Before me, _____, on this
11  day personally appeared RICHARD KEITH COBORN, known to
12  me (or proved to me under oath or through
13  _____) (description of identity card or
14  other document) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that they executed the same for the purposes and
17  consideration therein expressed.
18       Given under my hand and seal of office this
19  _____ day of _____, 2020.
20
21                     _____
                       Notary Public in and for
22                     The State of Texas
23
24
25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

077

Richard Keith Coborn – 2/11/2020

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                    AMARILLO DIVISION

3   IRA DARLINA BAKER,          )
    individually, and as the    )
4   administratrix of the ESTATE)
    OF DARION DE'VON BAKER and  )
5   MARIO BAKER, individually,  )
    and on behalf of all        )
6   wrongful death beneficiaries)
    Of DARION DE'VON BAKER      )
7                               )
                Plaintiffs,     )
8                               )
    VS.                         )    Civil action no.
9                               )      2:19-cv-77
    RICHARD KEITH COBURN, and   )
10  MICHAEL JOSEPH MCHUGH in    )
    their individual capacities )
11                              )
                Defendants.     }
12

13

                REPORTER'S CERTIFICATION
14

15  THE STATE OF TEXAS)
    COUNTY OF POTTER  )
16

17       I, Gay Richey, a Certified Shorthand Reporter in

18  and for the State of Texas, hereby certify to the

19  following:

20       That the witness, RICHARD KEITH COBORN, was duly

21  sworn by the officer and that the transcript of the oral

22  deposition is a true record of the testimony given by

23  the witness;

24       That the original transcript was submitted on

25  MARCH 19, 2020, to Blair Saylor
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

078

Richard Keith Coborn - 2/11/2020

1   Oscarsson, counsel for the witness, for examination and

2   signature, and return to Scott Medlock by

3   APRIL 18, 2020;

4         I further certify that I am neither counsel for,

5   related to, nor employed by any of the parties in the

6   action in which this proceeding was taken, and further

7   that I am not financially or otherwise interested in the

8   outcome of the action.

9         GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this

10  12th day of March, 2020.

11

12

13

14              /s/ Gay Richey

15         _____

16         Gay Richey, Texas CSR 7260
           Expiration Date: 12/31/20
17         WRIGHT WATSON & ASSOCIATES
           Firm Registration No. 225
18         1250 S. Capital of Texas Highway
           Building 3, Suite 400
19         Austin, Texas  78746
           512-474-4363 - www.wrightwatson.com
20

21

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
812900f8-4ecd-44bb-a744-dce3b1e508f0

079

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | |
| | § | Civil Action No. |
| | § | 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| | § | |
| Defendants | § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 5
# Deposition of M. McHugh

Michael McHugh – 2/11/2020

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

IRA DARLINA BAKER,           )
individually, and as the     )
administratrix of the ESTATE )
OF DARION DE'VON BAKER and   )
MARIO BAKER, individually,   )
and on behalf of all         )
wrongful death beneficiaries )
Of DARION DE'VON BAKER       )
                             )
          Plaintiffs,        )
                             )
VS.                          )      Civil action no.
                             )        2:19-cv-77
RICHARD KEITH COBURN, and    )
MICHAEL JOSEPH MCHUGH in     )
their individual capacities  )
                             )
          Defendants.        }

**********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

MICHAEL MCHUGH

FEBRUARY 11, 2020

**********************************************************

        ORAL AND VIDEOTAPED DEPOSITION of MICHAEL MCHUGH,

produced as a witness at the instance of the Plaintiffs,

and duly sworn, was taken in the above-styled and

numbered cause on the 11th of February, 2020, from 1:04

p.m. to 2:52 p.m., before Gay Richey, CSR, in and for

the State of Texas, reported by stenograph, at the Law

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

081

Michael McHugh – 2/11/2020

1    Offices of Sprouse, Shrader, Smith, located at 701 S.

2    Taylor, Suite 500, Amarillo, Texas, pursuant to the

3    Federal Rules of Civil Procedure and the provisions

4    stated on the record or attached hereto.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

082

Michael McHugh – 2/11/2020

```
 1              A P P E A R A N C E S

 2   COUNSEL FOR THE PLAINTIFFS:

 3        Scott Medlock
          EDWARDS LAW
 4        Haehnel Building
          1101 East 11th Street
 5        Austin, Texas 78702
          Phone No.: (512) 623-7727
 6        E-Mail: scott@edwards-law.com

 7
     COUNSEL FOR THE DEFENDANTS:
 8
          Blair Saylor Oscarsson
 9        SPROUSE SHRADER SMITH
          701 S. Taylor, Suite 500
10        Amarillo, Texas 79105
          Phone No.: (806) 373-3454
11        E-Mail: blair.oscarsson@sprouselaw.com

12
     ALSO PRESENT:
13
          Officer Richard Keith Coborn
14        Brad, Videographer
          Gay Richey, Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

083

Michael McHugh – 2/11/2020

```
 1            E X H I B I T S
 2  NO.    DESCRIPTION                    PAGE
 3  7      Aerial diagram                  56
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

085

Michael McHugh – 2/11/2020

```
 1              P R O C E E D I N G S
 2              (Per agreement of all counsel, Federal
 3  Rule 30(b)(5) Read-On was waived).
 4              THE VIDEOGRAPHER:  Today is February 11th,
 5  2020.  This is the videotaped deposition of Michael
 6  McHugh, in the case of Baker, et al, vs. Coburn, et al.
 7              Counsel, please state your appearance for
 8  the record.
 9              MR. MEDLOCK:  Scott Medlock for the
10  Plaintiffs.
11              MS. OSCARSSON:  Blair Oscarsson for the
12  Defendants.
13              THE VIDEOGRAPHER:  The time is 1:04.
14              Court reporter, please swear in our witness.
15              THE COURT REPORTER:  Would you raise your
16  right hand, please.
17              (Witness Sworn).
18              THE WITNESS:  I do.
19                  MICHAEL MCHUGH,
20  the witness, being duly cautioned and sworn to tell the
21  truth, the whole truth and nothing but the truth,
22  testified as follows:
23                  EXAMINATION
24  BY MR. MEDLOCK:
25     Q.  Good afternoon, Officer.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

086

Michael McHugh – 2/11/2020

1    A.  Good afternoon.

2    Q.  Officer, we met earlier this morning.  My name is

3    Scott Medlock, and I'm the lawyer for the Baker family.

4        Do you understand that?

5    A.  Yes, sir.

6    Q.  Okay.  And you sat through your partner Officer

7    Coborn's deposition earlier today, correct?

8    A.  Correct.

9    Q.  Okay.  I'm just going to -- I'm going to try and

10   be a little briefer with -- with you, because we went

11   over a lot with Officer Coburn.  But I just want to

12   start with making sure that we're going to operate under

13   the same kind of ground rules.

14       If you don't hear my question, will you let me

15   know?

16   A.  Yes, sir.

17   Q.  And if you don't understand my question, will you

18   let me know?

19   A.  Yes, sir.

20   Q.  If you don't know the answer to a question, will

21   you let me know?

22   A.  Yes, sir.

23   Q.  If you need to change an answer or add anything

24   to an answer, will you let me know?

25   A.  Yes, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

087

Michael McHugh – 2/11/2020

1   A.  Yes.

2   Q.  What was the allegation at the suppression

3 hearing of Mr. Reta's case?

4   A.  He was pulled over for a faulty taillight, and

5 one of the brake lights wasn't illuminating --

6   Q.  Uh-huh.

7   A.  -- so -- the light was working, but the taillight

8 didn't get brighter when he hit his brakes.  He argued

9 that that wasn't a violation.  And it was found in our

10 favor; that it was a violation.

11   Q.  Okay.  And then was it the same kind of thing;

12 you stopped the car, searched it, and found something --

13   A.  Yes, sir.

14   Q.  -- that shouldn't have been there?

15   A.  Yeah, found methamphetamine.

16   Q.  All right.  And so then the charge -- I assume he

17 was then charged with possession of methamphetamine,

18 something like that?

19   A.  Yes, sir.

20   Q.  All right.  Any other times that you have

21 testified either in deposition or trial?

22   A.  Not that I can recall.

23   Q.  Okay.  As a police officer, have you ever

24 received any training about how to testify in court?

25   A.  Yes.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

8607c56d-5084-4bb8-9203-a9552944ff49

088

17

Michael McHugh - 2/11/2020

1   Q.   What have you -- what do you recall about that
2   training?
3   A.   I took a training on -- it's a DWI courtroom
4   demeanor, so --
5   Q.   Okay.
6   A.   -- it would teach us how to effectively prosecute
7   or be a good witness for the DWI trial.
8   Q.   What did you take away from that?  What did you
9   learn about how to be a good witness?
10   A.   To be more organized with your reports, to know
11   your case better than -- you know, don't just walk in
12   unprepared.
13   Q.   Anything else you remember from that training?
14   A.   No, not that I can recall.
15   Q.   Where do you recall doing that training?
16   A.   That was in the Moore County campus of Amarillo
17   College.
18   Q.   And do you know if that -- do you know anything
19   about the curriculum of that?  Was it like the TCOLE
20   standards, or was it something different, or --
21   A.   I received TCOLE credit for it.
22   Q.   Uh-huh.
23   A.   It was the TDCAA that put it on -- the Texas
24   District and County Attorney's Association.  They were
25   the ones that sponsored -- or, the District Attorney

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

089

Michael McHugh - 2/11/2020

1    Q.  Okay.  So all the shots that were fired from your

2  weapon would have been fired during the shooting of

3  Mr. Baker?

4    A.  Yes.

5    Q.  Okay.  And you did not reload during the

6  shooting, correct?

7    A.  Correct.

8    Q.  Okay.  Who did you give your -- did you give your

9  gun to anyone immediately after the shooting?

10    A.  After the shooting, I gave my gun to Deputy

11  Garay.

12    Q.  Okay.  The same deputy that you -- that took

13  Chief Coborn's gun?

14    A.  Correct.

15    Q.  Okay.  And were you aware of how many rounds were

16  still in the gun at that point?

17    A.  No.  I was not aware of how many were still in

18  the gun.

19    Q.  Okay.  I'll represent for you that the report

20  that the Rangers did found that there was one round in

21  the chamber and 10 in the magazine.

22       If that's correct, then you likely would have

23  fired five shots, right?

24    A.  Correct.

25    Q.  Okay.  You'd agree that it's important to be

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

090

Michael McHugh – 2/11/2020

1    looking at what you're shooting at when you're firing

2    your gun, right?

3        A.   Yes.

4        Q.   And you need to be aiming your gun at your target

5    when you're shooting, correct?

6        A.   Yes.

7        Q.   And it's important to know where your partner is

8    when you're shooting your gun --

9        A.   Yes.

10       Q.   -- correct?

11            And I assume that's again like Chief Coborn

12   testified, so that you don't accidentally shoot your

13   partner, right?

14       A.   Correct.

15       Q.   Same; it's important to be aware of all your

16   surroundings so you don't hit innocent bystanders or

17   things that you're not shooting at, right?

18       A.   Correct.

19       Q.   Okay.  At the time of the shooting of Mr. Baker,

20   you had been issued a body cam, correct?

21       A.   Yes.

22       Q.   And when were you supposed to turn your body cam

23   on?

24       A.   Prior to any traffic contact.

25       Q.   Is it also your recollection that that changed

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

091

Michael McHugh - 2/11/2020

1    A.  Yes.

2    Q.  Okay.  Are you-all still using the same body

3  cameras?

4    A.  We have changed to a different set of body

5  cameras that now activate whenever we turn on the lights

6  of the patrol car.  These ones {sic} were separate from

7  that system.  We now use -- it's a -- a comprehensive

8  system that is all working together.

9    Q.  Do you know why that change was made?

10    A.  Because of this incident.

11    Q.  Specifically because of this incident with

12  Mr. Baker?

13    A.  Yes.

14    Q.  And why -- why change the body cameras due to

15  this incident?

16    A.  So that there's no question if they're going to

17  get turned on or not.

18    Q.  Because Officer Coborn's didn't get turned on,

19  and yours got turned on late --

20    A.  Correct.

21    Q.  -- correct?

22    A.  Yes.

23    Q.  Would you also agree that having the body camera

24  turned on can also protect police officers?

25    A.  Yes, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

092

Michael McHugh - 2/11/2020

1  Q.  Okay.  It's also good to -- a good criminal
2  investigation tool, correct?

3  A.  Correct.

4  Q.  ==And you'd agree that if a police officer is doing==
5  ==his job correctly he should have nothing to fear with==
6  ==the body camera?==

7  ==A.  Correct.==

8  Q.  Okay.  Now, I believe that Chief Coborn said that
9  when you-guys were parked on the highway, doing your
10  highway interdiction, that you were about 200, 250,
11  yards away from the Pilot station; is that right?

12  A.  If 200 -- if it was 200 yards, I'd be very
13  surprised.  I'd say it's probably less.

14  Q.  Okay.  So probably less than 200 yards?

15  A.  Yes.

16  Q.  Okay.  And tell me what drew "your" attention to
17  the -- the Infinity as it was on Highway 54?

18  A.  When it passed us, the -- the brakes were applied
19  more heavy than the average person that normally freaks
20  out, taps their brakes when they pass a cop.

21  Q.  And then what else did you notice about the
22  vehicle's behavior after that?

23  A.  As it continued eastbound on 54, it crossed over
24  the tracks and then it was in the left-hand lane.  There
25  was a semi behind it, that sort of obscured our view for

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

093

Michael McHugh - 2/11/2020

1   a -- a moment, but we could still see underneath the
2   semi as it crossed the right-hand lane --
3   (indicating) -- and went into the Pilot parking lot in a
4   very quick manner.  It was a sharper turn than somebody
5   that -- that was planning on stopping there.
6       Q.  Okay.  And then at that point, you-all decide to
7   follow the car, the Infinity, into the Pilot lot,
8   correct?
9       A.  We -- yes.  We follow the car into the parking
10  lot to check it out, run the tag.
11      Q.  Okay.  And at that point, Chief Coborn is driving
12  and you were the passenger, correct?
13      A.  Correct.
14      Q.  Okay.  And so you're the one who ends up
15  recording the tag and calling it in, right?
16      A.  Correct.
17      Q.  Okay.  And you make two phone calls on that,
18  right?
19      A.  I believe I only made one phone call.
20      Q.  Okay.
21      A.  That -- that -- from what I can recall, I only
22  made one phone call.
23      Q.  Okay.  Did -- I thought the --
24          Who was that phone call made to?
25      A.  Inglewood Police Department.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

094

Michael McHugh - 2/11/2020

1   Q.  Okay.  How did you -- so did you first call the
2   car in -- the -- the tag in over the radio?
3   A.  I believe I did both.
4   Q.  Okay.
5   A.  I -- now that you're jogging my memory, I called
6   the -- the license plate in over the radio.  And I "may"
7   have called them, but I don't recall entirely.  But I
8   did for sure call Inglewood Police Department in
9   California.  Once we got the return, and dispatch
10  confirmed that it was stolen -- there was a number on
11  the return, so I decided to call it and find out more
12  information.
13  Q.  Okay.  And was that your personal cell phone you
14  were using?
15  A.  Yes.
16  Q.  Do you still have that cell phone?
17  A.  It is at my house.
18  Q.  Okay.  Are you still using that cell phone?
19  A.  No.
20  Q.  Okay.  Do you recall if you -- when you talked to
21  Inglewood, if you put them on speakerphone or if you
22  were just talking to them?
23  A.  I don't recall.
24  Q.  Okay.  What do you remember about what Inglewood
25  told you?

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

095

Michael McHugh - 2/11/2020

1    A.  They told me that it was still confirmed as

2  stolen, and they transferred me over to their Records

3  Department.   The Records -- I asked the Records

4  Department what was the circumstances surrounding, you

5  know, the -- the vehicle being stolen.   And the woman

6  that I spoke to went through the case really quickly,

7  and came back and said somebody left the vehicle running

8  in a parking lot of either a Walgreen's or a CVS, or

9  something to that effect, and when they -- she came out

10  of the store, it was gone.

11    Q.  Okay.  And so at that point your understanding

12  was that the car was stolen, but that it was a -- kind

13  of a nonviolent theft; there was no carjacking, or

14  anything like that?

15    A.  That was my understanding.

16    Q.  Okay.  And it -- so at that point, you had no

17  reason to suspect that Mr. Baker or Mr. Dees was

18  involved in any sort of violent crime, correct?

19    A.  At that time, no.

20    Q.  Okay.  And then you didn't even know their names

21  until after the shooting occurred, correct?

22    A.  Correct.  We had no idea.

23    Q.  Okay.

24    A.  Or, I had no idea who was in the vehicle, or what

25  their names were, what their gender was, nothing.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

096

Michael McHugh - 2/11/2020

1    Q.  Okay.  You didn't even observe -- you didn't even
2    know if it was Mr. Baker and Mr. Dees in the vehicle
3    until you saw them going back to the gas pump, correct?
4    A.  Correct.
5    Q.  Okay.  So your entire knowledge of what was going
6    on with Mr. Baker and Mr. Dees was based on your
7    observations of -- of the scene that day, right?
8    A.  Correct.
9    Q.  Okay.  You'd also agree that when you saw the car
10   on the highway it wasn't doing anything dangerous,
11   right?
12   A.  No.  It wasn't doing anything dangerous.
13   Q.  Okay.  You didn't see it speeding, or weaving in
14   and out of traffic, anything like that?
15   A.  No, sir.  It wasn't -- it wasn't driving like
16   that at all.
17   Q.  Okay.  And before it makes that right turn into
18   the Pilot lot, you hadn't seen the car do anything
19   illegal on the highway, correct?
20   A.  No, sir.
21   Q.  Now, after you pass by the car in the Pilot lot,
22   you and Chief Coborn drive across the street to Toot'n
23   Totum, right?
24   A.  Correct.
25   Q.  And why do you do that?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

097

Michael McHugh - 2/11/2020

1     Q.  When you decide to initiate the traffic stop, you

2  don't suspect Mr. Baker or Mr. Dees of anything other

3  than car theft, right?

4     A.  Correct.

5     Q.  And before they get back into the car, you don't

6  see them do anything threatening, correct?

7     A.  Not threatening.

8     Q.  Okay.  Do you recall if there were any other cars

9  at the gas pumps?

10    A.  I'm sure there were.  But if I had to tell you

11  like types, and stuff, no, I couldn't tell you what

12  other cars were there.

13    Q.  Okay.  Do you remember if there were any cars at

14  the gas pumps between where the Infinity was and the

15  Highway 54 side?

16    A.  I don't recall.

17    Q.  Okay.  You just don't remember either way?

18    A.  I don't remember.

19    Q.  Okay.  At the time, that's something you should

20  have been aware of when you made the decision to use

21  deadly force, correct?

22    A.  Yes.

23    Q.  Okay.  You don't recall any people being out,

24  walking around in the parking lot, correct?

25    A.  No.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

098

Michael McHugh - 2/11/2020

1    Q.  Other than the people who were at the -- the
2    entrance to the Pilot, do you remember anyone being
3    outside, at all, other than yourself, and Chief Coborn,
4    and the two gentlemen?
5        A.  I don't remember seeing anybody.
6        Q.  Okay.  And, again, that's something you should
7    have been aware of when you made the decision to use
8    deadly force?
9        A.  Well, that's what I mean, is, I don't remember
10   seeing anybody in the vicinity around the -- the vehicle
11   itself.
12       Q.  Okay.
13       A.  Or our vehicle.
14       Q.  Okay.  And you'd need to know if there was anyone
15   around the vehicle when you made the decision to use
16   deadly force to make sure that you're not accidentally
17   shooting someone you don't intend to?
18       A.  Correct.
19       Q.  Okay.
20       A.  I didn't see anybody around the vehicles.
21       Q.  Let's take a look at Exhibit 1, which is the --
22       A.  Areal view?
23       Q.  -- the areal view.
24           Does where Chief Coborn put the Infinity look
25   correct to you?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

099

Michael McHugh – 2/11/2020

1  out.

2      Q.  You're pretty sure he's already back inside the

3  driver's seat?

4      A.  I never saw him out of the car, short of --

5  except for when he was exiting the building.

6      Q.  You saw him go straight from the Pilot to the

7  driver's seat?

8      A.  I didn't see him get in the -- the driver's seat,

9  but that's where I surmise that he was at.

10     Q.  Okay.  Because the -- the where -- the -- the

11  Tahoe was parked facing towards the Pilot station, so

12  you just saw him as he was leaving the Pilot station.

13  Then you kind of lost track of him after that?

14     A.  Yeah.  I lost visual sight of him.

15     Q.  Okay.  So you believe that he was in the driver's

16  seat, but not 100 percent sure?

17     A.  I wasn't 100 percent until I got in the vehicle.

18     Q.  Okay.  And you go up to the side of the vehicle,

19  correct?

20     A.  Correct.

21     Q.  And those windows are also tinted, correct?

22     A.  Correct.

23     Q.  Okay.  Were you able to see inside through the

24  passenger vehicle?

25     A.  To a degree.  I was able to see that the

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

100

Michael McHugh – 2/11/2020

1   passenger was -- (indicated) -- had his hands up like

2   this.

3        Q.  Okay.

4        A.  And he was showing me his hands, as I was

5   ordering him to.

6        Q.  What else could you see inside the vehicle?

7        A.  I had to step back to get a better view.

8        Q.  Uh-huh.

9        A.  And I moved forward to approximately right next

10  to the passenger-side front wheel, so that I could see

11  through the windshield at the driver.  I could see

12  Mr. Dees in the passenger seat, and then I could see

13  Mr. Baker in the driver's seat, better, from that angle.

14       Q.  Okay.  And when you see Mr. Dees, he's got his

15  hands up in the, like, "don't shoot," "surrender"

16  position --

17       A.  Correct.

18       Q.  -- correct?

19           Okay.  And are you ever directly in front of the

20  car, or are you just kind of on the passenger side by

21  the front wheel?

22       A.  I'm on the passenger side by the front wheel.

23       Q.  Okay.  So you never actually get in front of the

24  car, correct?

25       A.  No, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

101

Michael McHugh – 2/11/2020

1    Q.   Okay.   When you see inside with Mr. Dees, with

2    his hands up in the surrender position, what does

3    Mr. Baker appear to be doing?

4    A.   His face was blank.

5    Q.   Okay.

6    A.   As if he was not acknowledging anything that was

7    going on.

8    Q.   What else do you remember about Mr. Baker?

9    A.   I remember putting his -- him putting his hand

10   from the ignition down to the gearshift, and just moving

11   it into "Drive."

12   Q.   Do you remember him doing anything else?

13   A.   As soon as he put it in "Drive," he had took his

14   right hand and moved it down between the console and his

15   leg, as if he was reaching for something.   I -- that's

16   what it appeared to me that he was doing.   But he

17   moved -- (indicating) -- he almost moved his whole body

18   down there, as well.

19   Q.   You saw him moving his whole body down --

20   A.   It -- it --

21   Q.   -- below the -- the dash?

22   A.   As well as somebody could sitting in the driver's

23   seat.

24   Q.   Also, as if he might be trying to get out of the

25   line of fire if somebody was about to shoot him?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

102

Michael McHugh – 2/11/2020

1      A.  Correct.

2      Q.  And are you aware of where Officer Coborn was at

3  that moment?

4      A.  I was.

5      Q.  Where was -- where did you believe Officer Coborn

6  was?

7      A.  I believe that he was standing directly in front

8  of the vehicle; maybe a little closer to the driver's

9  side, than the passenger side.

10     Q.  So in front of the vehicle, shaded a little over

11  the driver's side?

12     A.  Yeah, from the center.

13     Q.  Okay.  Do you remember -- I -- I --

14         Now, did you hear Mr. Dees say "Don't shoot"?

15     A.  (Shaking head).

16         I never heard Mr. Dees say anything.

17     Q.  Do you recall either of the young men ever saying

18  anything?

19     A.  Not until we pulled Mr. Dees out of the vehicle,

20  I didn't hear either of their voices. {Sic}.

21     Q.  Okay.  What about -- and you'd agree, then, that

22  you never heard them make any sort of verbal threats,

23  correct?

24     A.  No, sir, I never heard anything like that.

25     Q.  And when you saw Mr. Baker kind of duck down, you

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

103

Michael McHugh – 2/11/2020

1  were looking through the front windshield?

2      A.  Yes, at -- and then I moved back to get -- I -- I

3  saw the car go in "Drive," so I moved away from it.

4  (Indicating).  I moved closer to the gas pumps.  And

5  having more light from a further distance away, we

6  was -- I was able to see -- to keep my eyes on him.

7      Q.  Okay.  When you -- was the car actually moving

8  when you saw him shift it into "Drive," or did he have

9  his foot on the brake at that point?

10     A.  I don't know if he had his foot on the brake.  I

11 couldn't see his feet, and I couldn't see the

12 taillights.  I heard the engine revving as if he

13 hadn't -- he forgot to put it in "Drive."

14     Q.  Uh-huh.

15     A.  But I couldn't see if he had his foot on the

16 brake, or not.

17     Q.  Okay.  But you see him move into "Drive."

18         Does the car immediately move at that point?

19     A.  Yes.

20     Q.  Okay.  How far forward does the car appear to go?

21     A.  A couple feet.

22     Q.  Okay.  And then the car immediately starts

23 turning to the left, correct?

24     A.  Yes.

25     Q.  Okay.  When did you start shooting at the car?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

104

Michael McHugh – 2/11/2020

1    A.  I started shooting as soon as Mr. Dees was no

2  longer in my line of fire since he was not a threat.  So

3  as soon as the "B" pillar on the vehicle crossed my line

4  of sight, and I could see where Mr. Baker was sitting,

5  is where I start shooting.

6    Q.  What's the "B" pillar?

7    A.  So on a vehicle, there's -- (indicating) -- the

8  pillars that separate the windows.  So there's the "A"

9  pillar, that's the separation from the windshield to the

10  driver's window, or the passenger's window; and then

11  there's the "B" pillar, which is the one that's in

12  between the front and back.  (Indicating).

13    Q.  Okay.  So the "B" pillar is kind of the -- the

14  line between the front -- the passenger-side front

15  window and the passenger-side back window?

16    A.  Yes.

17    Q.  Okay.  So you start shooting after the car has

18  kind of moved far enough where you have an angle where

19  you can shoot through the back passenger's window

20  towards Mr. Baker?

21    A.  Correct.

22    Q.  Because you know that Mr. Dees has surrendered,

23  so you don't want to shoot at him --

24    A.  Correct.

25    Q.  -- correct?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

105

Michael McHugh - 2/11/2020

1        Where were you standing when he started shooting?

2      A.   I was standing right next to the back passenger

3   window.

4      Q.   So the -- as the car is moving to the left,

5   making a turn, as the -- as the back passenger window

6   reaches your position that's when you start shooting?

7      A.   No.  The -- the vehicle went forward.

8      Q.   Uh-huh.

9      A.   -- a few feet.  So while I was standing next to

10   the vehicle, as it was traveling forward a few feet, is

11   when it -- (indicating) -- it cleared my line of fire.

12   I never had to move; it moved for me.

13      Q.   Okay.  So then you fire while the car is making

14   that movement?

15      A.   Correct.

16      Q.   Okay.  And then when do you stop firing?

17      A.   As soon as the vehicle pulled away from me, and I

18   couldn't justify another shot.

19      Q.   Okay.  What -- at what point -- when you say you

20   "couldn't justify another shot," explain for the jury

21   what you mean by that.

22      A.   I -- I didn't believe that I had a shot that I

23   could have made, on the vehicle, so I didn't take one.

24      Q.   Meaning, that you didn't think you could hit

25   Mr. Baker?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

106

Michael McHugh – 2/11/2020

```
 1    A.  Yes.

 2    Q.  So you stopped shooting once the car had kind of

 3  cleared you, and was turning to the left on its way out

 4  of the parking lot, right?

 5    A.  Yes, sir.  The vehicle started coming within the

 6  angle of -- if I had taken a shot -- (indicated) -- it

 7  would have either gone across the highway or it would

 8  have hit one of the next gas pumps.  And --

 9    Q.  That's a bad idea?

10    A.  Yes; yes.

11    Q.  Okay.  You were never shooting at the car when

12  you could --

13        Well, let's look at --

14    A.  This one?

15    Q.  That one.

16        I think that's Exhibit 5; is that right?

17    A.  Correct.

18    Q.  You were never shooting at the car when

19  Exhibit 5 was your vantage point to the car, correct?

20    A.  No.

21    Q.  Okay.  You were never standing directly behind

22  the car, shooting at it, correct?

23    A.  Directly behind, as --

24    Q.  Yeah.

25    A.  -- if I was taking this photo?  No, but maybe off
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

107

Michael McHugh – 2/11/2020

1    to the side.

2        Q.   Okay.   Did you change positions while you were

3    firing?

4        A.   No.

5        Q.   Okay.   So you -- I think we established earlier,

6    you probably fired five shots?

7        A.   Yes.

8        Q.   And you would have been standing in the same

9    place where you fired all five?

10       A.   Yes.

11       Q.   Do you remember where you were standing, relative

12   to the gas pump, when you started firing?

13       A.   Directly next to -- to one of the gas pumps.

14       Q.   Okay.   Let's take a look at --

15            Yeah, that's the better one.

16       Q.   I'm going to hand you another version of that so

17   that we can make this a little clearer.

18            MR. MEDLOCK:   Blair, would you mind if we

19   used your copy to mark --

20            MS. OSCARSSON:   Sure.   Exhibit 1?

21            MR. MEDLOCK:   Yeah.   And we'll mark that one

22   as -- what are we on, 7?

23            Could you hand that one for me please, sir?

24            MS. OSCARSSON:   Just stick it over that.

25            MR. MEDLOCK:   Yeah.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

108

Michael McHugh – 2/11/2020

```
 1      A.   Directly next to it.

 2      Q.   Okay.

 3           All right.  And do you know where Officer Coborn

 4   was when you started shooting?

 5      A.   Yes.

 6           Do you want me to indicate it?

 7      Q.   Would you, please?

 8      A.   Yeah.

 9      Q.   Well, let's -- let's put an "M" next to you,

10   or -- or underneath you?

11      A.   Okay.

12      Q.   And then if you could draw Officer Coborn in, as

13   well.

14      A.   Okay.  I'll do my best.  There's a pillar in the

15   way, so I'm just going to go over the pillar.

16      Q.   Okay.

17      A.   (Complied).

18           Disregard the pillar.

19      Q.   Okay.  So Officer Coborn was standing on the

20   other side of the pillar where you have written "RC."

21      A.   Yeah.

22      Q.   Correct?

23      A.   Correct.

24      Q.   Okay; perfect.  Thank you.

25           Do you have any opinion on whether it was your
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

109

Michael McHugh – 2/11/2020

1   bullets that hit Mr. Baker, or Mr -- or Officer

2   Coborn's?

3        A.   I believe it was mine.

4        Q.   You believe it was yours.

5             What is that belief based on?

6        A.   The Ranger told us, you know, where he was struck

7   and where it exited at.  And just based on watching the

8   in-car video and seeing where my first shot went, I -- I

9   believe it was that first shot.

10       Q.   So the -- the evidence that would support your

11  belief that it was your shot is what you saw from the

12  in-car video and your knowledge from the Ranger of where

13  the bullets hit Mr. Dees -- hit Mr. Baker?

14       A.   Yeah.  And -- and just how he was positioned in

15  the vehicle, and just -- I remember where my first shot

16  went.

17       Q.   Where do you remember your first shot going?

18       A.   Right through the upper -- (indicating) -- if the

19  back passenger window was divided into quadrants, it

20  would have been the top, right quadrant.

21       Q.   So the top, right quadrant back passenger window

22  is where your first shot went?

23       A.   Correct.

24       Q.   Do you remember where any of your other shots hit

25  the car?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

110

Michael McHugh - 2/11/2020

1   A.  The back windshield.  And the others, I don't
2   know.

3   Q.  So you remember one of the five going through the
4   upper-right quadrant of the back passenger window?

5   A.  (Nodding head).

6   Q.  And you remember one shot going through the rear
7   window of the car?

8   A.  I believe it was two going through the rear
9   window of the car, two through the rear window.

10   Q.  So you don't know where the other two shots --

11   A.  They may have hit the -- the back quarter panels
12   or -- or the back, like, tailgate area.

13   Q.  Okay.  But as the -- as we sit here today, you
14   have no recollection of where those shots hit?

15   A.  No.

16   Q.  Okay.

17   A.  It all happened too quickly.

18   Q.  Were you ever shooting while Mr. Baker's back was
19   facing you?

20   A.  I believe so.

21   Q.  Okay.  Why do you believe so?

22   A.  The rate at which the car pulled away, it -- I
23   mean, it -- there's just no way it wasn't to me at one
24   point or another.  It was going away from me too quickly
25   for him to have not had his back to me at one point.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

111

Michael McHugh – 2/11/2020

1    Q.  You'd agree that if it was one of your shots that

2  struck and killed Mr. Baker, that the car would have had

3  to have pulled around you and Officer Coborn when you

4  fired it, correct?

5    A.  Pulled around?

6    Q.  Well, the car is moving to the left, right?

7    A.  Yes.

8    Q.  Okay.  And Officer Coborn is standing in front of

9  the car, correct?

10   A.  Correct.

11   Q.  So if one of your shots went in Mr. Baker's back,

12  the car would had to have passed -- have passed,

13  physically, Mr -- Officer Coborn when that shot was

14  fired, correct?

15   A.  I don't believe so, because I was standing enough

16  to the rear of the vehicle -- (indicating) -- by that

17  time, that Officer Coborn hadn't completely cleared the

18  vehicle yet, or moved to -- moved out of the way of the

19  vehicle yet.

20   Q.  Okay.  You'd agree the car never hit Officer

21  Coborn, correct?

22   A.  It did not.

23   Q.  Okay.  ==Did you see Officer Coborn step to the==

24  ==side as the car started?==

25   ==A.  No.==

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

112

Michael McHugh - 2/11/2020

1    Q.   Okay.  So Officer Coborn would have remained in

2    essentially the same position from when the car started

3    until when you stopped shooting, correct?

4        A.   He may have started moving out of the way, but

5    I -- I was more focused on where I was aiming my weapon.

6        Q.   And where you're aiming your weapon at, Officer

7    Coborn is never in your line of fire, correct?

8        A.   No.

9        Q.   You realize Mr. Baker was shot twice, correct?

10       A.   Correct.

11       Q.   Okay.  Do you think two of your shots could have

12   hit him, or just one?

13       A.   It could have.  I don't know for sure.

14       Q.   Okay.  You feel more confident about one, than

15   two?

16       A.   Yeah.

17       Q.   You'd agree that Officer Coborn continued

18   shooting at the car as it was driving away, correct?

19       A.   Just from watching the video; I didn't hear

20   anything at the time.  Like, it was just -- I was so

21   focused on something else, that I didn't hear the shots.

22       Q.   Okay.  So you'd say from watching the video, you

23   do believe he was shooting --

24       A.   Yes.

25       Q.   -- as it moved away?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

113

Michael McHugh - 2/11/2020

1    You heard some gunshots after the car has left

2    the frame of the video?

3        A.   Correct.

4        Q.   Okay.  And you don't recall watching what Officer

5    Coborn was doing as far as shooting/not shooting after

6    you went back to get in the Tahoe, right?

7        A.   When I ran back to the Tahoe, I thought that

8    Officer Coborn had followed me back over to the Tahoe

9    because the vehicle was going to take off us --

10       Q.   Uh-huh.

11       A.   -- take off on us, and we were going to be in a

12   pursuit.  But when I got to the door of the passenger

13   side of the Tahoe, I opened up, saw that he wasn't on

14   the other side getting in, looked for him in the

15   passenger -- or, in the parking lot, and he was chasing

16   after the car that was rolling away pretty slowly.

17       Q.   Okay.  So when you next see the car, after you

18   run back to the Tahoe, it's moving at that rolling speed

19   as opposed to a speed where it appears that someone is

20   depressing the gas?

21       A.   Correct.

22       Q.   Other than to protect yourself and Officer

23   Coborn, did you have any other justifications for

24   shooting at Mr. Baker and Mr. Dees?

25       A.   Just for Officer Coborn; I didn't really consider

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

114

Michael McHugh – 2/11/2020

1   myself.  I was more considered -- worried about Officer
2   Coborn.
3       Q.  Okay; fair enough.
4           The only justification that you believed you had
5   to use deadly force was to protect Officer Coborn,
6   correct?
7       A.  Correct.
8       Q.  Okay.  You'd agree that at some point Officer
9   Coborn was no longer threatened by the car, correct?
10      A.  Correct.
11      Q.  Okay.  You'd agree that once the car is past
12  Officer Coborn, and he is behind it, that the car was no
13  longer a threat to Officer Coborn, correct?
14      A.  I couldn't perceive what he was seeing at the
15  time.
16      Q.  Okay.  From your perspective.
17      A.  From my perspective, I couldn't see where the car
18  was at with him, so I -- I couldn't -- I couldn't
19  justify because there was a gas pump in the way.
20      Q.  Okay.  You'd agree that if the car is traveling
21  away from Officer Coborn, and doesn't do anything to
22  change its behavior to reverse back towards him, that
23  there's no threat justifying using deadly force at that
24  point, correct?
25      A.  Correct.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

115

Michael McHugh - 2/11/2020

1    Q.  You'd agree that once Officer Coborn is no longer

2   in front of the car, either as it's pulling away or as

3   it's turning to the left, that you no longer have

4   justification to use deadly force, correct?

5    A.  I don't, no.

6    Q.  Okay.  And you'd also agree that as a police

7   officer, you have to be able to justify using deadly

8   force every single time you pull the trigger, correct?

9    A.  Correct.

10    Q.  Okay.  You'd also agree that your backup arrived

11   pretty quickly?

12    A.  Pretty quickly, yes.

13    Q.  Okay.  And you'd agree that as soon as the backup

14   arrived, they shut down the scene?

15    A.  As best as they could, yeah.

16    Q.  Okay.  And you'd agree that the scene included

17   the -- what was going on at the Pilot station and what

18   was going on at Toot'n Totum, right?

19    A.  Yes.

20    Q.  Did you actually shut down Highway 54, as well?

21    A.  I didn't.  There was still traffic moving along

22   54.  In fact, I think there was an accident that

23   occurred because people were paying attention to us,

24   rather than the road.

25    Q.  Okay.  Might have been preferable to shut down 54

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

116

Michael McHugh - 2/11/2020

1    Q.  Okay.  Were you ever trained -- what was your
2    understanding of when it was legally permissible to
3    shoot at a moving vehicle?
4        A.  What was talked about in Tennessee vs. Garner;
5    so, a fleeing felon that's a threat to yourself or
6    others.
7        Q.  And it has to be an immediate threat, correct?
8        A.  Correct.
9        Q.  Okay.  Can't be a hypothetical fact, correct -- a
10   hypothetical "threat," correct?
11       A.  Correct.
12       Q.  You have to be able to articulate some behavior
13   from the individual that you're shooting at that
14   justifies using deadly force, correct?
15       A.  Correct.
16       Q.  Okay.  You can't use deadly force just to "stop"
17   a fleeing felon, correct?
18       A.  Correct.
19       Q.  Okay.  Were you ever trained about the Fifth
20   Circuit's decision in Lytle vs. Bexar County?
21       A.  I don't recall.
22       Q.  Okay.
23       A.  It doesn't sound familiar.
24       Q.  Okay.  And you'd agree that when the immediate
25   threat concludes, you need to stop using deadly force,

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

117

Michael McHugh - 2/11/2020

1  correct?

2      A.  Correct.

3      Q.  Okay.  Once you can no longer articulate behavior

4  that justifies using deadly force, you have to stop

5  using deadly force, correct?

6      A.  Yes.

7      Q.  And you'd agree that it's obvious that someone

8  could be injured or killed if you're shooting at a

9  moving vehicle, correct?

10     A.  Yes, sir.

11     Q.  You'd agree that, absent any training, it's

12  dangerous to allow officers to shoot at moving vehicles,

13  correct?

14     A.  It could be, yes.

15     Q.  Have you ever received any don't shoot/don't

16  shoot training?  {Sic}.

17     A.  No --

18     Q.  Okay.

19     A.  -- I have not.

20     Q.  How about any scenario-based training on when

21  it's permissible to use deadly force?

22     A.  I've done plenty of scenario-based training, but

23  I can't recall -- you know, during the academy we did

24  plenty of scenario stuff where, you know, we would draw

25  our weapons and fire if we needed to, but I don't recall

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

118

Michael McHugh - 2/11/2020

1    if there was ever anything about moving vehicles.

2        Q.  Okay.  So fair to say that you may have had --

3    you've had some scenario-based training, but no

4    scenario-based training that involved vehicles?

5        A.  Not that I can remember, off the top of my head.

6        Q.  Okay.  Is that the last time that you remember

7    receiving any scenario-based training on when you could

8    use deadly force, at the academy?

9        A.  No.  We've used -- we've done scenario-based

10   training, and I've done it several times over the years

11   in different classes; active shooter classes, we do

12   scenario-based training.  If it's an active shooter,

13   it's more than likely going to be a deadly force

14   situation, so.

15       Q.  In none of those other trainings have you done a

16   scenario-based training involving a vehicle, correct?

17       A.  Not that I can think of, no.

18       Q.  Okay.  Are you aware of any other incidents where

19   Stratford Police Department officers have shot at

20   people?

21       A.  Just two; one with Chief Hooks, and one with

22   Officer Coborn.

23       Q.  The two that Officer Coborn discussed earlier

24   today?

25       A.  Correct.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

119

Michael McHugh - 2/11/2020

1    Q.  Okay.  Were you involved in either of those

2  situations?

3    A.  The first one, I --

4    Q.  I'm sorry.  Is that the one with Chief Hooks?

5    A.  Yes.

6    Q.  Okay.  Tell me about the Chief Hooks one.

7    A.  Chief Hooks and I, we were made aware of a

8  pursuit that's coming into town from the Dumas area on

9  New Year's Day of 2018; so, about two months prior to

10 this incident.  And I deployed spikes on the vehicle

11 successfully.  And Chief Hooks -- the vehicle continued

12 going at a pretty high rate of speed, and Chief Hooks

13 wanted to put an end to the stop.  So he -- or, the

14 pursuit -- so he attempted to use a shotgun to stop the

15 vehicle and -- and shoot the driver.

16   Q.  Okay.  Was he successful in stopping the vehicle

17 with a shotgun?

18   A.  In a manner of speaking, yes.  I think the

19 shotgun shells -- or, the projectiles -- hitting the

20 vehicle scared the driver into stopping, and he came to

21 a stop.

22   Q.  Where was Chief Hooks when he was shooting at the

23 driver?

24   A.  He was on the side of the road.

25   Q.  Okay.  Was the car -- had the car already moved

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

120

Michael McHugh – 2/11/2020

1  past you-all, or was it --

2    A.  It had moved past me.  He was about half a mile

3  up the road from me, in case it got past me, so I

4  couldn't tell you how -- where the vehicle was in

5  relation to him.  I just know that he shot that.

6    Q.  Okay.  So you're not aware if the car was past

7  Chief Hooks, when he shot at it, or parallel with him,

8  or heading right towards him?

9    A.  No.

10   Q.  Okay.  Did that car ever go off the road?

11   A.  No.  It -- it basically slammed on the brake and

12  came to a stop right where Chief Hooks was stopped at.

13   Q.  Right after he shot at it?

14   A.  Yeah.

15   Q.  Okay.  And what was that -- what was that driver

16  suspected of doing?

17   A.  Traveling at a high rate of speed.  I'm not --

18  I'm not 100 percent sure what -- what else he was

19  accused of.  Just, it was a pursuit coming into town

20  from Moore County.

21   Q.  Okay.  So the -- the folks in Moore County told

22  you-all, "Hey, there's a guy coming in.  Can you deploy

23  the spike strips, see if that stops him"?

24   A.  Yeah.

25   Q.  Okay.  They didn't tell you what they were after

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

121

Michael McHugh - 2/11/2020

1    Q.  Okay.  So kind of as you were firing that first

2    shot at him, he kind of moved out of your vantage

3    point --

4    A.  Yes.

5    Q.  -- there?

6        So you could really only see him -- the last time

7    you could really see him was when you fired that first

8    shot, right?

9    A.  No.  I could continue to see him.  I mean,

10   because there was enough light coming in from the front

11   windshield that when he -- the car started moving away

12   from me, I could see into the -- into the back

13   windshield, which is where I shot, in a day or two.

14   Q.  Okay.  So you -- did you actually see your shot

15   hit Mr. Baker?

16   A.  No.  It was -- it was too dark inside the

17   vehicle.  All I could see was the shadow of his -- of

18   his body.

19   Q.  Okay.  Did you see his body react at all after

20   you fired that shot --

21   A.  Huh-uh.

22   Q.  -- that you think hit him?

23   A.  No.

24   Q.  Okay.  Did you ever see Mr. Baker come back up

25   from that, kind of, ducking position he was in?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

122

Michael McHugh – 2/11/2020

1    A.  No, sir.

2    Q.  Not even when you saw the silhouette go by from

3  your vantage point inside the squad car?

4    A.  No, sir.

5    Q.  You never saw Mr. Baker with any weapon, correct?

6    A.  No, sir.

7    Q.  Okay.  Do you know why Chief Hooks left the

8  department?

9    A.  From my understanding, it was a family decision;

10  he wanted to move closer to relatives.

11    Q.  To the best of your knowledge, it had nothing to

12  do with anything going on in the department?

13    A.  No, sir.

14    Q.  Do you believe that you fired first, or that

15  Officer Coborn fired first?

16    A.  I believe Officer Coborn fired first.

17    Q.  Tell me why you believe that.

18    A.  I heard the shots.

19    Q.  You didn't start firing until after you heard the

20  shots?

21    A.  Yeah.

22    Q.  Okay.  Now, Officer Coborn testified that he was

23  about 6 inches in front of the hood of the car when the

24  car started moving.

25         Do you recall that testimony?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

123

```
 1                    CHANGES AND SIGNATURE

 2    WITNESS NAME: MICHAEL MCHUGH

 3    DATE OF DEPOSITION: 2-11-20

 4    PAGE/LINE          CHANGE                    REASON

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

Michael McHugh – 2/11/2020

```
1        I, MICHAEL MCHUGH, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4
5
6                    _____
                     MICHAEL MCHUGH
7
8   THE STATE OF TEXAS)
9   COUNTY OF SHERMAN )
10       Before me, _____, on this
11  day personally appeared MICHAEL MCHUGH, known to me (or
12  proved to me under oath or through _____)
13  (description of identity card or other document) to be
14  the person whose name is subscribed to the foregoing
15  instrument and acknowledged to me that they executed the
16  same for the purposes and consideration therein
17  expressed.
18       Given under my hand and seal of office this
19  _____ day of _____, 2020.
20
21                   _____
                     Notary Public in and for
22                   The State of Texas
23
24
25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

125

Michael McHugh – 2/11/2020

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                     AMARILLO DIVISION

 3   IRA DARLINA BAKER,         )
     individually, and as the   )
 4   administratrix of the ESTATE)
     OF DARION DE'VON BAKER and  )
 5   MARIO BAKER, individually,  )
     and on behalf of all        )
 6   wrongful death beneficiaries)
     Of DARION DE'VON BAKER      )
 7                               )
                     Plaintiffs, )
 8                               )
     VS.                         )    Civil action no.
 9                               )      2:19-cv-77
     RICHARD KEITH COBURN, and   )
10   MICHAEL JOSEPH MCHUGH in    )
     their individual capacities )
11                               )
                     Defendants.  }
12

13
                     REPORTER'S CERTIFICATION
14

15   THE STATE OF TEXAS)
     COUNTY OF POTTER  )
16

17        I, Gay Richey, a Certified Shorthand Reporter in

18   and for the State of Texas, hereby certify to the

19   following:

20        That the witness, MICHAEL MCHUGH, was duly sworn

21   by the officer and that the transcript of the oral

22   deposition is a true record of the testimony given by

23   the witness;

24        That the original transcript was submitted on

25   MARCH 19, 2020, to Blair Saylor
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

126

Michael McHugh – 2/11/2020

1  Oscarsson, counsel for the witness, for examination and

2  signature, and return to Scott Medlock by

3  APRIL 18, 2020;

4          I further certify that I am neither counsel for,

5  related to, nor employed by any of the parties in the

6  action in which this proceeding was taken, and further

7  that I am not financially or otherwise interested in the

8  outcome of the action.

9          GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this

10 12th day of March, 2020.

11

12

13

14              /s/ Gay Richey

15         _____

16         Gay Richey, Texas CSR 7260
           Expiration Date: 12/31/20
17         WRIGHT WATSON & ASSOCIATES
           Firm Registration No. 225
18         1250 S. Capital of Texas Highway
           Building 3, Suite 400
19         Austin, Texas  78746
           512-474-4363 – www.wrightwatson.com
20

21

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
8607c56d-5084-4bb8-9203-a9552944ff49

127

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | |
| | § | Civil Action No. |
| | § | 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| | § | |
| Defendants | § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 6
# Deposition of G. Dees

1           UNITED STATES DISTRICT COURT.
               NORTHERN DISTRICT OF TEXAS
2                 AMARILLO DIVISION

3   _____

    IDA DARLINA BAKER, Individually,
4   And as the administrator of the
    ESTATE OF DARION DEV'ON BAKER, and
5   MARIO BAKER, Individually, and on
    behalf of all wrongful death beneficiaries
6   of DARION DEV'ON BAKER,

7       Plaintiffs,

8   Vs.               Civil Action No.2:19-cv-77

9   RICHARD KEITH COBURN and MICHAEL
    JOSEPH McHUGH, in their individual
10  capacities, the CITY OF STRATFORD,
    TEXAS,
11
        Defendants.
12  _____

13

14  THE VIDEO ZOOM DEPOSITION OF GREGORY DEES, JR.
                  May 21, 2020
15

16

17

18

19

20  _____

21              Madelyn E. Gray
               Court Reporter
22            P.O. Box 111519
          Memphis, Tennessee 38111
23            (901) 527-1100
         Madelyn.gray@riversidereporting.com
24



RIVERSIDE REPORTING SERVICE

1       The video zoom deposition of Gregory Dees,

2    Jr., taken on behalf of the Defendants,

3    pursuant to Consent, on May 21, 2020,

4    beginning at approximately 10:30 a.m. in the

5    law offices of Evans Petree, PC, 1715 Aaron

6    Brenner Drive, Suite 800, Memphis, Tennessee.

7           This deposition is taken in accordance

8    with the terms and provisions of the Federal

9    Rules of Civil Procedure.

10          All forms and formalities are waived,

11    and objections as to relevancy, materiality

12    and competency are reserved, to be presented

13    at or before the hearing.  Objections as to

14    the form of the question must be made at the

15    time of the taking of the deposition.  The

16    signature of the witness is not waived.

17

18

19

20

21

22

23

24

3

1                    - APPEARANCES -
2
     For the Plaintiffs:
3
     MR. SCOTT MEDLOCK
4    Attorney at Law
     Edwards Law
5    1101 East 11th Street
     Austin, TX 78702
6
     MR. BRIAN L. YOAKUM
7    Attorney at Law
     Evans Petree, PC
8    1715 Aaron Brenner Drive, Suite 800
     Memphis, TN 38120
9
     For Richard Keith Coburn and
10   Michael Joseph McHugh:
11   MS. BLAIR SAYLOR OSCARSSON
     Attorney at Law
12   Sprouse Shrader Smith, PLLC
     P.O. Box 15008
13   Amarillo, Texas 79105-5008

14   For the City of Stratford:

15   MR. ROBERT ELLIOTT
     Attorney at Law
16   501 Denrock
     Dalhart, Texas 79022
17
     Videographer:
18
     MR. BRAD SNYDER
19   Magic Media
     112 West 8th Avenue - Suite 612
20   Amarillo, Texas 79101
     Brad@magicmediatx.com
21

22

23

24

1                            - INDEX -

2      WITNESS:                                    PAGE NUMBER

3            GREGORY LEE DEE, JR.

4
       Direct Examination
5      By Ms. Oscarsson --------------5

6      Cross-Examination
       By Mr. Medlock-----------------71
7
       Redirect Examination
8      By Ms. Oscarsson--------------85

9

       EXHIBITS
10     Exhibit 1 (Facebook page)----------89

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          VIDEOGRAPHER:  Today is May 21,

2     2020.  This is the videotape deposition of

3     Gregory Dees, Jr. in the case of Baker, et al

4     versus Coburn, et al.  Counsel, would you

5     please state your appearances for the record.

6          MR. MEDLOCK:  Scott Medlock for the

7     plaintiffs.

8          MR. YOAKUM:  Brian Yoakum for the

9     plaintiffs.

10          MS. OCSARSSON:  Blair Oscarsson for

11     the City of Stratford and for police officers

12     Richard Coburn and Michael McHugh.

13          MR. ELLIOTT:  Robert Elliott, city

14     attorney for the City of Stratford observing.

15          VIDEOGRAPHER:  The time is 10:26

16     and we are now on the record.  Court reporter,

17     please swear the witness.

18          GREGORY LEE DEES, JR.

19     having been first duly sworn, was examined and

20     testified as follows:

21          DIRECT EXAMINATION

22     BY MS. OSCARSSON:

23     Q.   Good morning, Mr. Dees.  Like I said a

24     second ago, my name is Blair Oscarsson and I

1    it makes no sense.  Don't feel like it's you.

2    Tell me I don't understand what you're asking

3    me, and I will try to rephrase and make -- ask

4    a question in a way that you can understand.

5    Fair enough?

6    A.    That's fair enough.

7    Q.    Okay.  If you answer something that you

8    didn't understand, I'm not going to know you

9    didn't understand.  I'm going to move on and

10   we're going to be stuck with whatever you

11   said.  So that's not what we want, okay?

12   A.    Okay.

13   Q.    All right.  Can you please tell us your

14   full legal name?

15   A.    Gregory Lee Dees.

16   Q.    Are you junior or a second or anything

17   like that?

18   A.    Junior.

19   Q.    Is that legally part of your name Gregory

20   Lee Dees, Jr.?

21   A.    Yes, ma'am.

22   Q.    Do you ever go by the last name or first

23   name Walker?

24   A.    Yes, ma'am.

1    Q.    Okay.  What is that?  What is the

2    significance of that?

3    A.    A Facebook name.

4    Q.    Okay.  Is Walker someone in your family?

5    A.    Ma'am?

6    Q.    Is Walker a person in your family, or did

7    you just pick that out of thin air?

8    A.    No. It's a street name.

9    Q.    Okay.  What does that mean?

10    A.    You know, just the name of the street in

11    the area.

12    Q.    Oh, okay.  Is that like the area of town

13    where you live?

14    A.    Yes.  No, it's like where I'm -- like

15    family is from.

16    Q.    Okay.  Is that where you grew up?

17    A.    Yes, ma'am.

18    Q.    Okay.  What's your date of birth?

19    A.    7/27/1993.

20    Q.    Okay.  So along with Walker, do you have

21    any names that you use on the street or with

22    people, other people?

23    A.    No. No, ma'am.

24    Q.    Okay.  How long have you lived in

1   Memphis?   Well, first off, do you live in

2   Memphis?

3   A.   Yes, ma'am.

4   Q.   Okay.   How long have you lived there?

5   A.   All my life.   26 years.

6   Q.   Okay.   Born and raised?

7   A.   Yes, ma'am.

8   Q.   What is your address?   Where do you

9   reside?

10   A.   927 Spring Dale Run.

11   Q.   Spring Deer D-E-E-R?

12   A.   Dale D-A-L-E.

13   Q.   Spring Dale Drive; is that right?

14   A.   Run.   Spring Dale Run Drive.

15   Q.   Okay.   Is that Memphis?

16   A.   Yes, ma'am.

17   Q.   What's your zip code?

18   A.   38108.

19   Q.   Okay.   Who lives at that house with you?

20   A.   Me and my girl, my girlfriend.

21   Q.   Okay.   What's her name?

22   A.   Omeschia Ford.

23   Q.   Can you spell her name, please?

24   A.   O-M-E-S-C-H-I-A, F-O-R-D.

1   A.    No, ma'am.

2   Q.    Is your girlfriend employed?

3   A.    No, ma'am.

4   Q.    Have you ever been involved in a lawsuit?

5   A.    No, ma'am.

6   Q.    Okay.  Let's talk about February 2018.  I

7   want to talk about the timeline as far as when

8   you left and arrived and the different dates.

9   So tell me first off, did you travel to

10   California in February 2018?

11   A.    Yes, ma'am.

12   Q.    Did you leave from Memphis?

13   A.    Yes, ma'am.

14   Q.    What day did you leave Memphis?

15   A.    I want to say like three days before,

16   like the 25th or the 24th.

17   Q.    Okay.  My, my understanding is that the

18   incident occurred on February 21st.

19   A.    Yes.  Like I think somewhere like a week

20   ahead of the time.  I want to -- it's like a

21   week before the All Star Game.  Whichever day

22   the All Star Game was on.

23   Q.    All right.  You're cutting out a little

24   bit so let me, let me make sure that we are

1   clear.  It's my understanding the All Star
2   Game was on Sunday, the 18th; is that right?
3   A.   Okay.  So it had to have been -- I had to
4   have been made it like around about the 10th
5   or the 11th, like a couple of days before.
6   Q.   Okay.  Well, that's eight days before.
7   A.   I just can't remember.  I know I made it
8   to California right before the All Star Game
9   took place.
10  Q.   Okay, but you don't remember the day of
11  the week that you traveled?
12  A.   I don't remember, ma'am.
13  Q.   Okay.  Did you go by airplane or car or
14  bus?  How did you get there?
15  A.   Airplane.
16  Q.   Do you remember what airline you flew?
17  A.   I think Delta.
18  Q.   Okay.  Did y'all fly direct from Memphis
19  to LA, or did you stop off and switch planes?
20  A.   No, we flew directly -- we flew directly
21  to Chicago.
22  Q.   Okay.
23  A.   We flew to Chicago and then from Chicago
24  we went to Burbank, to be exact.

1   Q.   All right.  Now did y'all go for the

2   whole All Star weekend or just for the game on

3   Sunday?

4   A.   The whole weekend.

5   Q.   Were y'all able to get tickets for any of

6   it?

7   A.   Yeah.

8   Q.   Which part did you attend?

9   A.   We just attend the out -- we didn't get

10  tickets to the game.  We got tickets into like

11  the, you know, the walk around like the, like

12  the scene.  Like back stage.  Like I want to

13  say back stage, but like inside the Staple

14  Center like you were allowed to walk around.

15  We got those type of seats.

16  Q.   Okay.  But y'all didn't go in and see the

17  actual game?

18  A.   No, ma'am.  We were watching the game.

19  Q.   Sorry.  You cut out again.

20  A.   I said we were watching the game.

21  Q.   On TV though?

22  A.   Yeah.  Yes, ma'am.

23  Q.   Did you see any famous people walking

24  around?

1    18th, and then the next day Monday, the 19th

2    is President's Day.  What did y'all do that

3    day?

4    A.    I think we decided to -- I want to say,

5    to get something to eat and check into another

6    hotel room.  That day I think we decided to

7    leave, or something like that.

8    Q.    Did y'all have a round trip ticket on the

9    airplane whenever y'all left?

10   A.    No, ma'am.

11   Q.    Y'all just had a one way ticket?

12   A.    One way ticket.

13   Q.    What was your plan to come back?  How

14   were y'all going to get back?

15   A.    With our money.  With the money we had.

16   Q.    How were y'all -- what route, and I mean,

17   what method were you going to travel?

18   A.    Can you say that one more time?

19   Q.    Yes, sir.  Were you planning on traveling

20   by air or by car, or how were y'all --

21   A.    Air.

22   Q.    -- going to get from California back to

23   Tennessee?

24   A.    Air.

```
 1    Q.    By air?

 2    A.    Yes, ma'am, by plane.

 3    Q.    And so did y'all go to the airport and

 4    try to buy a ticket?

 5    A.    No, ma'am.  We looked on-line before we

 6    went to the airport.

 7    Q.    Okay.  And did you buy a ticket?

 8    A.    No, ma'am.

 9    Q.    Why not?

10    A.    Because it was a certain ticket was way

11    too high at the moment, and it was days later

12    that it was going to go down.

13    Q.    So Monday y'all have to check -- and you

14    check into another hotel, and not the Magic

15    Carpet, but Monday night you stayed somewhere?

16    A.    No.  We didn't ever try to get -- we

17    didn't never try -- our mind was thinking, and

18    we thought about getting another hotel, but at

19    the same time we thought about leaving.  And

20    once we thought about leaving, the tickets

21    were too high.

22    Q.    Okay.  Did y'all check out bus tickets?

23    A.    Did we get bus tickets?

24    Q.    Did you look into getting a bus ticket?
```

1    A.    No, ma'am.

2    Q.    All right.  So what are y'all thinking on

3    Monday about how you're going to get back

4    home?

5    A.    We were thinking about the airplane until

6    it costed too much, and we were just going to

7    stay out there for a few more days until the

8    plane ticket go down.

9    Q.    Okay.  Did y'all look at renting a car?

10   A.    Did we look at renting?

11   Q.    Renting a car?

12   A.    No, ma'am.

13   Q.    All right.  So y'all stay another --

14   y'all stay Monday and then Tuesday, February

15   20th what happened?

16   A.    I think we were on the road or leaving.

17   I think we left.

18   Q.    Well, y'all stole a car from a Walgreens

19   at about 5:30 California time, right?

20   A.    Yes, ma'am.  Could you tell me what day

21   that was on?

22   Q.    That was Tuesday, February 20th is what I

23   understand.  Does that sound right to you?

24   A.    Yes, ma'am.  So that's the day -- that

```
 1    what.   No, an Uber car.   We decided to go to
 2    Walgreens to get a Uber car.
 3    Q.   Okay.   And so how did y'all end up
 4    stealing that car?
 5    A.   We were in front of the Walgreens, and I
 6    think Darion is like the car's running and I'm
 7    fixing -- I'm fixing to get in it.   You know,
 8    I ain't got no other choice but to get in.
 9    Well, you know, he didn't make me get in, but
10    he is like the car is running, I'm fixing to
11    hop in.   And I was like cool, I'm fixing to
12    hop in with ya.   He was like go get the bags.
13    So I went and got the bags.
14    Q.   All right.   I'm going to ask you to slow
15    down just a little because I didn't understand
16    that.   So tell me what Darion said when y'all
17    saw the car that y'all ended up stealing?
18    What did Darion say?
19    A.   I'm fixing to get in the car.   Go get the
20    bags.
21    Q.   Where were the bags?
22    A.   Sitting beside a wall.
23    Q.   Okay.   Like y'all's suitcases?
24    A.   We didn't just have too much extra
```

1    luggage.  We pretty much like type of shop

2    when we land type of people.  Like we just

3    don't tote a lot of luggage, so like backpacks

4    basically.

5    Q.    All right.  So y'all got the backpacks in

6    your bag, and you put them in the car?

7    A.    Yes, I did, ma'am.

8    Q.    Okay.  And then did you get in the car

9    too?

10   A.    Yes, I did.

11   Q.    All right.  Who was driving?

12   A.    Say that one more time?

13   Q.    Who was driving when y'all were at

14   Walgreens?

15   A.    Oh, Darion.  Darion.

16   Q.    All right.  So what were y'all saying to

17   each other as you got into this car that y'all

18   were stealing?

19   A.    Put the direction on for Memphis.  Put

20   the GPS --

21   Q.    I'm sorry?

22   A.    Put, put the GPS map, you know, on my

23   cell phone.  It' a location map like for

24   directions.  Put the GPS map on for Memphis,

1   Tennessee.

2   Q.   All right.   So did you do that or did

3   Darion?

4   A.   I did.

5   Q.   All right.   So where did y'all head at

6   that point?

7   A.   To Memphis.   Like we thought towards

8   Memphis, the direction.

9   Q.   Okay.   So that night, the night of

10  Tuesday, the 20th did y'all stop to spend the

11  night somewhere?

12  A.   Yes, ma'am.   We slept in a store parking

13  lot and got a little rest.

14  Q.   I'm sorry.   Where?

15  A.   We slept in a parking lot in front of a

16  store like a 24 hour like, you know,

17  convenience and kind of rested up there.

18  Q.   Do you remember which city y'all were in?

19  A.   No, ma'am.   A little bit outside of LA.

20  I mean, a little bit outside of California.

21  Q.   Okay.   So like in Arizona?

22  A.   Before you get to Arizona.

23  Q.   Okay.

24  A.   I want to say.

 1    like once you get ready to go back on the map

 2    and like get fresh data, and like I logged

 3    into the WiFi from the store that we were in.

 4    And I put the fastest route to Memphis and it

 5    brung -- and it brung us up towards Stratford.

 6    It didn't take us back to the I-40.  It brung

 7    us back, you know, another way.

 8    Q.    Okay.  All right.  So y'all pull into

 9    Stratford.  About what time of day was that?

10    A.    I want to say later that day about 7:00.

11    Q.    Okay.

12    A.    7:00 or 8:00 or 9:00 somewhere.

13    Q.    Okay.  It was getting dark; is that fair

14    to say?

15    A.    Yes, ma'am.  Yes, ma'am.  It was getting

16    dark.

17    Q.    Not, not pitch black out, but the sun is

18    starting to go down?

19    A.    Yeah.  Yeah.

20    Q.    All right.  And I guess did y'all need

21    gas?

22    A.    Yes, we did.

23    Q.    Okay.  So tell me what, what y'all did

24    when y'all recognized you needed gas and

1    about we need to get gas, is that what you

2    said?

3    A.    Yes, ma'am, we did.

4    Q.    Okay.  So y'all pull into the Pilot

5    Station there in Stratford, correct?

6    A.    Yes, we did.

7    Q.    And y'all park your car at the gas pump,

8    correct?

9    A.    Correct.

10   Q.    And the way that station is the gas pumps

11   are out a little bit and then there is other

12   parking, and there is the store; is that fair?

13   A.    Uh-huh.

14   Q.    If you can answer with a yes or no,

15   please.

16   A.    Yes, ma'am.  That's fair.

17   Q.    Thank you.  Thanks.  Okay.  So then did

18   you and Darion both go into that store, the

19   Pilot store?

20   A.    Yes, we did.

21   Q.    Okay.  Did y'all have any conversations

22   with any other people in the Pilot store?

23   A.    Yes, we did, ma'am.  I had a conversation

24   with the man who I was looking for directions

1    I-40?

2    A.    No.

3    Q.    Do you remember what they said?

4    A.    Not necessarily, ma'am.

5    Q.    Okay.  All right.  So then y'all leave

6    the store; is that right?

7    A.    Ma'am?

8    Q.    You and Darion leave the store, correct?

9    A.    Yes, we did.

10    Q.    Did y'all leave together, or one of you

11    leave first?

12    A.    We left out together.

13    Q.    Did y'all buy anything in the store

14    inside?

15    A.    Yes, ma'am, gas and a drink.  Something

16    to drink, some candy or something.

17    Q.    Okay.  Okay.  And then tell me what

18    happened when you were leaving the store?

19    A.    As we were leaving the store, the officer

20    left out with us.

21    Q.    Okay.  Did the officer open the door for

22    y'all when y'all walked out?

23    A.    Yes, he did.

24    Q.    Okay.  And then where did you walk?

1   A.   To the gas pump.

2   Q.   Where did Darion walk?

3   A.   Inside the car.

4   Q.   Were you and Darion talking to each other

5   at the time?

6   A.   No, we were not.

7   Q.   Were y'all exchanging looks or anything

8   about there is a cop and we are in a stolen

9   car?

10   A.   Not at that time because the windows are

11   tinted.  We did, but not just yet.

12   Q.   Okay.  Tell me about the tinted windows?

13   How dark were they?

14   A.   Probably I want to say about 5 percent.

15   Q.   For people to look -- for people outside

16   the car looking in the back seat could you see

17   in?

18   A.   No, ma'am.

19   Q.   If people are looking in from the front

20   seat, could you see in?

21   A.   I don't know.  I don't know, ma'am.  I

22   can't answer that question because I never

23   like looked in from the front into the inside,

24   so no.

```
 1   Q.   Okay.  All right.  So then do you get the
 2   gas pump and start putting gas in the car?
 3   A.   I didn't get a chance to put the gas in
 4   the car.  By the time I touched the gas pump,
 5   they came behind us.  Well, getting ready to
 6   come behind.
 7   Q.   Okay.  And when you say they came behind,
 8   they were in their patrol car, correct?
 9   A.   Yes, they were.  They didn't walk up to
10   the car.
11   Q.   I'm sorry.  You cut out.
12   A.   I said yes, ma'am.
13   Q.   All right.  They were in their patrol car
14   and they pulled up right behind that Infinity,
15   correct?
16   A.   Correct.
17   Q.   Okay.  Now, you are saying you did not
18   have time to start putting gas in the car,
19   what did you do?
20   A.   Get in the car.  Put the pump -- well,
21   left the pump out, I guess, and got in the
22   car.
23   Q.   What were you and Darion saying to each
24   other at that time?
```

```
 1    California, right?
 2    A.    Right.
 3    Q.    So when you're hopping in the car, Darion
 4    is already in the car, correct?
 5    A.    No.  Yes, ma'am.
 6    Q.    What were y'all saying to each other?
 7    A.    The police are behind us.
 8    Q.    When you -- were you completely in the
 9    car before Darion put the car in gear?
10    A.    Yes, I was in the car.
11    Q.    Well, I guess my question -- that was a
12    bad question.  Did it all kind of happen at
13    once that he put the car in drive as you were
14    jumping in?
15              MR. MEDLOCK:  Object to the form.
16              THE WITNESS:  No, I don't think so.
17    Q.    (BY MS. OSCARSSON:)  Tell me what you
18    remember about the order of those things?
19    A.    When we got in the car?
20    Q.    Yes, sir.
21    A.    I don't remember.  I don't remember.
22              MR. MEDLOCK:  Object to the form.
23              THE WITNESS:  I don't remember too
24    much about when we got in the car, but besides
```

1    the police behind us, and that was it like.

2    We didn't talk the whole step like.  We didn't

3    talk the whole -- we didn't say too much like

4    to each other the whole step because we are

5    busy watching the police are behind us.  Like

6    we can't talk to each other and watch the

7    police at the same time.

8    Q.    (BY MS. OSCARSSON:)  It was really fast,

9    right?

10    A.    Right.

11    Q.    You agree with me Darion did put the car

12    in drive, correct?

13    A.    Yeah.  Once I got in, I think. Once I got

14    in.

15    Q.    Okay.  And then where -- once you got in

16    the car, where did you put your body?

17    A.    In the -- like in the seat.  In the seat.

18    In the car in the seat.

19    Q.    Did you try to get down in the

20    floorboard?

21    A.    No. It is way too early.

22    Q.    Okay.  All right.  Then I'll back up a

23    little.  So when you get in the car, where are

24    the police officers?

```
 1   A.   Behind like -- by the time I got in the
 2   car they were running up on the car.   They are
 3   side by side one on each door.
 4   Q.   Okay.   One comes around on your side and
 5   one comes around on Darion's side, right?
 6   A.   Right.
 7   Q.   What are they saying?   The officers?
 8   A.   Let me see your hands, and one of them is
 9   saying roll the window down, but they never
10   said nothing about getting out.   Get out or
11   nothing like that.
12   Q.   Let me see your hands.   Let me see your
13   hands, right?
14   A.   Yes.   Yes.
15   Q.   Okay.   And what were you doing at that
16   time?
17   A.   Letting them see my hands.
18   Q.   Okay.   And Darion was putting the car in
19   drive, correct?
20   A.   No.
21   Q.   Okay.   Is it your testimony that Darion
22   raised his hands up?
23   A.   Yes, he did.
24        MR. MEDLOCK:   Object to the form.
```

```
 1              THE WITNESS:  Of course, he did.
 2    Q.   (BY MS. OSCARSSON:)  Okay.  At what point
 3    did Darion put the car in drive?
 4    A.    Once, once he showed them their hands, I
 5    guess.
 6    Q.   And you agree with me to put the car in
 7    drive, you've got to put your hand back down,
 8    at least this one, right?
 9    A.   He didn't put his hand back down because
10    the steering wheel is right here (indicating),
11    so his hands never dropped.  They level.  They
12    are level.
13    Q.   Where was -- where was the gear shift in
14    that Infinity?
15    A.   I can't hear you, ma'am.  Say that one
16    more time, please.
17    Q.   Where was the gear shift in that
18    Infinity?
19    A.   Where was the gear shift?
20    Q.   Yes, sir.
21    A.   I don't remember.  In the console like
22    the middle of the car.
23    Q.   Okay.  So you would agree with me that if
24    your hands are up and you're going to put the
```

```
 1              THE WITNESS:  No, he was not in the
 2   front of the car.
 3   Q.   (BY MS. OSCARSSON:)  At what point did
 4   that officer get in front of the car?
 5   A.   He never got in the front.  The officer
 6   on Darion's side got in the front.
 7   Q.   Okay.  The office on your side, did he
 8   stay by your window, or did he then kind of,
 9   as the car moved on he --
10   A.   He moved on with it.
11              THE COURT REPORTER:  Wait.  Wait.
12              THE WITNESS:  Yes, ma'am.
13   Q.   (BY MS. OSCARSSON:)  The officer on
14   Darion's side, it's your testimony he was in
15   front of the car?
16   A.   No.  Yeah, the officer on Darion's side
17   was in front of the car.  The officer on my
18   side kind of spreaded out with him, with the
19   car.
20   Q.   All right.  And the car is in drive going
21   forward, correct?
22   A.   At the moment.  It didn't go -- it didn't
23   completely go forward.  It made a quick left.
24   Q.   That's right.  It went forward for a
```

1    little bit and then it veered to the left --

2    A.    No, it made an immediate.  No, it made an

3    immediately left.  He made it like he turned

4    the wheel.  He bent the wheel.  He bent the

5    wheel.  Then went left --

6    Q.    Then he put the car -- that was my fault.

7    I interrupted you that time.  Go ahead.

8    A.    He bend the wheel and then go left.

9    Q.    Okay.  So he put the car in drive, goes

10   forward and bends left, correct?

11   A.    No. No. I don't know nothing about put

12   the car in drive thing.  He bent the wheel.  I

13   want to say he bent the wheel and then put the

14   car in drive.  That is what I want to say

15   because -- that is what I want to say, ma'am.

16   That's what I am saying.  He bent the wheel

17   and then put the car in drive.  He didn't put

18   the car in drive automatic because we don't

19   know where we're driving to.

20   Q.    Okay.  And at the time the car -- when he

21   put the car in drive, the officer on his side

22   is in front of the car, correct?

23   A.    You are saying when he do put the car in

24   drive?

1   (indicating).  Drive out.  Leave.

2   Q.   Get out of there -- get out of there

3   quickly?

4   A.   Yes, ma'am.

5   Q.   Okay.  Now, you said in some of those

6   recordings that you were trying to ball up in

7   the floor.  Did I understand you right?

8   A.   Yes, ma'am.  Once, once a lot of shots

9   took place.

10   Q.   Did Darion lean down or try to ball up

11   and get down?

12   A.   No, ma'am, because he was busy steering

13   the wheel at the moment.  He didn't get a

14   chance to ball down.

15   Q.   Okay.  So the incident's over and it's

16   quick.  It's a few seconds, right?

17   A.   Right.

18   Q.   And then tell me what happened?

19   A.   After like what?  What happened when?

20   Q.   Well, after the shots stopped.

21   A.   We ended up driving towards the gas pump.

22   We ran into a gas pump which stopped the car.

23   Q.   And at that point the car was just

24   rolling, and it wasn't accelerating, right?

```
 1   A.    Yes, ma'am, and it was still shots being
 2   taking place, and when the car stopped, that
 3   is when the shots stopped.
 4   Q.    Now, it's my understanding that the car
 5   rolls from that gas station all the way across
 6   the street to another gas station; is that
 7   right?
 8   A.    That's correct.
 9   Q.    All right.  So once the car stopped, what
10   happens next?
11   A.    They ran to the car, but they didn't run
12   all the way up on the car.  They stayed a far
13   distance back, and they were still talking
14   like don't move.  And I raise my hand up like
15   (indicating) like, sir, please don't kill me.
16   Please don't kill me, sir.
17   Q.    And when you say they, you mean the
18   officers?
19   A.    Ma'am?
20   Q.    When you say they, you mean the officers?
21   A.    Yes, ma'am.
22   Q.    And at this time what was Darion doing?
23   A.    I think unconscious or something at the
24   time.  He was slumped over, I guess like in
```

1   his seat like.  He wasn't doing nothing.  He

2   was bleeding.

3   Q.    Was he making any sounds?

4   A.     Yeah.  He said I'm shot; I'm shot.  They

5   shot me, G, like he made that sound once

6   before we got to the pump.  He didn't make no

7   sounds once we got to the pump because I

8   believe he was already gone, from my

9   knowledge.  But when the car lost control,

10   that's when he made the sound.  He said ahh,

11   G, they shot me.  Like he was burning.  Like

12   he's moving like he was burning.

13   Q.    All right.  And so then they get you out

14   of the car and handcuff you, correct?

15   A.    They dragged me out of the car and then

16   handcuffed me, correct.

17   Q.    Okay.  And could you see what was going

18   on with Darion at that point?

19   A.    Of course, not.  When I say out of the

20   car, I meant dragged me from the car.

21   Q.    Okay.

22   A.    And after that, they came and got their

23   dogs.  They let their dogs, you know, they let

24   their dogs check on me instead of like --

1    safety, that was incorrect?

2    A.   I can't answer that, ma'am, because I

3    don't -- I don't understand that question,

4    period.

5    Q.   Okay.  The reporter said on that news

6    story that they were going to blur out your

7    face because you were afraid for your safety.

8    And so my question is did the reporter get it

9    wrong that you were not afraid for your

10   safety?

11   A.   They had to because I never tell them

12   nothing about -- I didn't ever tell them

13   nothing about I was afraid.  I'm not an afraid

14   person, so that is kind of hard to believe,

15   ma'am.

16   Q.   Well, do you want to watch the news

17   story?  Would that refresh your recollection?

18   A.   No, I don't need to watch it.

19   Q.   All right.  Backing up a little.  When

20   did you meet Darion?

21   A.   Childhood days.

22   Q.   Did y'all go to school together?

23   A.   No, the same community, the neighborhood.

24   Q.   Okay.  Y'all grew up in the same

1   neighborhood?

2   A.   Yes, we did.

3   Q.   What neighborhood?

4   A.   Walker.

5   Q.   Which is where you get your Facebook

6   name?

7   A.   Uh-huh.

8   Q.   Okay.  So do y'all know each other's

9   family?

10   A.   Kind of a lot.  Yes, ma'am.  The

11   majority, and I wouldn't say the full family,

12   but we know enough family members.

13   Q.   What kind of things did you and Darion do

14   together?

15   A.   Played basketball.

16   Q.   What else?

17   A.   Go to parties.  We travel out of town.

18   Q.   Other than this trip to California, where

19   had y'all been?

20   A.   Memphis.

21   Q.   So had y'all not traveled out of town

22   before together?

23   A.   No, ma'am.

24   Q.   And I may have already asked you this,

1    A.    Once they ran to the car.

2    Q.    Okay.  Like as soon as they get outside

3    on both sides of the car, you have got your

4    hands up; is that right?

5    A.    Uh-huh.

6    Q.    Is that a yes?

7    A.    Yes, sir.

8    Q.    Okay.  Thank you, sir.  Now, what did

9    Darion do?  Darion Baker do when the officers

10   were on each side of the car?

11   A.    Looked at him and that was it at the

12   time.  He looked at them, and the look, I

13   guess the look he gave them he turned the

14   wheel.  As he looked at them, he turned the

15   wheel.

16   Q.    Okay.  And when he turned -- did he turn

17   the wheel before putting the car in drive or

18   after putting the car in drive?

19   A.    I think after.

20   Q.    I'm sorry, did he turn -- did he turn the

21   wheel before or after?

22   A.    Before.  Before.  He already had --

23   before.

24              MS. OCSARSSON:  Objection.

1    Q.    (BY MR. MEDLOCK:)  He turned the wheel
2    before putting the car in drive; is that
3    correct?
4    A.    Yeah.  Yes, sir.
5    Q.    Okay.  When did the car -- when the car
6    started moving, did it ever go straight
7    forward?
8    A.    Say that again, sir.
9    Q.    When the car started moving, did it ever
10   go straight forward?
11   A.    No, sir.
12   Q.    When the car -- what direction did the
13   car end up when it started?
14   A.    It goes left.  It merged left, a quick
15   left.  It automatically go left.  Automatic.
16   Q.    When did the officers start shooting, do
17   you remember?
18   A.    Once the car went left. Once they noted
19   it got away from them, and that is when they
20   started shooting once the car -- once they
21   noticed the car got away.
22   Q.    So the officers started shooting before
23   the car started moving or after the car
24   started moving?

```
 1    A.    When the car started moving.

 2              THE COURT REPORTER:  When?

 3              THE WITNESS:  It started -- they

 4    started shooting like after the car started

 5    moving.

 6    Q.    (BY MR. MEDLOCK:)  And (inaudible)

 7    A.    They didn't walk up shooting, no.  They

 8    didn't spread out shooting, but once the car

 9    moved, they shot.

10    Q.    Okay.  Was the officer on Darion's side

11    of the, on the driver's side of the car, was

12    he still on the driver's side when the car

13    started moving to the left?

14    A.    Say that one more time.

15    Q.    Yeah.  The officer on the driver's side

16    of the car, was he still on the driver's side

17    when the car started moving?

18    A.    No.  No, sir.  He got out of the way.

19    Q.    When did he move off the driver's side?

20    A.    He moved off the driver's side before the

21    car made a left.

22    Q.    Okay.  So where was he standing when the

23    car started moving?

24    A.    Like away from the car like on my side.
```

```
 1    Like behind the car a little bit.
 2    Q.    I'm sorry, and where would the officer
 3    who was on Darion's side, the driver's side,
 4    where was he when the car started moving?
 5    A.    He was in -- he moved from the front.  He
 6    moved from the side of the car into the front.
 7    Q.    Okay.  So the officer who was on the
 8    driver's side where Darion Baker was, had
 9    moved to the front of the car before the
10    car --
11    A.    Yeah.
12    Q.    -- before the car started moving; is that
13    correct?
14    A.    That's correct.
15    Q.    Now, after the -- as the car is pulling
16    away, do you remember Darion Baker saying
17    anything?
18    A.    Uh-huh.  Oh, G, I'm shot.  They shot me,
19    G.
20    Q.    Had the car -- was the car already moving
21    to the left when he said that?
22    A.    Yes, sir.
23    Q.    Okay.  Had the car already kind of
24    completed turning to the left when --
```

1    A.    Complete --

2    Q.    -- when you heard Darion Baker said ahh,

3    I'm shot?

4    A.    Yes, sir.

5    Q.    Right before Darion said ahh, I shot,

6    what was he doing?

7    A.    Driving.  Trying to drive off.

8    Q.    Okay.  And what position was his body in?

9    A.    What you mean like position like?  Like

10   standing straight up wise?

11   Q.    Yeah.  Was he sitting straight up?

12   A.    Yes, sir, like that.

13   Q.    Was he hunched over?

14   A.    Like that, sitting straight up driving.

15   Q.    Now as the car was driving away from the

16   officers, did they continue shooting?

17   A.    Yes, sir.

18   Q.    Now after Darion Baker put the car in

19   drive, did he ever reach down again?

20   A.    No, sir, he never reached down.

21   Q.    Now, after Darion Baker was shot, do you

22   believe that he was in pain?

23   A.    Yes, of course.

24              MS. OCSARSSON:  Object to the form.

```
 1    Q.    (BY MR. MEDLOCK:)   Describe why you think
 2    that Darion Baker was in pain?
 3    A.    Because he was moving like he was -- he
 4    moved.   He jumped or something like that, and
 5    he told me he got shot.
 6    Q.    Did he make any noise after he was shot
 7    other than --
 8    A.    Yeah.
 9    Q.    -- other than the --
10    A.    Ahh.
11    Q.    And did it seem like he was in pain to
12    you?
13    A.    Of course.
14              MS. OCSARSSON:   Object to the form.
15              THE WITNESS:   Of course, he seemed
16    like he was in pain.   He lost control of the
17    wheel.
18    Q.    (BY MR. MEDLOCK:)   And when did he --
19    what do you mean by he lost control of the
20    wheel?
21    A.    Like he wasn't driving no more.   His
22    hands left the wheel like removed from the
23    wheel.
24    Q.    And did the car start to slow down then
```

1   at that point?

2   A.    Yes, sir.   It wasn't going in the same

3   motion.   Once he lost control of the wheel, it

4   kind of slowed down a little bit.

5   Q.    Okay.   Was it kind of like the car was

6   still in drive, but his foot was off the gas?

7   A.    No.   The care -- yes, yes, yes, sir.

8   Just like that.

9   Q.    Okay.   It's moving forward, but it's not

10  moving fast and it's like the car is in drive?

11  A.    Yeah.   You got it.

12  Q.    Okay.   And then what happened after that?

13  A.    We hit the pump.   We hit the gas pump.

14  Q.    Okay.   The car rolls kind of across the

15  street and hits the gas pump?

16  A.    Yes, sir.

17  Q.    And after the car stopped moving fast and

18  it was kind of like it was moving in drive,

19  were the police still shooting at the car?

20  A.    Yes, sir.

21  Q.    All right.   Thank you very much for your

22  time, Mr. Dees.   Ms. Oscarsson might have some

23  more questions.   I'm sorry.   Hold on and

24  before I pass the witness there was one other

```
 1              AMENDMENT SHEET.
         I, the undersigned,_____,
 2   do hereby certify that I have read the
     foregoing
 3   deposition and that, to the best of my
     knowledge,
 4   said deposition is true and accurate with the
     exception of the following corrections listed
 5   below:
     PAGE  / LINE /
 6          /       /
            /       /
 7          /       /
            /       /
 8          /       /
            /       /
 9          /       /
            /       /
10          /       /
            /       /
11          /       /
            /       /
12          /       /
            /       /
13          /       /
            /       /
14          /       /
            /       /
15          /       /
            /       /
16          /       /
            /       /
17          /       /
            /       /
18          /       /
            /       /
19          /       /
            /       /
20
     _____  _____
21   DATE                     SIGNATURE OF WITNESS
     Sworn to and Subscribed before me,
22   this _____ day of _____,_____

23   _____
     Notary Public
24   My Commission expires:_____
```

91

```
 1        COURT REPORTER'S CERTIFICATE

 2   STATE OF TENNESSEE:

 3   COUNTY OF SHELBY:

 4        I, MADELYN GRAY, Reporter and Notary

 5   Public, Shelby County, Tennessee, CERTIFY:

 6        1.   The foregoing deposition was taken

 7   before me at the time and place stated in the

 8   foregoing styled cause with the appearances as

 9   noted;

10        2.   Being a Court Reporter, I then reported

11   the deposition in Stenotype to the best of my

12   skill and ability, and the foregoing pages

13   contain a full, true and correct transcript of

14   my said Stenotype notes then and there taken;

15        3.   I am not in the employ of and am not

16   related to any of the parties or their

17   counsel, and I have no interest in the matter

18   involved.

19        WITNESS MY SIGNATURE, this, the 4th day of

20   _____, 2020.

21

22   _____
     MADELYN GRAY, Court Reporter,
23   Notary Public for the State of
     Tennessee at Large * * *
24
     My Commission Expires:  September 2023
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | Civil Action No. 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| Defendants | § § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 7
# Autopsy of D. Baker

171

# South Plains Forensic Pathology, P.A.
## Luisa Florez, M.D.
P.O. Box 64813
Lubbock, Texas 79464
(806) 790-9611

NAME: Darion Baker

D.O.B: 11-2-1994

AGE:  23 years

SEX:  Male

RACE: Black

AUTOPSY NO:  18- 132

D.O.D. (FOUND):  2-21-2018

COUNTY:  Sherman

DATE OF EXAM: 2-22-2018

TIME OF EXAM:  0933 hrs

**Authorization for Autopsy:** Judge Brenda Acker, Justice of the Peace, Sherman County, Texas.

**In attendance:** Texas Ranger Dominic Zuniga.

FINDINGS:   I.  Gunshot wounds of back (2):

    A. Penetrating gunshot wound of upper left back:

        1.  Entrance: Upper left back.

        2.  Pathway: Skin and subcutaneous soft tissue.

        3.  Recovery: Markedly deformed jacketed deformed lead bullet; medial to the left humeral head.

        4.  Direction: Back to front and right to left.

    B. Perforating gunshot wound of right midback.

        1.  Entrance: Right mid back.

        2.  Pathway: Skin, subcutaneous soft tissue, 9th and 10th posterior left ribs, left lung and left lateral 5th rib.

        3.  Exit: Lateral left chest.

        4.  Direction: Back to front, right to left and upward.

        5.  Associated injuries: Left hemothorax (800 cc).

*D00779*

NAME:   Baker, Darion

## OPINION

CAUSE OF DEATH:   Blood Loss.

DUE TO:   Perforation of Left Lung.

DUE TO:   Gunshot Wounds of Back (2).

SPECIAL STUDIES:   Toxicology and radiology.

_____   DATE _____
Luisa Florez, M.D.

*D00780*   173

NAME:  Baker, Darion

## EXTERNAL EXAMINATION

Received is the symmetrically developed, thin and hydrated body of an adult black male. Identification information is on the body bag. The height is 68 inches. The weight is 128 pounds. The body is in full rigor with very faint pink dorsal blanching lividity which spares areas exposed to pressure. The body is slightly warm. The calvarium is symmetrically developed, with black scalp hair. There is no palpable crepitus over the bridge of the nose. The eyebrows are intact. The palpebral and bulbar conjunctivae are pale and there are no petechial hemorrhages. The irides are brown, with central, round, and symmetric pupils. The nasal bridge and septum are intact and in the approximate midline. The facial hair consists of delicate whiskers on the upper lip and chin. Dentition is natural and in good repair. The external ears are grossly unremarkable with bilateral cosmetic earlobe piercing. The external auditory canals are free of blood, debris and foreign materials.  The neck is soft and symmetric with the trachea in the approximate midline. The chest is symmetrically developed. The abdomen is soft, without palpable masses or organomegaly. The external genitalia are those of a normally developed adult circumcised male with bilaterally descended testes within the scrotum. The anus and perineal region are grossly unremarkable.

The upper and lower extremities are symmetrically developed and are without an absence of digits or fingernails. The fingernails are lengthy and dirty. The toenails are lengthy and dystrophic.

CLOTHING AND PERSONAL EFFECTS: The decedent arrives clad in cut off clothing including a black jacket, white muscle shirt, white t-shirt, purple underwear, red shorts, black sweatpants, black shoes and white socks. A gold tone earring with clear stones is on the left earlobe. Paper bags cover both hands. Defects on the clothing match the wounds.

EVIDENCE OF THERAPEUTIC INTERVENTION:  An endotracheal tube entering the mouth is subsequently identified as being properly placed. EKG pads are on bilateral anterior shoulders and bilateral abdomen. Defibrillator pads are on the anterior torso. An intraosseous catheter is on the left shin. Needle puncture marks are on the right antecubital fossa.

SCARS AND IDENTIFYING MARKS:  A pair of linear horizontal parallel scars up to 5 cm is on the left knee. Linear and irregular scars are on the right knee. A dark brown irregularly triangular scar is on the proximal left shin. A 1 cm linear horizontal scar is on the dorsal right forearm. A 2 cm linear vertical scar is on the ventral right forearm.

EVIDENCE OF INJURY:  Two gunshot wounds are identified.  The directions of the wounds are stated in reference with the standard anatomical planes.  The wounds are labeled "A" and "B" without regard to chronological sequence or severity of injury.

## GUNSHOT WOUNDS OF BACK (2):
A. **Penetrating Gunshot Wound of Upper Left Back:**

*D00781*   174

NAME:   Baker, Darion                                         AUTOPSY REPORT   18-132

1. Entrance:   A $^{3/16}$ inch irregularly oval entrance wound is on the upper left back, 10 ½ inches below the top of the head, 2 ½ inches below the top of the left shoulder, and 2 ¾ inches left of the posterior midline.  The wound has a ¼ inch marginal abrasion with the maximum width at the 4:00 o'clock position giving the wound the shape of a "D". No soot or stippling is identified.

2. Pathway:   The bullet perforates the skin, subcutaneous soft tissues and does not penetrate into the thoracic cavity.

3. Recovery:   A markedly deformed jacketed lead bullet is recovered medial to the left humeral head.

4. Direction:   The direction of the wound is back to front and right to left.

## B. Perforating Gunshot Wound of Right Mid Back:

1. Entrance: A $^{3/16}$ inch irregularly oval entrance wound on the right mid back is 17 inches below the top of the head, 9 ¼ inches below the top of the right shoulder and ¾ inch right of the posterior midline. The wound has an eccentric marginal abrasion reaching a maximum width of a ⅛ inch at the 2 o'clock position.  No soot or stippling is identified.

2. Pathway: The bullet perforates the skin, subcutaneous soft tissues, fractures the left 9th and 10th posterior ribs and perforates the left lung.  Subsequently, the bullet fractures         the         left         5th         lateral         rib         before         exiting.

3. Exit:   A ¼ inch irregularly oval exit wound on the lateral left chest is 15 ½ inches below the top of the head, 7 ¼ inches below the top of the left shoulder and 6 ¼ inches left of the anterior midline. Lacerations up to ⅛ inch give the wound a rectangular aspect.

4. Direction: The direction of the bullet is back to front, right to left and upward.

5. Associated Injuries:  Approximately 800 cc of blood is in the left chest.

*These injuries having been described will not be repeated.*

## INTERNAL EXAMINATION

The body cavities have smooth surfaces and emit no unusual odors. The organs have the normal anatomic relationships. The mediastinum and omentum are unremarkable. The spine has no osteophytic lipping. The bone marrow is normal in appearance. The thoracic and abdominal musculature is unremarkable.

Reflecting the scalp demonstrates no scalp soft tissue injuries. The underlying calvarium is unremarkable.  The 1300 gm brain has clear meninges without epidural, subdural, or subarachnoid hemorrhages. The cerebral spinal fluid is clear.  The dural sinuses are unremarkable. The cerebral hemispheres are symmetrical and edematous.  The Circle of Willis is normally formed without arteriosclerosis. The mammillary bodies are unremarkable. Sections of the cerebral hemispheres, cerebellum, pons and medulla reveal normal architecture. There is normal pigmentation of the substantia nigra. The pituitary gland is unremarkable in the sella turcica. Stripping the dura reveals no skull fractures.

*D00782*   175

AUTOPSY REPORT

NAME:   Baker, Darion

Anterior dissection of the neck reveals no airway obstruction. The tongue, hypopharynx, upper esophagus, larynx and trachea are unremarkable. The cervical spine, laryngeal cartilages and hyoid bone are intact and atraumatic. The thyroid gland is unremarkable on sectioning.

The 245 gm heart has a normal amount of epicardial fat without lesions. The coronary artery system is right dominant and patent. The left anterior descending coronary artery does not tunnel into the myocardium. The coronary ostia are normally situated below the sinotubular junction and are not constricted by arteriosclerotic plaque. Sections of the myocardium are the usual red-brown and are without evidence of old or recent infarction. Sections in the area of the atrioventricular node are unremarkable. The ventricular chambers are not dilated. The left ventricle has no hypertrophy. The mitral and aortic valves are thin and delicate and are free of vegetations. The mitral valve is not redundant. The endocardium is unremarkable. The thoracic aorta is of normal course and caliber and has no atherosclerosis. The great vessels arise normally. The pulmonary arteries and veins are unremarkable, as is the vena cava. The abdominal aorta and its major branches have no atherosclerosis or aneurysms.

The right and left lungs weigh 255 and 175 gm, respectively. The pleural surfaces are mottled purple posteriorly, with moderate anthracosis. The vasculature is unremarkable, without thromboemboli in either lung. The left lung is collapsed. The trachea and bronchi are patent. Sectioning the lungs reveals no grossly apparent emphysema, consolidation, tumors or granulomas. The hilar lymph nodes are unremarkable.

The esophageal mucosa is unremarkable, and the gastroesophageal junction remains distinct. The gastric mucosa is autolytic, with no ulcers or tumors. The stomach contains approximately 10 cc of pink-brown fluid without grossly identifiable food. The stomach contents have no alcoholic odor and contain no identifiable fragments of pills or capsules. The large and small intestines are grossly unremarkable. The appendix is intact.

The 1045 gm liver has a smooth, glistening capsule and a red-brown cut surface without grossly apparent fatty change, cirrhosis, cysts or tumors. The gallbladder has an unremarkable mucosa and contains approximately 20 cc of orange-brown bile without stones. The 30 gm spleen has a purple capsule and soft parenchyma. The lymphoid follicles are not prominent. The abdominal lymph nodes are grossly unremarkable. The pancreas has pale yellow lobulated parenchyma without autolysis or fibrosis. The adrenal glands are unremarkable on sectioning.

The right and left kidneys weigh 90 and 100 gm, respectively. The renal capsules strip with ease, revealing smooth cortical surfaces. Sections are pale without cortical thinning. The corticomedullary junctions remain distinct, and the pyramids and collecting systems are unremarkable. The ureters drain freely to the bladder, which contains approximately 10 cc of yellow urine and has an unremarkable mucosa. The prostate gland and testicles are unremarkable on sectioning.

*D00783*   176

AUTOPSY REPORT

NAME:  Baker, Darion

No acute fractures are on the spine, pelvis, or long bones of the upper and lower extremities.

**RADIOLOGY:**  X-rays of the head and torso are performed and reveal one (1) bullet.

**EVIDENCE COLLECTED:**  Fingerprints, fingernail scrapings, paper bags, blood stain card, bullet recovered and clothing.

**TOXICOLOGY:**     A urinary drug screen performed during the autopsy is positive for marijuana. Comprehensive toxicologic analysis is performed by NMS Laboratories and reported separately.

# MICROSCOPIC EXAMINATION

HEART (slide 1): No significant histopathologic abnormalities.

LIVER (slide 2): No significant histopathologic abnormalities.

LUNG (slide 2): Areas of parenchymal collapse.

KIDNEY (slide 2): Several calcium casts.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br><br>2:19-cv-77 |
| Plaintiffs | §<br>§ | |
| v. | §<br>§ | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | §<br>§<br>§<br>§<br>§ | |
| Defendants | §<br>§ | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR**
**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 8
# Department of Public Safety Firearms Laboratory Report

178

# TEXAS DEPARTMENT OF PUBLIC SAFETY





**CRIME LABORATORY**
1404 Lubbock Business Park Boulevard Suite 200
Lubbock, TX 79403
Voice 806-740-8900  Fax 806-740-8918
LubbockCrimeLab@dps.texas.gov

STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
ROBERT J. BODISCH, SR.
SKYLOR HEARN
DEPUTY DIRECTORS

COMMISSION
STEVEN P. MACH, CHAIRMAN
MANNY FLORES
A. CYNTHIA LEON
JASON K. PULLIAM
RANDY WATSON

## Laboratory Case Number: LUB-1802-00900

### Firearms/Toolmarks Laboratory Report

Issue Date:   March 23, 2018

Eustacio Galvan
Texas Ranger Division
807 W 15th St
Hereford, TX 79045

**Agency Case Information:**      **Hereford Texas Ranger Division - 2018ITRC50022056**

**Offense Information:**    Weapons Offense - 2/21/2018 - Sherman County

**Suspect(s):**      BAKER, DARION DEVON (DOB 11/02/1994)

**Submission Information:**

02 - White Box on February 23, 2018 by Galvan, Eustacio VIA In Person

**Requested Analysis:**  Perform firearms and/or toolmarks examination.

**Evidence Description, Results of Analysis and Interpretation:**

**02 : White Box**

**02-01 : Item 4a: One fired bullet (subdivided by examiner) "Projectile from vehicle"**

**02-03 : Item 1a: One Glock model 22, .40 S&W caliber semiautomatic pistol s/n: NPX381 (subdivided by examiner)**

**02-04 : Item 1b: One box magazine w/ eleven unfired .40 S&W caliber cartridges (cartridges placed in DPS container) (subdivided by examiner)**

**02-05 : Item 2a: One Glock model 22, .40 S&W caliber semiautomatic pistol s/n: NPX382 (subdivided by examiner)**

**02-06 : Item 2b: One box magazine w/ one unfired .40 S&W caliber cartridge (cartridge placed in DPS container) (subdivided by examiner)**

**02-07 : Item 3a: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-08 : Item 3b: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-09 : Item 3c: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-10 : Item 3d: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-11 : Item 3e: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-12 : Item 3f: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-13 : Item 3g: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-14 : Item 3h: One fired copper jacket fragment (subdivided by examiner)**

**02-15 : Item 3i: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-16 : Item 3j: One fired copper jacket fragment (subdivided by examiner)**

**02-17 : Item 3k: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

ACCREDITED AS AN ASCLD/LAB *International* FORENSIC SCIENCE TESTING LABORATORY UNDER ISO/IEC 17025:2005

*D00788*    179

**LUB-1802-00900**                    Firearms/Toolmarks Laboratory Report                    **March 23, 2018**

**02-18 : Item 3l: One fired copper jacket fragment (subdivided by examiner)**

**02-19 : Item 3m: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-20 : Item 3n: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-21 : Item 3o: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-22 : Item 3p: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-23 : Item 3q: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-24 : Item 3r: One fired .40 S&W caliber cartridge case (subdivided by examiner)**

**02-26 : Item 4b: One fired bullet (subdivided by examiner)**

**02-27 : Item 4c: One fired bullet (subdivided by examiner)**

**02-28 : Item 4d: One fired copper jacket fragment (subdivided by examiner)**

**02-29 : Item 4e: One fired copper jacket fragment (subdivided by examiner)**

**02-30 : Item 5a: One fired copper jacket fragment (subdivided by examiner)**

**02-31 : Item 5b: One fired lead core (subdivided by examiner)**

The submitted fired bullets (Items 4a and 4b) and copper jacket fragment (Item 5a) were identified as having been fired from the same unknown firearm.

The submitted fired bullets (Items 4a and 4b) and copper jacket fragment (Item 5a) were neither identified nor eliminated as having been fired from the same firearm as the submitted fired bullet (Item 4c), copper jacket fragments (Items 3h, 3l, 4d) and Glock semiautomatic pistols (Items 1a and 2a) due to insufficient corresponding individual characteristics.

The submitted fired bullet (Item 4c) and copper jacket fragments (Items 3h, 3j, 3l, and 4d) were neither identified nor eliminated as having been fired from the same firearm, the same firearm as the submitted fired bullets (Items 4a and 4b), copper jacket fragment (Item 5a), and Glock semiautomatic pistols (Items 1a and 2a) due to insufficient corresponding individual characteristics.

The submitted lead core (Item 5b) and copper jacket fragment (Item 4e) were not suitable for microscopic comparison purposes due to the lack of class or individual characteristics present.

The submitted fired cartridge cases (Items 3a and 3b) were fired in the submitted Glock semiautomatic pistol (Item 1a).

The submitted fired cartridge cases (Items 3c - 3r) were fired in the submitted Glock semiautomatic pistol (Item 2a).

The submitted Glock semiautomatic pistols (Items 1a and 2a) were functional with no malfunctions detected during testing.

The submitted magazines fit and functioned in their respective firearm.

**Disposition:**

The evidence will be returned.

* D00789 *   180

**This report has been electronically prepared and approved by:**

Darrell Morgan

Forensic Scientist

Texas DPS Lubbock Crime Laboratory

**This report has been issued via email to:**

Eustacio Galvan (eustacio.galvan@dps.texas.gov)

*A test report shall not be reproduced except in full, without written approval of the laboratory. This report contains conclusions, opinions, and interpretations based on and supported by data obtained from using appropriate and validated scientific methods and procedures. The laboratory's current methods and procedures are available online at http://www.txdps.state.tx.us/CrimeLaboratory/Pubs.htm.*

*In addition to this report, the lab maintains a complete case record which may be discoverable under Article 39.14 of the Texas Code of Criminal Procedure.*

Page 3 of 3



TEXAS DEPARTMENT OF PUBLIC SAFETY
CRIME LABORATORY

## Disclosure Form

LAB-QA-36-LIMS Rev.02 (06/2017) p.1 Issued by: QAC

The information included on this document is based on Texas DPS Crime Laboratory Service policy published online at www.txdps.state.tx.us/CrimeLaboratory/Pubs.htm, specifically in the Quality Manual (LOG-07-05). The information disclosed is provided in accordance with Brady, Giglio and Michael Morton law and is intended for prosecutor evaluation.

Any events requiring disclosure for the indicated employee are listed below. If there are no disclosure-required events, this will be indicated by listing "None".

| Name: Morgan, Darrell | Date: 05/11/2017 |
| --- | --- |

| Incident | Date | Quality Action Plan tracking ID as appropriate | Description of Incident | Manager Name/Date |
| --- | --- | --- | --- | --- |
| None | | | | McCord, Cathy - 5/11/2017 |

*This Disclosure Form was generated on 3/23/2018 at 4:25:02PM.*

TEXAS DEPARTMENT OF PUBLIC SAFETY
CRIME LABORATORY

LUB-1802-00900
Page 1 of 2

TxDPS 07.10.17

## Statement of Qualifications

LAB-QA-35-LIMS Rev.01 (06/2017) p.2 Issued by: QAC

| **Name:** Morgan, Darrell | **Date:** 02/14/2018 |
|---|---|

**Laboratory:** Lubbock

**Job Title:** Forensic Scientist

**Forensic Testing Categories:**                                    ☐ **N/A (non-testing activities)**

List all disciplines and category(ies) of testing in which you currently conduct casework:

| Discipline | Category |
|---|---|
| Firearms & Toolmarks | Firearms |
| Firearms & Toolmarks | Serial Number Restoration |
| Firearms & Toolmarks | Toolmarks |

**Education:** List all higher academic institutions attended (list high school only if no college degree has been attained)

| Institution | Dates Attended | Major | Type of Degree Completed (or None) |
|---|---|---|---|
| McNeese State University | 1/2007 - 12/2012 | Forensic Chemistry | Bachelor of Science |

**Courtroom Experience:** List the discipline/category(ies) in which you have qualified to testify as an expert witness and indicate over what period of time and approximately how many times you have testified in each.

| Discipline/Category | Period of Time | Times |
|---|---|---|
| Firearm/Toolmark | 12/2016-Present | 10 |

**Certifications:** List certifications held, the issuing body, and dates certified.

**Professional Affiliations:** List any professional organizations of which you are or have been a member.  Indicate any offices or other positions held and the date(s) of these activities.

| Organization | Period | Activities |
|---|---|---|
| Crime Lab Wellness Program | 12/2017-Present | Create ideas to promote our fellow co-workers to work out and make healthier eating choices. |

**Employment History:** List all scientific or technical positions held, particularly those related to forensic science.  Be sure to indicate employer and give a brief summary of principal duties and tenure in each position (List current position first)

**Job Title:** Firearm/Toolmark Examiner                         **Tenure:** 9/2013 - Present

**Employer:** Texas Department of Public Safety

**Provide a brief description of principal duties:**

I perform casework in the Firearm and Toolmark Section, which includes: firearm and toolmark identification and serial number restoration.

**Job Title:** Lab Technician                                              **Tenure:** 6/2013 - 8/2013

**Employer:** Lab Corp

**Provide a brief description of principal duties:**

Pressurized cylinders with a mix of compounds from methane to decane, then stabilized the pressure.

**Other Qualifications:** List below any scientific publication and/or presentation you have authored or co-authored, research in which you are or have been involved, academic or other teaching positions you have held, any awards you have received, and any other information which you consider relevant to your qualification as a forensic scientist.

**Publications**

**Presentations**

Randall County Sheriff's Office in Amarillo, TX 9/9/15

*D00792* 183

TEXAS DEPARTMENT OF PUBLIC SAFETY
CRIME LABORATORY

LUB-1802-00900
Page 2 of 2

TxDPS 07.10.17

## Statement of Qualifications

LAB-QA-35-LIMS Rev.01 (06/2017) p.2 Issued by: QAC

| Name | Morgan, Darrell | Date | 02/14/2018 |
|------|-----------------|------|------------|

Lubbock Police Department / Lubbock Sheriff's Office 4/4/16

**Research**

**Academic/Teaching Positions**

**Awards**

**Other**

**Other Training:**  List continuing education, workshops, in-service and formal training received.

| Course Title | Source | Date Attended | Hours |
|--------------|--------|---------------|-------|
| Mossberg Armorer Course | Mossberg | 2/2014 | 16 |
| TAFTE | Texas DPS | 9/2014 | 8 |
| Glock Armorer Course | Glock | 10/2014 | 8 |
| Ethics: All Things Courtroom: Testimony, Conformation, Discovery | Southwestern Association of Forensic Scientists | 10/2014 | 8 |
| Basic Shooting Reconstruction, IED's and HME's | Southwestern Association of Forensic Scientists | 10/2014 | 8 |
| Firearms Round Table Discussion | Southwestern Association of Forensic Scientists | 10/2014 | 8 |
| Sig Sauer Armorer Course | Sig Sauer | 3/2015 | 16 |
| Practical Shooting Incident Reconstruction | Association of Firearm And Tool Mark Examiners | 5/2017 | 8 |
| Is Murder A'Foot? Crime Scene - Staged or Simply Altered? | Association of Firearm And Tool Mark Examiners | 5/2017 | 4 |
| Springfield XD/XDm Armorers Course | Association of Firearm And Tool Mark Examiners | 5/2017 | 8 |
| Association of Firearm And Tool Mark Examiners Conference | Association of Firearm And Tool Mark Examiners | 5/2017 | 48 |

*This Statement of Qualifications was generated on 3/23/2018 at 4:25:02PM.*

*D00793* 184

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | Civil Action No. 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| Defendants | § § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 9
# Crime Scene Photos











\* D00130 \*



* D00315 *

191





UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | |
| | § | Civil Action No. |
| | § | 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § § | |
| Defendants | § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 10
## Stratford Police Incident Report (R. Alvarez)

| STRATFORD POLICE DEPARTMENT (STATE OF TEXAS) | Case #: 18-00001 | 1 |
|---|---|---|
| 212 North Poplar St.<br>Stratford, TX 79084<br><br>(806) 366-3051 | Report Type: Incident Report<br>Status: Cleared By Arrest<br>Reason:<br>Report Date: 1/1/2018<br>Title: PURSUIT | Page 1 of 2 |

| CASE #: 18-00001  ☐ Cargo Theft | INVESTIGATING OFFICER: |
|---|---|
| Incident Date/Time: 1/1/2018 10:35:40 AM<br>Location: HWY 287 AT COLDWATER CREEK BRIDGE<br>      STRATFORD, TX 79084 | McHugh, Michael  ID-NR: 403 |

SIGNATURE: _____

| Suspect Name | DOB | DL/ID# |
|---|---|---|
| RODRIGO J. ALVAREZ | ▓▓▓▓ | ▓▓▓▓ |

REGION/DISTRICT/SGT. AREA:      Texas

APPROVING SUPERVISOR:
ID-NR:

SIGNATURE: _____

**SUSPECT**

| | |
|---|---|
| Name: | ALVAREZ, RODRIGO JOSE |
| Address: | 8409 W MONTEREY WAY |
| City, State, Zip: | PHOENIX, AZ 85037 |
| County: | -- -- |

Arrested:  ☐
UCR Offense:

| | | | |
|---|---|---|---|
| DOB: | ▓▓▓▓ | DL Number: | ▓▓▓▓ |
| Age: | 29 | ID Card Number: | -- -- |
| Race/Gender: | White / Male | SSN: | -- -- |
| Ethnicity: | Hispanic | Home Phone: | -- -- |
| Height/Weight: | 5' 09" / 180 lbs. | Cell Phone: | -- -- |
| Build: | -- -- | Occupation: | -- -- |
| Hair/Eyes: | -- -- / -- -- | Employer: | -- -- |
| Complexion: | -- -- | Work Phone: | -- -- |
| Alias: | -- -- | | |
| Scars: | -- -- | | |
| Marks: | -- -- | | |
| Tattoos: | -- -- | | |
| Disabilities: | -- -- | | |

**EVIDENCE INFORMATION:**
**VIDEO EVIDENCE**

| Evidence Collected: | ☐ Yes  ☒ No |
|---|---|
| Reason: | Off-duty at time of call. |

**FORCE USED INFORMATION:**
**FORCE USED**

| | |
|---|---|
| Force Used on: | Unknown |
| Date: | 1/1/2018 |
| Type: | SELECT |
| Checked Tension: | No |
| Double-locked: | No |
| Location: | -- -- |
| Reason: | SPIKE STRIP DEPLOYMENT FOR VEHICLE PURSUIT |

| **STRATFORD POLICE DEPARTMENT (STATE OF TEXAS)** | Case #:  **18-00001** | **2** |
|---|---|---|
| 212 North Poplar St.<br>Stratford, TX 79084<br><br>(806) 366-3051 | Report Type:  **Incident Report**<br>Status:  **Cleared By Arrest**<br>Report Date: **1/1/2018**<br>Title:  **PURSUIT** | Page 2 of 2 |

**NARRATIVE:**

On 1/1/2018 at approximately 10:19am, I, Officer Michael McHugh of the Stratford Police Department (Badge #403), was notified by Sherman County dispatch of a pursuit coming towards Stratford. The information I received was that the pursuit began south of Dumas, TX and was currently south of Cactus traveling at a high rate of speed. I proceeded to the southern city limits of Stratford and at the direction of Chief Randy Hooks established a position to deploy spike strips on the fleeing vehicle when they came close to Stratford. I established a position north of the Coldwater Creek Bridge over highway 287 in the median. The position I established was in the central median from a guarded posititon with a guard-rail blocking my vehicle and myself from the on-coming vehicle.

The fleeing vehicle, a tan, late model Toyota Tundra, soon came north down the draw towards my position and when there was no vehicles traveling the roadway between myself and the suspect vehicle, I pulled the spike strip out blocking one lane of roadway. The fleeing vehicle attempted to go around the spike strip into the left lane and at the last second I pulled the strips in front of it,  The vehicle struck the spike strips with three tires and continued northbound. I retrieved the spike strips from the road and signalled to the pursuing units that there was a successful deployment of strips. From my position, I was able to see the vehicle come to a stop approximately one quarter mile north of where I had deployed the spike strips. Once the spike strips were stowed away in my vehicle, I joined the other pursuing units to assist.

End of Report.

| STRATFORD POLICE DEPARTMENT (STATE OF TEXAS) | Case #: **18-00001** | **1** |
|---|---|---|
| 212 North Poplar St. Stratford, TX 79084 (806) 366-3051 | Report Type: **Supplement Report** Status: **Open** Reason: Report Date: **1/11/2018** Title: | Page 1 of 2 |

**CASE #: 18-00001**  ☐ Cargo Theft
Incident Date/Time: **1/1/2018 10:35:33 AM**
Location: **U.S. 287 SOUTH**
      **Stratford, TX 79084**

| Suspect Name | DOB | DL/ID# |
|---|---|---|
| **RODRIGO J. ALVAREZ** | ▮▮▮ | ▮▮▮ |

INVESTIGATING OFFICER:
**Hooks, Randy  ID-NR: 401**

SIGNATURE: _____

REGION/DISTRICT/SGT. AREA:   **Texas**

APPROVING SUPERVISOR:
  ID-NR:

SIGNATURE: _____

## SUSPECT

| | | | |
|---|---|---|---|
| Name: | **ALVAREZ, RODRIGO JOSE** | | |
| Address: | **8409 W MONTEREY WAY** | | |
| City, State, Zip: | **PHOENIX, AZ 85037** | | |
| County: | – – | | |
| | | | |
| Arrested: | ☒ | | |
| UCR Offense: | | | |

| | | | |
|---|---|---|---|
| DOB: | ▮▮▮ | DL Number: | ▮▮▮ |
| Age: | **32** | ID Card Number: | – – |
| Race/Gender: | **White / Male** | SSN: | – – |
| Ethnicity: | **Hispanic** | Home Phone: | – – |
| Height/Weight: | **5' 09" / 180 lbs.** | Cell Phone: | – – |
| Build: | – – | Occupation: | – – |
| Hair/Eyes: | – – / – – – | Employer: | – – |
| Complexion: | – – | Work Phone: | – – |
| Alias: | – – | | |
| Scars: | – – | | |
| Marks: | – – | | |
| Tattoos: | – – | | |
| Disabilities: | – – | | |

## VEHICLE INFORMATION:
### VEHICLE

| | | | |
|---|---|---|---|
| Vehicle Status: | **Seized** | Year: | **2017** |
| License Plate State: | **AZ** | Make: | **Toyota** |
| License Plate: | **CCJ9919** | Model: | **Tundra** |
| Registration Exp. Date: | **6/2018** | Towed By: | **Pack's Garage and Wrecker Service** |
| | **ALVAREZ, RODRIGO** | Towed To: | **Pack's Garage and Wrecker Service** |
| Owner: | – – | Released To: | – – |
| Vehicle Type: | **Passenger Vehicle** | Impounded: | **Yes** |
| VIN: | **5TFDW5F17HX659662** | | |

## EVIDENCE INFORMATION:
### VIDEO EVIDENCE

Evidence Collected:  ☐ Yes  ☒ No
Reason:



**197**

| **STRATFORD POLICE DEPARTMENT (STATE OF TEXAS)** | Case #: **18-00001** | **2** |
|---|---|---|
| 212 North Poplar St.<br>Stratford, TX 79084<br><br>(806) 366-3051 | Report Type: **Supplement Report**<br>Status: **Open**<br>Report Date: **1/11/2018**<br>Title: | Page 2 of 2 |

**FORCE USED INFORMATION:**

**FORCE USED**

| | |
|---|---|
| Force Used on: | **Unknown** |
| Date: | **1/1/2018** |
| Type: | **FIREARM - SHOTGUN FIRED** |
| Checked Tension: | **No** |
| Double-locked: | **No** |
| Location: | **U.S. 287 SOUTH** |
| Reason: | **TO STOP A FLEEING VEHICLE, THAT WAS A DANGER TO THE SAFTEY OF THE OFFICERS AND PUBLIC.** |

**NARRATIVE:**

On 01/01/2018 I Randy Hooks Chief of Police for the City of Stratford was contacted by the Sherman county dispatch and was informed that a pursuit had entered into Sherman county north bound on U.S.287 toward Stratford. I had the dispatcher contact Officer Mike McHugh, I then went enroute to that location. While enroute Officer McHugh went in service and I instructed Officer McHugh to set up at the Coldwater bridge located south of Stratford and establish a position to deploy spike strips on the fleeing vehicle.

I then positioned myself north of the Coldwater bridge on the east side of 287 in case the fleeing vehicle avoided the spike strips I was going to try and disable the vehicle by shooting a tire out if necessary.

Sheriff Allen was also enroute and he stated on the radio he would go further south and attempt to spike the fleeing vehicle, Sheriff Allen then stated the vehicle went around his spikes and was continuing north at a high rate of speed, at this time the vehicle came into sight and Officer McHugh deployed his spikes, the vehicle hit them with two tires but was still coming north and was not stopping . Knowing the fleeing vehicle was about to come into town and enter a major intersection and fearing for the safety of the officers and the citizens I discharged 5 rounds from my department issue shot gun disabling the vehicle, the driver identified as Rodrigo Jose Alvearez ▮▮▮▮▮▮ was taken into custody at this time and transported to the Sherman county jail.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | Civil Action No.<br><br>2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| Defendants | § § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 11
# Stratford Police Incident Report (C. Marks)

| STRATFORD POLICE DEPARTMENT (STATE OF TEXAS) | Case #: **18-00037** | **1** |
|---|---|---|
| 212 North Poplar St.<br>Stratford, TX 79084<br><br>(806) 366-3051 | Report Type: **Offense Report**<br>Status: **Closed**<br>Reason:<br>Report Date: **4/7/2018**<br>Title: **PURSUIT** | Page 1 of 6 |

| CASE #: **18-00037**  ☐ Cargo Theft<br>Incident Date/Time: **4/6/2018 2:28:53 PM**<br>Location: **US HWY 54**<br>**TX** | INVESTIGATING OFFICER:<br>**Coborn, Richard ID-NR: 402** |
|---|---|
| Suspect Name          DOB        DL/ID#<br>**CALEB J. MARKS**<br>**STEPHANIE F. OLSON** | SIGNATURE: _____<br>REGION/DISTRICT/SGT. AREA:      **Texas**<br>APPROVING SUPERVISOR:<br>ID-NR:<br>SIGNATURE: _____ |

**OFFENSE INFORMATION:**

## OFFENSE

| | | | |
|---|---|---|---|
| Offender: | **MARKS, CALEB** | | |
| Offense: | **AGG ASSAULT DATE/FAMILY/HOUSE W/WEAPON** | | |
| Day/Date/Time: | **Friday, 4/6/2018 2:28 PM** | To Day/Date/Time: | **Friday, 4/6/2018 3:15 PM** |
| Offense Address: | **US HWY 54** | Classification: | **Felony 1** |
| City, County, State, Zip: | **TX** | Status: | **Completed** |
| Location Type: | **Highway/Road/Alley/Street/Sidewalk** | DPS Offense Code: | **13150007** |
| Entry Location: | **None** | Statute Citation: | **22.02 (b)(1)** |
| Exit Location: | **None** | | |
| Officers: | **Richard Coborn #402, Randy Hooks #401, Aaron Estrada #804, Michael McHugh #403** | | |
| Weapon Types Used : | **Motor Vehicle** | | |
| Bias Motivations: | **Unknown (offender's motivation not known)** | | |
| Suspected of Using: | **Drugs/Narcotics** | | |
| Criminal Activity: | **-- --** | | |
| Gang Type: | **None/Unknown** | | |
| Animal Cruelty: | **-- --** | | |

**200**

| STRATFORD POLICE DEPARTMENT (STATE OF TEXAS) | Case #:  18-00037 | **2** |
|---|---|---|
| 212 North Poplar St.<br>Stratford, TX 79084<br>(806) 366-3051 | Report Type: **Offense Report**<br>Status: **Closed**<br>Report Date: **4/7/2018**<br>Title: **PURSUIT** | Page 2 of 6 |

## SUSPECT INFORMATION:

### SUSPECT  # 1

| | | | |
|---|---|---|---|
| Name: | **MARKS, CALEB J** | | |
| Address: | **11512 W ORCHARD CT E** | | |
| City, State, Zip: | **WEST ALLIS, WI -5512** | | |
| County: | — — | | |

Arrested: ☐
UCR Offense:

| | | | |
|---|---|---|---|
| DOB: | ▓▓▓▓ | DL Number: | ▓▓▓▓ |
| Age: | **27** | ID Card Number: | — — |
| Race/Gender: | **White / Male** | SSN: | ▓▓▓▓ |
| Ethnicity: | **Not Hispanic** | Home Phone: | — — |
| Height/Weight: | **5' 06" / 155 lbs.** | Cell Phone: | — — |
| Build: | **Medium** | Occupation: | **NA** |
| Hair/Eyes: | — — / — — | Employer: | **NA** |
| Complexion: | **Light** | Work Phone: | — — |
| Alias: | — — | | |
| Scars: | — — | | |
| Marks: | — — | | |
| Tattoos: | — — | | |
| Disabilities: | — — | | |

### SUSPECT  # 2

| | | | |
|---|---|---|---|
| Name: | **OLSON, STEPHANIE FAITH** | | |
| Address: | **1325A N 29TH ST** | | |
| City, State, Zip: | **MILWAUKEE, WI -2416** | | |
| County: | — — | | |

Arrested: ☐
UCR Offense:

| | | | |
|---|---|---|---|
| DOB: | ▓▓▓▓ | DL Number: | ▓▓▓▓ |
| Age: | **27** | ID Card Number: | — — |
| Race/Gender: | **White / Female** | SSN: | — — |
| Ethnicity: | **Not Hispanic** | Home Phone: | — — |
| Height/Weight: | **5' 05" / 135 lbs.** | Cell Phone: | — — |
| Build: | — — | Occupation: | — — |
| Hair/Eyes: | — — / — — | Employer: | — — |
| Complexion: | — — | Work Phone: | — — |
| Alias: | — — | | |
| Scars: | — — | | |
| Marks: | — — | | |
| Tattoos: | — — | | |
| Disabilities: | — — | | |

| STRATFORD POLICE DEPARTMENT (STATE OF TEXAS) | Case #: **18-00037** | **3** |
|---|---|---|
| 212 North Poplar St.<br>Stratford, TX 79084<br><br>(806) 366-3051 | Report Type: **Offense Report**<br>Status: **Closed**<br>Report Date: **4/7/2018**<br>Title: **PURSUIT** | Page 3 of 6 |

**VICTIM INFORMATION:**

**VICTIM**

Name:            **The State of Texas**
Address:
County:
City, State, Zip:

DOB:                                     DL Number:
Age:                                     ID Card Number:
Race/Gender:                             SSN:
Ethnicity:                               Home Phone:
Height/Weight:                           Cell Phone:
Build:                                   Occupation:
Hair/Eyes:                               Employer:
Complexion:                              Work Phone:
Alias:
Scars:
Marks:
Tattoos:
Disabilities:

| STRATFORD POLICE DEPARTMENT (STATE OF TEXAS) | Case #: 18-00037 | **4** |
|---|---|---|
| 212 North Poplar St.<br>Stratford, TX 79084<br>(806) 366-3051 | Report Type: **Offense Report**<br>Status: **Closed**<br>Report Date: **4/7/2018**<br>Title: **PURSUIT** | Page 4 of 6 |

**LAW ENFORCEMENT VICTIM :**

**LAW ENFORCEMENT VICTIM   # 1**

Name:            **Coborn, Richard**
Address:
County:
City, State, Zip:

| | |
|---|---|
| DOB: | DL Number: |
| Age: | ID Card Number: |
| Race/Gender: | SSN: |
| Ethnicity:        — — | Home Phone: |
| Height/Weight: | Cell Phone: |
| Build: | Occupation: |
| Hair/Eyes: | Employer: |
| Complexion: | Work Phone: |
| Alias: | |
| Scars: | |
| Marks: | |
| Tattoos: | |
| Disabilities: | |

**LAW ENFORCEMENT VICTIM   # 2**

Name:            **Estrada, Aaron**
Address:
County:
City, State, Zip:

| | |
|---|---|
| DOB:        — — | DL Number: |
| Age: **Unknown** | ID Card Number: |
| Race/Gender: **White / Male** | SSN: |
| Ethnicity:        — — | Home Phone: |
| Height/Weight: | Cell Phone: |
| Build: | Occupation: |
| Hair/Eyes: | Employer: |
| Complexion: | Work Phone: |
| Alias: | |
| Scars: | |
| Marks: | |
| Tattoos: | |
| Disabilities: | |

**VEHICLE INFORMATION:**

**VEHICLE**

| | | | |
|---|---|---|---|
| Vehicle Status: | **Seized** | Year: | **2007** |
| License Plate State: | **WI** | Make: | **Chevrolet** |
| License Plate: | **ACA9003** | Model: | **Cobalt** |
| Registration Exp. Date: | **1/2019** | Towed By: | — — |
| | | Towed To: | — — |
| Owner: | — — | Released To: | — — |
| Vehicle Type: | **Passenger Vehicle** | Impounded: | **Yes** |
| VIN: | **1G1AZ55FX77102002** | | |

**203**

| STRATFORD POLICE DEPARTMENT (STATE OF TEXAS) | Case #: 18-00037 | 5 |
|---|---|---|

212 North Poplar St.
Stratford, TX 79084

(806) 366-3051

Report Type: **Offense Report**
Status: **Closed**
Report Date: **4/7/2018**
Title: **PURSUIT**

Page 5 of 6

## WEAPON INFORMATION:
### WEAPON

Make: **Chevrolet**   Model: **Cobalt**   Serial Number: **– –**

## EVIDENCE INFORMATION:
### VIDEO EVIDENCE

Evidence Collected: [X] Yes  [ ] No
Evidence Type: **Both Body and Car Camera**

## FORCE USED  INFORMATION:
### FORCE USED

Force Used on: **Unknown**
Date: **4/6/2018**
Type: **FIREARM - HANDGUN FIRED Glock 22 npx383**
Checked Tension: **No**
Double-locked: **No**
Location: **US HWY 54**
Reason: **Driver was using vehicle as a deadly weapon. Shot was fired into engine block in an attempt to disable the vehicle.**

204

| STRATFORD POLICE DEPARTMENT (STATE OF TEXAS) | Case #:  18-00037 | **6** |
|---|---|---|
| 212 North Poplar St.<br>Stratford, TX 79084<br><br>(806) 366-3051 | Report Type:  **Offense Report**<br>Status:  **Closed**<br>Report Date:  **4/7/2018**<br>Title:  **PURSUIT** | Page 6 of 6 |

**NARRATIVE:**

On April 6, 2018 about 1430 hrs, I Richard K. Coborn of the Stratford Police Department was sitting in Chief Randy Hooks office. At that time Sherman County dispatch advised all units on the radio that a pursuit was headed towards Sherman County on US HWY 54. Dispatch stated that Oklahoma law enforcement units were behind the vehicle while it was headed east bound at speeds up to 130 mph. Chief Hooks and I then headed west bound on HWY 54 in order to set up spike strips in order to prevent the vehicle from entering Stratford.  About 1/4 mile west of Co Rd 13 and HWY 54 was a small bridge with guard rails. Positioning my patrol unit in a safe place I placed the spike strips on the north side of the road way where I then waited for the suspect vehicle to reach my location. At 1438 I observed a small silver/gray passenger car approaching my direction from the east at a high rate of speed followed by several patrol vehicles. Once the vehicle was at a location where I could draw the strips across the road I did so. The driver of the vehicle then avoided the strips and continued west bound on HWY 54. Ensuring the spikes were safely off the road I entered into the pursuit as the last patrol vehicle.

As the vehicle approached Stratford city limits Chief Hooks advised the Fire Department and EMS to shut down the 4-way intersection with HWY 287 in order to avoid a collision with other vehicles. At 1441 the suspect vehicle entered Stratford at 130 mph, only slowing down to 100 mph. While pursing through town most of the intersecting roadways were full with traffic. The vehicle then cleared Stratford where I was able to close my distance with the suspect. At 1446 Deputy Aaron Estrada called over the radio that the vehicle was trying to push him off the road. While approaching Conlen the highway makes a curve where I was able to observe the silver car driving across both lanes of traffic and making Deputy Estrada veer his patrol unit away from the suspect in order to avoid a collision. Sherman County Sheriff Ted Allen was then set in Conlen with spike strips. Sheriff Allen's attempt to spike the vehicle was unsuccessful as well. While the vehicle sped through Conlen I was then able to move into a position behind Deputy Estrada in order to call the pursuit over the radio for him where we then switched our radios over to Dallam County.

Once through Conlen myself, Deputy Estrada and Texhoma Chief of Police made several attempts to overtake the vehicle in order to box it in and slow or stop the pursuit. Every attempt to do so was unsuccessful. Each time myself or Deputy Estrada would move into a position to get in front of the car the driver would cut us off or try to push us out of the way. During one of the attempts to get in front of the car the driver and passenger begin to flip myself and Deputy Estrada off.

At 1451 I make another attempt to move in front of the car in order to try to slow the speeds. While approaching the vehicle on the passenger side the driver then quickly in front of me.  Shortly after that, Deputy Estrada was able to take a few shots at the vehicle's tires.  After firing at the tires, the suspects' vehicle then approached another set of spike strips that was again avoided. Having an opportunity to catch up to the vehicle I then fired 1 round into the hood of the vehicle, striking the car in the headlight and into the radiator. However, the vehicle did not stop and continued west bound at 130 mph towards Dalhart.

At 1454 the vehicle avoided another set of spikes and entered into Dalhart at 125 mph. While approaching the intersection of HWY 54 & 87, I observed several 18 wheelers and trailers that were stopped at the red-light. I then called to Deputy Estrada where we were going to attempt to block the car in against the trailers. The vehicle quickly turned north through an alley where the driver was able to make his way across a set of rail road tracks and then turned back west. I was able to make the turn as well and fell in behind the vehicle. The driver the approached the overpass of HWY 87 and the railroad where there was a steep cement embankment. The vehicle then stalled out where the driver bailed. Looking down to the highway the driver then sat on the ledge and gave up. I quickly bailed out of my driver seat and ran to the back of my patrol unit and deployed my K9 in case the driver ran. The driver was then then identified as CALEB J MARKS ████████ and the passenger as STEPHANIE FAITH OLSON ████████. Placing my K9 back in his unit I then went with the arresting officers to the Dallam/Harley Jail where I charged Marks with using his vehicle as a deadly weapon during the pursuit against Deputy Estrada and myself.  At 130 mph and with Marks trying to cut us off and block us from getting in front of him, any collision could have seriously injured or killed myself, Deputy Estrada or any other civilian that happened to by on the highway at the time.

| STRATFORD POLICE DEPARTMENT (STATE OF TEXAS) | Case #: **18-00037** | **1** |
|---|---|---|
| 212 North Poplar St.<br>Stratford, TX 79084<br><br>(806) 366-3051 | Report Type: **Supplement Report**<br>Status: **Open**<br>Reason:<br>Report Date: **4/9/2018**<br>Title: **PURSUIT** | Page 1 of 1 |

| CASE #: **18-00037**<br>Incident Date/Time: **4/6/2018 2:30:55 AM**<br>Location: | ☐ Cargo Theft | INVESTIGATING OFFICER:<br>**Hooks, Randy  ID-NR: 401** |
|---|---|---|

| Suspect Name | DOB | DL/ID# |
|---|---|---|
| **CALEB J. MARKS** | ███ | ███ |

SIGNATURE: _____

REGION/DISTRICT/SGT. AREA:    **Texas**

APPROVING SUPERVISOR:
  ID-NR:

SIGNATURE: _____

## SUSPECT

| | |
|---|---|
| Name: | **MARKS, CALEB J** |
| Address: | **11512 W ORCHARD CT E** |
| City, State, Zip: | **WEST ALLIS, WI -5512** |
| County: | -- -- |

Arrested: ☐
UCR Offense:

| | | | |
|---|---|---|---|
| DOB: | ███ | DL Number: | ███ |
| Age: | **29** | ID Card Number: | -- -- |
| Race/Gender: | **White / Male** | SSN: | ███ |
| Ethnicity: | **Not Hispanic** | Home Phone: | -- -- |
| Height/Weight: | **5' 06" / 155 lbs.** | Cell Phone: | -- -- |
| Build: | **Medium** | Occupation: | **NA** |
| Hair/Eyes: | -- -- / -- -- | Employer: | **NA** |
| Complexion: | **Light** | Work Phone: | -- -- |
| Alias: | -- -- | | |
| Scars: | -- -- | | |
| Marks: | -- -- | | |
| Tattoos: | -- -- | | |
| Disabilities: | -- -- | | |

### EVIDENCE INFORMATION:
### VIDEO EVIDENCE

Evidence Collected:    ☐ Yes    ☒ No
Reason:

### NARRATIVE:

| STRATFORD POLICE DEPARTMENT (STATE OF TEXAS) | Case #:  18-00037 | **3** |
|---|---|---|
| 212 North Poplar St.<br>Stratford, TX 79084<br><br>(806) 366-3051 | Report Type:  **Supplement Report**<br>Status:  **Open**<br>Report Date:  **4/9/2018**<br>Title:  **PURSUIT** | Page 3 of 3 |

**NARRATIVE:**

On April 6, 2018 at abut 1430 hours my self Randy Hooks Chief of Police for the City of Stratford and Officer Richard Coborn where in my office when we where notified of a pursuit west bound on highway 54 coming toward Stratford. The dispatcher advised that the pursuing Oklahoma units stated speeds were in excess of 130 miles per hour.

Myself and Officer Coborn started east on highway 54 to set up spike strips in an attempt to stop the vehicle before it could get into the city of Stratford, Officer Coborn went to a bridge located about 8 miles east of Straford to set up spike strips, I was about a mile west of his location and set up in case the vehicle avoided the spike strips I was going to try and disable the vehicle with my duty shotgun. I was listening to radio traffic I head Officer Coborn say the vehicle avoided the spikes and was continuing west at a high rate of speed, at this point i observed the vehicle and discharged two rounds from my weapon not striking the vehicle, the vehicle continued west on 54 at  speeds in excess of 120 plus miles per hour. I contacted the dispatcher and advised to them contact the fire department  and close the major intersection at U.S. 54 and U.S.287 due to fact vehicle was not slowing down.

At this point  Sherman County deputy Aaron Estrada entered the pursuit, he, Officer Coborn and the Texhoma Police Chief continued west on 54, Officer Coborn was calling the pursuit and informed all units that the vehicle had attempted to ram Deputy Estrada, when the vehicle came into Conlen Sheriff Allen attempted to deploy strips but the vehicle avoided them and continued west bound, when the vehicle was about 10 miles west of Dalhart another set of spikes were deployed and the vehicle avoided them and continued west toward Dalhart at a high rate of speed.

At this point fearing for the safety of the citizens and the Officers involved I instructed Officer Coborn to use what  force was justified to terminate the pursuit, the pursuit continued into the city of Dalhart, the vehicle left highway 54, turning north in an alley and then west by the railroad deport where the vehicle was stopped. The driver and passenger were taken into custody with out further incident.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | |
| | § | Civil Action No. |
| | § | 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| | § | |
| Defendants | § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR**
**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 12
# Texas Commission on Law Enforcement, Curriculum for Intermediate Use of Force

**208**

# *Intermediate Use of Force*



*Course Number 2107*

**Minimum Hours 13**

**TEXAS COMMISSION ON LAW ENFORCEMENT
OFFICER STANDARDS AND EDUCATION**

Revised April 2005

**TEXAS COMMISSION ON LAW ENFORCEMENT
OFFICER STANDARDS AND EDUCATION**

**LEARNING OBJECTIVES**

**UNIT I**

**1.0   STATUTORY AUTHORITY FOR USE OF FORCE**

THIS GUIDE IS DESIGNED TO ASSIST THE INSTRUCTOR IN DEVELOPING AN APPROPRIATE LESSON PLAN OR PLANS TO TEACH THE LEARNING OBJECTIVES, WHICH ARE REQUIRED AS MINIMUM CONTENT OF THE INTERMEDIATE PEACE OFFICERS COURSE.  THE FOLLOWING METHODS AND REFERENCE MATERIALS ARE PRESENTED AS SUGGESTIONS.

METHODS:

The students should be familiar with the following statutes.  The instructor may:

1.   Present this material as the first unit of instruction.

2.   Make a reading assignment prior to the first class.

3.   Administer a test over this material prior to the class to determine students level of knowledge.

4.   Assign homework to the students over these statutes.

5.   Use computer or video assisted instruction; or

6.   Take other reasonable steps to inform the student of the statute's relevance as a foundation and prerequisite to successfully completing the course.

NOTE:   The students should be given a handout listing the titles of these statutes and informing the student that the final exam for the course will include questions from these statutes.

REFERENCE MATERIALS:

Basic Peace Officer Instructor Guide (TCLEOSE)

Penal Code - Chapter 9 (except Subchapter F)

Code of Criminal Procedure

Articles:   2.13, 2.14, 6.05, 6.06, 6.07, 8.01, 8.03, 8.04, 8.05, 8.06, 11.21, 11.22, 14.05, 15.24, 15.25

1.0   STATUTORY AUTHORITY FOR USE OF FORCE

<u>FUNCTIONAL AREA:</u>     In this section the student will obtain a thorough understanding and knowledge of the statutory laws related to the use of force. The student will be able to demonstrate on a written objective type examination an understanding of this area to a specified percentage.

See Sections 3.3.35 and 3.3.36 (excluding Sections dealing with Subchapter F) the Basic Peace Officer Course and the sections cited above in the Texas Penal Code and the Texas  Code of Criminal Procedure.

**TEXAS COMMISSION ON LAW ENFORCEMENT OFFICER
STANDARDS AND EDUCATION**

**LEARNING OBJECTIVES**

**UNIT II**

**2.0   INTRODUCTION TO USE OF FORCE**

THIS GUIDE IS DESIGNED TO ASSIST THE INSTRUCTOR IN DEVELOPING AN APPROPRIATE LESSON PLAN OR PLANS TO TEACH THE LEARNING OBJECTIVES, WHICH ARE REQUIRED AS MINIMUM CONTENT OF THE INTERMEDIATE PEACE OFFICERS COURSE.  THE FOLLOWING METHODS AND REFERENCE MATERIALS ARE PRESENTED AS SUGGESTIONS.

METHODS:

- Lecture
- Discussion

REFERENCE MATERIALS:

Fyfe James J. ed., Readings on Police Use of Deadly Force, Washington, D.C.:  Police Foundation, 1982.

Geller, William A. and Karales, Kevin J., Split-second Decision:  Shootings of and by Chicago Police, Chicago:  Chicago Law Enforcement Study group, 1981.

Matulia, Kenneth, A Balance of Forces, Gaithersburg, Maryland:   International Association of Chiefs of Police, 1985.

Milton, Catherine, Halleck, Jeanne Wahl, Lardner, James, and Abrecht, Gary, Police Use of Deadly Force, Washington D. C. :         Police Foundation, 1977.

Scharf, Peter, "Shooting:    Moral Judgments Related to the Police Use of Deadly Force," Criminology Yearbook, Santa Monica, CA:         Sage Publications, 1980.

The Use of Force in Patrol Work, Ohio:      Ohio Department of Development, 1983.

4

**212**

2.0     INTRODUCTION TO USE OF FORCE

FUNCTIONAL AREA:      The student will obtain a basic overview of the terminology and concepts regarding use of force.  The student will also obtain information concerning research indicating factors and situations where use of force may be likely.  The student will be able to demonstrate on a written objective type examination an understanding of this area to a specified percentage.

2.1     LEARNING OBJECTIVE:      The student will be able to identify definitions relating to use of force.

A.     Force - noun

    1.     Defined in Webster's as:

        a.     Strength or energy brought to bear - cause of motion or change - active power; moral or mental strength; capacity to persuade or convince.

        b.     Violence, compulsion, or constraint exerted upon person or thing.

        c.     The quality of conveying impressions intensely in writing or speech.

B.     Force - verb

    1.     Defined in Webster's as:

        a.     To do violence to.

        b.     To compel by physical, moral, or intellectual means.

        c.     To make or cause through natural or logical necessity.

        d.     To achieve or win by strength in struggle or violence.

    2.     An aggressive act committed by any person which does not amount to assault, and is necessary to accomplish an objective.

    3.     Synonyms - compel, coerce, constrain, oblige.

5

**213**

C.  Deadly Force

    1.  Force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.

D.  Reasonable or Necessary Force

    1.  The minimum amount of lawful aggression sufficient to achieve a legitimate law enforcement objective.

2.2  <u>LEARNING OBJECTIVE:</u>  The student will be able to identify psychological aspects of the use of force.

A.  Law Enforcement Role in Arrest

    1.  In physical arrest, the police role is essentially defensive.

    2.  Webster's Dictionary defines the word <u>defensive</u> as "serving to protect", "devoted to resisting or preventing aggression or attack".

    3.  It is not aggression when an officer takes the initiative to confront a law violator.  The officer's act is not one of hostility, it is one designed to defend and protect the community from criminality.

    4.  Most of an officer's problems grow out of the use of necessary force employed against a combative but unarmed law violator.

    5.  An officer needs a range of decision-making tools that permits use of exactly that degree of control which constitutes necessary force.

B.  Concept of Control

    1.  Control is that degree of influence the officer must exert over the violator to take him or her safely into custody.

    2.  Control is a "two-way street".  An officer must be in complete self-control to be able to control a violator.

    3.  Self-control alone will be one of the greatest assets in dealing with a law violator.
        a.  Self-control results from the development of confidence in one's skills.

        b.  Self-control is achieved through training and practice both on the job and off.

    4.  The objective of using control is to elicit cooperation from the violator.

6

**214**

5.      Some "tools" for the officer to maintain a psychological and physical edge.

    a.      Demonstrated alertness.

    b.      Be emotionally in control.

    c.      Personal appearance and bearing.

    d.      If possible, maintain a height advantage.

    e.      Triangle interview.  (Example:  2 officers and one suspect).

    f.      Be over an arms length from suspect.

    g.      Be prepared to step back.

    h.      Talking versus fighting.

C.      Emotions, Attitudes, Prejudices

1.      Arrest can be both an emotional and physical problem for officer and arrestee.

2.      Emotional response or reaction is directly involved in an encounter between an officer and a violator.

3.      Attitudes or prejudices can lead to conflict.

4.      An officer has the potential to reduce the problems and danger associated with physical arrest if he is firm but fair with the violator.

5.      Emotional responses are often the direct result of uncertainty. Uncertainty is likely to result in compensating behavior.

6.      Compensating behavior may take one of the following forms:

    a.      Hesitation.

    b.      Verbal abuse.

    c.      Bluff.

    d.      Unnecessary force.

7.      An officer must learn to control personal emotions.

2.3     <u>LEARNING OBJECTIVE:</u>      The student will be able to identify factors to consider when determining the need to use force when effecting an arrest.

A.      Use of Force

1.      In every arrest situation the officer must be firm and be prepared to protect himself/herself and others.

a.      Force must be controlled and used wisely with a purpose.

b.      Only the minimum amount of force necessary to effect the arrest should be used.

2.      An officer should consider the following factors when assessing the need to use force.

a.      Is the suspect submitting peacefully or resisting?

b.      Is the suspect armed?

c.      What is the nature of the crime?

d.      Does the suspect have a previous arrest record or history showing a pattern of violence?

e.      What is the number of suspects involved?

f.      How much support from other officers is available?

2.4     <u>LEARNING OBJECTIVE:</u>      The student will be able to identify important aspects of training as they relate to use of force.

A.      Mental Preparation

1.      An officer must prepare mentally for the use of weapons or having weapons used against him or her.

2.      An officer must be prepared, based on training and experience, to react instantly to violent acts by persons who may have little regard for the value of life.

B.      Training

    1.      Through training and knowledge of the laws pertaining to use of force, the officer attains:

        a.      Confidence.

        b.      Instinctive reaction.

        c.      Mental alertness.

        d.      Control over emotions.

    2.      Lack of training may result in:

        a.      Lack of confidence.

        b.      Poor marksmanship with weapons.

        c.      Panic and loss of control.

        d.      Civil liability.

2.5   LEARNING OBJECTIVE:      The student will be able to identify the seven most common types of incidents in which peace officers will be shot by civilians.

A.      A study of Chicago Police Department shootings which is consistent with other research found the following:

    NOTE:      Instructor(s) are encouraged to use more recent statistical data they possess.

## OFFICERS' INITIAL PERCEPTIONS OF INCIDENTS IN WHICH CIVILIANS SHOT POLICE IN CHICAGO, 1974-1978

Incident Type

Incidents In Which
Civilians Shot Police

| | | Number | Percentage |
|---|---|---|---|
| 1. | Armed Robbery | 16 | 16.5% |
| 2. | Person with a gun | 13 | 13.4% |
| 3. | Not police business    (non-line-of-duty) | 10 | 10.3% |
| 4. | Shots fired | 9 | 9.3% |
| 5. | Suspicious person | 6 | 6.2% |
| 6. | Drug offense | 6 | 6.2% |
| 7. | Disturbance    (non-domestic) | 6 | 6.2% |
| 8. | Traffic offense | 5 | 5.2% |
| 9. | Assault or crime  (robbery etc.) on officer | 5 | 5.2% |
| 10. | Domestic disturbance | 4 | 4.1% |
| 11. | Sex (vice) offense | 3 | 3.1% |
| 12. | Rape | 3 | 3.1% |
| 13. | Ambush-no warning | 3 | 3.1% |
| 14. | Burglary | 2 | 2.1% |
| 15. | Robbery | 1 | 1.0% |
| 16. | Person shot | 1 | 1.0% |
| 17. | Person otherwise injured | 1 | 1.0% |
| 18. | Person with deadly weapon other than gun | 1 | 1.0% |
| 19. | Civil disorder (riot, mass disturbance) | 1 | 1.0% |
| 20. | Handling, transporting, custody of prisoners | 1 | 1.0% |
| | Total | 97* | 100.0% |

\* - Not ascertained = 1.

2.6   <u>LEARNING OBJECTIVE:</u>       The student will be able to identify the seven most common types of incidents in which peace officers are most likely to shoot a civilian.

    A.   A study of Chicago Police Department shootings, which is consistent with other research, found the following.

### OFFICERS' INITIAL PERCEPTION OF TYPE OF INCIDENTS IN WHICH POLICE SHOT CIVILIANS IN CHICAGO, 1974-1978

| Incident Type | Number | Percentage |
|---|---|---|
| | Incidents in which Police Shot Civilians | |
| 1.  Armed Robbery | 97 | 19.6% |
| 2.  Burglary | 72 | 14.5% |
| 3.  Person with a gun | 61 | 12.3% |
| 4.  Disturbance (non-domestic) | 35 | 7.1% |
| 5.  Shots fired | 31 | 6.3% |
| 6.  Suspicious person | 22 | 4.4% |
| 7.  Not police business  (non-line-of-duty) | 22 | 4.4% |
| 8.  Traffic offense | 21 | 4.2% |
| 9.  Robbery | 20 | 4.0% |
| 10. Auto theft | 14 | 2.8% |
| 11. Domestic disturbance | 13 | 2.6% |
| 12. Person with deadly weapon other than gun | 12 | 2.4% |
| 13. Assault or crime  (robbery etc.) on officer | 12 | 2.4% |
| 14. Person shot | 10 | 2.0% |
| 15. Theft (including purse snatch) | 9 | 1.8% |
| 16. Person otherwise injured (not shot) | 7 | 1.4% |
| 17. Sex (vice) offense | 5 | 1.0% |
| 18. Rape | 4 | 0.8% |
| 19. Person screaming for help | 4 | 0.8% |
| 20. Drug offense | 3 | 0.6% |
| 21. Demented person | 3 | 0.6% |
| 22. Homicide | 2 | 0.4% |
| 23. Auto pursuit/stop | 1 | 0.2% |
| 24. Gambling | 1 | 0.2% |
| 25. Civil disorder (riot, mass disturbance) | 1 | 0.2% |
| 26. Handling, transporting, custody of prisoners | 1 | 0.2% |
| 27. Ambush of officer-no warning | 1 | 0.2% |
| 28. Other | 11 | 2.2% |
| Total | 495a | 100.0%b |

a - Not ascertained = 2 incidents.
b - Does not total 100% due to rounding.

    B.       One-fourth of these shootings occurred off-duty.

2.7 <u>LEARNING OBJECTIVE:</u> The student will be able to identify the most frequent types of resistance encountered by law enforcement officers.

 A. A task analysis study conducted in Ohio classified the following types of resistance encountered by officers in those cases in which they were resisted. Multiple types of resistance occurred in many cases.

  1. Barricade  9%

  2. Passive resistance  28%

  3. Pulled away  78%

  4. Ran away  48%

  5. Threw object  16%

  6. Wrestled  80%

  7. Hit/kicked  59%

  8. Special tactics/other  6%

  9. Weapon  15%

2.8 <u>LEARNING OBJECTIVE:</u> The student will be able to identify factors that affect an agency's justifiable homicide rate (JHR):

 A. The JHR is the rate of justifiable homicides per number of police officers. The JHR by police is related to the level of crime and violence in the community.

 B. Blacks are disproportionately represented as victims of justifiable homicide by the police when only total population is considered, but directly proportional when the total involvement in crime is considered.

 C. Departments with sufficient numbers of street supervisors providing tactical guidance and manpower support have a lower incidence of use of deadly force.

 D. Comprehensive administrative deadly force review policy and procedural controls seems to be related to a lower JHR.

 E. Agencies which require a .38 caliber weapon and ammunition, experience a lower JHR than agencies which permit officers to carry larger weapons.

F.   State laws have less impact on the use of deadly force than do departmental guidelines.

G.   The majority of existing firearm training systems are deficient in: assuring policy understanding, officer survival tactics, comprehensiveness, job relatedness, attendance control, and assuring that only qualified officers are certified to carry firearms.

H.   When an agency chooses to have a stakeout unit without a management policy directive, its JHR is significantly greater than those agencies with a policy directive.

I.   Although the presence of a decoy unit has no statistically significant bearing on the JHR, the existence of a decoy unit with a policy directive seems to be associated with a reduction in JHR.

J.   The presence of a SWAT unit tends to decrease the shooting incidents and JHR.

K.   In-service crisis intervention training as opposed to pre-service training was associated with a low JHR.

L.   Agencies with simulator, stress, and physical exertion firearms training experience a higher JHR than agencies without such training.

M.   Marksmanship awards given to officers for proficiency in firearms training are associated with high JHR.

N.   In-service training in the principles of "officer survival" is correlated with a high JHR.

O.   Agencies that issue shotguns to their officers experience a higher JHR than agencies that do not issue such ancillary weapons.

P.   Firearms use incidents tend to decrease with the presence of a hostage negotiation unit.

2.9   <u>LEARNING OBJECTIVE:</u>   The student will be able to identify moral considerations or forces affecting an officer's decision to use deadly force.

A.   The law, both statutory and case law.

B.   Administrative or Departmental Policy should be at least as restrictive as the law. In many cases it will be more strict than legal restrictions.

C.   Informal organizational norms, which reflect law enforcement's informal culture, may or may not be more strict than legal or agency restrictions.

    D.     Individual choice or conscience reflects the inner controls of the officer.

    E.     These forces can be depicted by a model of concentric circles.

2.10   <u>LEARNING OBJECTIVE:</u>    The student will be able to identify the reasons for various administrative mechanisms developed to reduce avoidable shootings.

    A.     Avoidable shootings are those which, while justifiable and lawful, could have been avoided by some reasonable effort on the part of the officer without additional danger to that officer and others.

    B.     Written guidelines are based upon assumptions that:

        1.    Avoidable shootings occur when officers lack specific guidelines defining when they may be permitted to use deadly force.

        2.    Officers have difficulty implementing ambiguous abstract legal statutes and policy statements.

        3.    If guidelines are made more specific, then inappropriate shootings will be reduced.

    C.     Training requirements are based upon assumptions that:

        1.    Avoidable shootings occur because untrained officers make errors in tactical, perceptual, or legal judgment.

        2.    Officers can be trained to implement deadly force policies by making finer discriminations in situations and using tactics that make use of deadly force less likely.

        3.    If officers are given realistic training, the probability of panic, tactical mistakes, etc., will be reduced.

    D.     Intensive shooting review requirements are based upon assumptions that:

        1.    Avoidable shootings occur because officers fail to use caution or act emotionally due to failure of the department to review and sanction avoidable shootings in the past.

        2.    Officers are deterred by fear of consequences of investigation of shooting abuses.

        3.    If level of sanction is increased, avoidable shootings due to lack of care, experience, and emotion will be reduced.

    E.     Reduction of avoidable shootings positively effects the department's image within the community and the image the community has of officer's professionalism.

F.    The moral values of the administration.

## TEXAS COMMISSION ON LAW ENFORCEMENT OFFICER STANDARDS AND EDUCATION

## LEARNING OBJECTIVES

## UNIT III

### 3.0   FORCE OPTIONS

THIS GUIDE IS DESIGNED TO ASSIST THE INSTRUCTOR IN DEVELOPING AN APPROPRIATE LESSON PLAN OR PLANS TO TEACH THE LEARNING OBJECTIVES,WHICH ARE REQUIRED AS MINIMUM CONTENT OF THE INTERMEDIATE PEACE OFFICERS COURSE.   THE FOLLOWING METHODS AND REFERENCE MATERIALS ARE PRESENTED AS SUGGESTIONS.

METHODS:

- Lecture
- Discussion
- Demonstration
- Role Play

REFERENCE MATERIALS:

Basic Peace Officer Instructor Guide (TCLEOSE).

Nova Technologies, Inc., The Nova XR - 5000.

"Safety Technical Evaluation of the Model XR - 5000 Electronic Stun Gun", 1985, The University of Nebraska Medical Center.

Thompson, George J., and Stroud, Michael J., Verbal Judo:  Redirecting Behavior with Words, Albuquerque, New Mexico:  The Verbal Judo Institute, 1984.

Thompson, George J., Verbal Judo, Springfield, Illinois:  Charles C. Thomas Publisher, 1984.

Koga, Robert K. and Nelson, John G., The Koga Method:  Police Baton Techniques, California:  Glencoe Press, 1968.

Hull, Jr., Grafton H. and Frisbie, Joseph C.,  "The Stun Gun Debate:  More Help than Hazard?"  The Police Chief,  February 1987, pp. 46-51.

Kubota, Takayuki, Baton Techniques and Training, California:   Charles C. Thomas, 1972.

3.0      FORCE OPTIONS

<u>FUNCTIONAL AREA:</u>     This unit will acquaint the student with various force options or alternatives available to peace officers.  The student will be able to demonstrate on a written objective type examination an understanding of this area to a specified percentage.

3.1   <u>LEARNING OBJECTIVE:</u>     The student will be able to identify six force options available to peace officers.

  A.     Command Presence - just entering into a scene.

  B.     Verbal Tactics - words, language.

  C.     Empty Hand Control or Weaponless Control - takedowns, comelongs, etc.

  D.     Chemical/Electrical Means - mace, stun gun.

  E.     Baton or Impact Weapons.

  F.      Deadly Force.


3.2   <u>LEARNING OBJECTIVE:</u>     The student will be able to identify and discuss the relationship of level of vulnerability to the appropriate level of force response as exhibited in the "Use of Force Continuum Scale".

  A.     Explain and discuss the model after showing it on an overhead and/or providing the student with a copy.

  B.     Ineffective control results when the level of force is less than the subject's level of resistance.

  C.     Excessive control results when the level of force is greater than the subject's level of resistance.

  NOTE:      Appendix A contains a complete explanation of the model which the instructor may use to prepare his/her lesson plan.

17

225

3.3    <u>LEARNING OBJECTIVE:</u>    The student will be able to identify factors that relate to an officer's command presence.

    A.    The Scene

        1.    Each scene has its own dynamics long before an officer arrives.

        2.    Events change because of certain kinds of presences.

                Example:    You are watching children at play and want to capture the moment on film. When you enter the scene with a camera everything changes. The children become self-conscious and pose instead of being themselves. Whatever pictures are taken are different than they would have been had a hidden camera been used.

        3.    This same type of situation occurs when an officer enters the scene, things change. This is due to the officer's command presence.

        4.    An officer must be able to think of the scene as it was before he/she entered it and what it becomes while he/she is present.

        5.    People act differently under different circumstances and an officer's entrance into a scene creates a <u>new</u> set of circumstances.

3.4    <u>LEARNING OBJECTIVE:</u>    The student will be able to identify aspects of communication strategies used when dealing with the public.

    A.    Strategic Communication

        1.    Communication is an important skill.

            a.    97% of an officer's duties involve verbal skills.

            b.    Only about 3% of contacts require physical force.

        2.    Communication process

            a.    Words.

            b.    Touch.

            c.    Body movement.

        3.    Message

            a.    Content - actual message.

       b.       Voice - verbal personality (how it is said).

       c.       Non-verbals - raised eyebrows, posture, etc.

4.      Perception of a message

       a.       7% of the time a message is received due to content.

       b.       33% of the time a message is received due to voice.

       c.       60% of the time a message is received due to non-verbals (body language).

       d.       This means that approximately 93% of the time a message is received and interpreted based on <u>how</u> it is said rather than <u>what</u> is said.

5.      Improper listening

       a.       Not paying attention to what is said, merely waiting for the opportunity to speak as soon as someone finishes talking.

6.      Communication is a professional skill, <u>not just luck.</u>

7.      Peace officers must communicate under uniquely stressful conditions:

       a.       To people who do not want to talk, or listen.

       b.       To emotionally charged individuals.

       c.       Dangerous circumstances.

       d.       While being watched by others.

       e.       To people who dislike and/or mistrust peace officers.

8.      Most people respond positively to reasonable requests from a peace officer.

9.      Frustrated people often resist.

10.     Upset people are often incapable of acting reasonably.

       a.       They will not respond to appeals of reason.

11.     Commands or orders usually meet with resistance.

12.     An officer must trust tactics which redirect behavior.

       a.       Maintain disinterest (objectivity).

        b.       Learn to allow people to express frustration.

        c.       Listen.

        d.       Do not take things personally.

3.5    <u>LEARNING OBJECTIVE:</u>    The student will be able to identify characteristics of verbal judo (verbal persuasion).

    A.    Introduction

        1.       The word "judo" means "gentle way".

        2.       Judo is a way of redirecting energy by using minimum effort to achieve maximum efficiency.

        3.       Flexibility is strength, rigidity is weakness.

    B.    Verbal Judo (Verbal Persuasion)

        1.       Defined as the use of words and verbal strategy to redirect the negative behavior of others into more positive behavior.

        2.       Effective officers are intuitively expert mediators.

            a.       Skills are learned through experience.

        3.       Teaches strategies to resolve street encounters peacefully and safely.

        4.       To avoid needless violence, officers must redirect human behavior with words.

        5.       This redirecting of behavior involves the use of rhetoric.

    C.    Rhetoric

        1.       Defined as the art or skill of selecting the best available verbal means of persuasion at any given moment.

3.6    <u>LEARNING OBJECTIVE:</u>    The student will be able to identify five elements used in the prior analysis of a scene.

    A.    Process for prior analysis of a scene includes perspective, audience, voice, purpose and organization (PAVPO).

1.     Perspective

    a.     Officer's point of view.

    b.     Past experience is a factor.

    c.     An officer should try to exhibit "disinterest".

    d.     The concept of "disinterest" means free from bias, impartial; it does not mean <u>un-</u> interested, unconcerned, or mechanical.

2.     Audience

    a.     The other's point of view.

    b.     An officer's ability to "read" an audience is a crucial skill.

    c.     Types of audiences.

        (1).     A single person, known.

            Example:     businessman, repeat offender, etc., that the officer knows.

        (2).     A single person, unknown.

        (3).     Single group, well-defined.

            Example:     street gang, special interest group, etc., that the officer has dealt with before.

        (4).     Single group, unknown.

        (5).     Multiple groups, well-defined.

            Example:     two or more street gangs, two families in dispute, etc., that the officer has dealt with before.

        (6).     Multiple groups, unknown.

    d.     Each type of audience must be analyzed.

    e.     No matter what type of audience an officer faces it is helpful to see the situation from the other person's or group's point of view.

3.     Voice

    a.     Verbal personality.

**229**

       b.       Elements of verbal personality:

             (1).    Tone and level of voice modulation.

             (2).    Accompanying facial expressions (a sneer, nervous smile, etc.)

             (3).    Hand or body gestures.

             (4).    Word choice (diction).

4.      Purpose

       a.       An officer must develop an ability to discover and sustain a clear sense of purpose throughout an encounter scene.

       b.       An officer must know the reason for being there and what is to be accomplished.

5.      Organization

       a.       The plan of an encounter.

       b.       Every encounter has a beginning, a middle, and an end.

       c.       An officer must control all three in a situation to be successful.

B.      PAVPO are the basic elements of effective communication.

3.7   <u>LEARNING OBJECTIVE:</u> The student will be able to identify benefits for officers that may result from training in rhetorical strategies.

    A.    Benefits for officers

        1.    Rhetorical training will make officers better able to:

            a.    Control their own biases and perspectives.

            b.    Analyze an audience (suspect, victim, witness, etc.) quickly and skillfully.

            c.    Create appropriate voices to influence their audience.

            d.    Define and sustain a clear sense of purpose.

            e.    Organize verbal strategies to achieve purpose.

            f.    Apply the elements of rhetoric (PAVPO) to the hard realities of the street encounter, i.e., verbal judo.

            g.    Solve street problems using flexible and alternative thinking.

            h.    Earn increased respect from the public for professional action.

            i.    Develop greater self-confidence and self-respect in their work.

            j.    Improve officer safety.

3.8   <u>LEARNING OBJECTIVE:</u>   The student will be able to identify benefits to an officer and for law enforcement administrators that may result from good training in communication strategies.

    A.    Benefits for Law Enforcement Administrators

        1.    Fewer formal complaints filed.

        2.    Fewer informal complaints.

        3.    Fewer internal affairs investigations.

        4.    Greater officer efficiency.

        5.    More efficient retraining of officers who establish a profile of violent street behavior.

        6.    Better public image for the law enforcement agency.

3.9   <u>LEARNING OBJECTIVE:</u>      The student will be able to identify four elements that an officer must recognize and control in every encounter.

NOTE:      Acronyms are included to assist the instructor(s) in presenting their topic and to enhance student learning and retention.  Their use is an instructor <u>option.</u>

A.    Four elements of confrontation - PACE (problem, audience, constraints, and ethics)

   1.    Problem

      a.    Analyze and identify the problem.

      b.    Enables an officer to plan an approach.

      c.    Problems often change as confrontation progresses.

   2.    Audience

      a.    Everyone encountered is part of the audience.

      b.    How is the audience reacting?

         Examples:    receptive, hostile, critical, etc.

      c.    Read audience and adapt tactics appropriately.

      d.    If person has a friend in the audience you may try to enlist their help.  Ask the friend to help reason with and persuade the person to follow the officer's orders.

   3.    Constraints

      a.    Determine  if  there  are  any  obstacles  to  effective communication and try to eliminate them if possible.

         Example:    time of day, weather, location, external noise, officer's  own  mood,  person's  values  and beliefs, etc.

   4.    Ethical Presence

      a.    An expression of self-control.

      b.    Use words to state purpose, not to express personal feelings.

      c.    Maintain professional attitude.

24

**232**

       d.     Anything perceived as hasty, irrational, or unfair, makes an officer seem unethical.

3.10   <u>LEARNING OBJECTIVE:</u>   The student will be able to identify 5 helpful "tools" used in redirecting someone's behavior using verbal persuasion.

    A.    Method of Redirecting Behavior - LEAPS, (listen, empathize, ask, paraphrase, and summarize)

       1.    Listen

          a.     Sort the real problem from the symptoms of the problem.

          b.     Determine priorities you must respond to.

          c.     Determine context of the event.

       2.    Empathize

          a.     Understand the other person's state of mind.

          b.     See through the eyes of the other person.

       3.    Ask

          a.     Use questions to gain control by causing others to report to you.

          b.     Questions direct attention away from the problem.

          c.     Buys time.

          d.     Demonstrates concern.

       4.    Paraphrase

          a.     Repeat what you have learned in your own words.

          b.     Forces other person to stop talking and listen.

          c.     Helps to insure that the officer understands the situation.

       5.    Summarize

          a.     Allows the officer to conclude the situation.

          b.     Officer provides the bottom line.

c.     State the resolution clearly.

3.11  <u>LEARNING OBJECTIVE:</u>     The student will be able to identify types of verbal appeals.

    A.     Appeals as a motivational device

        1.     Arouse interest in other person.

        2.     Persuades people to see things in different ways.

        3.     Good speakers analyze the audience and develop an appeal that applies to the audience's personal sense of reason.

    B.     Types of Appeals

        1.     Ethical appeal

            a.     Based upon position as a professional officer.

            b.     Assure other person.

            c.     Persuade others of your desire for a positive outcome.

            d.     This appeal is useful when dealing with people who are upset and highly emotional.

        2.     Rational appeal

            a.     Based on use of reasoning.

            b.     Appeal to common sense, good judgment, or community standards.

            c.     Show that solution is reasonable and most likely to produce results.

            d.     This appeal is valuable when dealing with people having a strong sense of right and wrong.

        3.     Practical appeal

            a.     Based on an urgent need to change a particular circumstance.

            b.     Ignores long term consequences.

            c.     It is a short term solution.

            d.     Adapt yourself and persuade the other person that you are like them.

      e.      Based on the beliefs and value system of the person.

    4.      Personal appeal

      a.      Based on addressing person's needs and desires.

      b.      Set aside your own personal values.

      c.      This type of appeal works well with headstrong people who insist on getting their own way.

3.12   <u>LEARNING OBJECTIVE:</u>    The student will be able to identify when words are no longer working as a force option.

   A.     When Words Fail - SAFER (security, attack, flight, excessive repetition, and revised priorities)

    1.      Security

      a.      Person seriously threatens bodily harm to an officer or the general public.

      b.      An officer's control is compromised.

    2.      Attack

      a.      An officer's personal body danger zone is violated.

      b.      A person couples aggressive words with present ability.

          Example:    a person threatens to hit you while lunging toward you.

      c.      Words and gestures alone are not an attack.

      d.      Sometimes a person displays conflicting signs, words suggest one thing and actions suggest another.

      e.      A good principle to remember is:  when words and actions disagree, trust actions.

      f.      Actions can also be misleading, but whenever words and actions disagree you should be alert and ready to use force.

    3.      Flight

      a.      When a suspect begins walking or running away.

      b.      When a person escapes from custody.

4.      Excessive Repetition

    a.      When an officer is forced to repeat the same words or ideas over and over, conclude he/she is not being persuasive.

    b.      Repeated refusal by a person to comply with a reasonable request.

    c.      When a person is unreceptive to alternatives after repeated appeals.

5.      Revised priorities

    a.      Possibly when the problem or constraints change.

    b.      Other events of greater importance occur.

3.13   <u>LEARNING OBJECTIVE:</u>      The student will be able to identify criteria relating to a professional peace officer.

A.      Definition of Professional

    1.      Employs theoretical knowledge under constantly changing and unpredictable circumstances.

B.      Criteria of Professionalism

    1.      A person who applies knowledge under varying circumstances.

    2.      Ability to communicate effectively with those persons outside of the profession.

    3.      Ability to use rhetorical elements;  PAVPO as a part of the system of processing reality.

    4.      Ability to know when to move from words to force.

        a.      There is no clear-cut simple answer.

        b.      As a professional, an officer's use of force is:

            1.      Selective - the officer knows what kind of force and how much to use.

            2.      Appropriate - used in a controlled and purposeful manner.

    5.      Ability to return to words and verbal strategies once the threat to an officer's safety (or other's safety) is over.

6.     Possess the knowledge to recognize a person's actions that indicates their being under the influence of some substance or has a mental or physical disorder.

7.     Ability to evaluate your own performance.

8.     Capability of describing and characterizing your own performance to superiors.

      a.     An officer must be consciously competent, i.e., know why you did what you did in any given situation.

3.14   <u>LEARNING OBJECTIVE:</u>     The student will be able to identify general principles relating to confrontation communication (verbal judo).

A.     Summary

    1.     PAVPO (prior analysis of a scene)

      a.     Perspective.

      b.     Audience.

      c.     Voice.

      d.     Purpose.

      e.     Organization.

    2.     PACE (elements of a confrontation)

      a.     Problem.

      b.     Audience.

      c.     Constraints.

      d.     Ethical presence.

    3.     LEAPS (method of redirecting behavior)

      a.     Listen.

      b.     Empathize.

      c.     Ask.

      d.     Paraphrase.

        e.      Summarize.

    4.    SAFER (when words fail)

        a.      Security.

        b.      Attack.

        c.      Flight.

        d.      Excessive repetition.

        e.      Revised priorities.

B.    Principles of Verbal Judo

    1.    Exhibit disinterest - be open, flexible, and unbiased.

    2.    Every situation is unique.

    3.    Usually people are flawed, not corrupt.

    4.    Establish and maintain a continuous rapport (constant "hold").

    5.    Maintain a "not me"/"otherness" perspective.

    6.    Project a clear strong ethical presence.

    7.    Check your assumptions.

    8.    Flexibility is strength - rigidity is weakness.

    9.    Employ the equity principle - treat everyone alike.

    10.    Remember the Golden Rule - treat others as you would like to be treated in the same situation.

    11.    Be professional - know your limitations.

    12.    Check your actions.

        a.      When words and actions disagree, people believe actions.

    13.    Respond rather than react.

    14.    Anticipate before getting involved.

3.15  <u>LEARNING OBJECTIVE:</u>    The student will be able to identify when it is appropriate to use weaponless control techniques.

**238**

NOTE:    This course is not designed as a "how to" course, although academies are free to add skill sessions to this course.

A.    When words do not control and the use of a weapon is not appropriate, weaponless control should be used.

    1.    Officers should be trained in this skill area and periodically practice such techniques to maintain proficiency.

    2.    Weaponless control and techniques can involve:

        a.    Restraining holds.

        b.    Impact or stunning blows.

        c.    Pain compliance techniques to cause the person to cease resistance.

B.   The first principle of self-defense is prevention.   The best method of defense against an assault is to think ahead so that you are prepared before you act.

   1.   Be aware of potential dangers.   Prepare yourself physically and mentally for physical encounters.

   2.   Avoid over-extending yourself to a point of no return.   Do not commit yourself to an act that you cannot reasonably carry out.

   3.   Maintain the proper distance to allow you adequate reaction time (generally over arms length).   Be prepared and able to step back.

C.   A second principle is if attacked it is better to move out of the line of force than to try to stop the force.

   1.   Side-step and allow the force to pass by and dissipate.

   2.   Once the force has passed, apply a control technique.

D.   Three basic concepts of weaponless control are:  self-control, balance, and awareness.

   1.   <u>Self-Control</u> alone will bring you more success in dealing physically with law violators than all the defense and control methods ever taught.   If you cannot control yourself in a stressful situation, then your skill with techniques will be neutralized.   Self-control is attained through confidence and confidence is gained through knowledge and ability.

      a.   Self-control is enhanced through practice, but practice alone will not suffice.   It is important to realize that you must understand the basic principles and theories as well as practice.

         (1)   Have practice without understanding the principles and theories is just as impractical as having theories and principles without the practice.   They are both part of the whole.   Both are equally necessary to meaningful physical control and self-defense training.

         (2)   When you apply a technique or control hold on a law violator your body does not do it by itself, your mind and body must operate in unison.

      b.   The acceptance and following of principles as a training aid is important.

    (1)    Principles allow you to explain "why" things work and why you should stand or move a certain way to accomplish your purpose.

    (2)    It is a well accepted fact that a student understands better and retains longer the training he/she receives when he/she can understand not only how, but why.

c.    Listed below are three principles used in law enforcement as they pertain to self-defense and weaponless control.

    (1)    The police role in physical arrests is essentially defensive.

        (a)    It is important to understand the word "defensive". Law Enforcement's job is to defend the public and to take the violator safely into custody.

        (b)    It is neither offensive, which means to commit the first act of hostility, nor passive, which means to endure without resistance. The definition of "defend" is to, "repel danger or harm, and to serve to protect".

    (2)    An arrest is an emotional problem as well as a physical one.

        (a)    Both you and the arrestee undergo emotional stress. You feel stress because of your attitudes and experiences in other arrest situations, and because you are never sure of the danger levels of any given situation.

        (b)    The violator feels emotions and stress because he/she is about to be arrested and taken into custody.

(3)   The mind and the body are one.

    (a)   This is physiologically true as well as being true in self-defense and weaponless control training.

    (b)   Your body sends messages to the brain through the five senses and responses to those stimuli are sent back to the body.  In most cases this cycle is a routine, everyday act of the body, but it becomes increasingly more important to understand this process when we deal with stressful situations.

    (c)   Understanding the need to improve this coordination and cooperation is essential to successful training in self-control and weaponless defense.

2.   <u>Balance</u>

a.   Balance consists of two different areas; mental balance as well as physical balance.

    (1)   Mental balance is being prepared through training and practice to first, control your own emotional and physical self, and then being prepared to control the violator and, ultimately, the situation.  In every situation you should be able to think the problem all the way through to its successful completion.  Do not allow the emotional level of the violator or situation to overcome your self-control and balance.

    (2)   Physical balance is the position that allows you the ability to move while maintaining balance, strength and advantage.

34

**242**

b.   The basic position of balance is the "position of interrogation".

(1)   Proper positions

(a)   Distance - proper distance gives you time to react.

1)   Just outside suspect's reach.  Slightly more than arm's length.

HAZARD:   <u>If you can touch a suspect, you are generally too close.</u>

2)   Be able to see suspect from head to foot, and you can see everything in between. Do not stare into suspect's eyes.  Watch the suspect's shoulders as they will telegraph any movement.

(b)   Gun side away from suspect.  Keep weapon as inaccessible to suspect as possible.

(c)   Balanced stance-right or left handed.

1)   Lead foot pointed directly at suspect.

2)   Rear foot slightly to rear at approximately a 45 degree angle.

3)   Do not lock your knees; bend them slightly to facilitate any defensive movement.

3.   <u>Awareness</u> - Awareness is basically observing the entire situation and being specifically aware of some major hazards to the law enforcement officer when approaching a suspect.

a.   Five major concerns when approaching a suspect are:

(1)   Where are the suspect's hands?  If they are in his/her pockets, <u>do not</u> tell him/her to remove them.  Try not to draw attention to your concern until you are in a position to remove them safely.  (After maneuvering to a safer position).

(2)   Weapons

35

**243**

        (a)    Visually frisk suspect, especially the waistline area.

        (b)    Anything in the immediate area that could be used as a weapon in its natural state.

    (3)    Associates, relatives - <u>anyone</u> who may come to the suspect's aid or assistance.

    (4)    Escape routes - you should be aware of possible escape routes the suspect may take when confronted. The suspect is likely to be more familiar with an area than the officer, especially in his/her own home, neighborhood, etc.

        (a)    Doors

        (b)    Dark rooms

        (c)    Dark yards

    (5).    Your footing - where are you standing and what is the terrain like?

        (a)    Roadway curb

        (b)    Staircase

        (c)    Front porch

        (d)    Obstacles:  Furniture, water, shrubs

        (e)    Sloping ground

D.    Areas of the body most vulnerable to physical attack:

    1.    Head - face

    2.    Neck - larynx, trachea

    3.    Chest

    4.    Abdomen

     5.     Groin

     6.     Legs

E.     Areas of the body which may be potentially fatal:

     1.     Head

     2.     Neck

     3.     Throat area

F.     Parts of the body which can be used as weapons and are capable of producing damage and/or pain:

     1.     Head - by butting

     2.     Hands - fists and fingers

     3.     Arms - elbows, forearms

     4.     Feet

     5.     Legs - knees

NOTE:     Learning Objectives 3.16, 3.17, and 3.18 are optional depending on local policies.

3.16   <u>LEARNING OBJECTIVE:</u>     The student will be able to identify factors relating to the justification for use of electrical or chemical weapons.

A.     Description of electrical weapons

     1.     A hand-held electronic weapon capable of emitting an electrical charge. (e.g., stun guns, lasers).

     2.     When used properly it can effectively coerce, repel, stun, disorient, or incapacitate an individual during contact, and for several minutes after contact with the instrument has ceased.

     3.     When used properly it is recognized as safe, non-injurious, and non-lethal by the medical and scientific communities.

B.     Justification For Use

     1.     It can be utilized by all officers regardless of their physical size, strength, and speed.

     2.     Minimal training time is required.

3.    No special skills need be acquired, other than basic defensive blocks, holds, and takedowns.

4.    It can be utilized at almost all levels of non-lethal force:

    a.    Coercion.

    b.    Repellent.

    c.    Stunning.

    d.    Non-injurious incapacitation.

5.    Non-injurious short term incapacitation reduces the chance of using excessive force.

6.    Enhances the officer's ability to respond to threats safely.

3.17    <u>LEARNING OBJECTIVE</u>:    The student will be able to identify possible situations in which the electrical or chemical weapons can be used.

A.    Against animals that are violent and threatening.

B.    As a tool to gain compliance with a lawful verbal command.

    1.    This method would only be authorized in situations where the verbal order was lawful and where failure to comply with that verbal order would establish probable cause to justify an arrest.

C.    To overcome physical resistance to an arrest and/or search.

D.    To prevent officer injury; protection of self.

E.    To prevent injury to civilians or other officers.

F.    To control violent crowd situations in order to prevent injury to officers or civilians.

G.    To control a violent suspect who is in custody but still causing injury to himself, an officer, other civilians or damage to property.

3.18    <u>LEARNING OBJECTIVE</u>:    The student will be able to identify types of <u>unauthorized</u> use of the electrical or chemical weapons.

A.    To threaten, harass, taunt, belittle or abuse anyone.

B.    Use in areas where there are heavy concentrations of combustible materials.

    1.    Sparks from the electrical weapons are capable of igniting flammable materials.

C.    Use above the shoulders of electrical weapons (i.e., neck, head, eyes, etc.).

3.19    <u>LEARNING OBJECTIVE:</u>    The student will be able to identify when it is appropriate to use a baton or impact weapon.

A.    A baton is classified in the Penal Code as a weapon capable of inflicting serious bodily injury or death.  (46.01 (1) P.C.)

B.    Use of the baton is proper in lawful situations requiring a degree of force greater than that readily provided by weaponless control techniques, but less than that provided by resorting to the use of deadly weapons.

C.    Situations which may necessitate the use of a baton.

    1.    When an officer is a member of a tactical squad in a crowd or riot control formation, the baton may be used to move, separate, disperse or deny a person access to a structure or through an area.

    2.    When an officer is attacked by a suspect armed with a non-firearm type weapon, the officer may use the baton to disarm, distract, or disable the suspect, or to hold the suspect at bay until additional assistance arrives.

    3.    When the officer is assaulted by an unarmed suspect, the baton can be used to disable the suspect; or to defend against an assault.

    4.    When the officer is confronted by several suspects who are threatening the officer; when the suspects are capable of carrying out the threats, and when they make an overt act to carry out the threats, the officer may use the baton to fend off an attack or assault and make an arrest(s).

    5.    When the officer is confronted by a suspect or suspects who he/she has reasonable cause to believe committed a crime, and the suspect or suspects refuse or fail to comply with the officer's direction prior to searching or handcuffing, the baton may be used to obtain compliance.

        a.    The officer has the burden to justify the use of a baton by the totality of circumstances.

        b.    Additional facts tending to justify the baton's use are:

        (1)      The physical stature of the suspect as compared to the officer.

        (2)      The need for immediate control of the suspect or situation due to a tactical consideration; the officer's perception of the suspect's knowledge or apparent knowledge of a martial art form; or assumes an aggressive stance; or the suspect's inability to be controlled by lesser means due to the influence of alcohol and/or drugs.

    6.    Section 9.51 P.C.

D.    Guidelines for Using Baton

    1.    The baton should normally be positioned between you and the suspect.

    2.    If the baton is held in either the right or the left hand, a good defensive position should be maintained.

    3.    Do not intentionally use a baton to strike at the head or throat.

        a.    Head is easiest part of the body for the suspect to defend.

            (1)    Suspect has hands and arms to defend against blow.

        b.    Easy for officer to lose control of baton to suspect.

        c.    If the head is struck, it could cause serious injury.

    4.    The baton should not be used to apply a choking technique.

E.    Vulnerable Areas

    1.    There are certain areas and parts of the body that are particularly vulnerable. When the baton is used against certain parts of the human body, it can cause serious injury. It is up to the officer to use caution.

    2.    Areas which are particularly vulnerable:

        a.    Head

        b.    Neck

        c.    Throat

        d.     Spine

    3.     Use of the baton against these points is considered by some departments to be justified only when deadly force is justified.

F.    Target Areas

    1.     Hands, wrist, elbows

    2.     Knees, shins

    3.     Chest, midsection

    4.     The above areas are appropriate targets to control subjects in most situations.

G.    Limitations

    1.     Officers should receive appropriate skill training and hands-on practice before using a baton in the line of duty.

    2.     Departments frequently place limitations on the use of batons.  It is crucial that officers know and adhere to their agency's policy if they are to avoid serious problems from criminal and civil sanctions.

## TEXAS COMMISSION ON LAW ENFORCEMENT OFFICER STANDARDS AND EDUCATION

### LEARNING OBJECTIVES

### UNIT IV

#### 4.0   DEADLY FORCE

THIS GUIDE IS DESIGNED TO ASSIST THE INSTRUCTOR IN DEVELOPING AN APPROPRIATE LESSON PLAN OR PLANS TO TEACH THE LEARNING OBJECTIVES, WHICH ARE REQUIRED AS MINIMUM CONTENT OF THE INTERMEDIATE PEACE OFFICERS COURSE.  THE FOLLOWING METHODS AND REFERENCE MATERIALS ARE PRESENTED AS SUGGESTIONS.

METHODS:

- Lecture
- Discussion
- Audio Visual

REFERENCE MATERIALS:

Farber, Bernard J., "Liability Issues In Use of Deadly Force", Defense Manual, #85-4, Glen Ellyn, IL: Americans for Effective Law Enforcement, Inc., 1985.

Geller, William A., "Deadly Force:  What We Know," Journal of Police Science and Administration, International Association of Chiefs of Police, Inc., 1982.

Matulia, supra

Model Rules for Peace Officers:  A Resource Manual on Police Discretion and Rulemaking, Austin, Texas:  Texas Advisory Commission on Intergovernmental Relations, 1980.

Standards for Law Enforcement Agencies, Fairfax, VA:  Commission on Accreditation for Law Enforcement Agencies, Inc., 1984.

Training Key Volume Fourteen, International Association of Chiefs of Police, 1983.

4.0   DEADLY FORCE

> FUNCTIONAL AREA:   The student will be able to identify the appropriate uses of deadly force as defined by court decisions.  The student will be able to identify the typical post shooting reactions by officers and their departments including psychological and investigative responses.  The student will be able to demonstrate on a written objective type examination an understanding of this area to a specified percentage.

4.1   LEARNING OBJECTIVE:   The student will be able to identify issues that should be addressed in an agency's deadly force policy.

> Instructor Note: Issues identified and discussed should include not only the use of force, but impact and effect on officers who use deadly force as a response option.

A.   Defense of Life

  1.   An officer may use deadly force to protect himself or others when and to the degree he reasonably believes an immediate threat of death or serious bodily injury exists to himself or others.

  2.   Penal Code - Chapter 9

B.   "Fleeing Felon" Rule

  1.   Limited by Tennessee v. Garner, 105 S.Ct. 1694 (1985).

  2.   The rule has been modified by the Supreme Court, but not eliminated.

C.   Risk to Innocent Bystanders

  1.   An officer should not use deadly force if there is a risk that an innocent person could be killed or injured.

  2.   While an officer might be justified in the discharge of his weapon, the law requires that he do so with reasonable prudence to avoid injury to others and that he exercise care commensurate with the danger involved.

  3.   Cases dealing with risk to innocent bystanders.

    a.   Supreme Court of New Jersey v Hellwig, 21 N.W. 412, 122 A.2d 497 (1956).

    b.   Popow v City of Margate, 476 F. Supp. 1237 (D.C. N.J. 1979);

    c.   Grandstaff v City of Borger, 767 F.2d 161 (1985).

    d.   Coon v Ledbetter, 780 F.2d 1158 (5th Cir. 1986).

D.    Shots At or From a Motor Vehicle

    1.    Shooting at or from a motor vehicle raises these issues:

        a.    Difficulty in hitting the target.

        b.    Ricochets striking innocent persons.

        c.    Population densities.

        d.    Difficulty in penetrating steel belted radial tires.

        e.    Inability to put a stop to vehicle momentum even when the target suspect is hit.

        f.    Liability from what may happen when suspect is disabled and control of suspects vehicle is lost.

E.    Warning Shots

    1.    Most departments have policies against using warning shots or shots to summon assistance.

    2.    Reasons why warning shots should not be used:

        a.    Risk to innocent persons.

        b.    The threat of an inappropriate response from other officers who mistake the warning as an intended shot and subsequently shoot at the suspect.

        c.    Using a warning shot as an excuse that hitting a person was not intended.

        d.    Warning shots may prompt a suspect to return fire when his original intention was to flee.

        e.    There may be legal consequences associated with a warning shot that strikes an unintended target.

    3.    Relevant case:  <u>Jones v Wittenberg University,</u> 534 F.2d 1203 (6th Cir. 1976).

F.    Shots to Destroy Animals

    1.    The killing of an animal is justified:

        a.    For self-defense.

44

**252**

b.    To prevent substantial harm to the officer or another.

c.    When the animal is so badly injured that humanity requires its relief from further suffering.

2.    A seriously wounded animal should be destroyed only after all attempts have been made to obtain assistance from animal control, the humane society, or other agency responsible for animal control and disposal.

3.    Officer and bystander safety are paramount concerns.

4.    Officers have been killed by ricochets when destroying animals.

G.    Back-up or Secondary On-duty Weapon

1.    Many peace officers carry a concealed secondary weapon.

2.    The reason for this practice is that officers are concerned about being disarmed during a confrontation.

3.    A major criticism of the back-up weapon is that it may be intended or used as a "throw-down" gun in the event that an officer shoots an unarmed suspect.

4.    In order to protect officers from such allegations a strict policy of registering all back-up weapons carried must be followed.

5.    The officer should qualify with all weapons carried.  415.035 Texas Government Code

6.    Relevant case:  Webster v City of Houston, 735 F.2d 838 (5th Cir.) (en banc), rev'd on other grounds, 739 F.2d 993 (5th Cir. 1984) (en banc).

H.    Off-Duty Weapons

1.    Law enforcement agencies vary in their requirements that officers carry firearms while off-duty.

2.    Some departments require their officers to carry weapons off-duty, others give the officer the option, and still others prohibit the practice.

3.    Research shows that off-duty law enforcement officers account for about 20 to 25 percent of total justifiable homicides.

4.    Departments which make it mandatory to carry an off-duty weapon experience a higher percentage of off-duty deaths of both

officers and citizens than do departments with an optional off-duty
weapon policy.

     5.     The officer should register and qualify with <u>all</u> weapons carried off-
duty pursuant to agency policy.

I.     Certain guidelines should be provided for in an  agency's deadly force
policy.

     1.     When to shoot.

     2.     The investigative procedure after a shooting.

     3.     Firearm equipment requirements.

     4.     Firearms training.

J.     PTSD among Police officers: What's happening and Why?
     1.     Of all the incidents officers are dispatched to resolve, few will
create either as much stress and/or danger as presented in
domestic violence (DV) disputes. Because of Violence Against
Women Act (VAWA) and increased reporting of physical/sexual
abuse, police officers are responding to more calls where use of
force will be an element of the confrontation. Whether initially used
against the officer by the suspect or as a response by the officer to
the suspect, DV calls now account for a large majority of peace
officer fatalities while in the line of duty.
     2.     Although some officers do not feel fear during a shooting, they still
sense imminent danger to themselves or others that met the
standard for using deadly force.

     3.     PTSD is not just a "shooting related" disorder. Police officers are
exposed to traumatic events such as seeing abused children or dead
bodies, severe assaults and involvement in using deadly force.

     4.     Four symptoms related to PTSD which officers may experience:
A. Reliving the event (nightmares, flashbacks, or triggers)
B. Avoiding situations that remind you of the event, or isolation in
general
C. negative changes in beliefs and feelings
D. heightened state of awareness or anxiety

4.2     <u>LEARNING OBJECTIVE:</u>     The student will be able to identify the fleeing
felon rule established in common law.

A.     The common law rule was that law enforcement officers could use deadly
force to arrest for a felony or to prevent the escape of any fleeing felon.

     1.     The officer did not have to be in any danger in order to shoot a
fleeing felon.

2.    It did have to be reasonably necessary to prevent the escape, to effect the arrest, or to prevent the imminent occurrence of a felony.

3.    Arose at a time when almost all felonies were punishable by capital punishment.

4.    Deadly force could not be used to apprehend a misdemeanant.

B.    Majority of law enforcement agencies had already rejected the fleeing felon rule by their policy.  Only 7.5% of departments explicitly allowed the fleeing felon rule at the time of the <u>Garner</u> decision.

C.    Modified by <u>Tennessee v Garner,</u> 105 S.Ct. 1694 (1985).

4.3    <u>LEARNING OBJECTIVE:</u>    The student will be able to identify key elements of the most significant court case(s) concerning the use of deadly force.

A.    <u>Tennessee v Garner,</u> 105 S.Ct. 1694 (1985)

1.    Previous charges of excessive force via the U.S. Constitution focused on lack of due process (6th and 14th amendments) and/or cruel and unusual punishment (8th amendment).

2.    The <u>Garner</u> case focused on the 4th amendment constitutional right to be free of unreasonable seizure.

a.    "A police officer may not seize an unarmed, non-dangerous suspect by shooting him dead."

B.    Some unclarity in the <u>Garner</u> case

1.    Language in that case stated that:

a.    Deadly force "may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."

b.    "It is not unconstitutional on its face.  Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not unconstitutionally unreasonable to prevent escape by using deadly force.  Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used

47

**255**

if necessary to prevent escape, and if, where feasible, some warning has been given."

2.    Statement 1-a focuses on present dangerousness while statement 1-b seems to focus on the crime that was just committed.

3.    Section 9.51 (c) Texas Penal Code focuses on the crime committed and/or the risk to the officer or others if the arrest is delayed.

4.    The <u>Garner</u> case does not clearly modify section 9.51.  Officers should look to their department's policy and procedures or rules for guidance.

4.4    <u>LEARNING OBJECTIVE:</u>    The student will be able to identify three psychological reactions that officers often experience following a shooting incident.

A.    The Shooting

1.    A common experience of officers who use deadly force is the viewing of the event in "slow motion".

2.    Because of being under physiological stress, the officer's senses are keenly attuned to the event.

3.    Some officers have reported seeing the bullet leave their gun and enter the suspect.  They see blood come out of the suspect's body and his body bend and slowly fall to the ground and hear the suspect's screams.

B.    Flashbacks

1.    Sometimes the shooting is re-lived in dreams and nightmares.

2.    Many officers involved in shootings have nightmares that reflect their unexpressed feelings about the violent event.

3.    Sometimes conscious recognition of past shooting incidents occurs.

Example:    When driving by the location of a past shooting, the officer may re-live the event.

C.    Fear

1.    Whenever an officer relieves a shooting incident, fear is experienced.

2.    Not just fear associated with the violent aspect of the event, but also fear related to being unable to forget the traumatic incident.

48

     3.     Some officers begin to fear insanity when they cannot "shake" memories of the shooting.

     4.     Fear may also revolve around real or imaginary retribution.

     5.     Most commonly, officers fear having criminal or civil charges filed against them.  While officers only have seconds to make decisions, prosecuting and plaintiff's attorneys have months to examine every possible alternative in a situation.

     6.     Even if completely exonerated from any wrong doing, the officer recognizes that their future involvement in such an incident may result in an attempt to show a "pattern of unjustified violence".

     7.     Fear may cause an officer to avoid violent confrontation or react too slowly because of the consequences.

4.5    <u>LEARNING OBJECTIVE:</u>    The student will be able to identify the 5 phases of transition that persons who experience traumatic events typically go through.

    A.    Denial Phase

        1.    A tendency to reject the traumatic incident.

        2.    Refusal to believe the event occurred.

        3.    In officer-related shootings this phase may be brief or nonexistent because of the necessity to immediately deal with the aftermath of the event.

    B.    Anger Phase

        1.    Feeling anger or resentment that the traumatic event "had to happen to me".

    C.    Bargaining Phase

        1.    A wish that the event had never taken place.

        2.    An officer wishes he could "take back the bullet".

    D.    Depression Phase

        1.    This phase is often the longest.

        2.    Its severity depends on:

            a.    The individual's basic personality.

        b.        The nature of the event.

        c.        The reaction of the department.

        d.        The reaction of the community.

        e.        The officer's support system.

E.        Acceptance Phase

    1.        The Officer:

        a.        "Gets over" the total preoccupation with the event.

        b.        Accepts the fact that the event occurred.

        c.        Resumes a normal life.

4.6    <u>LEARNING OBJECTIVE:</u>    The student will be able to identify various post-shooting services available to officers.

A.        Legal Services

    1.        Departments should provide their officers with legal assistance and guidance.

    2.        Litigation arising out of police use of deadly force can occur many years after the incident.

    3.        It is important to prepare a defense of an officer's use of force immediately after the incident occurs by compiling relevant documentation.

B.        Psychological Services

    1.        An officer involved in a shooting undergoes a self-examination of their moral and ethical conscience.

    2.        If properly controlled this "soul-searching" can be a beneficial and healthy experience.

    3.        Some officers mentally crumble under the strain of soul searching after a shooting.

    4.        Psychologists working with police officers say that almost all officers go through similar experiences after the use of deadly force.

        a.        Officers become less aggressive in their work.

        b.        Officers become more introspective about their role as public servants.

     c.     Other officers treat them with fascination.

     d.     City officials are likely to publicly keep their distance from the officer.

     e.     The officer's family relationship may become strained.

     f.     The officer will probably experience flash-backs and nightmares.

     g.     A very high proportion of officers involved in fatal shootings ultimately leave their departments because of stress disability.

5.     Departments should encourage religious or psychological counseling to officers following a shooting incident.

6.     Where these services are provided, the results seem positive.

7.     The family of the involved officer also faces stress and often times are completely forgotten by the department and the officer.

8.     This isolation is psychologically unhealthy and must be overcome.

9.     The psychologist and clergy can assist by providing professional services to both officer and family.

C.     Administrative Leave

1.     An officer involved in a shooting incident needs time to think about the experience.

2.     An officer should meet with a psychologist and an attorney and may want to talk with a clergy member.

3.     The officer and department are subjected to community and media pressure.

4.     These pressures and the need for time to think places the department under some obligation to temporarily relieve the officer from the challenges of law enforcement duties.

5.     Many departments do not recognize this need, while others that have recognized it stigmatize the officer by placing him or her on "suspension".

6.     The term "suspension" carries negative connotation.

7.     When an officer is "suspended pending an investigation", the media, the public, and officers see this as a disciplinary reaction to an incident.

51

**259**

8.   To avoid this stigma, yet provide the officer with a few days of paid time off, "administrative leave" is recommended.

4.7   <u>LEARNING OBJECTIVE:</u>   The student will be able to identify typical procedures that are followed after an officer involved shooting.

A.   Departmental Policy

1.   Each department has its own procedures for investigating an officer involved shooting.

2.   Most agencies have extensive investigative requirements in such circumstances.

B.   Typical Procedures

1.   When an officer is involved in a shooting he or she must:

a.   Determine the physical condition of any injured person.

b.   Render first aid when necessary.

c.   Summon necessary medical aid.

d.   Notify the dispatcher of the incident and location.

2.   The officer is required to remain on the scene (unless injured) until investigators arrive.

3.   The officer must protect his or her weapon for examination, treat it as potential evidence, and submit it for investigation.

4.   The officer must prepare a detailed report of the incident.

5.   An officer is usually permitted to discuss the case with supervisory and assigned investigative personnel, the assigned District Attorney (or officer's attorney), psychologist, clergy, or immediate family.  Discussion with anyone else is prohibited.

NOTE:   Emphasize that each department has its own procedures and that the officer should follow those procedures.

4.8   <u>LEARNING OBJECTIVE:</u>   The student will be able to identify typical procedures that are followed in an internal affairs investigation of excessive force.

**260**

A.    Each department has its own policy and procedures concerning internal affairs investigations.  Officers should be aware of these practices.

B.    Where there is the possibility of criminal charges being filed many departments will conduct separate investigations.

   1.    Garrity v New Jersey,  385 U.S. 493 (1967) ruled that evidence gathered from an employee under threat of dismissal was not admissible in a criminal trial.

C.    During an administrative investigation, officers may be compelled to answer questions, participate in a line-up, or take a polygraph examination.

   1.    If the officer is warned of the possible consequences of non cooperation, he may be disciplined.

   2.    This information is not admissible under Garrity v New Jersey.

D.    If an officer is under arrest or is a suspect in a criminal investigation and any answer sought by the investigator (or any information derived from such answer) is intended for use in a criminal trial, the officer must be given the Miranda warning contained in Article 15.17 and 38.22 of the CCP.

E.    Texas statutes provide guidelines for investigations.

   1.    614.021 - .023 Texas Government Code.

      a.    Guthery v. Taylor, 112 SW3d 715, (Tex. App. – Houston {14th Dist.} 2003, no pet.).

   2.    143.051 - .056 Texas Local Gov't Code.

   3.    158.031 - .051 Texas Local Gov't Code.

**TEXAS COMMISSION ON LAW ENFORCEMENT OFFICER
STANDARDS AND EDUCATION**

**LEARNING OBJECTIVES**

**UNIT V**

**5.0   LEGAL ISSUES**

THIS GUIDE IS DESIGNED TO ASSIST THE INSTRUCTOR IN DEVELOPING AN APPROPRIATE LESSON PLAN OR PLANS TO TEACH THE LEARNING OBJECTIVES, WHICH ARE REQUIRED AS MINIMUM CONTENT OF THE INTERMEDIATE PEACE OFFICERS COURSE.   THE FOLLOWING METHODS AND REFERENCE MATERIALS ARE PRESENTED AS SUGGESTIONS.

METHODS:

- Lecture
- Discussion
- Audio Visual

REFERENCE MATERIALS:

Del Carmen, Rolando V., "Legal Liabilities and Responsibilities of Corrections Agency Supervisors," Federal Probation, September 1984.

Farber, supra

Matulia, supra

Silver, Isidor, Police Civil Liability, New York:  Matthew Bender, 1986.

Reynolds, William Bradford, "Remarks Before the National Sheriff's Association", U.S. Department of Justice:  Nashville, Tennessee, June 20, 1983.

5.0   LEGAL ISSUES

FUNCTIONAL AREA:        This section will expose students to a myriad of legal issues that revolve around the inappropriate use of force.  Legal issues that will be covered include criminal liability, civil torts, civil rights violations, damages, attorney fees, constitutional rights, vicarious liability legal theories, and defense strategies.  The student will be able to demonstrate on a written objective type examination an understanding of this area to a specified percentage.

5.1   LEARNING OBJECTIVE:        The student will be able to identify the possibilities of criminal charges being filed in civil rights cases involving excessive force.

A.      Conspiracy against rights of citizens-Title 18 Section 241 United States Code Annotated.

B.      Deprivation of rights under color of law - Title 18 Section 242 United States Code Annotated.

1.      United States v. Contreras,  134 F. Supp.2d 820 (S.D. Texas 2000),

2.      United States v Bradley,  196 F.3d 762 (7th Cir. 1999).

3.      United States v Daniels,  281 F.3d 168 (5th Cir. 2002

C.      Federal civil rights complaints are investigated by the FBI.

1.      10-12,000 complaints a year, one third are investigated with about 75 to 100 presented to a grand jury.

2.      They look for clearly offensive, deliberate, and willful misconduct.

3.      They may, if an agency is taking swift decisive action to punish misconduct, defer to that administrative process.

D.      No good faith defense for criminal violations.

E.      Violations of the Civil Rights of a Prisoner - Article 39.04 Texas Penal Code.

1.      Gordon v State,  681 S.W.2d 629 (Texas App. 14 District 1984), reversed 707 S.W.2d 626 (Tex. Cr. App. 1986).

5.2   LEARNING OBJECTIVE:        The student will be able to define and identify tort suits, the three degrees of tort actions, and breach of duty.

A.      Tort Suits - suits brought in state court when one person feels that they have suffered some injury because of the fault of another.

55

**263**

B.   Negligence - failure to exercise the proper degree of care a prudent or reasonable person would exercise in similar circumstances.

C.   Gross Negligence - an aggravated form of negligence where the wrongdoer acts with reckless disregard for the probable consequences of their actions.

D.   Intentional Action - occurs when a person willfully engages in an act where the chance that harm will result is so great that they must be "aware" that harm will occur.

E.   Winning a tort suit requires proof that there was a duty which was breached, and the breach caused the injury or damage.

5.3   <u>LEARNING OBJECTIVE:</u>   The student will be able to identify governmental liability under the Texas Tort Claims Act.

A.   A governmental unit is only liable in Texas Courts to the extent that the Texas Tort Claims Act permits.

B.   Texas Civil Practice and Remedies Code (TCPRC).

   1.   Section 101.001

   2.   Section 101.021

   3.   Section 101.023 through Section 101.027

   4.   Section 101.055 through Section 101.057

   5.   Section 101.103

   6.   Section 101.105 and Section 101.106

C.   Cases relevant to the Texas Tort Claims Act

   1.   <u>Forbus v City of Denton,</u> 595 S.W.2d 621 (Texas Civ. App. 1980).

   2.   <u>State v Terrell,</u> 574 S.W.2d 616 (Texas Civil App. 1978), 588 S.W.2d 784 (Sup. Ct. 1979).

   3.   <u>County of Brazoria v Radtke,</u> 566 S.W.2d 326 (Texas Civil App. 1978).

   4.   <u>City of San Antonio v Higle,</u> 685 S.W.2d 682 (Texas App. 4 District 1984), ref. n.r.e.

   5.   <u>City of Amarillo v Langley,</u> 651 S.W.2d 906 (Texas App. 7 District 1983).

5.4     <u>LEARNING OBJECTIVE:</u>     The student will be able to identify the four elements of Title 42 U.S.C. Section 1983, the Civil Rights Act of 1871.

    A.     The Civil Rights Act of 1871 was originally passed to protect the civil rights of the recently freed slaves in the south.

    B.     It is often referred to as a "Section 1983" suit because it is found in Title 42 of the United States Code under Section 1983.

    C.     Section 1983 is the most important federal civil rights statute involved in actions against the police.

    D.     Section 1983 provides that every person shall be liable to the party injured who:

        1.     Under color of state law

        2.     Subjects or causes to be subjected

        3.     Any citizen or inhabitant

        4.     To the deprivation of any rights, privileges or immunities secured by the Constitution and laws.

5.5     <u>LEARNING OBJECTIVE:</u>     The student will be able to identify major constitutional provisions that are used as the basis for Section 1983 actions involving police use of force.

    A.     The Fourth Amendment

        1.     <u>Wolf v Colorado,</u>  69 S.Ct. 1359 (1949).

        2.     <u>Tennessee v Garner,</u>  105 S.Ct. 1694 (1985).

    B.     The Fifth Amendment (in part)

        1.     <u>Benton v Maryland,</u> 89 S.Ct. 2056 (1969).

    C.     The Eighth Amendment

        1.     <u>Robinson v California,</u>  82 S.Ct. 1417 (1962).

    D.     The Fourteenth Amendment

      1.      <u>Grandstaff v City of Borger,</u> 767 F.2d 161 (1985).

5.6    <u>LEARNING OBJECTIVE:</u>     The student will be able to identify certain basic principles of the nature and scope of Section 1983 that have emerged from Supreme Court decisions.

A.    Section 1983 must be carefully read and understood in the context of interpretations by the federal courts, especially the United States Supreme Court.

B.    Occasionally, where congress has disagreed with a particular judicial interpretation, it has acted to amend the statute.

      1.      <u>District of Columbia v Carter,</u> 93 S.Ct. 602 (1979).

C.    Basic principles that have emerged from readings of Supreme Court decisions:

      1.      Section 1983 itself creates neither substantive rights nor jurisdiction in the federal courts.

            a.      <u>Chapman v Houston Welfare Rights Organization,</u> 99 S.Ct. 1905 (1979).

      2.      The plaintiff suing under Section 1983 must specifically plead federal jurisdiction under the appropriate jurisdictional statute.

      3.      Section 1983 is available to a plaintiff even if the conduct alleged also violates state law.

            a.      <u>Monroe v Pape,</u> 81 S.Ct. 473 (1961).

      4.      A plaintiff suing under Section 1983 need not bring separate state and federal actions.

            a.      <u>Migra v Warren City School District Bd. of Education,</u> 104 S.Ct. 892 (1984).

      5.      There is no requirement that a section 1983 plaintiff first exhaust his remedies under state law.

            a.      <u>Monroe v Pape,</u> supra.

            b.      <u>Patsy v Florida Board of Regents,</u> 102 S.Ct. 2557 (1982).

      6.      The actions complained of must have been taken under color of law or use of authority even if the defendant was misusing his authority.

            a.      <u>Monroe v Pape,</u> supra.

       b.    <u>Patsy v Florida Board of Regents,</u> supra.

7.    In order to have valid Section 1983 claim instead of a state tort claim, it is necessary to prove that actions taken were beyond mere negligence.

       a.    <u>Daniels v Williams,</u>  106 S.Ct. 662 (1986).

       b.    <u>Davidson v Cannon,</u>  106 S.Ct. 668 (1986).

8.    The defendant's actions must be the legal cause of the harm alleged by the plaintiff.

       a.    <u>Martinez v California,</u>  100 S.Ct. 553 (1980).

5.7   <u>LEARNING OBJECTIVE:</u>      The student will be able to identify types of relief or damages that are available in a tort or Section 1983 suit.

    A.   Section 1983 cases frequently involve injunctive relief telling someone (usually the agency) not to do something or to do something.

    B.   Three types of monetary damages can be awarded a plaintiff if they win the suit.

        1.   Nominal damages can be awarded when the plaintiff cannot prove a substantial loss or injury, usually $1.00.

        2.   Compensatory damages can be awarded to compensate for their actual loss.

        3.   Punitive damages can be awarded over and above compensatory damages if the defendant acted in a wanton, reckless, malicious, or fraudulent manner or acted with "reckless and callous indifference" to the rights of the plaintiff.

        4.   Punitive damages cannot be awarded against a local government.

        5.   Punitive damages usually must be paid by the individual and not the governmental entity or insurance company.

        6.   Cases dealing with types of damages.

            a.   <u>Smith v Wade,</u>  105 S.Ct. 1623, 33 Cr.L. 3021 (1983).

            b.   <u>Carlson v Green,</u>  446 U.S. 14 (1980).

            c.   <u>Newport v Fact Concents, Inc.,</u>  453 U.S. 247 (1981).

            d.   <u>Palmer v Hall,</u>  517 F.2d 705 (5th Cir. 1975).

5.8   <u>LEARNING OBJECTIVE:</u>      The student will be able to identify the potential for loss of large sums of money to pay for attorney fees under Title 42 Section 1988 U.S.C.A. even if compensatory or punitive damages are small.

    A.   Title 42 Section 1988 U.S.C.A. passed in 1976 allows the court to award reasonable attorney fees to the prevailing party.

    B.   In many cases awards for attorney fees have greatly exceeded awards for damages.

    C.   Making an early settlement offer can stop the "meter" of attorneys charges if the actual damage awarded later is less than the offer.

    D.   Cases dealing with attorney fees.

        1.   <u>McNamara v Moody,</u>  606 F.2d 621 (5th Cir. 1979).

2.      <u>Dean v Gladney,</u>  621 F.2d 1331 (5th Cir. 1980), cert. d 101 S.Ct. 1521.

3.      <u>Swope v Bratton,</u>  541 F.Supp. 99 (1982).

4.      <u>Smiddy v Varney,</u>  574 F.Supp. 710 (1983).

5.      <u>Marek v Chesny, Ill.,</u>  105 S.Ct. 3012 (1985).

6.      <u>Kentucky v Graham,</u>  105 S.Ct. 3099 (1985).

7.      <u>Hensley v Eckerhart,</u>  461 U.S. 424.

8.      <u>City of Riverside v Rivera,</u>  39 Cr.L. 3241 (6-27-86).


5.9      <u>LEARNING OBJECTIVE:</u>      The student will be able to identify opportunities for legal representation and indemnification as provided by statute, local ordinance, or local policy in an excessive force case.

A.      Indemnification - to make good another's loss caused by some particular act or omission.  (Cochran's Law Lexicon, 5th edition)

B.      County employees

1.      157.903 Local Government Code.

2.      Chapter 102, Texas Civil Practice and Remedies Code.

C.      City or special purpose district peace officers.

1.      157.903 Local Government Code.

2.      Chapter 102, Texas Civil Practice and Remedies Code.

D.      State Employees

1.      Chapter 104, Texas Civil Practice and Remedies Code.


5.10      <u>LEARNING OBJECTIVE:</u>      The student will be able to identify the role their agency's written directives have in the officer's liability.

A.      Written directives of an agency may be used against the officer and/or the agency.

B.     Written directives of an agency may be used to support the officer and/or the agency.

C.     An officer using more force than the agency's written directives allow is increasing his vulnerability to legal liability.

D.     The good faith defense for an officer is greatly enhanced when following the written directives of the department.

E.     Cases dealing with the role of written directives.

     1.     <u>Dillinbeck v City of Los Angeles,</u> 72 Cal. Reporter 321, 446 P.2d 129 (Cal. 1968).

     2.     <u>Delong v City and County of Denver,</u> 530 P.2d 1308 (Colo. App. 1947).  Affirmed 545 P.2d 154 (January 26, 1976).

     3.     <u>City of San Antonio v Higle,</u> 685 S.W.2d 682 (Texas App. 4 District 1984), ref. n.r.e.

5.11    <u>LEARNING OBJECTIVE:</u>     The student will be able to identify officer liability in not following prudent police procedures prior to the decision to use force.

A.     Failure to follow proper procedures can make a situation more dangerous.

B.     Failing to follow prudent procedures in stopping and confronting suspects may increase the risk that force be used.

C.     An officer can be found liable in his justified use of deadly force if his negligent conduct created a danger for himself or others.

D.     Relevant cases.

     1.     <u>Young v City of Killeen, Texas,</u> 775 F.2d 349 (5th Cir. 1985).

     2.     <u>Cheatham v City of New Orleans, La.,</u> 378 So.2d 369.

5.12    <u>LEARNING OBJECTIVE:</u>     The student will be able to identify possible personal liability for failure to stop other officers from using excessive force in his presence.

A.     A police supervisor has an affirmative duty to intervene to stop officers who are engaging in excessive force in his presence.

B.     A non-supervisory officer has an affirmative duty to intervene to stop officers and/or supervisors who are engaging in excessive force in his presence.

C.    Relevant cases dealing with liability for failure to intervene.

    1.    <u>Webb v Hiykel,</u>  713 F.2d 405 (8th Cir. 1983).

    2.    <u>Byrd v Brishke,</u>  466 F.2d 6 (7th Cir. 1972).

    3.    <u>Whirl v Kern,</u>  407 F.2d 781 (5th Cir. 1968).

    4.    <u>Putman v Gerloff,</u>  639 F.2d 415, 423 (8th Cir. 1981).

    5.    <u>Ware v Reed,</u>  709 F.2d 345 (5th Cir. 1983)


5.13   <u>LEARNING OBJECTIVE:</u>      The student will be able to identify factors that the courts use to determine if unreasonable force was used in a case.

A.    Reasonable force may be used to effect an arrest when an officer has probable cause for that arrest.

B.    The 4th Amendment limits the level of force that may be used to reasonable force.

C.    Reasonableness is based on individual facts and circumstances of the situation.

D.    The need for force will be evaluated.  The feasibility or availability of alternatives are considerations.

E.    Motivation for the force will be evaluated.  Whether the force was used to maintain or gain control or to harm will be considered.

F.    The extent of injury inflicted will be evaluated.  Minor injuries may be relegated to state court as a tort suit rather than as a Section 1983 cause.

G.    Whether the officer's actions created a situation of dangerousness where a fatal error was likely.


H.    Other considerations which might be used:

    1.    The nature of the offense in which control was lost.

    2.    Actions of third parties who were present.

    3.    An emergency situation which existed.

    4.    Behavior of the person against whom force was used.

    5.    The physical size, strength, and weaponry of the arrestee.

    6.    Known character of the arrestee.

**271**

I.    In general, an action is unreasonable if a reasonable man in similar circumstances would recognize the act as involving a risk of harm and a risk of such magnitude as to outweigh the utility of the act or the manner in which it was done.  If an officer's conduct in discharging his weapon creates a danger recognizable as such by a reasonable and similarly situated officer, he will be held accountable to others as the proximate result of his conduct.

J.    Relevant cases

    1.    <u>Roberts v Marino,</u>  656 F.2d 1112 (5th Cir. 1981).

    2.    <u>Shillingford v Holmes,</u>  634 F.2d 263 (5th Cir. 1981).

    3.    <u>Whitley v Albers,</u>  38 Cr.L. 3161.

    4.    <u>Kyle v New Orleans,</u>  353 So.2d 969 (La. 1977).

    5.    <u>Young v City of Killeen, Texas.,</u>  775 F.2d 1349 (5th Cir. 1985).

5.14   <u>LEARNING OBJECTIVE:</u>      The student will be able to identify factors relating to police negligence in establishing or maintaining roadblocks in police emergencies.

    A.    Issues that occur in Roadblock Litigation

        1.    Place and time of roadblock.

        2.    Whether the roadblock was placed in a position which afforded clear visibility to oncoming cars.

        3.    Whether advanced signals were placed to warn traffic.

        4.    Whether nearby parked cars were removed.

        5.    Relevant cases of roadblock litigation.

            a.    <u>City of Amarillo v Langley,</u>  651 S.W.2d 906 (Texas App. 1983).

            b.    <u>Jamieson by and Through Jamieson v Shaw,</u>  772 F.2d 1205 (5th Cir. 1985).

            c.    <u>Myers v Town of Harrison,</u>  438 F.2d 293 (2d Cir. 1971).

            d.    <u>Cannada v Moore,</u>  578 S.W.2d 597 (Mo. 1979).

    B.    Rolling Roadblocks

        1.    Police attempt to use a gradually slowing police car or some other means to "box in" a speeding car in order to compel it to slow down and eventually stop.

        2.    <u>City of Amarillo v Langley,</u>  supra.


5.15   <u>LEARNING OBJECTIVE:</u>      The student will be able to identify fourth amendment applications to excessive force cases.

    A.    Because the <u>Garner</u> case on deadly force based the constitutional violation upon the Fourth Amendment's right to be free from unreasonable seizure rather than a due process violation under the Fifth and Fourteenth Amendments, more litigation on excessive force can be expected.

        1.    Under this reasoning the use of any significant degree of excessive force in effecting an otherwise constitutional arrest may constitute an unreasonable seizure.

    B.    Whether a particular seizure is constitutionally unreasonable depends upon factual circumstances.

       1.      To determine the question requires that the court "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the governmental interests alleged to justify the intrusion."  (Garner)

C.      The use of Fourth Amendment deprivation could allow even minor cases into federal court under 1983 where those have been denied or diverted to state courts before.

D.      Fourth Amendment cases

       1.      Kidd v O'Neil,  774 F.2d 1252 (4th Cir. 1985).

       2.      Robbins v Harum,  773 F.2d 1004 (9th Cir. 1985).

       3.      Tennessee v Garner,  105 S.Ct. 1694 (1985).

5.16   LEARNING OBJECTIVE:      The student will be able to identify the concepts of vicarious liability.

A.      Definitions

       1.      Respondeat Superior - an old English common law notion that the master is responsible for the acts of the servant.  Does not apply to government employees.

       2.      Vicarious Liability - under this theory in order to hold an administrator, supervisor, or local government liable, a plaintiff would have to show that they were somehow negligent in the manner in which they supervised their subordinates.

B.      To find the administrator, supervisor, or governmental entity liable there must be an affirmative link between the civil rights violation and the agency or supervisor.  For Section 1983 cases, that link to the agency is a policy or custom.

C.      A policy is (1) an officially adopted policy or (2) widespread practice that is so common that it fairly represents agency or departmental policy.

D.      Plaintiffs want to link local government to the civil rights action because they have the "deep pockets" or money.

E.      There are six steps a plaintiff must establish to link vicarious liability to the local governmental entity.

       1.      Prove improper, unconstitutional action by officer.

       2.      Prove action was pursuant to policy or custom.

      3.      Prove policy or custom was wrong.

      4.      Prove policy or custom was known or should have been known by the agency administrator.

      5.      Prove that administrator represented the local governmental entity because of delegated policy making authority.

      6.      Prove that local government knew or acquiesced to the policy or policy makings.

F.      Vicarious liability cases

      1.      <u>Monnell v Department of Social Services,</u>  436 U.S. 658 (1978).

      2.      <u>McNamara v Moody,</u>  606 F.2d 621 (5th Cir. 1979).

      3.      <u>Grandstaff v City of Borger, Texas,</u>  767 F.2d 161 (5th Cir. 1985), cert. denied.

      4.      <u>Bennett v City of Slidell,</u>  728 F.2d 762, rehearing denied, 735 F.2d 861.  (5th Cir. 1984), cert. denied, 105 S.Ct. 3476 (1985).

      5.      <u>Webster v City of Houston,</u>  735 F.2d 838 (5th Cir.)  (en banc), rev'd on other grounds, 739 F.2d 993 (5th Cir. 1984)  (en banc).

5.17    <u>LEARNING OBJECTIVE:</u>    The student will be able to identify seven most common ways for vicarious liability to be established in federal civil rights violation cases.

A.      The seven most common ways to establish vicarious liability for the actions of a law enforcement officer are:

      1.      Negligent hiring

            a.      Employing someone without adequately investigating their background or qualifications for the job.

            b.      Failure to screen properly and to weed out the obviously unfit provides the link needed if an employee violates someone's civil rights.

            c.      Only gross negligence is actionable.

            d.      Negligent hiring cases.

                (1)     <u>Moon v Winfield,</u>  383 F.Supp 31 (N.D. Ill. 1974).

      (2)     <u>Peters v Bellinger,</u> 159 N.E.2d 528 (Ill., App. 1959).

      (3)     <u>McKenna v The City of Memphis,</u> 544 F.Supp., 415 (W.D. Tenn. 1982).

2.     Negligent Assignment

    a.     Assigning someone to a job without making sure he or she is prepared and fit to do the job.

    b.     If an officer is obviously unfit for an assignment, the assignment should be changed.

    c.     Negligent assignment case.

      (1)     <u>Moon v Winfield,</u> supra.

3.     Negligent supervision

    a.     Not adequately overseeing the activities of an employee if the supervisor "knew or should have known" such supervision was required.

    b.     Negligent supervision cases.

      (1)     <u>Marusa v District of Columbia,</u> 484 F.2d 828 (D.C. Cir. 1973).

      (2)     <u>Thomas v Johnson,</u> 295 F.Supp. 1025 (D.D.C. 1968).

      (3)     <u>London v Ryan,</u> 349 So.2d 1334 (La. App. 1977).

4.     Negligent retention

    a.     Failure to suspend or terminate an employee who has demonstrated incompetence, unreliability or other unsuitability for the job.

    b.     Negligent retention cases.

      (1)     <u>McCrink v City of New York,</u> 71 N.E.2d 419 (Ct. App. N.Y. 1974).

      (2)     <u>Brandon v Allen,</u> 516 F.Supp. 1355, 1357 (W.D. Tennessee 1981).

      (3)     <u>Brandon v Holt,</u> 105 S.Ct. 873, 83 L.Ed.2d 878 (1985).

5.      Negligent entrustment

        a.      The failure of a supervisor to properly supervise or control an employee's custody use of equipment or facilities entrusted to him on the job.

        b.      Examples:  automobile, firearms, nightstick, tear gas, etc.

        c.      Negligent entrustment case.

            (1)    <u>McAndrews v Mulavcheck,</u> 162 A.2d 820 (N.J. 1960).

6.      Failure to direct.

        a.      Not telling the employee of the specific requirements and proper limits of the job to be performed.

        b.      Failure to direct case.

            (1)    <u>Ford v Brier,</u> 383 F.Supp. 505 (E.D. Wis. 1974).

            (2)    <u>Dwell v Lawson,</u> 489 F.2d 877 (10th Cir. 1974).

            (3)    <u>Bonsignore v City of New York,</u> 521 F.Supp. 394 (S.D.N. 1981), affirmed 2nd Circuit 1982.

            (4)    <u>Odal Typographers, Inc. v City of New York,</u> 560 F.Supp. 558 (1983).

7.      Failure to train

        a.      Agencies have an affirmative duty to train their employees.

        b.      Plaintiff must establish that there was a policy of failure or improper training.

        c.      Failure to train cases.

            (1)    <u>Meistinsky v City of New York,</u> 140 N.Y.S. 2d 212 (1955).

            (2)    <u>Owens v Haas,</u> 601 F.2d 1242 (2nd Cir. 1979), cert. denied, 100 S.Ct. 483.

            (3)    <u>McClelland v Facteau,</u> 610 F.2d 693 (10th Cir. 1979).

            (4)    <u>Mozingo v Barnhart,</u> 285 S.E.2nd 497 (W. Va. 1981).

            (5)    <u>Peer v City of Newark, N.J.,</u> 176 A.2d 249 (N.J. Ct. App. 1961).

(6)  Jackson v City of Baton Rouge, La.,  286 So. 2d 743 (La. App. 1973).

(7)  Thomas v Johnson,  295 F.Supp. 1025 (D.D.C. 1968).

(8)  Myers v Town of Harrison,  310 F.Supp. 526, affirmed 438 F.2d 293, cert. denied 404 U.S. 828 (1971).

(9)  Sager v Woodland Park,  543 F.Supp. 282 (D. Col. 1982).

(10)  Languirand v Hayden,  717 F.2d 220 (5th Cir. 1983).

(11)  Wellington v Daniels,  717 F.2d 932 (4th Cir. 1983).

(12)  Vippolis v Village of Haverstraw,  37 Cr.L 2387 (2d Cir. 1985).

(13)  City of Okla. City v Tuttle,  53 U.S.L.W. 5639, 37 Cr.L., 3077 (1985).

5.18  LEARNING OBJECTIVE:    The student will be able to identify the issue of good faith as it affects officer liability and the liability of local government.

A.  The good faith defense means that officers or personnel will not be held personally liable for damages when:

   1.  The law is not clearly established,

   2.  The law is not known or could not reasonably be known, or

   3.  The staff member is unaware that his or her actions or inactions might result in a constitutional violation.

B.  If the law is clearly established, the good faith immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

C.  A police officer should be excused from liability where he acted under a statute that he reasonably believed to be valid but that was later held unconstitutional.

D.  Local governments cannot use a good faith defense.

E.  The potential for a conflict of interests arises in the legal defense of a suit in which an officer argues that he was only following agency policy and procedures in the use of force and is entitled to a good faith defense. This argument, especially if the officer is called as a witness, could increase the local agency's exposure to monetary liability.  Some legal experts have maintained that officers and local governments should have separate

attorneys for this reason.  Officers should seek legal advice as to the correct course of action in this matter.

F.    Relevant good faith cases.

    1.    <u>Harlow v Fitzgerald,</u>  102 S.Ct. 2727 (1982).

    2.    <u>Pierson v Ray,</u>  87 S.Ct. 1213 (1967).

    3.    <u>Richardson v City of Conroe, Texas.,</u>  582 F.2d 19 (5th Cir. 1978).

    4.    <u>Owen v City of Independence,</u>  100 S.Ct. 398 (1980).

    5.    <u>Palmer v Hall,</u>  517 F.2d 705 (1975).

    6.    <u>City of Amarillo v. Langley,</u>  651 S.W.2d 906 (Tex. App. 7th Dist. 1983).

    7.    <u>Coon v Ledbetter,</u>  780 F.2d 1158 (5th Cir. 1986).

<u>Appendix A</u>

<u>**USE OF FORCE MODEL**</u>

by Special Agent John C. Desmedt
U.S. Secret Service

## <u>INTRODUCTION</u>

After several centuries of social evolution and several decades of collective law enforcement experience, mankind has begun to recognize the speciality of police science as a discipline worthy of serious study.  Much has been learned and documented about the role of police in modern society.  But, in spite of all knowledge accumulated and insights gained, there is very little information about the degrees of force recommended for or applied by law enforcement officers.  Officers, trainers and administrators would all benefit from a classification or clarification scheme for the use of force, but this issue seems not to have been squarely addressed.

## <u>DEADLY FORCE AND FIREARMS</u>

There are clear limits placed on an officer's right to use deadly force.  Statutes lay down the basic rules, courts further refine the statutes and agency policy adds another layer of regulation.  Because the use of deadly force is irreversible, policy for its use is intrinsically more important than policy for use of less- than-deadly force.  And since the term deadly force is usually understood to mean use of firearms, most agencies have some type of mandated firearms training.  Officers are awarded ribbons, medals and plaques for demonstrated proficiency on the range.  And, in furtherance of our knowledge about deadly force, volumes have been written about the effects of different weapons and ammunition.

Part of most firearms training programs normally addresses deadly force and its use to prevent death or serious injury.  An officer is taught to evaluate a situation to decide if there is justification for using the upper limit of his authority.  Some agencies even address the use of firearms on animals.  But whatever language is used to describe deadly force policy, the only point in question is whether or not the officer is justified in using deadly force.  It is a black and white issue.   There is never a question about the caliber of the bullet, how much it weighs or how fast it travels; these factors are not left to the judgment of the officer, but are predetermined by policy.

## LESS-THAN-DEADLY FORCE

When the use of less-than-deadly force is involved, everything is left to the judgment of the officer. They are given no guidelines about how much force to use and no specifics on how to meet force with force. They are expected to rely only on their own instinct. Their agency and society trust in their good faith and damn them if they are wrong.

Existing statutes and policies spell out conditions when an officer may use deadly force correctly. These guidelines help us look back on a situation to determine if officers were or were not justified in their actions. But, if a policy is to be truly helpful for officers, it should clarify what level of force is appropriate before the situation becomes critical--before deadly force is applied. Officers need guidelines for determining when to use less-than-deadly force also.

Police officials and their academic advisors have addressed low-intensity problems in police/citizen contacts by applying interdisciplinary approaches in the study of such subjects as police/community relations, communication arts and the rhetoric of confrontation. High-intensity, acute, life-threatening emergencies are also planned for with a wealth of firearms training techniques and an abundant arsenal of deadly weapons.

It is, of course, more prudent to resolve any confrontation with words rather than with wounds. And, when the situation requires it, the firearm can be the simple-to-operate equalizer that renders the officer's size, conditioning and defensive skill irrelevant as long as he can point the weapon and pull the trigger. But, it is between the point at which words no longer serve to control an uncooperative subject and the point at which the use of deadly force is not yet justified that the wealth of legal, sociological and technological assistance becomes sparse and the standard policies and guidelines become clouded.

How can an officer justify his/her actions if the use of force has never been clearly defined or understood? This question has no acceptable answer, yet officers hit the street every day knowing full well that they will be called upon to use force. Still, the officers go out telling each other, "You have only a split second to react and they have years to prove you wrong." Must officers be naive and brave, foolish and dedicated at the same time?

## THE GRAY AREA - WEAPONLESS CONTROL

The area between the all-or-nothing extremes of the police/citizen "confrontation continuum" is served by both weaponless control techniques and use of intermediate impact weapons. Little has been written in this area. This situation exists for specific reasons.

One reason is that in America there is a handgun tradition far stronger than the practice of any martial art. Except for the rigidly structured and supervised sports of boxing and wrestling, the martial arts are synonymous with the culture of the Orient. Anything else we could extract from our own history would be no more enlightening than a brawl.

A second reason concerns the several situational altercations which occur when an officer places his/her hands on a subject.  Ordinarily, an officer is accustomed to being a physical entity unto him/herself.  Remaining balanced and upright is not a conscious effort unless an officer stands on ice or walks on uneven ground.  But when an officer places his/her hands on a subject, or when a subject places his/her hands on the officer, the two persons become one physical unit.  The movements of the subject directly affect the officer's ability to control his/her own balance.  Control of balance then becomes a conscious concern, taking up thinking time which the officer could better use in problem solving.

Words and firearms can affect control from a distance, but weaponless control is close-in control.  Physical distance is, in most cases, a measure of safety, but vulnerability and anxiety increase in inverse proportion as physical proximity and reaction time decrease.

Just as the course of a conversation cannot be predicted verbatim, the result of weaponless control application cannot be known in advance.   And just as there are variables determining the effects of deadly force, there is no single factor to guarantee the success of less than deadly force.  There are, however, several distinctions between verbal responses, weaponless control techniques and use of deadly force that can be postulated.

•   As we learned as children, words do no harm, whereas physical acts can cause pain or injury.

•   Weaponless control is usually unpleasant to learn and easy to forget.

•   The average officer's precision with weaponless control techniques is erratic.

•   Since formulation of weaponless control techniques is the product of someone else's uninvolved opinion about how to best solve a control problem, there is always room for second guessing.  (Nobody disputes the efficacy of talking a subject into compliance.   Compare a trigger pull; there may be a little debate about its appropriateness, but none about its effectiveness).

•   Manufacturing precision and ballistic science lend standardization and predictability to the use of firearms.  But the variables of pressure, torque, pain threshold, impact and leverage resulting from force, vector, state of mind, and relative strengths, body structures and positions, are totally unique to each weaponless control situation, never to be duplicated.

**THE USE OF FORCE MODEL**

With the Use of Force Model, we have attempted to generalize, categorize and interrelate the reasons, considerations and limitations in the use of all measures of force for all occasions.  To use the model, an officer need only place any situation at the proper level and match it against the appropriate response.  This concept of grouping situations into logical categories conforms to principles of educational psychology, assists officers in better understanding the use of force, and thereby helps officers to respond properly and promptly during times of stress.

**CONTROL**

To better appreciate this model, first disassociate the idea of offense versus defense from your thinking as the primary descriptive terminology in the use of weaponless control techniques. Next, insert the idea of control. Don't dwell on the adversarial nature of the relationship; instead, substitute the idea that you will control with the other's consent, if you can get it--but by force, if need be.

One school of thought holds that the role of police is essentially defensive. What is defensive about going forth to arrest a subject who does not wish to be arrested? Chasing a suspect is, in the broader sense, defending society in general but is offensive in its narrower context. An officer uses force when he/she needs to establish control over a subject. The reasons he/she must establish control are to perform lawful duties and protect against harm. An officer need not rethink this argument during each emergency, but does need to periodically clarify his/her values with a statement of purpose and working philosophy.

The correct amount of force is that amount necessary to establish control over the subject and neutralize threat or resistance. The officer must immediately match the risk sensed from the subject with the proper means of control. The confrontation must be resolved with a minimum of injury to all parties concerned in a timely manner. Since all possible conflict situations cannot be listed in detail, and since all proper responses also cannot be precisely spelled out, situations are classified by major problems and relative seriousness.

**WHAT THE MODEL REPRESENTS** - The Subject's Actions

In this model, the subject's threat/resistance level determines the necessary amount of force the officer uses. Therefore, the first step in using the model in all cases is to determine the level of the subject's threat/resistance. Previous data concerning the subject's propensity for violence may be taken into account when establishing the initial response level, if there is time for such planning. (The model is depicted on page 80 of this Appendix).

B is the neutral point on the vertical axis at which no problem exists. Rising up line AB, there is a continuous increase in the potential or real resistance by the subject and vulnerability to the officer. Horizontally along line BC extend the successively stronger responses by the police and progressively greater potential for injury to the subject.

In the first increment above point B, proximity alone links officer and subject. That is, the officer is near the subject's personal space and area of possible control. At this point of no overt resistance, the mere presence of the officer is enough to control the subject since the subject presents no problem. Further escalation of conflict by the subject is self-explanatory up line AB.

**WHAT THE MODEL REPRESENTS** - Police Options

Line BC represents the means of establishing control, not in order of frequency or chronology but in the order of intensity and severity. Going from left to right along this line, the officer plays out his/her repertoire of available controls. The further along this line, the greater chance there is of establishing control, but there is also a greater chance of causing bodily injury to the subject.

**WHAT THE MODEL REPRESENTS** - Presence

Far to the left on line BC, the first increment indicates the mere presence of legal authority in the person of the officer; as previously noted, this may in itself be a form of control.  This control can be augmented by an imposing physical stature, an appearance of conditioning and an alert demeanor.  If these advantages exist, the officer's position on the horizontal scale is moved correspondingly to the right.

An officer's presence may, at any point before deadly force on the horizontal continuum, suddenly cause the subject to realize that he should abandon resistance. But, the higher the initial resistance, the less likely this will occur.

**WHAT THE MODEL REPRESENTS -** Verbal Direction

The next level of control is verbal direction, ranging from a smiling "Please" to a heart-pounding "Stop or I'll shoot!"  Verbal direction, advice and persuasion may arrest the subject's intent at any point on the continuum.  Once again, though, the more intense the subject's resistance, the less probable that words alone will suffice unless there is time to establish dialogue or negotiations.  There is a point, too, at which words prove fruitless when used without higher level control.  Along this horizontal axis, presence and verbal direction are included with any higher level controls when higher level controls are necessary.

**WHAT THE MODEL REPRESENTS** - Weaponless Control

When words do not control and lethal force is not appropriate, weaponless control is available to fill the gap.  In this model, weaponless control has been divided into three categories--from least injurious (but with least probability of control against high-level resistance), to most effective against high-level resistance (but with greatest possibility of bodily injury to the subject).  These categories are listed below:

1. Mechanical techniques  deal with the skeletal structure of the body.  Either impact pressure or opposing prohibitive pressures are used.  Any of these pressures can fracture bone or cause other damage to the body.  Mechanical techniques generally offer the best chance for establishing physical control of an individual, but also the greatest chance of injury to him/her.  Techniques in this category include:

    a. Impact techniques  such as penetrating karate strikes and kicks.  These techniques may be used to stun as well as to stop.  Impact techniques are intended to penetrate explosively into tissue to a depth sufficient to affect specific nerve centers or to jar the bone with enough force to accomplish the same result, stopping an attacking subject.

    b. Prohibitive joint locking and breaking techniques  such as arm locks. These techniques are applied to any jointed part of the body:  fingers, thumbs, wrists, elbows, shoulders, ankles, knees and hips.  The application of joint locks is often an intermediate step before full control or restraint is accomplished against a resistive or aggressive subject. When massive force is applied after the joint lock is fully established, tendon or ligament damage may result.

      c.    <u>Neck restraints,</u>  either vascular control or choke holds.  Important note: Lateral vascular neck controls are not the same as choke holds.  They are two distinct types of control with very different potential for body damage.  Choking techniques are infinitely more dangerous than vascular controls.  Many people who are not well informed mistake the two types of holds.  The reason for such mistakes is that both techniques appear similar in execution, are applied to body parts in close proximity, and, if the technique is not well performed, a lateral vascular neck control may unintentionally turn into a choking technique.

          The vascular control is meant to establish control only by means of changing the rate of blood flow to and from the brain.  Choke holds, however, constrict the flow of air to the lungs and may cause other undesired reactions as well.  (For further information on a systematic use of force involving neck restraint, see the KCPD lateral neck restraint system of Jim Lindell, Physical Training Supervisor for the Regional Training Academy, Kansas City, Missouri).

2.    <u>Pain compliance techniques</u>  consist of the application of non-impact pressure to pain receptors.  This motivates the subject to find relief either by ceasing all resistance or by propelling himself in the direction of relief given by the officer.

      The outcome of the use of pain compliance techniques is not always predictable, however, when attempted by means of wrist locks or nerve pressure unless a control instrument is used.  This is so because the quality of pain varies widely from one subject to another and between body parts, and it is greatly affected by mental condition and drugs.  The use of control tools such as a Kubotan, Yawara or other short stick instruments, when readily available and expertly applied, can greatly increase the chances of establishing control.  These instruments are designed to maximize pain, and when used strictly as pain compliance instruments, they cause little tissue damage.

3.    <u>Inhibitory techniques</u>  (stunning) are techniques to stun or temporarily cause inhibition of respiration or loss of conscious control of the motor functions of the extremities.  Examples are a quick penetration pressure to a pressure point, a palm heel struck to the head, a similar blow to the lower rib cage or a sharp strike to the solar plexus.  Both of the latter two techniques can cause the diaphragm to spasm and breathing to be temporarily suspended.  These techniques can give the officer the opportunity to apply locking techniques, handcuffs or other restraining devices to the previously uncooperative subject.

This range of mechanical techniques could also include most unconventional military combat techniques at the lethal force end of the continuum.  Although these unconventional techniques are not usually taught in police academies, they are also examples of this category of weaponless technique.

**WHAT THE MODEL REPRESENTS** - Impact Weapons (Straight Baton, Side-Handle Baton, etc.)

Impact weapon techniques start at the same point on the continuum as mechanical weaponless techniques; and just as with weaponless techniques, batons or other impact weapons can be used with various degrees of intensity.  If a subject is aggressively

offensive, an officer should be able to apply baton techniques at the appropriate level of intensity, as indicated by the matching category on the vertical axis.

If a subject is likely to harm others, perhaps more intense baton techniques would be in order.  When a subject places life and limb in jeopardy, the baton can still be useful, but its potential does not match the probability of establishing instantaneous control that a firearm offers.

## HOW TO USE THE MODEL

In using this model, the subject's level of action is determined first (on the vertical scale), since it is his/her action which determines the amount of force used by a law enforcement officer.  This vertical continuum is sectioned to indicate degrees of threat/resistance.  It would be better if the lines on the graph were replaced by a gradual shading from white (point B) to dark red (point A).  This coloration would indicate the level of threat/resistance posed by the subject, which is also the level of vulnerability faced by the officer.

The horizontal axis represents the use of force by a law enforcement officer.  This line BC is sectioned to indicate levels of control.  This line would be better represented by progressive shading from white (point B) to dark blue (point C).  This darkening would represent both the probability of establishing positive control and the probability of tissue damage to the subject.

The graph is traversed by three lines.  Line BD represents the ideal use of force.  Note that it exactly bisects the chart at 45 degrees.  In creating this model, it would have been possible to move this line slightly to the lower right to indicate that an officer may use slightly more force than a resisting subject uses; the law allows the officer to be the aggressor and to use greater force to win the encounter.  However, it is far more practical and professional to leave the ideal at 45 degrees to indicate that an officer may meet force with equal force, but uses his skill and training to his lawful advantage.

Lines BE and BF create a discretionary gray area within which the officer's actions are acceptable.  Area ABE indicates potential ineffective control or response, and area CBF represents potential excessive control or response.

This model can be used for both pre-incident training and post- incident analysis.  If a situation is complex and characterized by fast-changing levels of threat/resistance, then its course may be plotted by numbering each action and reaction (e.g., 1.  This happened first.  2.  This happened second, 3.  etc.)

## TO ANALYZE PAST USE OF FORCE

For use in situational analysis to determine in retrospect whether an officer reacted appropriately:

1.      Determine the level of threat/resistance on the vertical axis.

2.      At that level, follow a horizontal line to the right edge of the graph.

3.      Determine the level of control used on the horizontal axis.

4.   At that level, follow a vertical line upward until it intersects the line drawn in step 2.

5.   Repeat for all actions taken.  Label each point of intersection sequentially.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | |
| | § | Civil Action No. |
| | § | 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| Defendants | § § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 13
# Texas Commission on Law Enforcement, "Basic" Force Options Curriculum

# Texas Basic Peace Officer



*Course Number 1000*

## Texas Commission on Law Enforcement Officer Standards and Education

**Revised:  January 2013**

# 643-HOUR BASIC PEACE OFFICER COURSE

(Revised January 2013)

In accordance with Commission regulations, the Basic Peace Officer Course shall consist of a minimum of 643 classroom hours and shall include, but not be limited to, the subjects set forth below.  This is the recommended sequence for teaching the course.  Academies may change the sequence, if necessary.

| # | SUBJECT | HOURS |
|---|---------|-------|
|   | Introduction and Orientation | 2 |
| 1. | Fitness and Wellness, and Stress Management | 16 |
| 2. | Professional Policing | 8 |
| 3. | Professionalism and Ethics | 8 |
| 4. | U.S. & Texas Constitutions, Bill of Rights, and Criminal Justice System | 8 |
| 5 | Multiculturalism and Human Relations | 10 |
| 6. | Code of Criminal Procedure | 20 |
| 7. | Arrest, Search, and Seizure | 28 |
| 8. | Penal Code | 44 |
| 9. | Traffic | 68 |
| 10. | Intoxicated Driver and SFST | 24 |
| 11. | Civil Process | 8 |
| 12. | Alcoholic Beverage Code | 4 |
| 13. | Health and Safety Code – Controlled Substances Act | 12 |
| 14. | Family Code – Juvenile Issues | 10 |
| 15. | Written Communications | 16 |
| 16. | Spanish | 16 |
| 17. | Force Options | 24 |
| 18. | Mechanics of Arrest | 40 |
| 19. | Firearms | 48 |
| 20. | Emergency Medical Assistance | 16 |
| 21. | Emergency Communications | 12 |
| 22. | Professional Police Driving | 32 |
| 23. | Communication and Problem Solving | 16 |
| 24. | Patrol/Consular Notification | 42 |
| 25. | Victims of Crime | 10 |
| 26. | Family Violence and Related Assaultive Offenses | 20 |
| 27. | Crisis Intervention Training (CIT) and Mental Health Code | 16 |
| 28. | Hazardous Materials Awareness | 6 |
| 29. | Criminal Investigation | 44 |
|   | Including:  Introduction, General, Protection of and Crime Scene Search, Interviewing Techniques, Booking Procedures, Courtroom Demeanor and Testimony, Case Management | |
| 30. | Racial Profiling | 4 |
| 31. | Asset Forfeiture | 4 |
| 32. | Identity Crimes | 4 |
| 33. | TCLEOSE Rules Overview | 3 |

TOTAL HOURS                                                                                       643

## 17 .  Force Options

**Unit Goal: 17.1.  The student will have an understanding of the legal authorities pertaining to peace officers' use of force.**

**17.1.1. The student will be able to define the following terms relating to use of force.**

Definitions:
- Deadly force - PC 9.01(3)
- Force - Black's Law Dictionary
- Reasonable Force - Black's Law Dictionary

**17.1.2. The student will be able to explain the legal authorities for the use of force.**

Legal authorities for use of force:
- Justification as a defense - PC 9.02
- Confinement as justifiable force - PC 9.03
- Threats as justifiable force - PC 9.04
- Reckless injury of innocent third person - PC 9.05
- Civil remedies unaffected - PC 9.06
- Arrest and search – PC 9.51

Estate of Ceballos v Bridgewater, Porras &Mull
According to the 5th Circuit Court appeals, this case on deadly force are clear; "an officer
    cannot use deadly force without an immediate threat to himself or others." (Penal Code
    9.51)

Milstead v Kibler, 243 F.3d 157 (4th Cir. 2001)
"…police officers performing a discretionary function enjoy an immunity that shields them
    from liability for civil damages unless (1) the officers' conduct violates a federal
    statutory or constitutional right, and (2) the right was clearly established at the time of the
    conduct, such that (3) an objectively reasonable officer would have understood that the
    conduct violated that right. "

Okonkwo v Fernandez, 2003 WL 22227858 (N.D. Tex. 2003)
"Government officials who perform discretionary functions are entitled to the defense of
    qualified immunity, which shields them from suit as well as liability for civil damages, if
    their conduct does not violate clearly established statutory or constitutional rights of
    which a reasonable officer would have known.  A defendant official must affirmatively
    plead the defense of qualified immunity.

Graham v. Connor, 490 U.S. 386 (1989)
Graham, a diabetic having an insulin reaction, was mistakenly believed to be intoxicated by
    Charlotte, North Carolina police officers. Though Graham asked officers to check his
    wallet for a diabetic decal he carried and a friend attempted to get permission to give

Graham orange juice, Charlotte police refused and during a struggle, four officers threw
him headfirst into a police car. Graham sustained serious injuries resulting in his suit
alleging violation of his constitutional rights. The lower courts directed a finding for the
police officers under the 14th Amendment's absence of malice analysis-that they did not
intend to harm Graham.  The U.S. Supreme Court reversed the lower courts ruling
directing that the inquiry must, under the 4th Amendment, be whether the officers' actions
are objectively reasonable in light of the facts and circumstances confronting them at the
time, without regard to their underlying intent or motivation.

Related cases:

- Brower v Inyo County, 489 U.S. 593 (1989)
- Saucier v Katz, 121 S. Ct. 2151 (2001)
- Osabutey v. Welch, 857 F.2d. 220 (1988)
- Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034  (1987)
- Harlow v. Fitzgerald, 457 U.S. 800 (1982)

*Refer to departmental policy.*

*Refer to IRG*

**17.1.3. The student will be able to explain the justification(s) for use of force.**

Justification Generally:
- Public duty          PC 9.21
- Necessity  PC 9.22

*Refer to IRG:  Force/Deadly force case study.*

*Refer to departmental policy*

Protection of Persons:
- Self defense – PC 9.31
- Deadly force in defense of person – PC 9.32
- Defense of third person  – PC 9.33
- Protection of life or health – PC 9.34
- Affirmative Defense – CPRC 83.001

Protection of Property:
- Protection of one's own property - PC 9.41
- Deadly force to protect property - PC 9.42
- Protection of third persons property - PC 9.43
- Use of device to protect property - PC 9.44

Special Relationships:
- Parent-child - PC 9.61
- Educator-student - PC 9.62
- Guardian-incompetent - PC 9.63

Custody and Escape:
- Custody - PC 38.01(1)
- Escape - PC 38.01(2)
- Prevention of escape from custody - PC 9.52
- Maintaining security in correctional facility - PC 9.53

Tennessee v. Garner, 471 U.S. 1 (1985):
Absent circumstances, such as exhibition of weapons or the commission of a violent felony suggesting that the suspect is likely to pose a threat of death or injury if not immediately apprehended, the 4th Amendment prohibits seizure of the suspect by the use of deadly force.

**Unit Goal:  17.2.  The student will have a basic understanding of the concepts regarding use of force.**

**17.2.1. Identify definitions relating to use of force.**

Definition of the NOUN "force":
- Strength or energy brought to bear, cause of motion or change, active power; moral or mental strength; capacity to persuade or convince.
- Violence, compulsion, or constraint exerted upon person or thing.
- The quality of conveying impressions intensely in writing or speech.

- Definition of the VERB "force":
- To do violence to.
- To compel by physical, moral, or intellectual means.
- To make or cause through natural or logical necessity.
- To achieve or win by strength in struggle or violence.
- An aggressive act committed by any person which does not amount to assault, and is necessary to accomplish an objective.
- Synonyms - compel, coerce, constrain, oblige.

"Deadly Force" - is defined as force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.

"Reasonable or Necessary Force" - is the amount of lawful physical coercion sufficient to achieve a legitimate law enforcement objective and is objectively reasonable under the facts, circumstances and alternatives confronting an officer at the time action are taken.

<u>Cases relevant to Texas</u>:

- Fraire v. City of Arlington, 957 F.2d 1268 (1992) (Use of Force)
- Graham v. Connor, 490 U. S. 386 (1989) (Use of Force)
- Brother v. Klevenhagen, 28 F. 3d 452 (5th Cir. 1994) (Use of Force)

- Morris v. Dillard Dept. Store, 277 F.3d. 743 (5th Cir. 2001) (Hog-Tie/Asphyxiation)
- Jackson v. City of Schertz, Texas, 2007 WL 4205709 (W.D.Tex. 2007) (Taser)
- City of Waco v. Williams, 209 S.W.3d 216 (Tex.App-Waco, 2006, pet. den.) (Taser)
- Hathaway v. Bazany, 2007 WL 3200413 (5th Cir. 2007) (shooting at a moving car)

Other relevant Circuit Court cases:
- Baskin v. Smith, 50 Fed Appx. 731 (6th Cir. 2002) (Handcuffing)
- Martinez v. New Mexico Dept. of Public Safety, 47 Fed. Appx. 513 (10th Cir. 2002) (Pepper Spray)
- Jennings v. Jones, 2007 WL 2339195 (1st Cir. 2007) (Pepper Spray)
- Robinson v. Solano County, 278 F.3d 1007 (9th Cir. 2002) (Seizure at Gunpoint)
- Kuha v. City of Minnetonka, 328 F. 3d 427 (8th Cir. 2003) (Use of Canine as Force)
- Robinette v. Barnes, 854 F. 2d 909 (6th Cir. 1988) (Use of Canine as Force)
- Cruz v. Laramie, 239 F.3d 1183 (10th Cir. 2001) (Hog-Tie/Hobble Tie)

*Note: Instructor should discuss the different Circuit Courts and explain that Texas is in the 5th Circuit.*

## 17.2.2. Describe psychological aspects of the use of force.

Law enforcement role in arrest:
- In physical arrest, the police role is essentially defensive
- The word defensive is defined as "serving to protect," "devoted to resisting or preventing aggression or attack"
- It is not aggression when an officer takes the initiative to confront a law violator - the officer's act is not one of hostility; it is one designed to defend and protect the community from criminality
- An officer's problems may grow out of the use of force employed against a combative but unarmed law violator when reasonable alternatives to use of force are not employed.
- An officer needs a range of decision-making tools that permits use of exactly that degree of control that constitutes reasonable force

Concept of Control:
- Control is that degree of influence the officer must exert over the violator to take him or her safely into custody
- Control is a "two-way street." An officer must be in complete self-control to be able to control a violator
- Self-control alone will be one of the greatest assets in dealing with a law violator
- Self-control results from the development of confidence in one's skills
- Self-control is achieved through training and practice both on the job and off
- The objective of using control is to elicit cooperation from the violator

Emotions, Attitudes, Prejudices:

- Arrest can be both an emotional and physical problem for officer and arrestee
- Emotional response or reaction is directly involved in an encounter between an officer an a violator
- Attitudes or prejudices can lead to conflict
- An officer has the potential to reduce the problems and danger associated with physical arrest if s/he is firm but fair with the violator
- Emotional responses are often the direct result of uncertainty
- Uncertainty is likely to result in compensating behavior
- Compensating behavior may take one of the following forms: hesitation, verbal abuse, bluff, unnecessary force

**17.2.3. Identify the deciding factors for use of force when effecting an arrest.**

Use of Force  Factors:
- In every arrest situation the officers must be firm and be prepared to protect themselves and others
- Force must be controlled and used wisely with a purpose
- Only the amount of force reasonably necessary to effect the arrest should be used
- An officer should consider the following factors when assessing the level of force that is reasonable under the circumstances:
- Is the suspect submitting peacefully or resisting?
- Is the suspect armed?
- What is the nature of the crime?
- Does the suspect have a previous arrest record or history showing a pattern of violence?
- What is the number of suspects involved?
- How much support from other officers is available?
- What is the risk that the force chosen might cause injury to a bystander or other officers?

**17.2.4.  Identify moral considerations and forces affecting an officer's decision to use deadly force.**

Moral considerations include statutory and case law and whether deadly force, justifiable, under the circumstances presented, may be avoided without risk of injury or death to the officer or others.

Administrative or departmental policy should be at least as restrictive as the law.  In many cases it will be stricter than legal restrictions.

Informal organizational norms, which reflect law enforcement's informal culture, may or may not be stricter than legal or agency restrictions.

Individual choice or conscience reflects the inner controls of the officer.

**Unit Goal:  17.3.  The student will be aware of various force options or alternatives available to peace officers.**

**17.3.1. List and discuss force options available to peace officers.**

Note to Instructor:  Instructors are encouraged to begin using a use of force model similar to the Dynamic Resistance-Response Model (DRM) .



Force Options:
- Professional presence - entering into a scene
- Verbal communications - words, language
- Weaponless strategies - takedowns, come-alongs, etc.
- Weapon strategies
  - Chemical/electrical means
  - Mace
  - Stun gun
  - Baton or impact weapon

- Deadly force

**17.3.2. Identify the principal considerations in applying a use of force.**

Principal considerations:
- Ineffective control results when the level of force is less than the subject's level of resistance.
- Excessive control results when the level of force is unreasonably greater than the subject's level of resistance potentially causing preventable injury.
- The force used should be no more than a reasonable officer would use under the total circumstances of the situation.
- Follow departmental policy and the law.
*See PC, Chapter 9*

*Refer to departmental policy.*

**17.3.3. Discuss the impact of an officer's professional presence.**

Each scene has its own dynamics long before an officer arrives.  Events change because of certain kinds of presences.

This same thing occurs when officers enter the scene; things change.  This is due to the officers' presence.

Officers must be able to think of the scene as it was before they entered it and what it becomes while they are present.  People act differently under different circumstances, and officers' entrances into a scene create new sets of circumstances. This means that officers must remain alert to the dynamics of the people present and whether elements within a group may be in the posture of assisting the officer or interfering with or hostile to the performance of duty.

Example:  You are watching children at play and want to capture the moment on film.  When entering the scene with a camera everything changes.  The children become self-conscious and pose instead of being themselves.  Whatever pictures are taken are different than they would have been had a hidden camera been used.

**17.3.4.  Identify the various aspects of communication strategies used when dealing with the public.**

Communication is an important professional skill.

97% of an officer's duties involve verbal skills.

Only about 3% of contacts require physical force.

Elements of communication:

- Words, touch, body movement, message
- Content - actual message.
- Voice - verbal personality (how it is said).
- Non-verbals - raised eyebrows, posture, etc.

.

Perception of a message:

- 7% of the time a message is received due to content.
- 33% of the time a message is received due to voice.
- 60% of the time a message is received due to non-verbals (body language).

This means that approximately 93% of the time a message is received and interpreted based on how something is said rather than what is said.

Improper listening is not paying attention to what is said; such as merely waiting for the opportunity to speak as soon as someone finishes talking.

Communication is a professional skill, not just luck.

Peace officers must communicate under uniquely stressful conditions:

- To people who do not want to talk, or listen
- To emotionally charged individuals
- In dangerous circumstances
- While being watched by others
- To people who dislike and/or mistrust peace officers
- Most people respond positively to reasonable requests from a peace officer
- Frustrated people often resist
- Upset people are often incapable of acting reasonably and will not respond to appeals of reason
- Commands or orders usually meet with resistance
- An officer must trust tactics which redirect behavior
- Maintain disinterest (objectivity, free from bias, impartial, it does not mean un-interested, unconcerned, or mechanical)
- Learn to allow people to express frustration.
- Listen
- Do not take things personally

## 17.3.5.   Identify elements that an officer must recognize and control in every encounter.

Problem:

- Analyze and identify the problem
- Enables an officer to plan an approach
- Problems often change as confrontation progresses

Audience:

- Everyone encountered is part of the audience
- How is the audience reacting?  Examples: receptive, hostile, critical, etc.

☐ Read audience and adapt tactics appropriately
☐ If person has a friend in the audience you may try to enlist their help - ask the friend to help reason with and persuade the person to follow the officer's orders

Constraints:
Determine if there are any obstacles to effective communication and try to eliminate them if possible.  Examples:  time of day, weather, location, external noise, officer's own mood, person's values and beliefs, or the person is deaf, mentally ill, mentally retarded, intoxicated, etc.

Ethical Presence:
☐ An expression of self-control.
☐ Use words to state purpose, not to express personal feelings.
☐ Maintain professional attitude.
☐ Anything perceived as hasty, irrational, or unfair, makes an officer seem unethical.

*Reference:  Thompson, George J., & Stroud, Michael J. (1984).  Verbal judo:  redirecting behavior with words.  Albuquerque, New Mexico:  The Verbal Judo Institute.*

**17.3.6.   Identify some helpful "tools" used in redirecting someone's behavior using verbal persuasion.**

Listen:
☐ Sort the real problem from the symptoms of the problem
☐ Determine priorities you must respond to
☐ Determine context of the event

Empathize:
☐ Understand the other person's state of mind
☐ See through the eyes of the other person

Ask:
☐ Use questions to gain control by causing others to report to you
☐ Questions direct attention away from the problem
☐ Buys time
☐ Demonstrates concern
☐ Paraphrase
☐ Repeat what you have learned in your own words
☐ Forces other person to stop talking and listen
☐ Helps to ensure that the officer understands situation
☐ Summarize
☐ Allows the officer to conclude the situation
☐ Officer provides the bottom line
☐ State the resolution clearly

<u>Types of verbal appeals</u>

<u>Ethical appeal</u>:
- ☐ Based upon position as a professional officer
- ☐ Assures other person
- ☐ Persuade others of your desire for a positive outcome
- ☐ This appeal is useful when dealing with people who are upset and highly emotional

<u>Rational appeal</u>:
- ☐ Based on use of reasoning
- ☐ Appeal to common sense, good judgment, or community standards
- ☐ Show that solution is reasonable and most likely to produce results
- ☐ This appeal is valuable when dealing with people having a strong sense of right and wrong

<u>Practical appeal</u>:
- ☐ Based on an urgent need to change a particular circumstance
- ☐ Ignores long-term consequences
- ☐ It is a short-term solution
- ☐ Adapt yourself and persuade the other person that you are like them
- ☐ Based on the beliefs and value system of the person

<u>Personal appeal</u>:
- ☐ Based on addressing person's needs and desires
- ☐ Set aside own personal values
- ☐ This type of appeal works well with headstrong people who insist on getting their own way

<u>Words are no longer working</u>:
- ☐ When a person seriously threatens bodily harm to an officer or the general public, an officer's control is compromised.
  - o Sometimes a person combines aggressive words and actions
  - o Words and gestures alone are not an attack
  - o Sometimes a person displays conflicting signs - words suggest one thing and actions suggest another
  - o A good principle to remember is: when words and actions disagree, trust actions.
  - o Actions can also be misleading, but whenever words and actions disagree, be alert and ready to use force.
- ☐ When a suspect begins walking or running away, or when a person escapes from custody
- ☐ When an officer is forced to repeat the same words or ideas over and over, the officer should conclude that the person is not being persuaded
- ☐ When repeated refusal by a person to comply with a reasonable request constitutes a need for more than words

☐   When a person is unreceptive to alternatives after repeated appeals

*Reference:  Thompson, George J., & Stroud, Michael J. (1984).  Verbal judo:  redirecting behavior with words.  Albuquerque, New Mexico:  The Verbal Judo Institute.*

### 17.3.3.  Recognize criteria relating to a professional peace officer's use of force.

A professional peace officer employs theoretical knowledge under constantly changing and unpredictable circumstances.

Criteria for assessing whether a person is acting professionally are:
- ☐   Ability to communicate effectively with those persons outside of the profession
- ☐   Ability to accurately assess the situation and define the problem
- ☐   Ability to know when to move from words to force
  - o   There is no clear-cut simple answer
  - o   As a professional, an officer's use of force is:
    - ☐   Selective (the officer knows what kind of force and how much to use)
    - ☐   Appropriate (used in a controlled and purposeful manner)
- ☐   Ability to return to words and verbal strategies once the threat to an officer's safety (or other's safety) is over
- ☐   Possess the knowledge to recognize a person's actions that indicates his/her being under the influence of some substance or having a mental or physical disorder.
- ☐   Ability to evaluate personal performance
- ☐   Capability of describing and characterizing performance to superiors
  - o   An officer must be consciously competent, i.e., know why you did what you did in any given situation.

*Reference:  Thompson, George J., & Stroud, Michael J. (1984).  Verbal judo:  redirecting behavior with words.  Albuquerque, New Mexico:  The Verbal Judo Institute.*

### 17.3.8. Identify typical procedures that are followed after an officer-involved shooting.

**Departmental Policy**
Each department has its own procedures for investigating officer-involved shootings.  Most agencies have extensive investigative procedures in such circumstances.

*Note to the instructor:  Emphasize that each department has its own procedures and that the officer should follow those procedures.  Instructors should discuss evidentiary procedures common to use of force incidents and the involved officers' role.*

Applicable cases and codes:
- Garrity v New Jersey, 385 U.S. 493 (1967) ruled that evidence gathered from an employee under threat of dismissal was not admissible in a criminal trial

- Texas Government Code, Chapter 614, Sections 614.021, 614.022, and 614.023
- Guthery v Taylor, 112 SW3d 715 (Tex. App.-Houston [14th District] 2003, no pet.);
- City of Seagoville v. Lytle, 227 S.W.3d 401 (Tex. App.–Dallas 2007, no pet.)
- For civil service cities see Chapter 143 Local Government Code.
- Sheriff's Civil Service see Chapter 158 Local Government Code

Internal Affairs Investigations:

Each department has its own policy and procedures concerning internal affairs investigations. Officers should be aware of these practices. Where there is the possibility of criminal charges being filed many departments will conduct separate investigations because of Garrity v. New Jersey. During an administrative investigation, officers may be compelled to answer questions, participate in a line-up, or take a polygraph examination. If the officer is warned of the possible consequences of non-cooperation, s/he may be disciplined. This information is not admissible in a criminal trial under Garrity v New Jersey. If any answer sought by the investigator (or any information derived from such answer) is intended for use in a criminal trial, the officer must be given the Miranda warning contained in Article 15.17 and 38.22 of the CCP. Texas statutes provide guidelines for investigations.

**Unit Goal: 17.4. The student will understand the factors basic to unreasonable force and the possible consequences when excessive force is used.**

**17.4.1. Identify the possible consequences that may arise from improper or excessive use of force.**

Federal Laws

Conspiracy against rights of citizens
(Conspiracy against rights of citizens-Title 18 Section 241 United States Code Annotated.)

Deprivation of rights under color of law
(Violations of the Civil Rights of Person in Custody - Article 39.04 Vernon's Annotated Texas Penal Code.)

Deprivation of rights under color of law - Title 18 Section 242 United States Code Annotated.)

Federal civil rights complaints are investigated by the FBI:

- 10,000 to 12,000 complaints a year, one third are investigated with about 75 to 100 presented to a grand jury
- They look for clearly offensive, deliberate, and willful misconduct
- They may, if an agency is taking swift decisive action to punish misconduct, defer to that administrative process
- No good faith defense for criminal violations

**17.4.2. Identify factors that the courts use to determine if unreasonable force was used in a case.**

Court factors:

- Officers can be held to be personally liable for using excessive force - there are factors that may be considered in determining liability
- Reasonable force may be used to effect an arrest when an officer has probable cause for that arrest
- The 4th Amendment limits the level of force that may be used to reasonable force
- Reasonableness is based on individual facts and circumstances of the situation
- The need for force will be evaluated - the feasibility or availability of alternatives are considerations
- The extent of injury inflicted will be evaluated - minor injuries may be relegated to state court as a tort suit rather than as a Section 1983 cause

*See Civil Practice and Remedies Code, Section 101.55 Vernon's Texas Code Annotated.*

Applicable cases:
- ☐ Tennessee v Garner, 471 U.S. 1 (1985)
- ☐ Graham v Connor, 109 S.Ct.. 1865 (1989)
- ☐ Gordon v State, 707 S.W.2d 626 (Tex. Cr. App. 1986)

Other considerations which might be used:
- The nature of the offense in which control was lost
- Actions of third parties who were present
- An emergency situation which existed
- Behavior of the person against whom force was used
- The physical size, strength, and weaponry of the arrestee
- Known character of the arrestee

In general, an action is unreasonable if a reasonable man in similar circumstances would recognize the act as involving a risk of harm and a risk of such magnitude as to outweigh the utility of the act or the manner in which it was done. If an officer's conduct in discharging his weapon creates a danger recognizable as such by a reasonable and similarly situated officer, They will be held accountable to others as the proximate result of his conduct.

The officer's liability is affected by the agency's written directives.

Written directives of an agency may be used against the officer and/or the agency. Written directives of an agency may be used to support the officer and/or the agency. An officer using more force than the agency's written directives allow is increasing his vulnerability to legal liability.

The potential for a conflict of interests arises in the legal defense of a suit in which an officer argues that he was only following agency policy and procedures in the use of force and is entitled to a good faith defense.

This argument, especially if the officer is called as a witness, could increase the local agency's exposure to monetary liability. Some legal experts have maintained that officers and local

governments should have separate attorneys for this reason.  Officers should seek legal advice as to the correct course of action in this matter.

The officer's liability is affected by not following prudent police procedures prior to the decision to use force.  Failure to follow proper procedures can make a situation more dangerous.  Failing to follow prudent procedures in stopping and confronting suspects may increase the risk that force be used.  An officer can be found liable in his justified use of deadly force if his negligent conduct created a danger for himself or others.

An officer may face possible personal liability for failure to stop other officers from using excessive force in his presence.

A police supervisor has an affirmative duty to intervene to stop officers who are engaging in excessive force in his presence.  A non-supervisory officer has an affirmative duty to intervene to stop officers and/or supervisors who are engaging in excessive force in his presence.

(CCP Art 2.13)  (a) It is the duty of every peace officer to preserve the peace within the officer's jurisdiction.  To affect this purpose, the officer shall use all lawful means.  (b) The officer shall: (1) in every case authorized by the provisions of this Code, interfere without warrant to prevent or suppress crime.

A peace officer or peace officer supervisor has the duty to intervene if officers are engaging in the excessive use of force.

Applicable cases:
- Davis v Rennie, 264 F3d 86 (lst Cir. 2001), holds that "An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under 42 USC Sec. 1983 for their nonfeasance
- Shaw v Stroud, 13 F.3d 791 (4th Cir. 1994), Supervisor may be liable for acts of subordinate, even where supervisor has no direct involvement, if the supervisor has failed to document and take corrective action for prior similar acts of misconduct

*Note to the instructor:  Once students are through this and the Strategies of Defense topical areas, all techniques in these topical areas should be practiced and assessed in all scenarios, role-plays, and practical applications.*

**INSTRUCTOR RESOURCE GUIDE MATERIAL**

**17.  FORCE OPTIONS**

**USE OF FORCE**

**LEARNING OBJECTIVE:  17.1.2.**

**PURPOSE:**      Demonstrate to class the legal authorities for the use of force.

**ACTIVITY:**        Scenario.

1.    Set the scene:

Officer confronts a suspect.  As the officer approaches from approximately 30 feet, the suspect pulls a small caliber pistol and begins firing at the officer.  The officer unholsters his weapon, drops to the ground and instantly notices a group of individual bystanders some distance behind the suspect.

2.    Divide class into groups.  Designate spokesperson and arrive at majority answer and report findings to class.

3.    What force may the officer justifiably use?

4.    By what authority?

5.    What may be the consequences of his injuring a third party?

6.    By what authority?

**USE OF FORCE**
**LEARNING OBJECTIVE:  17.1.2.**

**PURPOSE:**   Demonstrate to class the legal authorities for the use of force.

**ACTIVITY:**   Role play (in classroom).

1.   Select one student suspect and one student officer.

2.   Instruct suspect:

· He is a suspect in a felony theft case.
· Place his hands in his pockets and leave them during the interview.
· He should be evasive with his responses to officers questions, particularly those regarding his whereabouts during the time the offense was committed.
· If the officer asks him to remove his hands from his pockets, he should become argumentative.
· Suspect should ask officer "why?"  "Do you think I have a gun?"

3.   Instruct officer :

· Receive a call to investigate felony theft suspect.  Only information available is that the suspect has his hands in his pockets.
· Investigate.

4.   Divide class into groups of equal number.  Group designates a spokesperson and arrives at a majority answer and reports findings to class.

5.   Can an officer demand suspect "take hands out of pockets?"

6.   What can you do if he doesn't?

7.   What amount of force can be used to remove his hands from pockets, if any?

8.   Why can force be used, if any?

9.   By what authority?

10.   Does an order to "take hands out of your pockets" create a risk that the officer might be injured if the suspect has a weapon in his pocket?

11.     What alternatives are available to ordering a person to take his hands out of his pockets and what risks do such alternatives pose?

12.     Place group responses on chalkboard and discuss differences.  Elaborate on when and what force may be used.

 **USE OF FORCE**
**LEARNING OBJECTIVE:  17.1.3.**

**PURPOSE:**   Demonstrate to class the civil liabilities and legal remedies for unnecessary use of force.

**ACTIVITY:**   Scenario.

      1.      Set the scene.

            ·  Officer is interviewing an individual and determines the individual has committed a violation and he is going to immediately place this person under arrest.
            ·  The officer tells the suspect he is under arrest for this particular offense.
            ·  The suspect is argumentative and uncooperative.
            ·  The suspect is not being physically aggressive.

      2.      Divide class into groups.  Designate spokesperson and arrive at majority answer and report findings to class.

      3.      Is suspect legally able to respond to any physical force the officer uses to arrest him?  If so, by what authority?

**USE OF FORCE**
**LEARNING OBJECTIVE:  17.1.3.**

**PURPOSE:**   Demonstrate to class civil liability and civil remedies when unnecessary force is used.

**ACTIVITY:**   Scenario.

      1.     Set to scene:

           Officer arrives at the scene of a reported shooting.  He observes an individual lying face down across the threshold.  The individual appears to be unconscious.  He is bleeding from what appears to be a gunshot wound in his right side.  You investigate and find a shotgun tied to a chair and a rope tied from the trigger device of the shotgun to the opened door.  Your investigation further reveals that this was a device to deter burglaries.

      2.     Question(s).  Group or individuals response(s).

           1.     Is the owner or manager justified in using force to prevent the consequences of theft.

           2.     If so, by what authority?
                   If not, why not?

           3.     Is the owner or manager justified in using force or the threat of force in this manner?

           4.     If so, by what authority?
                   If not, why not?

## LAW ENFORCEMENT OFFICERS KILLED

Instructors should research current FBI statistics relating to law enforcement officers killed and assaulted

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | |
| | § | Civil Action No. |
| | § | |
| | § | 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| | § | |
| Defendants | § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 14
# Stratford Police Policy – Use of Force

| | **STRATFORD POLICE DEPARTMENT** |
|---|---|
| | **Policy   6.1   Use of Force** |
| | **Effective Date:**          **Replaces:** |
| | **Approved:** _____<br>                         Chief of Police |
| | **Reference:** 3.01, 3.02, 3.04, 6.01, 6.02, 6.03, 6.06, 6.07, 6.08, 6.09, and 6.10. |

## I.  POLICY

This department values the protection and sanctity of human life.  It is therefore the policy of this department that officers use only the force that is reasonably necessary to effectively bring an incident under control, while protecting the lives of the officer and others. The use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer could use under the same or similar circumstances.  The officer's actions will be reviewed based upon the information known to the officer at the time the force was used. Information discovered after the fact will not be considered when assessing the reasonableness of the use of force.

Officers are prohibited from using any force as a means of punishment or interrogation.

## II.  PURPOSE

The purpose of this policy is to provide law enforcement officers of this agency with guidelines for the use of deadly and non-deadly force.  This policy does not set forth a higher standard of care with respect to third party claims.

## III. DEFINITIONS

A.  <u>Deadly force</u>

Deadly Force: Any use of force that creates a substantial risk of causing death or serious bodily injury.

B.  <u>Non-deadly force</u>

Non-deadly Force: Any use of force other than that which is considered deadly force. This includes any physical effort used to control or restrain another, or to overcome the resistance of another.

C. <u>Objectively Reasonable</u>

1. Objectively Reasonable: This term means that, in determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in light of the known circumstances, including, but not limited to, the seriousness of the crime, the level of threat or resistance presented by the subject, and the danger to themselves and the community.

2. In evaluating the reasonable application of force, officers may consider their own age, size, strength, skill level with department weapons, state of health, and the number of officers opposing the number of suspects.

## IV. PROCEDURES

A. <u>Use of Non-deadly Force</u>

1. Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable and necessary to bring an incident under control. (TBP: 6.01)

2. Officers are authorized to use department-approved, non-deadly force techniques and issued equipment when one or more of the following apply:

   a. To protect the officer or others from physical harm.

   b. To lawfully restrain or subdue a resistant individual.

   c. To bring an unlawful situation safely and effectively under control.

B. <u>Use of Deadly Force</u>

Law enforcement officers are authorized to use deadly force when one or both of the following apply:

1. To protect the officer or others from what is reasonably believed to be an immediate threat of death or serious bodily harm. (TBP: 6.02)

2. To prevent the escape of a fleeing violent felon who the officer has probable cause to believe will pose a significant threat of death or serious physical injury to the officer or others. Where practicable prior to discharge of the firearm, officers shall identify themselves as law enforcement officers and state their intent to shoot.



C. Deadly Force Restrictions

1.  Warning shots shall not be fired. (TBP: 6.09)

2.  Firearms shall not be discharged at a moving vehicle in an attempt to disable the vehicle.

3.  Because of the low probability of penetrating a vehicle with a handgun, officers threatened by an oncoming vehicle should attempt to move out of its path, if possible, instead of discharging a firearm at it or any of its occupants. However, if an officer reasonably believes that a person is immediately threatening the officer or another person with deadly force by means of a vehicle, an officer may use deadly force against the driver of the vehicle.

4.  Officers may use deadly force to destroy an animal that represents a threat to public safety or as a humanitarian measure where the animal is seriously injured, when the officer reasonably believes that deadly force can be used without harm to the officer or others.  In these circumstances, a supervisor shall be contacted prior to the use of deadly force if time permits.

## V.  LIMITATIONS ON FORCE

The following acts associated with the use of force are prohibited.

A.  Application of choke hold or carotid control holds, except when the officer reasonably believes such holds are the only means of protecting himself or herself or another person from an imminent threat of serious physical injury or death.

B.  Use of Stream-lites or Kel-lites or other flashlights as batons.  An officer may use a flashlight or other object designed for a use other than as a weapon only to defend himself or herself or another from imminent serious bodily injury or death and then only if departmentally sanctioned methods are not available or are impractical.  The use of a flashlight or other alternative weapon under such circumstances, depending on the manner of use, may be deemed an application of deadly force.

## VI.  TRAINING

A.  All officers shall receive training in the use of their firearms, all non-lethal weapons, authorized by the department, hands-on arrest and defensive tactics, as well as the Use of Force policy prior to performing any law enforcement duties.

B.  All officers shall be trained and qualified with their firearms at least annually. (TBP: 3.01, 3.02)

C.  All officers shall receive training in the department's Use of Force policy at least annually. (TBP: 3.02)



D. All officers shall receive hands-on arrest and defensive tactics training at least every two years. (TBP: 3.06)

E. Officers shall receive training in all non-lethal weapons issued or used by the department and demonstrate proficiency with those weapons at least every two years. (TBP: 3.04)

F. All Use of Force training shall, at a minimum, comply with the standards established by TCLEOSE.

**VII.      REPORTING USE OF FORCE**(TBP: 6.03, 6.06)

A. Officers shall document any application of force except for those arising in training, departmental demonstrations, or off-duty recreational activities.

B. If officers have employed any use of physical force (other than the routine use of handcuffs or use of a firm grip to direct the movements of a subject) or used any impact, electrical, or chemical weapons, or pointed or discharged any firearm, they shall first provide for appropriate medical aid for the subject (TBP: 6.07) and then:

    1. Immediately notify the on-duty the Chief of Police of any use of force or discharge of a weapon.  The Chief of Police shall determine if an immediate investigation is required.
    2. Photographs of the subject will be taken as soon as possible after the use of force to document any injury or lack of injury.

    3. Submit a Use of Force form to the Chief of Police prior to the end of shift describing the incident, the force used, and any medical aid rendered.  The Use of Force form shall be in addition to any other required reports.

**VIII.      DEPARTMENTAL REVIEW**

A. Review

    1. The officer's Chief of Police shall review all reported uses of force to determine whether:

        a. Departmental orders were violated.

        b. Relevant departmental policy was clearly understandable and effective to cover the situation.

        c. Departmental training was adequate.

        d. Departmental equipment operated properly.



2.  At least annually, the Chief of Police shall conduct an analysis of use-of force incidents and to determine if additional training, equipment, or policy modifications may be necessary. (TBP: 6.10.)

B.  Internal investigations

1.  An internal investigation will be conducted on any firearms discharge (other than training), and any other use of deadly force by members of the department. An internal investigation  may be conducted on other uses of force incidents if a violation of law or department policy is suspected.   In addition to the internal investigation, a criminal investigation shall also be conducted in any firearms discharge or other use of force incident where an officer or other person is injured or killed and in any other circumstances where a violation of law is suspected.   The criminal investigation may be conducted by another law enforcement agency with concurrent jurisdiction and the results may be presented to the grand jury for review.

2.  Procedures for Officer Involved Shooting Investigations are covered in Policy 6.6.

C.  Assignment

Pending administrative review, any officer whose actions have resulted in the death or serious bodily injury of another person, either through the intentional use of force or by accident involving a use of force or vehicle accident, shall be removed from line-duty assignment.  This action protects both the officer's and the community's interest until the situation is resolved. This re-assignment is not considered punitive in nature. (TBP: 6.08)



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | Civil Action No. 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| Defendants | § § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 15
# Report of Dr. Nizam Peerwani, M.D.



**Fellow American Academy
of Forensic Sciences**

# Nizam Peerwani, MD
Senior Forensic Consultant
Board Certified in Anatomic, Clinical and Forensic Pathology
Mailing Address: P.O. Box 121634, Arlington, Texas 76012
817-966-1739   817-496-9641 (FAX)

April 15, 2020

Jeff Edwards
Attorney at Law
Edwards Law
1101 East 11th Street
Austin TX 78702

Dear Mr. Edwards,

     Re:   Darion Daven BAKER

At your request, I have reviewed the following:
1        Offense Report: Texas Rangers
2        Ranger Galvan handwritten notes.
3        Autopsy Report: South Plains Forensic Pathology Report: 03-08-2018.
4        Texas Department of Public Safety Forensic Biology Lab Report: 03-12-2018
5        Texas Department of Public Safety Firearm/Toolmark Report: 03-23-2018.
6        Crime Scene and EMS Photos (100)
7        Vehicle photos at the scene and in a garage (100).
8        Stratford EMS
9        Multiple videos:
     a.  MP4: Coburn
     b.  MP4" McHugh
     c.  Pilot Security
     d.  David Knight
     e.  Toot n Totum
     f.  BC Michael McHugh

I am a medical doctor, licensed to practice medicine in the State of Texas. I specialize in forensic pathology and I am board certified in anatomic, clinical and forensic pathology. I serve as the Chief Medical Examiner for the counties of Tarrant, Parker, Denton and Johnson in the State of Texas. Over the past thirty-five years, I have performed thousands of forensic

1

examinations many of which involved death due to firearms including those in police custody.

In this case, you have asked me to render an opinion pertaining to the direction of fatal shots that struck Darion Daven BAKER as well as whether Darion Daven BAKER experienced conscious pain and suffering.

## Overview

Darion Daven BAKER ("Baker") was 23 years of age when he was shot to death by police officers from Stratford in Sherman County, Texas.  According to the investigation conducted by Ranger Eustacio Galvan, Texas Ranger who was assigned to conduct investigate officer involved police shooting outside Pilot Gas Station in Stratford, Texas on 02-21-2018 in the evening hours. According to the Ranger report, Stratford Police Officers attempted a high-risk traffic stop on a stolen vehicle in the Pilot Travel Center parking lot in Stratford, Texas. During this process, the driver of the stolen vehicle, Baker, was shot to death. Stratford Police officers enlisted the assistance of Stratford EMS who arrived at the scene at 19:37 hours. Baker was pronounced dead at the scene.

An autopsy was ordered by Justice Brenda Acker of Sherman County, Texas and performed by Luisa Florez, MD of South Plains Forensic Pathology, PA

## Medical Response at the Scene

1.      Stratford EMS

Stratford EMS responded to the scene on 02-21-2018
Call:                  19:30 hours
Unit Enroute:          19:34 hours
Arrived at scene:  19:37 hours
Patient's side:        19:37 hours
Pronounced:        20:07 hours

Paramedic reported that when they first encountered Baker, they observed him lying on the ground besides a motor vehicle with gunshot wound. He had agonal breathing and heart rate.  He was carried to the EMS vehicle where he was intubated. Cardiac monitor showed idioventricular rhythm without pulse. He was pronounced dead.

2

**321**

Vitals on 02-21-2018
19:38 hours: agonal/idioventricular
19:35 hours: asystole with bp = 0, RR = 0 and GCS = 3.
20:07: Field pronouncement

## Forensic Examination

Dr. Luisa Florez, MD of South Plains Forensic Pathology, PA, conducted the autopsy on Baker on 02-22-2018 starting at 09:33 AM

Dr. Flores concluded that Baker sustained two gunshot wounds:
1.      Upper left back passing through the soft tissue of back without entering the chest cavity and lodging in the left upper axilla medial to the left humerus head. This was the non-fatal wound. A jacketed deformed bullet was recovered.
2.      Right mid-back. This was the fatal wound. The bullet entered the chest cavity through the left posterior 9th and 10th ribs, passing through the thoracic spine, the left lung, leaving the chest cavity through the left lateral 5th rib and making an exit from the body along the left flank. The bullet was not recovered.

A.      Description of Firearm Injury: Dr. Florez provided following description of gunshot Wounds:
I.      Penetrating gunshot wound of the torso:
   1.  Wound of Entrance: Left upper back 10-1/2 inches below the head (Wound No "A") and 2-3/4 inches left of the posterior midline.
   2.  Wound Appearance: Irregular oval shaped defect measuring 3/16 inches with marginal abrasions ¼ inch wide accentuated at 4 o'clock.
   3.  Range: Absence of powder tattooing, searing or muzzle imprint (based on the wound appearance and shape of the entrance defect as well as the scene photos, the wound is consistent with an entry gunshot wound through an intermediate target. These features are depicted in photos examined, including Photo # 99/98)
   4.  Path of the Bullet: The bullet travelled right-to-left (laterally) without entering the chest cavity.
   5.  Wound of Exit: None.
   6.  Bullet Recovered: Deformed jacketed large caliber bullet from soft tissue of left axilla (arm-pit) medial to the head of left humerus.
   7.  Injuries: Soft tissue laceration with hemorrhage.

3



Photo-1: GSW No "A"
Source: Medical Examiner's File



Photo-2: Bullet left axilla
Source: Medical Examiner's File

4

II.     Penetrating gunshot wound of posterior torso (fatal GSW) with:
1.  Wound of Entrance:  Right mid-back (Wound No "B"), 17" below head and ¾" right of posterior midline.
2.  Wound Description: Oval-shaped defect = 3/16 inch with marginal abrasion measuring ¼ inch. Tangential shot w/accentuated margins along right lateral border. Medial border presents irregular abrasion suggesting that the bullet is "yawing".
3.  Range: Absence of powder tattooing, searing or muzzle imprint (based on the wound appearance and shape of the entrance defect as well as the scene photos, the wound is consistent with an entry gunshot wound through an intermediate target. These features are depicted in photos examined, including Photo # 99/98)
4.  Path of the Bullet: Back to front, right to left and upwards.
5.  Bullet Recovered: None.
6.  Exit defect: Left lateral chest, 15-1/2: below head and 6-1/4" left of anterior midline = ¼" irregular oval defect
7.  Injuries:
      a.  Fractures of left 9th and 10th left posterior ribs.
      b.  Fracture of left 5th lateral rib.
      c.  Laceration of left lung
      d.  Left hemothorax (800=mL)

`



Photo-3: GSW No "B"
Source: Medical Examiner's File

324



Photo-4: Exit GSW
Source: Medical Examiner's File

Postmortem Toxicology
1. Urine drug screen (presumptive test)": Positive for marijuana.
2. NMS Lab:
    a. Chest cavity blood:
        i. Delta-9-COOH-THC (inactive metabolite) = 140 ng/mL
        ii. Delta-9-THC (principal psychoactive
    b. Immunoassay (ELISA) on chest cavity blood:
        i. Not Detected: Amphetamine, barbiturates, Benzo, Buprenorphine and cocaine.
        ii. Detected: Cannabinoids
    c. Lower alcohols (head-space): Not Detected – acetone and ethanol

C.    Postmortem Histology: Not contributory.
D.    Cause of Death:   Blood loss due to perforation of left lung due to gunshot wound of back (2)
E.    Manner of Death: Not classified.

## Positions of the Officers during the Shooting

Coburn's video recording displays Gregory Lee Dees (Dees), Jr, who was the passenger in the stolen Infiniti driven by the decedent Baker, with a nozzle in his

6

325

left hand at the Pilot Station. When Dees observed the police patrol vehicle approaching, he dropped the nozzle and entered the vehicle's front passenger seat. Officer Michael J. McHugh (McHugh) is now observed pointing his service weapon towards the direction of the vehicle before Dees has completely entered the motor vehicle. As McHugh reached the right front side of the vehicle, Richard K. Coburn (Coburn) appears with his service weapon drawn. He is on the left of the vehicle. Coburn attempted to break the front driver's window with his service weapon, whilst McHugh is observed approaching the front passenger's window (right side of the vehicle). Coburn now moves to the front of the vehicle whilst McHugh stays along the right side of the vehicle. The brake lights of the Infiniti are observed to come on and the vehicle begins to move forward and towards the left. As it does so, both officers are now along the right side of the vehicle. Both officers are observed discharging their weapons into the Infiniti as it drove away.

Coburn chased after the vehicle on foot and McHugh made his way back to the patrol car and drove after the vehicle which had now crossed US-54 and came to stop at a gas station metal post (barrier) at Toot n Totum located at 119 E. Texas Stratford, Texas. The vehicle was observed traveling slowly and did not attempt to adopt evasive action.

Baker had been shot and he is pulled out of the vehicle before Stratford EMS arrives.

## Discussion

A.    Wounding

Baker did not die because of blood loss. 800 mL of blood in the chest cavity documented at autopsy and probably some more at the scene is not sufficient to cause hemorrhagic shock.  He died because of cardiorespiratory arrest.

Baker weighed 128 pounds (or 58 kg). Blood in an adult person is generally estimated as 100 mL of whole blood/Kg body weight. Baker most probably had 5.8 liters of blood. Irreversible shock sets in when there is more than 50% blood loss (or approximately 2.9 liters or more in the case of Baker). Baker lost no more than 1.0 L of blood. Baker succumbed to agonizing respiratory failure due to expanding left hemothorax and left pneumothorax with subsequent cardiac arrest.

There were multiple shots fired at the vehicle, at least fifteen shots, (based on the vehicular photographs evaluated) by two officers, Coburn and McHugh

including
1.   Two shots along the right side of the vehicle:
     a.   Right rear window (rolled up).
     b.   Right rear passenger's door close to the hinger and the front seat
2.   Four shots fired at the rear of the vehicle:
     a.   Along right side rear wind shield
     b.   Two along the trunk door: one below the spoiler on the right side
          and one left of the "infinity" emblem.
     c.   One along the right side of spoiler.
3.   One shot along the right panel in the lower area close to the right front
     wheel.
4.   Three shots along the hood and right fender:
     a.   Two along the right edge of hood.
     b.   One along the right front fender behind the right headlamp
5.   Two along the left front panel above the left front wheel.
6.   Three shots in front of the vehicle including:
     a.   Two along the right anterior hood.
     b.   One along the front grill right of the "Infiniti" emblem
          along the right hood close to the right headlamp.

Two of these shots struck Baker along his back at a tangent (angle) and
travelled in a right-to-left direction. Based on video evaluation, photographs,
scene description and autopsy findings as well as testimonies rendered to the
Texas Ranger, the most likely direction from which shots were fired when they
struck Baker is the right side after the vehicle had passed Coburn when Coburn
was in no apparent danger. These include the shots that struck the vehicle
along the right rear window and the right rear passenger's door close to the
hinger and the front seat. This assumes that Baker was seated in the driver's seat
facing forward.

If, however, Baker had his upper torso turned towards the passenger's side, it is
likely that the two shots fired including the fatal shot came from the rear.

3.   Spine Injury

Bullet that struck the body along the right mid-back (Wound No "B"), entered
the left chest cavity causing comminuted fractures of left posterior 9th and 10th
ribs along the costo-vertebral region after having passed through adjoin
thoracic spine. Although Dr. Florez stated in her autopsy report that "no acute
fractures are on the spine, pelvis of long bones of the upper and lower
extremities", she did not perform posterior spine dissection. The entry wound
(Wound No "B") is very close the spine along the right back. This bullet travelled,

8

327

right-to-left. The bullet trajectory would have to pass along the posterior column of T-9 and T-10 thoracic vertebrae before entering the left chest cavity and collapsing the adjoining left posterior 9th and 10th ribs. Fracture of posterior spine column would stabilize the spinal canal and cause spinal cord compression and or spinal cord transection with paraplegia. This would explain why Baker failed to take evasive action thereby causing the vehicle to collide at low speed with a metal post at the Pilot Gas Station.
`



Costo-vertebral trauma with collapsed 9th and 10th left posterior ribs and adjoin spine

Photo-5: Chest cavity with spine and rib trauma
Source: Medical Examiner's File

9

328

2.      Trauma and Conscious Pain and Suffering

Forensically, pain is defined as the perception of nociceptive stimuli above the threshold of pain detection, whereas suffering is the negative affective response that is provoked by pain. Consciousness on the other hand is awareness of self and environment and includes both content and arousal.

State of consciousness includes two components: (1) *wakefulness* and (2) *awareness*. Both must be present for consciousness to be present. The neurons and their circuits (connections) that support wakefulness are in one region of the brain, whilst the neurons and circuits that provide awareness are in another region of the brain. The part of the brain responsible for wakefulness is the *reticular activating system* (RAS), a collection of neurons in the upper brainstem that sends widespread stimulatory projections to the areas of the brain responsible for awareness. However, although wakefulness is *necessary* for consciousness, wakefulness alone is *insufficient* for consciousness.

The parts of the brain responsible for awareness—the ability to think and perceive—are the *neurons* (brain cells) in the cortex (grey matter) of the two hemispheres and the *axons* (communicating projections) in the white matter between those neurons. The brain's neurons are in the *cerebral cortex* and in the deep grey matter in nuclei such as the thalamus. These billions of neurons make trillions of connections via axons in the white matter, constituting functional neural networks that support all conscious effort of the brain.

Traumatic injuries result in variable degree of pain and suffering depending upon the severity of the injury or event, and the state of consciousness. It is recognized that in certain types of clinical events or traumatic injuries, the loss of consciousness is rapid and abrupt, such as in cardiac ventricular fibrillation, high cervical spinal cord transection, transection of aorta, in epilepsy, or devastating craniocerebral trauma. In such cases, for all purposes, there is absence of conscious pain and suffering.

Baker, however, did not sustain any of the above injuries and he did not die

10

immediately. As noted above, he was shot twice, the shot labelled "A" (non-fatal shot), caused significant soft tissue injuries of the back and the left arm-pit. The shot labeled "B" (the fatal shot) fractured three ribs ploughed through the spine at the level of 9th and 10th ribs, fracturing the 6th left lateral rib and lacerated the left lung. There was a large amount of blood in the left chest cavity (left hemothorax) (800 mL) and most probably left pneumothorax which collapsed the left lung. The stimulus for respiration begins in the respiratory centers in the brain stem. Since there was no central nervous system trauma Baker continued to breath. Each breath he took would have been painful since he had sustained fractured ribs. Additionally, as the left hemothorax and pneumothorax expanded, his left lung collapsed causing suffocation. This is a frightful experience. At some point the expanding left hemothorax would have caused his mediastinal structures in the middle of the chest cavity to shift into the right chest cavity, causing additionally respiratory distress and cardiac impairment both of which ultimately led him to his death.

## Conclusion

It is my opinion that Darion Daven BAKER was shot to death by Stratford Police Officers. Two shots struck him. Based on everything I have evaluated, the fatal gunshot wound struck Baker along the right mid-back.

The shots that struck the motor vehicle more likely than not came from the right side. Both Officers Coburn and McHugh were on the right side of the vehicle. Both officers fired into the vehicle. If, however, Baker's upper torso was turned towards the passenger's side, the shots fired from behind could have struck Baker. Officer Coburn was firing from behind the vehicle.

It is also my opinion that Darion Daven BAKER experienced extreme conscious pain and suffering.

My opinions are rendered within a reasonable degree of medical probability and are based on my education, training and experience. I reserve the right to change and/or expand upon these opinions should additional information become available to me.

I am over the age of 18, and competent to make the above declaration. This declaration is made under penalty of perjury pursuant to 28 U.S.C. 1746, and I declare that the foregoing is true and correct.

Thank you for allowing me to review this case.

Yours sincerely,

Nizam Peerwani, M.D.
*Senior Consultant*

# Nizam Peerwani

Chief District Medical Examiner
Tarrant County Medical Examiner's District & Crime Lab
200 Feliks Gwozdz Place
Fort Worth, Texas 76104-4919
(817) 920-5700
FAX     (817) 920-5711
CELL:   (817) 966-1739
Peerwani@aol.com



## EDUCATION

Bachelor of Science in Biology & Chemistry, 1972.
Doctor of Medicine, 1976.
American University of Beirut, Lebanon.

Post-graduate Training:
Residency in Anatomic and Clinical Pathology, 1976-1979.
Baylor University Medical Center, Dallas, Texas.

Chief Resident, 1979-1980.
Baylor University Medical Center, Dallas, Texas.

## BOARD CERTIFICATIONS

American Board of Pathology in:
1.      Anatomic and Clinical Pathology, November 1980.
2.      Forensic Pathology, May 1983.

## LICENSE   Texas State Board of Medical Examiners (FLEX), July 1977, License No. E8809

## PROFESSIONAL APPOINTMENTS

1.      Chief Medical Examiner, Tarrant County, Texas
        September 1979 – present.
2.      Chief Medical Examiner, Parker County, Texas
        October 1985 – present.
3.      Chief Medical Examiner, Denton County, Texas
        October 1989 – present.
5.      Chief Medical Examiner, Johnson County, Texas
        July 2008 – present.


## TEACHING APPOINTMENTS AND AFFILIATIONS

1.      Clinical Instructor, 1976 – 1980.

13

**332**

Baylor School of Medical Technology, Dallas, Texas.
Baylor College of Dentistry, Dallas, Texas.
2.      Department of Pathology:
Clinical Assistant Professor of Pathology, 1979-1983.
Assistant Professor of Pathology, 1983-1989.
Associate Professor, 1989-2005.
University of North Texas Health Science Center, Fort Worth, Texas.
3.      Adjunct Clinical Professor, 1981-1984
Family Practice Residency Program
John Peter Smith Hospital, Fort Worth, Texas.
4.      Adjunct Professor of Nursing, School of Graduate Nursing, 1987-1992
University of Texas at Arlington, Texas.
5.      Adjunct Professor, 2013 - present
American University of Science & Technology, Lebanon
6.      Professor, 2006-present
Wesleyan University, Fort Worth, Texas.
7.      Program Director, Forensic Fellowship Program, 2003-present
United States Graduate Medical Education.

## SCIENTIFIC PAPER PRESENTATIONS AND PUBLICATIONS

1.      Crow, RM, Peerwani N and Krouse M, "A Practical Technique for Freeing the
Mandible in a Viewable Body with Fixed Rigor Mortis", presented at the 35th
Annual Meeting of American Academy of Forensic Sciences, Cincinnati, Ohio,
February 1983
2.      Peerwani N, Crow RM, Krouse M, "Superimposition as an Identification Technique
in Decomposing Bodies", presented at the 36th Annual Meeting of American
Academy of Forensic Sciences, Anaheim, California, February 1984
3.      Peerwani N, Crow RM and Krouse M, "Intravenous Fentanyl [Sublimaze] Sedation
and Sudden Death", presented at the 36th Annual Meeting of American
Academy of Forensic Sciences, Anaheim, California, February 1984
4.      Crow RM, Peerwani N and Krouse M, "Intraoperative Death due to Dislodgement
of Endotracheal tube", presented at the 36th Annual Meeting of American
Academy of Forensic Sciences, Anaheim, California, February 1984.
5.      Houts, JA and Peerwani N, "Suicide Patterns in a Large Metropolitan Area in
Texas", presented at the 39th Annual Meeting of American Academy of Forensic
Sciences, San Diego, California, February 1987
6.      Krouse M and Peerwani N, "Vitreous Humor Gases as an Indicator of Postmortem
Interval", Poster Session presented at the 40th Annual Meeting of American
Academy of Forensic Sciences, Philadelphia, Pennsylvania, February 1988.

7.      Peerwani N., and Harvey C., "Sudden Death from Aortic Sinus Aneurysm",
presented at the 43rd Annual Meeting of American Academy of Forensic
Sciences, Anaheim, California, February 1991.
8.      Peerwani, N. and Sisler G., "Sudden Death from Amniotic Embolus", presented
at the 44th Annual Meeting of American Academy of Forensic Sciences, New

Orleans, La, Feb 1992.

9.   Peerwani, N.  and Krouse, M.A., Multiple Papers on "Mt Carmel Disaster in Waco, Texas" presented at the 27th Annual Meeting of N.A.M.E., Fort Worth, Texas, September 1993.

10.   Peerwani, N.  And Sisler G., "Sudden Death Associated with Atrioventricular Node Tumor" presented at the 27th Annual Meeting of N.A.M.E., Fort Worth, Texas, September 1993.

11.   Peerwani, N., "LIMS and Imaging in a Medical Examiner's Office", presented at the 27th Annual Meeting of N.A.M.E., Fort Worth, Texas, September 1993.

12.   Peerwani N., et.al. "In The Aftermath of Branch Davidian Siege", presented at the 46th Annual Meeting of American Academy of Forensic Sciences, San Antonio, Texas, February 1994.

13.   Peerwani N., et.al.  The Role of Forensic Anthropology in the Recovery and Analysis of Branch Davidian Compound Victims: Recovery Procedures and Characteristics of the Victims.  *Journal of Forensic Sciences.*  Vol. 40, No. 3, May 1995, pp. 335-340.

14.   Peerwani N., et.al.  The Role of Forensic Anthropology in the Recovery and analysis of Branch Davidian Compound Victims: Techniques of Analysis.  *Journal of Forensic Sciences.*  Vol. 40, No. 3, May 1995, pp 341-348.

15.   Peerwani N., Haglund W.D. et.al. Forensic Investigations of the Kibuye Mass Grave, Rwanda.  International Association of Forensic Sciences. 15th Triennial Meeting in Los Angeles, Ca. August 22-28, 1999.

16.   Peerwani N. Changing Patterns in Child Abuse. Texas District and County Attorney's Association. 2000 Crime against Kids Seminar. San Antonia, Tx. June 20, 2000.

17.   Peerwani N. Forensic Considerations in Recovering Organs from Medical Examiner Cases. Texas Transplantation Society, 12th Annual Meeting, Austin, Tx. June 22-25, 2000.

18.   Peerwani, N. Health and Human Rights: Is It Child Abuse? Pediatric, Pathology and Public Health Joint Grand Rounds. American University of Beirut, Lebanon. July 19, 2000.

19.   Peerwani, N. and Lynch V. (2006) *Forensic Nursing*. St. Louis, Elselvier Mosby

20.   Peerwani, N.: Human Rights and Forensic Pathology. 4th Mediterranean Academy of Forensic Science, Antalaya, Turkey, October 13-18, 2009.

21.   Peerwani N., et.al. "A Comparison of Drug-Related Deaths in Tarrant County, With Law Enforcement Seizures of Illicit Substances over a Similar Time. Oral Presentation: 62nd Annual Meeting of American Academy of Forensic Sciences, Seattle, WA in February 2010.

22.   Peerwani N. and Sollom R. Do No Harm: A Call for Bahrain to End Systematic Attacks on doctors and Patients. PHR Publication. April 2011.

23.   Peerwani N., et.al. "Missing Persons and Human Rights, multi-discipline presentation as a workshop Oral Presentation: 64th Annual Meeting of American Academy of Forensic Sciences, Atlanta, GA in February 2012.

24   Peerwani N, Sozer A., Haglund W., Varney H and Lamburne R. Libyan Human

15

**334**

Identification Needs Assessment and Gap Analysis. PHR Publication. March 2013. Sponsored by: Physicians for Human Rights, Boston, MA, November 2012.

25. Peerwani N., "Pattern Recognition", Annual Forensic Conference sponsored by Texas Forensic Science Commission at the Capitol, Austin, Texas, June 2012.

26. Peerwani N. et al. "Forensic Science founded on observation and experience and improved by education and research".
Plenary Session: Panelist at the 65th Annual American Academy of Forensic Science, Washington DC, February 18-23, 2013.

27. Peerwani N. "Forensic Autopsy in a Fire Death", Texas State Fire Marshall's Conference, January 2013, Houston, Texas.

28. Peerwani N. "Mechanism of Death in Flash Fires", Texas State Fire Marshall's Conference, Houston, Texas, April 2013.

29. Peerwani N. "National Academy of Science Report and Junk Science"
Oral Presentation: American University of Science & Technology, Beirut, Lebanon, December 2013.

30. Peerwani N. "Cognitive Bias and Pattern Recognition", Texas State Fire Marshall's Conference, Plano, Texas, December 2013.

31. Peerwani N. "How Serious is HCN in a Fire?" Texas State Fire Marshall's Conference, San Antonio, Texas, February 2014.

32. Peerwani N. "Electrocutions and Solar Panels", Texas State Fire Marshall's Conference, San Antonio, Texas, August 2014.

33. Peerwani N., et.al. "Fatal Aortoesophageal Fistulae Due to Foreign Body Ingestion in Yong Children: Presentation of Two Cases."
Oral Presentation: 67th Annual Meeting of American Academy of Forensic Sciences, Orlando, FL in February 2015.

34. If the Dead Could Speak: Mass Deaths and Torture in Syria's Detention Facilities. Human Rights Watch Publication. December 2015.

35. Peerwani N., et.al. "If At First You Don't Succeed."
Oral Presentation: 68th Annual Meeting of American Academy of Forensic Sciences, Las Vegas, NV February 2016.

36. Peerwani N., et.al. "Mimic of Pediatric Head Trauma: Bipartite Parietal Bone in Pediatric Cases."
Oral Presentation: 68th Annual Meeting of American Academy of Forensic Sciences, New Orleans, LA in February 2017.

37. Peerwani N. The Role of Forensic Pathologists in Armed Conflict. Acad Forensic Pathol. 2017 7(3): 370-389.

## MASS DISASTER EXAMINATIONS AND HUMAN RIGHTS MISSIONS

1. Delta Flight # 1141 at Dallas-Fort Worth International Airport, August 1986
Scene Response and case studies. (Jurisdiction:        Dallas County, Texas)

2. Delta flight #191 at Dallas-Fort Worth International Airport, August 1988.
Death scene investigation, autopsies, identification and repatriation.
(Jurisdiction: Tarrant County, Texas).

3. Investigation of Multiple Fire and Shooting Deaths at Mt. Carmel, Waco, Texas on April 19, 1993 in the Aftermath of FBI Siege of the Compound.
Team Leader: Death Scene Investigation, Recovery of Charred Remains,

16

335

Forensic Autopsies, Human Identification and Repatriation of Remains for Burial.

4.  Evaluation of Rwanda Genocide in Kibuye, Rwanda, December 1995-January 1996.
    Forensic Pathology Team Member: Forensic Examinations of bodies in a Large Mass Grave 454 bodies)
    Jurisdiction:   International Criminal Tribunal for Rwanda (United Nations).
    Testified: At International War Crimes Tribunal for Rwanda: Arusha, Tanzania, Nov 1997.

5.  Evaluating of Bosnia Genocide, Tuzla, Bosnia, July 1996.
    Advance Team Leader: Establishment of morgue facility and Forensic Examinations of Multiple Remains from Srebrenica Massacre, Bosnia and Herzegovina.
    Jurisdiction: International Criminal Tribunal for former Yugoslavia (United Nations).

6.  Multiple Human Rights Missions to Guatemala (1996 to present).
    Field work and teaching - Sponsored by: Fundacion de Antropologia Forense de Guatemala (NGO).

7.  Human Rights Mission to Indonesia, November 1998.
    Field Work in Northern Sumatra (Aceh province) and teaching NGOs.
    Sponsored by: Asia Foundation and Physicians for Human Rights, Boston, Mass.

8.  Humanitarian Mission to Cyprus, October 1999.

9.  Evaluation of War Victims in Mass Graves (quality assurance program), Nicosia Cyprus.
    Sponsored by: Physicians for Human Rights, Boston, MA.

10. Human Rights Mission to Israel, Occupied West Bank and Gaza to Evaluate Use of Excessive Force Deployed by Israeli Defense Forces, October 2000.
    Sponsored by: Physicians for Human Rights, Boston, MA.

11. Human Rights Mission to Jenin, Occupied West Bank - Advance Team - Evaluation of Use of Excessive Force by Israeli Defense Forces.
    Sponsored by: Physicians For Human Rights, Boston, MA, March 2002.

12. Mass Graves and Local Capacity Evaluation, Afghanistan After the fall of Taliban.
    Sponsored by: United Nations High Commission for Human Rights, March - April, 2002.

13. Assessment of Mass Graves and Local Capacity Evaluation in Iraq after the fall of Sadam Hussein.
    Sponsored by: Physicians For Human Rights and Human Rights Watch, March 2004.

14. Evaluation of prison killing in Miguel Castro Castro Prison in Lima Peru in 1992. April 2006.
    Sponsored By: Inter-American Human Rights Commission.

15. Investigation and 2nd autopsy on high profile politician, Atsutsè Kokouvi AGBOBLI in Lomé, Togo.
    Sponsored by: Représentant du Haut Commissariat des Nations Unies aux droits de l'homme au Togo, OHCHR-Togo Office, Lomé, August 2008.

16. Assessment of Systematic Attacks on doctors and Patients in Bahrain.
    Sponsored by: Physicians For Human Rights, Boston, MA, April 2011.

17

17.   Libyan Human Identification Needs Assessment and Gap Analysis.
      Sponsored by: Physicians For Human Rights, Boston, MA, March 2013.
18.   Torture and Death in Syrian Detention Facilities. Human Rights Watch. December
      2015.

## QUALIFIED EXPERT WITNESS

1.   States of Texas (multiple counties), Oklahoma, Arkansas, Louisiana and Kansas:
     Both Civil and Criminal Courts.
2.   Federal Courts (Fort Worth, San Antonio and Midland, Texas).
3.   International Criminal Tribunal for Rwanda (United Nations).
4.   Inter-America Human Rights Court, San Salvador, El Salvador.
5.   Supreme Court, Lebanon.

## PROFESSIONAL ORGANIZATIONS

1.   American Academy of Forensic Sciences, Fellow
2.   American Society of Clinical Pathologists, Fellow (Retired)
3.   College of American Pathologists, Fellow
4.   National Association of Medical Examiners, Fellow

## AWARDS AND RECOGNITIONS

1.   Dean's Honor List, 1969-70 and 1970-71
     School of Arts & Science, American University, Lebanon
2.   Dean's Honor List, 1974-75
     School of Medicine, American University, Lebanon
3.   Best Instructor in Basic Sciences, 1983
     University of North Texas Health Science Center
4.   Physician's Recognition Award by American Medical Association, 1986.
5.   Professor of Year Award, Class of 1988, 1990
     University of North Texas Health Science Center, Fort Worth
6.   M.L. Coleman, Faculty Award in Preclinical Sciences (outstanding academician),
     1987, 1990, 1994, 1996.
     University of North Texas Health Science Center, Fort Worth
7.   Meritorious Award for outstanding service and leadership by Attorney General,
     State of Texas, March 1990 and 1991.
8.   Recognition Award from the Federal Bureau of Investigation for leadership role in
     scientific evaluation of deaths at Mt.  Carmel, Waco, Texas.
9.   Founder's Day Award, University of North Texas Health Science Center, Fort
     Worth, 2004
10.  Awarded by Chancellor of University of North Texas.

11.  Humanitarian Award, Physician for Human Rights, Cambridge, Massachusetts,
     October 2006.

18

**337**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | |
| | § | Civil Action No. |
| Plaintiffs | § § | 2:19-cv-77 |
| | § | |
| v. | § | |
| | § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| | § | |
| Defendants | § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 16
# Report of Dep. Chief Jeff Noble (ret.)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

IRA DARLINA BAKER, individually, and          )
as the administratrix of the ESTATE OF        )
DARION DEV'ON BAKER, and MARIO                )
BAKER, individually, and on behalf of all     )
Wrongful death beneficiaries of DARION        )
DE'VON BAKER,                                 )
                                              )     Civil Action No. 2:19-cv-77
              Plaintiffs,                     )
                                              )
RICHARD KEITH COBORN, and                     )
MICHAEL JOSEPH McHUGH, in their               )
Individual capacities,                        )
                                              )
              Defendants.                     )

**EXPERT REPORT OF JEFFREY J. NOBLE**

1.      My name is Jeffrey J. Noble, and I make this report at the request of plaintiff's counsel.

2.      I was a police officer in the City of Irvine for 28 years rising to the position of Deputy
        Chief of Police prior to my retirement.  I served as an interim Deputy Chief of Police at
        the Westminster Police Department for nine months.

        a.      I was a police officer for 28 years and retired in July 2012 as the Deputy Chief of
                Police with the Irvine Police Department, located in southern California.  As a
                Deputy Chief, I was directly responsible for all police operations including Patrol,
                Traffic, Criminal Investigations, Emergency Management, Crime Prevention,
                DARE, K9s, Training, and SWAT.  The City of Irvine encompasses over 70 square
                miles with a population of over 218,000.  I served in a wide range of assignments
                as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy
                Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs,
                Emergency Management and Crime Prevention.  The Irvine Police Department
                had over 200 police officers and over 100 civilian employees during my
                employment with the department.

        b.      In April 2014, I was hired by the Westminster, California Police Department as an
                interim Deputy Chief of Police.  My employment with the Westminster Police
                Department was by means of a temporary contract, and I was asked to review
                the department's Internal Affairs unit; department policies relating to Internal

1

**339**

Affairs investigations, discipline and police officer conduct; conduct department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period.  My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation.  I concluded this interim position in January 2015.  The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

c. As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

4. I have a Juris Doctor degree, with honors, from Western State University College of Law and I am admitted to practice law in the State of California.  I have a Bachelor's degree in Criminal Justice with an emphasis on Administration from California State University at Long Beach.

5. As a police consultant and expert witness, I have extensive experience on matters involving police investigative procedures, misconduct and corruption.  For example:

a. In 2014, I was part of a Carnegie Institute of Peace Think Tank for addressing police use of force in developing countries.

b. I have consulted with other police organizations on a wide range of police practices, procedures, including criminal and administrative investigations.  For instance, I was retained in 2004 as an expert to review and evaluate the internal investigation conducted by the San Francisco, California, Office of Community Complaints of the case widely known as "Fajitagate" involving the indictment of seven command staff members and three officers of the San Francisco Police Department.  In 2007 and again in 2009, I was retained by the City of Austin, Texas to review the police department's internal homicide and Internal Affairs investigation of two officer involved fatal shootings.

c. I have been retained as both a defense and a plaintiff's expert in over 250 cases and have testified as an expert in state court in California, Washington, Tennessee, Connecticut, Minnesota and New Mexico and in federal court in Illinois, Tennessee, Georgia, Virginia, Texas and California.  I have prepared expert reports for cases in the states of California, Washington, Pennsylvania, Georgia, Illinois, Tennessee, Idaho, Arkansas, Texas, Colorado, New York, Oklahoma, Connecticut, South Carolina, Florida, New Mexico,

Minnesota, Ohio, Kentucky, Louisiana, Indiana, Wisconsin, Wyoming and Missouri.

d.      I have been retained in criminal cases involving allegations of criminal uses of force by police officers in the states of New Mexico, Delaware, Minnesota, Pennsylvania, California, Georgia and Florida.

f.      I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice.  This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics.  The project was an effort to develop national best practices in internal investigations for police agencies.  I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct.  Because of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice."

g.      I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004.

h.      In 2013, I gave a presentation in Mexico at the request of the Mexican government on preventing corruption in police institutions.

i.      I have published 21 articles on policing which discussed the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and investigative procedures.  Those articles are listed in my attached resume.

j.      I have published two chapters for policing textbooks on tactical recklessness and the code of silence.

k.      I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on police Internal Affairs investigations titled, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight."

l.      As evidence that the opinions in our book are accepted by other experts of police administrative investigations, my book was cited extensively in the COPS 2009 publication, "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practice Guide for Local Law Enforcement."

3

6.    My experience, training and background are more fully described in my attached resume.

7.    My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

8.    I reviewed the following material in making my opinions:

- Complaint
- Handwritten statement of Mr. Cartrite
- Handwritten statement of Mr. Thoreson
- Handwritten statement of Mr. Hill
- Death Certificate Worksheet
- Ranger Galvan Handwritten Notes
- Firearms/Tool Marks Laboratory Report, Issue Date March 23, 2018
- Forensic Biology Laboratory Report, Issue Date March 12, 2018
- Autopsy Report – Dr. Luisa Florez
- Crime Scene Photographs (D00028-127)
- Crime Scene Photographs (D00128-257)
- Crime Scene Photographs (D00258-357)
- Crime Scene Photographs (D00358-537)
- Darion Baker Autopsy Photographs (D00538-681)
- Randy Hooks Follow Up Photographs (D00837-846)
- Stratford Police Department Use of Force policy
- Offense Report
- Videos
  - In-Car Video
  - Officer McHugh Body Camera
  - David Knight Video
  - Video 3 – Converted
  - Video 6 – Converted
  - Pilot Security Video
    - Video 1 – Interior of Store
    - Video 2 – Interior of Store
    - Video 3 – Gas Pumps
    - Video 4 – Double Front Doors of Store
    - Video 5 – Restaurant Area of Store
    - Video 6 – Exterior Gas Pump Area
    - Video 7 – Exterior Gas Pump Area
  - Interview of Officer McHugh

4

**342**

- o      Interview of Officer Coborn
- o      Interview of Gregory Dees (Interview 1 and 2)
- Deposition of Richard Coborn
  - o      Exhibit 1 – Google Earth Map
  - o      Exhibit 2 – Hand drawn Diagram
  - o      Exhibit 3 – Crime Scene Photograph
  - o      Exhibit 4 – Photograph Pilot Gas Station
  - o      Exhibit 5 – Photograph Rear of Infinity
  - o      Exhibit 6 – Stratford Police Department Use of Force Policy
- Deposition of Michael McHugh
  - o      Exhibit 7 – Aerial Diagram
- Texas Commission on Law Enforcement – Personal Status Report – Coborn (D00009-13)
- Texas Commission on Law Enforcement – Personal Status Report – McHugh (000003—8)

9.      At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such aid, I will ensure that they are made available for review, if requested, prior to their use.

10.      My professional charges for this litigation work is an hourly fee of $295 plus expenses including all travel time.  My fees for deposition and trial testimony are $2,950 per calendar day or any portion thereof, plus travel time and expenses.

11.      The opinions that follow are made within a reasonable degree of certainty within the field of police practices based on over 30 years of professional law enforcement experience and scholarship.

**Summary of Incident**

12.      On February 21, 2018, Officers Coborn and McHugh of the Stratford Police Department were in uniform in a marked police vehicle, parked along the highway looking for "interdiction stops" when they saw a Infinity exit the highway and park at the gas pumps of a Pilot gas station.  The occupants of the vehicle entered the gas station convenience store.

13.      The officers said the driver did not commit a vehicle code violation, nor did they suspect the occupants of the vehicle of committing a crime.  Nonetheless, the officers drove by the Infinity and obtained its license plate number.  The officers ran the license plate number as they drove across the street and discovered the Infinity had been reported stolen out of Inglewood, California.

14.      Officer McHugh called the Inglewood Police Department and was told the Infinity was stolen when the owner of the vehicle left the keys in the car and went inside a drug

5

**343**

store.  There was no evidence that the suspects used weapons or violence to steal the vehicle.  The officers decided to drive across the street to the Pilot gas station to try to determine who had been in the vehicle.  Officer Coborn went inside the store while Officer McHugh waited in the police car.

15.    Officer Coborn said he saw three white males speaking with two black males and as he entered the store the two black males walked away.  Officer Coborn said he spoke with one of the white males as he exited the store and was told the black males were suspicious as they had asked for directions to Memphis, but they wanted to avoid major highways or borders.

16.    Officer Coborn returned to the police vehicle as the two black males, Mr. Baker and Mr. Dees exited the store and walked to the Infinity.  Officer Coborn pulled his vehicle in behind the Infinity and activated his overhead police lights to affect a high-risk car stop.

17.    Abandoning generally accepted police high-risk vehicle stop tactics, Officer Coborn approached the driver's side of the vehicle and Officer McHugh approached the passenger side.  Officer Coborn gave the driver, Mr. Baker commands but said he could not see Mr. Baker through the driver's window due to the tinting on the window. Officer Coborn tried to break out the driver's window with his handgun and when that failed, he moved to the front of the vehicle so he could see inside.

18.    Meanwhile, Officer McHugh was giving commands to the passenger, Mr. Dees and Mr. Dees raised his hands.  Officer McHugh moved to the area of the front passenger tire for a better view inside the vehicle as Officer Coborn moved in front of the vehicle.

19.    When Mr. Baker started the vehicle and began to drive forward, both Officer Coborn and Officer McHugh shot into the vehicle.  Officer McHugh said he waited for the "B" pillar on the passenger side to move past him before he shot at Mr. Baker to avoid shooting Mr. Dees who had his hands raised.  Officer McHugh said he believes his rounds went through the rear passenger window and the rear window of the vehicle. Although Officer McHugh said he believes his first round struck Mr. Baker, he acknowledged it was too dark to see inside the vehicle and he did not see any movement from Mr. Baker consistent with being shot.  Officer Coborn said he shot at the front of the vehicle, the passenger side and then he ran behind the vehicle and fired multiple rounds at Mr. Baker as the vehicle was driving away.

20.    Gas station video shows Mr. Baker immediately turned the vehicle to the left, away from the officers, then he drove away over a curb, across the street, and he came to a point of rest when he hit a metal pole protecting gas pumps at the Toot 'n Totum gas station that is across the street from the Pilot gas station.

21.    Mr. Baker was shot two times in the back and died at the scene.

6

**344**

**Background**

22.    Braiden Cartrite

    a.    Written Statement (February 21, 2010)

        a.    Mr. Cartrite said he, Mr. Thoreson and Mr. Hill went to the Pilot Gas
             Station convenience store to get some drinks.  After they paid for their
             drinks, two black males asked them for directions to Kansas City.  The
             males said they did not have any cell phone service, so Mr. Cartrite
             showed him the directions on his phone.  Mr. Cartrite said when the
             subjects realized they had to cross state lines to get to Kansas City, they
             asked for directions to Memphis, Tennessee.  Mr. Cartrite said he and his
             friends told the subjects to take I-40 and they again said they could not
             cross any state lines or go through any tolls because their windows were
             tinted past the legal limit.

        b.    Mr. Cartrite said after a police officer entered the store, the subjects
             walked away and as he was walking out of the store the police officer
             stopped him and asked what he had been talking about with the subjects.
             Mr. Cartrite told the police officer that the subjects had asked for
             directions, but they were being really "sketchy" saying "we can't cross
             any borders or go through any tolls."  The police officer replied that there
             was a car outside that had been reported stolen.

        c.    Mr. Cartrite said he walked out to his car and saw the two subjects
             walking out to their car.  The officer turned his lights on and pulled in
             behind the car and yelled, "Stop, get on the ground."  Both subjects
             entered the car and the officer yelled, "Get out of the car."

        d.    Mr. Cartrite said he saw the brake lights of the subjects' car illuminate
             and the vehicle began to drive forward.

        e.    Mr. Cartrite said he could hear gunshots, but he could not tell who was
             shooting.  The car drove over a curb, then across traffic into the Toot n'
             Totum across the street where the car came to a rest.  The officer who
             had been in the passenger seat of the police car picked up the officer
             who was initially driving and they drove up to the car across the street.

        f.    The subject in the passenger seat would get out of the car, so the police
             officer opened up the back of the police vehicle and released his K-9.
             After the passenger was handcuffed, the officers pulled the driver out of

7

**345**

the car.[1]

23.    Payton Thoreson

    a.    Handwritten Statement (February 21, 2018)

        a.    Mr. Thoreson said two black males walked up to him and his friends and asked for directions to Kansas City because their phones were not working.  As they looked at the directions to Kansas City, one of the males kept saying he did not want to cross any state lines or hit any tollbooths.

        b.    Mr. Thoreson said the subjects then change their mind and said they wanted to go to Memphis, Tennessee.  Mr. Thoreson said he gave the subjects directions to Memphis.

        c.    Mr. Thoreson said a police officer walked into the store and the two black males walked off.  Mr. Thoreson said as they were leaving the store, the officer asked Mr. Cartrite what they were talking about with the subjects and Mr. Cartrite told the officer.  The officer told Mr. Cartrite that the car the subjects were in had been reported stolen.

        d.    Mr. Thoreson said they entered their car and when they were inside Mr. Cartrite told them of the conversation he had just had with the officer.  Mr. Thoreson said he decided to sit there and watch was about to happen.  The subjects walked to the car and the officer pulled in behind them and turned on his lights.

        e.    As the officers got behind the subjects, the subjects jumped into their car.  The officers exited their car and while holding their guns yelled, "Get out of the car," several times.  The subjects drove away and he could hear shots being fired.  Mr. Thoreson said he could not tell who was shooting, but soon after he believed the driver of the stolen car was hit because the car seem to be driving itself creeping along, bouncing off of curves, crossing the street, and finally coming to a stop.

        f.    The officers pulled the passenger out of the car while other officers pulled the driver out and immediately started to work on him trying to save his life.[2]

---

[1] Handwritten statement of Braiden Cartrite.
[2] Handwritten statement of Mr. Thoreson.

8

24.   Timothy Heath Hill

    a.   Handwritten statement (undated)

        a.   Mr. Hill said he, Mr. Cartrite and Mr. Thoreson went into the Pilot convenience store shortly after 7 PM to get something to drink.  Mr. Hill said he obtained his drink and after paying for it, two black males asked for directions to Kansas City.  Mr. Hill said Mr. Cartrite used his cellular telephone to give them directions, but the subjects said they did not want to cross any state lines.  Mr. Hill said he told subjects they could not get to a city in another state without crossing state lines and the subjects then asked for directions to Memphis, Tennessee.  Mr. Hill said he told the subjects to take I-40 and it would take them directly to Memphis.

        b.   Mr. Hill said the subjects seemed confused and said they did not want to go through any borders or use any toll roads.  Mr. Hill said he told them as long as they stayed on the interstate, they would not hit any tolls.  Mr. Hill said Mr. Thoreson asked them where they are coming from and the subject said, "A long way from here."

        c.   Mr. Hill said the subjects began to walk toward the cashier at about the same time a police officer was walking into the store.  Mr. Hill said he and Mr. Thoreson walked out to their car and Mr. Cartrite spoke with the officer.  When Mr. Cartrite got into the car, he told them that he believed the officer was going to arrest the subjects for stealing a car.

        d.   Mr. Hill said he saw the subjects get into their vehicle just as the officer turned his lights on and pull in behind the vehicle.  The officer yelled at the subjects to turn off the car and exit the vehicle.  The officers repeated their commands, but the car began to drive off.

        e.   Mr. Hill said at this point, shots were fired.  Mr. Hill said the vehicle slowly went over the curb, across the drive to the other curb, and then across the street to the Toot n' Totum.  The driver side officer followed the driver's window of the subject's car the entire time and the officer from the passenger side drove the police car across the street.  The officers pulled the passenger from the vehicle and handcuffed him.  Shortly after the driver side officer pulled the driver from the car and began CPR.[3]

---

[3] Handwritten statement by Mr. Hill.

25.    Officer Coborn

    a.    February 24, 2018 Interview by Ranger Galvan (Videotaped)

        1.)    Officer Coborn said he was working with Officer McHugh and he had worked for the Stratford Police Department for 5 years.

        2.)    Officer Coborn said he had a body worn camera and he was wearing it on the day of the shooting.

        3.)    Officer Coborn said he and Officer McHugh were working Highway 54 looking to make interdiction stops.  He said it had been snowing and sleeting earlier in the day and they were parked watching vehicles driving by.  Officer Coborn said a vehicle drove by that had out-of-state plates, new tires and the vehicle was clean which he thought was unusual due to the weather.  Officer Coborn said the vehicle appeared as a "textbook interdiction stop."

        4.)    Officer Coborn said the vehicle pulled into the Pilot truck stop and he pulled in behind the vehicle, but the occupants had already exited the vehicle and entered the store.  Officer McHugh ran the license plate and determined it was a stolen vehicle.  They radioed the plate into the dispatcher who also confirmed the vehicle was stolen.

        5.)    Officer Coborn said he positioned his vehicle behind the Toot 'n Totem where he could see the suspect vehicle.  Officer McHugh called the Inglewood Police Department where the vehicle had been reported stolen and they were told the vehicle had been stolen the day prior from a Walgreen's parking lot where it had been left running.

        6.)    Officer Coborn said he and Officer McHugh discussed tactics and whether they wanted to stop the vehicle on the highway or at the gas station.  Officer McHugh said he believed they had been "made," so they decided to drive to the Pilot gas station where he would go inside the store and Officer McHugh would stay in the patrol vehicle to see if they could find the occupants of the suspect vehicle.

        7.)    Officer Coborn said he parked in front of the store and when he went into the store, he saw three white males speaking with two black males.  The two black males went toward the cashier and the three white males exited the store.  Officer Coborn said he spoke with one of the white males who told him, "I'm not a cop or anything, but I would damn sure

10

**348**

stop them."  Officer Coborn asked why, and the white male said they wanted to go to Memphis, but they wanted to avoid any major highways and any borders.

8.)    Officer Coborn said he went to go back in the store and as he opened the door, he actually held the door open for the two black males to exit the store.  Officer Coborn said the subjects "power walked" to the Infinity.

9.)    Officer Coborn said he believe the subjects were going to get in their car and flee.  Officer Coborn said he got into his patrol car, told Officer McHugh to start the in-car video, and that they would have to make the car stop at the gas station.  Officer Coborn said he turned on his overhead lights and quickly positioned his car behind the suspect vehicle.

10.)   Officer Coborn said he has received training on how to conduct high-risk car stops.  Officer Coborn said as soon as he opened his driver's door, he called out, "Police, get out of your car, get out of your car."  Officer Coborn said the passenger was about to fuel the vehicle and had a look of "fight or flight."  The driver appeared to ignore him and slowly went to the vehicle and closed the door.

11.)   Officer Coborn said his focus was on the driver.  As he approached the driver's door, he could hear the car being started and he was still yelling, 'Show me your hands, show me your hands."  Officer Coborn said he punched the driver's window to shatter it to try to "rip the driver out," but he could not break the glass.

12.)   Officer Coborn said there was a glare off the tinted windows, so he could not see inside the car through the driver's window.  Officer Coborn said he had his gun pointed at the driver and as he passed the "A" pillar, he saw the driver moving his hand from the steering column to the gear shift and he could hear the gears change as the driver put the vehicle into drive.

13.)   Officer Coborn said when he was in front of the vehicle, the vehicle went into drive, the steering wheel went in his direction and the driver lowered his body.  Officer Coborn said knowing the vehicle was already in drive, he knew the driver was not reaching down to put the vehicle in drive. Officer Coborn said within a milli-second, the driver's body moved back up and he began to drive.  Officer Coborn said he believed that he was either going to be hit by the car or that he was going to be shot.  Officer Coborn said at that time he opened fire on the driver.

11

**349**

14.)   Officer Coborn said he does not know how many times he shot or where he may have struck the vehicle with his shots.

15.)   Officer Coborn said Officer McHugh was to his left and was not in his crossfire.  Officer Coborn said he was by the left front headlight of the vehicle and he took a huge step to his right (the driver's side) of the vehicle to avoid being struck.

16.)   Officer Coborn said the vehicle took off at a quick pace and then it went very slow.  The vehicle traveled over a curb in the Pilot parking lot, drove over rocks in a planter, went across the highway, hit a metal barrier at the gas pumps and came to a rest.  Officer Coborn said he went to radio the dispatcher and realized he did not have his radio.  He ran back to the Pilot gas station where he had dropped his radio and called in the incident to dispatch.

17.)   Officer Coborn said he then ran back across the street.  Officer McHugh was on the passenger side of the suspect vehicle and he retrieved his police K-9.  The passenger was face down on the ground and he was going to send in his K-9, but Officer McHugh said the driver had been shot.  He put his K-9 back in the police vehicle, grabbed a pair of gloves, and pulled the driver out of the vehicle.

18.)   Officer Coborn said both he and Officer McHugh are EMTs and they also work for an ambulance company.

19.)   Officer Coborn said he fired his Glock 40mm handgun.

b.   Deposition

1.)   Officer Coborn said he was carrying a Glock 40 mm handgun,[4] but he does not know if his handgun was fully loaded.[5]  Officer Coborn said he was told there was one round left in his handgun after the shooting and if his handgun had been fully loaded he would have shot 15 rounds.[6]

2.)   Officer Coborn said his Body Worn Camera was fairly new at the time of the incident and he believed he had turned it on.[7]  Officer Coborn said a green light on the Body Worn Camera indicates the camera has been

---

[4] Coborn deposition at 22.
[5] Coborn deposition at 25.
[6] Coborn deposition at 26.
[7] Coborn deposition at 29.

12

**350**

activated and a red light means it is recording.[8]  Officer Coborn said his department policy required him to activate his camera any time he encountered someone.[9]

3.)    Officer Coborn said he became the chief of police for the Stratford Police Department on November 28, 2019.[10]  Officer Coborn said the Stratford Police Department consists of two patrol officers and one chief.[11]

4.)    Officer Coborn said his department policy prohibits him from shooting at a motor vehicle to disable the vehicle, but said he may shoot at the driver if the driver is using the vehicle as a deadly weapon.  Officer Coborn said he has been trained to stop shooting when the threat no longer exists.[12] Officer Coborn said if the vehicle has moved past him it would no longer be a threat.[13]  Officer Coborn said a police officer must justify each trigger pull.[14]

5.)    Officer Coborn said he did not suspect Mr. Baker or Mr. Dees of anything until the license plate of the vehicle had been run.[15]  Officer Coborn said the vehicle was parked at the gas pumps and they drove by to get the license plate and determined the vehicle was stolen when they ran the plate.[16]  Officer Coborn said he only suspected it was a stolen car and he did not suspect any violent crimes.[17]

6.)    Officer Coborn said he and Officer McHugh parked across the street and Officer McHugh spoke with the Inglewood Police Department.[18]  Officer Coborn said Officer McHugh told him the vehicle had been stolen from a CVS and the keys had been left inside.[19]

7.)    Officer Coborn said he only saw the vehicle drive for a few seconds and about 300 feet before stopping pilot gas station[20] and he never saw anyone in the car until Mr. Baker open the driver's door and Mr. Dees

---

[8] Coborn deposition at 31.
[9] Coborn deposition at 34.
[10] Coborn deposition at 35.
[11] Coborn deposition at 36.
[12] Coborn deposition at 43.
[13] Coborn deposition at 44.
[14] Coborn deposition at 45.
[15] Coborn deposition at 46.
[16] Coborn deposition at 51.
[17] Coborn deposition at 52-53.
[18] Coborn deposition at 54.
[19] Coborn deposition at 55.
[20] Coborn deposition at 57.

13

**351**

began to pump gas.[21]

8.)     Officer Coborn said it was his intention to make an arrest and recovered the stolen vehicle.[22]

9.)     Officer Coborn said he did not see Mr. Baker or Mr. Dees do anything threatening before they got into their car.[23]  Officer Coborn said the only people he believed who were at risk during the incident were himself and Officer McHugh[24] and he knew of no facts that Officer McHugh was in danger.[25]

10.)    Officer Coborn said as he pulled in behind the vehicle, he turned on his red and blue lights and both Mr. Baker and Mr. Dees ran to the vehicle. Officer Coborn said he considered his actions to be a high risk car stop. Officer Coborn said he had his gun out when he pulled in behind the vehicle, he exited the driver's door of his vehicle and went to the driver's door of the Infinity.[26]

11.)    Officer Coborn said he could not see through the driver's window due to the window tint.[27]  Officer Coborn said he tried to break the driver's window before moving to the front of the vehicle to try to see inside. Officer Coborn said when he initially approached the vehicle, the vehicle's engine was turned off and as he moved to the front, the engine was turned on.[28]

12.)    Officer Coborn said to his knowledge, Officer McHugh was always on the passenger side of the Infinity and he never saw the vehicle moving toward the direction of Officer McHugh.[29]

13.)    Officer Coborn said he never heard Mr. Baker or Mr. Dees say anything.[30]

14.)    Officer Coborn said he began firing his handgun when the vehicle lunged forward toward him and that the vehicle lunged forward as soon as it was

---

[21] Coborn deposition at 56.
[22] Coborn deposition at 61.
[23] Coborn deposition at 62.
[24] Coborn deposition at 66.
[25] Coborn deposition at 67.
[26] Coborn deposition at 69-71.
[27] Coborn deposition at 72.
[28] Coborn deposition at 72.
[29] Coborn deposition at 75-76.
[30] Coborn deposition at 76.

14

**352**

put into gear.[31]  Officer Coborn agreed that if he shot at the vehicle before the vehicle moved, that his shots would be unjustified.[32]

15.)  Officer Coborn said he was 6 inches from the front of the vehicle, but the vehicle never touched him.[33]

16.)  Officer Coborn said Mr. Baker ducked down to his right and he does not know if he or Officer McHugh fired first.[34]

17.)  Officer Coborn said he continued to shoot as the car drove away because he did not know if the vehicle was still a threat to him or Officer McHugh. Officer Coborn said the vehicle was a potential threat if it turned back around and began to drive toward them.  Officer Coborn said as the vehicle drove away, no one was in front of the vehicle.[35]

18.)  Officer Coborn said the only people he was concerned with was himself and Officer McHugh.  Officer Coborn said as the vehicle was driving away it would have had to turn around to be a threat and he stopped firing when the vehicle entered US 54.[36]  Officer Coborn said he was never concerned about any bystanders.[37]

19.)  Officer Coborn said the vehicle began rolling as opposed to someone giving a gas as it crossed US 54 and the vehicle came to a stop when it ran into a pole.[38]

20.)  Officer Coborn said he has no idea if he or Officer McHugh shot Mr. Baker and said he would not have been able to shoot Mr. Baker in the back when he was in front of the vehicle.[39]  Officer Coborn acknowledged he could have shot Mr. Baker when he was chasing behind the vehicle.[40]

21.)  Officer Coborn said as the car passed him, he did not see any behavior of the vehicle that would indicate it was still an immediate threat to him or Officer McHugh.[41]

---

[31] Coborn deposition at 77.
[32] Coborn deposition at 78.
[33] Coborn deposition at 83.
[34] Coborn deposition at 84.
[35] Coborn deposition at 85-86.
[36] Coborn deposition at 86.
[37] Coborn deposition at 95.
[38] Coborn deposition at 88.
[39] Coborn deposition at 92-93.
[40] Coborn deposition at 94.
[41] Coborn deposition at 108.

22.)   Officer Coborn said he has never received training for high-risk traffic stops[42] and he has never received scenario or shoot/don't shoot training.[43]

26.    Officer McHugh

a.    February 24, 2018 interview by Ranger Galvan (Videotaped)

1.)   Officer McHugh said he will have been a police officer for four years in June.

2.)   Officer McHugh said he began working at 2 PM on the day of the incident in a two-officer vehicle with Officer Coborn.  Officer McHugh said he was the passenger and Officer Coborn was the driver.

3.)   Officer McHugh said they were sitting on the north side of I-54, just west of the tracks, when the suspect vehicle drove by.  Officer McHugh said the behavior of the vehicle when it drove by was not "necessarily bad." The vehicle looked too clean for this area, as it had snowed that morning and it was a wet snow, so everything was sticking.

4.)   Officer McHugh said they turned around and began to follow the vehicle and the vehicle made a sharp turn into the Pilot parking lot.  They turned into the Pilot parking lot and saw the vehicle parked by a gas pump.  The vehicle had a California license plate and he ran the plate.  The computer gave an audible warning of a hit on the plate.  Officer McHugh saw that it was a stolen vehicle and the information matched the plate, car and color.  Officer McHugh said he radioed the plate to his dispatcher to make sure they received the same information.

5.)   Officer McHugh said he and Officer Coborn watched the vehicle and the dispatcher confirmed the vehicle was stolen.  Officer McHugh said he called the Inglewood, California Police Department, the department that had taken the stolen vehicle report, to get additional information.  Officer McHugh said he spoke with someone in Records at the Inglewood Police Department who told him the vehicle had been stolen the day before from a Walgreen's parking lot.  The owner of the vehicle left the vehicle

---

[42] Coborn deposition at 105.
[43] Coborn deposition at 113.

16

**354**

running, went inside the store and when they returned the vehicle was gone.

6.)     Officer McHugh said he shared the information with Officer Coborn and at that point Officer Coborn put his vest on as he does not wear his vest all the time.  Officer McHugh said he and Officer Coborn discussed tactics and how they would approach the vehicle and how they would contact the driver once they identified who the driver was.

7.)     Officer McHugh said he did not see anyone exit the vehicle, so he did not know who the suspects were.

8.)     Officer McHugh said he initially planned to stop the suspect vehicle on the highway, but a lot of people in Stratford leave their vehicles running when they enter stores, so he feared the suspects may try to take another vehicle.  Officer McHugh said they drove across the street and parked in front the Pilot restaurant area so he could see all the people inside the dining area.

9.)     Officer McHugh said he stayed in the vehicle while Officer Coborn went inside and as Officer Coborn opened the first set of doors, two male blacks looked at Officer Coborn suspiciously.  Three white males then exited the store and he saw Officer Coborn speak with those individuals. Officer Coborn then returned to the store and as he opened the front door, the two male blacks exited the store.  Officer Coborn returned to the police vehicle as the subjects walked toward the stolen vehicle.

10.)    Officer Coborn entered the patrol car and they turned on the in-car camera and their overhead lights, and they pulled in behind the stolen vehicle.  Officer McHugh said he saw the passenger, but not the driver of the vehicle.  The passenger was holding the gas pump in his hand.  As they approached, the passenger dropped the gas pump and entered the vehicle.  Officer McHugh said he drew his handgun and ran up to the stolen vehicle yelling, "Get out of the vehicle, get out of the vehicle."

11.)    Officer McHugh said from where he was standing, he could not see inside the car due to the window tinting and because it was dark.  Officer McHugh said he moved to the front headlight area, so he could see inside the vehicle.  Officer McHugh said he continued to scream at the subjects to get out of the car.

17

**355**

12.)    Officer McHugh said he saw the driver's hand on the ignition and believed the driver was about to start the engine.  Officer McHugh said he was in front of the vehicle and believing the driver was going to drive the vehicle, so he moved back to the passenger window and put his gun up next to the glass.  Officer McHugh said he saw the driver's hand on the gear shift.  Officer McHugh said he saw the driver shift the vehicle into drive, so he backed away from the vehicle believing he may be hit if he stayed close to the vehicle.

13.)    Officer McHugh said the driver moved his hand from the gear shift to between his leg and the console.  Officer McHugh said he could not see the driver's left hand, but when his right hand went down, he began hearing gunshots.  The vehicle started moving toward the left where he believed Officer Coborn was still standing.

14.)    Officer McHugh said he believed the driver was trying to run over Officer Coborn, so he began shooting.  Officer McHugh said he believes he fired 2-3 times.

15.)    Officer McHugh ran back to the patrol vehicle.  He opened the passenger door because he believed Officer Coborn would return to the patrol car and get in the driver's seat.  Officer McHugh said he saw Officer Coborn chasing the suspect vehicle on foot, so he ran to the driver's door of the patrol vehicle and began to follow the suspect vehicle.

16.)    Officer McHugh said by the time he entered the driver's seat, the suspect vehicle was rolling across the street, jumped the curb, and ran into a concrete pole.

17.)    Officer McHugh said he could see the driver was slumped over the passenger.  The driver was not responsive.  Officer McHugh said he ordered the passenger out of the vehicle and the passenger complied.

b.      Deposition

1.)     Officer McHugh said he was carrying a Glock 40 mm handgun[44] and his handgun was fully loaded with 16 rounds.[45]  Officer McHugh said he is aware that the Rangers reported that there was one round in the

---

[44] McHugh deposition at 28.
[45] McHugh deposition at 30.

18

**356**

chamber and 10 rounds in the magazine after the shooting, thus he had fired five rounds.[46]

2.)   Officer McHugh said he attempted to activate his Body Worn Camera and he pressed the button, but the button just powered the camera and did not activate the recording.  Officer McHugh said he activated the camera when he ran back to the patrol car, but 45 seconds prior to his activation was recorded due to buffering.[47]

3.)   Officer McHugh said he first saw the Infinity when the vehicle drove past him and he believed the vehicle braked more heavily than the average person.[48]  Officer McHugh said he and Officer Coborn followed the Infinity into the Pilot gas station to get its license plate and when he got a hit on the plate he called Inglewood Police Department.[49]  Officer McHugh said the Inglewood Police Department confirmed the vehicle was stolen and told him the vehicle had been left running at a CVS parking lot.  Officer McHugh said he did not suspect a violent crime, and he did not know the suspects names or even their gender when the vehicle was parked in the Pilot gas station.[50]

4.)   Officer McHugh said the vehicle did not do anything dangerous or illegal when he saw it driving.[51]

5.)   Officer McHugh said he and Officer Coborn went across the street to the Toot 'n Totum to watch the vehicle.[52]

6.)   Officer McHugh said they decided to go into the Pilot store to look for the occupants of the vehicle and Officer Coborn went inside while he waited in the police vehicle.[53]

7.)   Officer McHugh said when he decided to make a traffic stop, they only suspected auto theft and not any other crime.[54]

---

[46] McHugh deposition at 31.
[47] McHugh deposition at 33-34.
[48] McHugh deposition at 36.
[49] McHugh deposition at 37.
[50] McHugh deposition at 39.
[51] McHugh deposition at 40.
[52] McHugh deposition at 41.
[53] McHugh deposition at 42.
[54] McHugh deposition at 43.

19

**357**

8.)      Officer McHugh said he does not recall if other vehicles were at the gas pumps or if there were people in the area.[55]

9.)      Officer McHugh said when Mr. Dees, who was pumping gas, jumped into the vehicle, he knew the vehicle was stolen so he drew his gun because they were making a felony car stop.[56]

10.)      Officer McHugh said he went up to the passenger side of the vehicle and although the windows were tinted, he could see the passenger, Mr. Dees, showing his hands as he was being ordered.  Officer McHugh said he moved forward to look through the windshield so he could see Mr. Dees and Mr. Baker better.  Officer McHugh said he was by the front passenger wheel and was never in front of the vehicle.[57]

11.)      Officer McHugh said Mr. Baker had a blank face and was not acknowledging the officers.  As soon as Mr. Baker put the vehicle into drive, his right hand moved between the console and his legs as though he were reaching for something and his body moved down as if to try to get out of the line of fire.  Officer McHugh said Officer Coborn was in front of the vehicle.[58]

12.)      Officer McHugh said he never heard Mr. Dees say anything.[59]

13.)      Officer McHugh said when the vehicle was put into drive, he moved closer to the gas pumps.  Officer McHugh said he could hear the vehicle's engine revving and the car immediately moved a couple of feet forward and then to the left.[60]

14.)      Officer McHugh said he started shooting as soon as Mr. Dees was no longer in his line of fire as he had his hands up in a position of surrender.  Officer McHugh said he began firing as the "B" pillar of the vehicle crossed by him.[61]

---

[55] McHugh deposition at 43.
[56] McHugh deposition at 45.
[57] McHugh deposition at 47-48.
[58] McHugh deposition at 49-50.
[59] McHugh deposition at 50.
[60] McHugh deposition at 51.
[61] McHugh deposition at 52.

20

15.)   Officer McHugh said he was standing to the rear passenger window and he stopped shooting when the vehicle pulled away from him.[62]  Officer McHugh said he was standing in the same place next to the gas pumps for all five of his shots.[63]

16.)   Officer McHugh said he believes his first shot stuck Mr. Baker as the first shot entered the right upper quadrant of the rear passenger window before striking Mr. Baker.[64]  Officer McHugh said another shot was at the rear windshield of the vehicle.[65]

17.)   Officer McHugh said he believes his first shot struck Mr. Baker, but he did not actually see the shots strike Mr. Baker as it was too dark and he did not see Mr. Baker's body react.[66]

18.)   Officer McHugh said he believes the car had not passed Officer Coborn when he fired.[67]  Officer McHugh acknowledged that Officer Coborn may have moved as he was focused on aiming his handgun.[68]

19.)   Officer McHugh said he does not know if two of his shots hit Mr. Baker, but said he feels comfortable that one of the shots did.[69]

20.)   Officer McHugh said he shot Mr. Baker to protect Officer Coborn.[70]

21.)   Officer McHugh said he believed Officer Coborn ran back to the police vehicle with him, but when he got to the passenger side of the police vehicle, he realized Officer Coborn was not there.  Officer McHugh said he look at the infinity and saw that it was rolling as opposed to someone the pressing the gas pedal.[71]

22.)   Officer McHugh said he never saw Mr. Baker with a weapon and he believes Officer Coborn fired the first shot.[72]

---

[62] McHugh deposition at 53.
[63] McHugh deposition at 55.
[64] McHugh deposition at 58.
[65] McHugh deposition at 59.
[66] McHugh deposition at 77-78.
[67] McHugh deposition at 60.
[68] McHugh deposition at 61.
[69] McHugh deposition at 61.
[70] McHugh deposition at 63.
[71] McHugh deposition at 62.
[72] McHugh deposition at 79.

21

**359**

27.     Gregory Dees

    a.     Interview by Ranger Galvan (February 22, 2018) (Video 1 and 2)

        1.)     Mr. Dees said the car was stolen.

        2.)     Mr. Dees said he and Mr. Baker went to Los Angeles for the NBA all-star game and they missed their return flight.  Mr. Dees said they left California on Tuesday.

        3.)     Mr. Dees said Mr. Baker got the car, but he does not know how.  Mr. Dees said Mr. Baker told him the car was stolen the day they left Los Angeles. Mr. Dees later admitted he was present when the car was stolen.  Mr. Dees denied that he drove the car.

        4.)     Mr. Dees said his only prior arrests were for driving on a suspended driver's license.

        5.)     Mr. Dees said he has known Mr. Baker all his life.

        6.)     Mr. Dees said there were no weapons in the vehicle.

        7.)     Mr. Dees said he did not stop when the officer told him to because he was afraid.

        8.)     Ranger Galvan read Mr. Dees his rights.  Mr. Dees had said he was read his rights earlier by Ranger Smith and he waived his rights again.

        9.)     Mr. Dees said there was nothing illegal in the car.  Mr. Dees denied using any drugs.

      10.)     Mr. Dees said when he got in the car at the gas pumps the officers shot at the car.

      11.)     Mr. Dees said he does not know why the officers shot at them and they were not reaching for anything.

      12.)     Mr. Dees said they stayed in a hotel on Century Blvd. when they were in Los Angeles.  He paid cash for the room, but he did show identification.

      13.)     Mr. Dees gave the Rangers consent to search his cellular telephone.

22

**360**

14.)     Mr. Dees said he ducked down under the dashboard when the shots were being fired and he did not see what Mr. Baker was doing as he was afraid of being shot.

28.     Autopsy Report – Dr. Luisa Florez

   a.     Dr. Florez found that Mr. Baker suffered two gunshot wounds to the back.

      a.     Gunshot wound one was a wound of the upper left back. The direction of travel was back to front and right to left.

      b.     Gunshot wound two was a perforating gunshot wound of the right midback.  The direction was back to front, right to left and upward.[73]

   b.     The cause of death was blood loss due to perforation of the left lung.[74]

29.     Videos

   a.     Officer Coborn In-Car Video

      a.     00:20 – Patrol vehicle begins to back up.

      b.     00:24 – Patrol vehicle stops and begins to drive forward.

      c.     00:33 – Officer Coborn pulls in behind the suspect vehicle.  Mr. Baker is seated in the driver's seat and Mr. Dees is to the rear passenger side of the holding the gas hose.

      d.     00:34 – Officer Coborn's overhead lights can be seen reflecting off the suspects' vehicle.  Officer Coborn comes to a stop a few feet behind the suspect vehicle.

      e.     00:35 – Mr. Dees drops the gas hose and enters the front passenger seat of the suspect vehicle.

      f.     00:37 – Officer McHugh is seen, with his handgun draw and pointed at the vehicle, approaching the passenger side of the suspect vehicle.

      g.     00:39 – Officer McHugh is at the front passenger door of the suspect vehicle, facing the vehicle, with his handgun pointed at the driver's compartment.  Officer Coborn is at the driver's door, facing the vehicle,

---

[73] D00779.
[74] D00780.

23

**361**

with his arms outstretched, and pointing his handgun at the driver's compartment.

h.    00:40 – Both Officer McHugh and Officer Coborn move slightly forward and each continue to point their handguns at the driver's compartment.

i.    00:43 – Officer Coborn punches the driver's window with his handgun twice.

j.    00:45 – Officer Coborn moves to the front of the vehicle, while Officer McHugh is standing at the front passenger door.  Both officers are still pointing their guns at the driver's compartment.  The brake lights of the vehicle are illuminated.

k.    00:47 – Multiple gunshots are heard with Officer Coborn standing in front of the vehicle and Officer McHugh by the front passenger door.

l.    00:48 – The vehicle begins to move forward after the shoots had been fired.

m.    00:49 – The vehicle makes a left-hand turn.  Officer Coborn is on the front passenger side and Officer McHugh is to the rear passenger side of the vehicle.

n.    00:50 – The vehicle drives away from the officers.  Both officers are behind the vehicle.  Officer Coborn begins to chase the vehicle on foot.

o.    00:51 – The vehicle and Officer Coborn go out of view of the camera. Officer McHugh is running back toward the passenger door of the patrol vehicle.

p.    00:55 – Additional shots can be heard.

q.    01:06 – Officer McHugh moves in front of the patrol car from the passenger to the driver's side.

r.    01:10 – The patrol car begins to drive forward.

s.    01:20 – The patrol car follows the suspect vehicle.  The suspect vehicle drives over a curb into an adjacent gas station.

t.    01:24 – The suspect vehicle collides with a pole in front of the gas pumps and comes to a stop.

24

**362**

u.      O1:25 – The patrol car comes to a stop behind the suspect vehicle.

v.      01:41 – Officer McHugh is to the driver's side of the vehicle and his flashlight can be seen.

w.      01:53 – The front passenger door open and a hand is held in the air.

x.      01:56 – Officer McHugh moves between the front of the patrol car and the rear of the suspect car as the front passenger door of the suspect vehicle is being opened.

y.      01:59 – Mr. Dees exits the front passenger seat.  Officer McHugh and Officer Coborn are to the passenger side of the suspect vehicle.

z.      02:00 – Mr.  Dees goes to the ground.

aa.     02:11 – Officer McHugh moves to the driver's side of the vehicle.

bb.     02:15 – Officer Coborn can now be seen holding a K-9.  Officer Coborn turns with his back toward Mr. Dees and moves back to the patrol vehicle.

cc.     02:29 – Officer Coborn returns without his K-9 and handcuffs Mr. Dees. Officer McHugh is standing next to the driver's door of the suspect vehicle.

dd.     02:37 – Officer Coborn drags Mr. Dees backwards and Officer McHugh retreats to the rear of the suspect vehicle.

ee.     02:44 – Officer McHugh moves up to the open front passenger door.

ff.     02:46 – Officer Coborn joins Officer McHugh at the front passenger door.

gg.     02:50 – Officer Coborn places his upper body inside the front passenger door.

hh.     03:21 – Officer McHugh and Officer Coborn move to the driver's door.

ii.     03:41 – Officer Coborn drags Mr. Baker from the driver's seat onto the ground.

25

**363**

jj.    03:59 – EMS arrives at the scene.

b.    Officer McHugh's Body Camera

a.    00:01 - Officer McHugh is at the front passenger door and yells, "Let me see your hands."  "Let me see your hands" is also yelled by Officer Coborn.

b.    00:05 – "You go forward," and shots begin (approximately 8 shots are heard).

c.    00:07 – The suspect vehicle has made its left-hand turn.  Officer Coborn is seen running after the vehicle.

d.    00:08 – Officer McHugh runs back to the patrol car.

e.    00:11 – Officer McHugh radios, "403, Stratford, shots fired, shots fired." Officer McHugh enters the front passenger seat.

f.    00:19 – Officer McHugh says, "Fuck," then exits the vehicle and runs to the driver's door and enters the vehicle.

g.    00:25 – The dispatcher radios "403, what's your 20?"  Officer McHugh radios, "Pilot parking lot, Pilot parking lot."

h.    00:29 – Officer McHugh enters the driver's seat and begins to drive forward.

i.    00:43 – Officer McHugh stops the patrol vehicle behind the suspect vehicle after the suspect vehicle collided with the pole and came to a stop.

j.    00:56 – Officer McHugh yells, "Let me see your hands."  Officer Coborn radios, "403, all units, EMS, shots fired, shots fired."

k.    01:01 – Officer McHugh yells, "Get out of the car.  Get out.  Get out of the car. Get-out-of-the-car."

l.    01:12 – Officer McHugh, "Get out of the car.  Get out of the car (K-9 barking).  Get down on the ground.  Get on the ground."

m.    01:31 – Officer McHugh, "No, he's down.  He's down."

26

**364**

n.    02:11 – Officer McHugh, "Don't move dude.  Get on your stomach. Get on your stomach.

o.    02:19 – Mr. Baker is in the driver's seat and his upper body is laying toward the passenger seat.

p.    02:34 – Officer McHugh opens the driver's door.

q.    02:38 – Officer McHugh, "Pull him out."

r.    02:52 – Officer McHugh, "403, Stratford, scene safe."

s.    04:06 – Officer McHugh asks Officer Coborn, "You all right?"  Officer Coborn said, "I'm good dude.  He reached for something dude, I couldn't help it."  Officer McHugh, "Is he alright."  Officer Coborn, "I don't know."

t.    04:32 – Officer Coborn, "We ran the plate on the car.  It came back stolen.  We didn't know who was in it.  So as soon as somebody came out [inaudible]."

u.    04:44 – Officer McHugh moves away from Officer Coborn and asks Mr. Dees, "Why did you guys try to run man?"  Mr. Dees said, "Sir, I don't know what's going on."  Officer McHugh, "You knew something was up because you tried to run into the vehicle.  Don't tell me you didn't know something was up."  Mr. Dees, "'Cause I seen y'all coming, cause I'm afraid of police.  Police killed my brother long time ago."  Officer McHugh, "Because this is a stolen vehicle is that why you were running?"  Mr. Dees, "No, I don't know about a stolen vehicle."  Officer McHugh, "Well you're driving one."

v.    Officer McHugh answers his cellular telephone, "Yes, sir.  We just shot one.  Stolen vehicle out of California.  Pull up behind 'em at Pilot, and a, they took off running, and a, they wouldn't get out of the car.  Driver started reaching, driver started reaching for something, and we lit him up.  We don't know.  We haven't searched the car yet, we got the vehicle secured.  We haven't searched the vehicle yet.  Alright, Randy's out of town.  Yeah, we are fine.  You want us to step off the scene?  You have your body camera on?"  Officer Coborn, "I hope so."  Officer McHugh, "The shooting occurred in the Pilot parking lot and the vehicle rolled across the street into Toot 'n Totem.  The vehicle rolled across the street into Toot 'n Totem from Pilot.  Okay.  Alright, bye."

27

**365**

**Officer Corburn and Officer McHugh Engaged in Tactical Recklessness and Their Reckless Tactics Directly Led to Their Uses of Deadly Force That Otherwise Would Likely Have Not Been Necessary**

30.     Police officers are trained how to evaluate and manage potentially violent field situations and how to apply tactics to minimize the danger of risk to themselves and others. Officers are trained to formulate a plan whenever possible by gathering information, considering risk factors, assembling sufficient resources, communicating with other officers, and using available time to their advantage. Officers understand the value of cover and concealment, contact and cover strategies, and calm and effective negotiation skills. They are well-versed in containing scenes, setting perimeters, isolating suspects, and evacuating those in harm's way. Modern police officers are also provided a wide range of tools (including less lethal options like pepper spray, Tasers, and impact projectiles) to minimize the necessity of using serious or deadly force. Police officers are taught tactics in the police academy and through continuing professional training throughout their careers. Supervisors debrief tactical situations with their officers and apply lessons to real-life situations. Police tactics are routinely discussed, emphasized, and reviewed at all levels of a police organization. This focus on officer safety stems from the recognition that when officers perform poorly an officer, a community member, or a suspect may suffer a severe or fatal injury.[75]

31.     Officers Coborn and McHugh knew the Infinity was stolen from in front of a drug store in California and that the owner had left the keys in the car.  They did not suspect any crime of violence or weapons and acknowledged when the vehicle pulled off the highway into the gas station that they did not suspect criminal activity.  While they did not have any information beyond a property crime, police officers confronted with an occupied stolen vehicle are trained to employ high-risk car stop tactics to protect themselves, people nearby and the suspects.

32.     High-risk car stop tactics are designed to maximize officer safety and the safe extrication of suspects from a vehicle.  While each stop may be different due to unique circumstances, officers are generally trained to radio their location and the vehicle description and to position their vehicle behind the suspects' vehicle, using distance and taking cover behind the "A" pillar of the police vehicle.  Officers then use verbal commands to attempt to gain compliance from the suspects.  Officers are instructed to never approach an occupied vehicle.[76]  The advantage of high-risk car stop tactics is that officers remain in a position of relative safety and the suspects are given an opportunity to comply with commands to minimize the need for force.

---

[75] "State-Created Danger:  Should Police Officers be Accountable for Reckless Tactical Decision Making?"  Noble, Jeffrey J. and Geoffrey P. Alpert (2009).
[76] The Tactical Edge: Surviving High-Risk Patrol, Charles Remsberg, (1986) at 316.

33.   Despite having reasonable time to plan their tactics, Officers Coburn and McHugh ignored these basic police concepts.  They pulled their marked vehicle behind the suspect vehicle, drew their handguns, immediately exited their vehicle and ran to the driver and front passenger doors creating a situation where neither officer had any cover and the officers were positioned in a crossfire situation.  Compounding these reckless tactics was Officer Coburn's use of the barrel of his handgun to try to break out the driver's window.  A reasonable police officer would never engage in such a reckless tactic as they may lose control of their firearm or may negligently discharge the gun. Officer Coburn was unsuccessful in breaking out the driver's window and improperly moved to the front of the vehicle.

34.   I am of the opinion that had Officers Coburn and McHugh followed generally accepted police practices and engaged in reasonable high-risk car stop tactics where they never would have been in a position to use unreasonable and unnecessary force.

**The Uses of Deadly Force by Officers Coburn and McHugh were Inconsistent with Generally Accepted Police Practices, Excessive and Objectively Unreasonable**

35.   Police officers are trained about the U.S. Supreme Court's landmark decisions in *Graham v. Connor* and *Tennessee v. Garner.*  Those decisions held that to determine whether the force used to affect a particular seizure is reasonable, one must balance the nature and quality of the intrusion on the individual's rights against the countervailing government interests at stake.  This balancing test is achieved by the application of what the Court labeled the objective reasonableness test.  The factors to be considered include in *Graham* and *Garner*: 1.) The severity of the crime, 2.) Whether the suspect poses an immediate threat to the safety of the officers or others, and 3.) Whether the suspect is actively resisting or attempting to evade arrest by flight.

36.   Whether one's actions were objectively reasonable cannot be considered in a vacuum, but must be considered in relation to the totality of the circumstances.  The standard for evaluating a use of force reflects deference to the fact that peace officers are often forced to make split-second judgments in tense circumstances concerning the amount of force required.  The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  Police officers are trained and prepared to assess dangerous situations and respond accordingly.  Police officers are trained that for their force to be appropriate the level and manner of force must be proportional to the level of resistance and threat with which they are confronted.  Proportionality is best understood as a range of permissible conduct based on the totality of the circumstances, rather than a set of specific, sequential, predefined force tactics arbitrarily paired to specified types or levels of resistance or threat.

29

**367**

37.     Whether or not the suspect poses an immediate threat to the safety of the officer or others is the most important of the *Graham* and *Garner* factors.  There must be objective factors to justify an immediate threat, as a simple statement by an officer that he fears for his safety or the safety of others is insufficient.  There is no requirement that a police officer wait until a suspect shoots to confirm that a serious threat of harm exists, but merely a subjective fear or a hunch will not justify the use of force by police.  To determine if there was an immediate threat that would justify the use of deadly force, one must consider whether a reasonable police officer in Officer Coburn's and Officer McHugh's position, knowing only the information know at the time by Officer Coburn and Officer McHugh would believe the subject posed an immediate threat of death or serious bodily injury to Officer Coburn or Officer McHugh or others.

38.     Officer Coborn said when he was in front of the vehicle, the vehicle went into drive, the steering wheel went in his direction and the driver lowered his body.  Officer Coborn said knowing the vehicle was already in drive, he knew the driver was not reaching down to put the vehicle in drive.  Officer Coborn said within a milli-second, the driver's body moved back up and he began to drive.  Officer Coborn unreasonably believed that he was either going to be hit by the car or that he was going to be shot.  Officer Coborn said at that time he opened fire on the driver.

    a.      Officer Coborn said he has been trained to stop shooting when the threat no longer exists.   Officer Coborn said if the vehicle has moved past him it would no longer be a threat.   Officer Coborn said a police officer must justify each trigger pull.

    b.      Officer Coborn said he continued to shoot as the car drove away because he did not know if the vehicle was still a threat to him or Officer McHugh.  Officer Coborn said the vehicle was a potential threat if it turned back around and began to drive toward them.  Officer Coborn said as the vehicle drove away, no one was in front of the vehicle.

    c.      Officer Coborn said the only people he was concerned with was himself and Officer McHugh.  Officer Coborn said as the vehicle was driving away it would have had to turn around to be a threat and he stopped firing when the vehicle entered US 54.   Officer Coborn said he was never concerned about any bystanders.

    d.      Officer Coborn said he has no idea if he or Officer McHugh shot Mr. Baker and said he would not have been able to shoot Mr. Baker in the back when he was in front of the vehicle.   Officer Coborn acknowledged he could have shot Mr. Baker when he was chasing behind the vehicle.

39.     Officer McHugh said he saw the driver's hand on the ignition and believed the driver was about to start the engine.  Officer McHugh said he was in front of the vehicle and

believed the driver was going to drive the vehicle, so he moved back to the passenger window and put his gun up next to the glass. Officer McHugh said he saw the driver's hand on the gear shift and the driver shift the vehicle into drive, so he backed away from the vehicle believing he may be hit if he stayed close to the vehicle. However, the video shows that Officer McHugh was next to the front passenger door when Officer Coburn moved to the front of the vehicle.

a.   Officer McHugh said he believed the driver was trying to run over Officer Coburn, so he began shooting. Officer McHugh said he believes he fired 2-3 times.

b.   Officer McHugh said he started shooting as soon as Mr. Dees was no longer in his line of fire as he had his hands up in a position of surrender. Officer McHugh said he began firing as the "B" pillar of the vehicle crossed by him and the video the vehicle was not going toward Officer Coburn.

c.   Officer McHugh said he was standing to the rear passenger window and he stopped shooting when the vehicle pulled away from him. Officer McHugh said he was standing in the same place next to the gas pumps for all five of his shots.

d.   Officer McHugh said he believes his first shot stuck Mr. Baker as he believes his first shot entered the right upper quadrant of the rear passenger window before striking Mr. Baker. But, he did not actually see the shots strike Mr. Baker and he did not see Mr. Baker's body react.

e.   Officer McHugh said he does not know if two of his shots hit Mr. Baker, but said he feels comfortable that one of the shots did.

f.   Officer McHugh said he shot Mr. Baker to protect Officer Coburn.

40.   It appears from the officers' in-car video that the initial shots were fired before the there was any movement by the Infinity. While some of Officer Coburn's shots were fired at the front of the vehicle, none of those rounds struck Mr. Baker as he was struck by two rounds to the back. One of the rounds was to the center of his back and the other entered his back upper left shoulder.

41.   Although Officer McHugh claims he believes at least one of his rounds struck Mr. Baker, his belief cannot be substantiated. Officer McHugh said it was too dark for him to see clearly inside the vehicle and he did not see Mr. Baker's body move consistent with being struck by one of his rounds. Officer McHugh fired 5 rounds. It appears from the video that it is possible that his first round was fired into the rear passenger side window after the vehicle began moving to the left. He continued firing despite Officer

31

**369**

Coborn not being in any danger.  Because both officers were firing identical 40 caliber handguns, it cannot be determined if Officer Coborn, Officer McHugh, or both, fired through the rear passenger window.  Regardless of which officer's bullets hit Mr. Baker, Officer McHugh's use of deadly force was objectively unreasonable, excessive and inconsistent with generally accepted police practices.

42. While Officer Coborn acknowledges that he has been trained to stop shooting when the threat no longer exists and if the vehicle has moved past him it would no longer be a threat, he also acknowledges that he did run after the vehicle and shoot at Mr. Baker as the vehicle drove away.  Officer Coborn said no one else was at risk in the incident other than himself and Officer McHugh and the only possible threat that he could describe when he was shooting at the rear of the vehicle was that if the vehicle stopped, turned around, and then drive back in his direction.  No reasonable police officer would believe that because a vehicle could stop and turn around that it would be an immediate threat of death or serious bodily injury.

43. It is my opinion that all off Officer Coborn's shots at the passenger side and the rear of the vehicle as it drove away were objectively unreasonable, excessive and inconsistent with generally accepted police practices.  I am also of the opinion that due to Mr. Baker's entry wounds to his back and because Officer Coborn was firing into the passenger side of the vehicle as it drove past him and into the rear of the vehicle as it drove away that Officer Coborn could only have shot Mr. Baker when he was to the passenger side or the rear of the vehicle.

**The Stratford Police Department Failed to Reasonably Train Officers Coborn and McHugh on High-Risk Car Stop Tactics and Use of Deadly Force Decision-Making**

44. Any reasonable chief of police would know that police officers, whom they have armed with force implements, including deadly force implements like firearms, may be placed in situations where their officers will have to make field decisions under tense, uncertain circumstances, on the appropriate level of force and tactical decisions to avoid the use of force.  Thus, any reasonable chief of police would ensure that their officers are reasonably trained in tactical decision making and the use of force.

45. Here, as discussed above, Officers Coborn and McHugh failed to use high-risk car stop tactics designed to for officer, suspect and community safety and instead abandoned their cover and rushed to the driver and passenger side of the suspect vehicle. Moreover, Officer Coborn admittedly shot at Mr. Baker as he was driving away and was not an immediate threat of death or serious bodily injury to anyone claiming he used deadly force because there was some remote possibility that Mr. Baker may make a U-turn and drive back toward the officers.

46. Officer Coborn said he has never received training for high-risk traffic stops and he has never received decision-making scenario or shoot/don't shoot training.

32

**370**

47. The officers' actions that ignored basic generally accepted police practices as it relates to high-risk car stop tactics and the use of deadly force, combined with Officer Coborn's statement that he had never received training for high-risk car stops or use of force decision-making training, indicate that the Stratford police department either failed to provide reasonable tactical and use of deadly force training to their officers, or that the training was so inadequate that officers were incapable of following the training in a field situation. For officers who regularly engage in highway drug interdiction, as Officers Coborn and McHugh testified they were doing when they saw the Infinity and was a significant part of their jobs, high-risk car stops are a situation that any policymaker would know regularly reoccur, and that their officers must be trained to handle. Likewise, for officers who carry a firearm, scenario decision making and shoot/don't shoot training is necessary as officers will be placed in reoccurring situations where they will need training to make life or death decisions. This was necessary training that the City did not provide Coborn and McHugh. This was necessary training that any reasonable chief of police would know their officers needed to provide to protect its citizens and officers. The failure to provide this obvious training resulted in Mr. Baker's death due to the officers' excessive force.

"I am over the age of 18, and competent to make the above declaration. This declaration is made under penalty of perjury pursuant to 28 U.S.C. 1746, and I declare that the foregoing is true and correct."

_____                    _9/17/20_
Jeffrey J. Noble                                          Date

33

**371**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | §§§§§§§§§ | Civil Action No. 2:19-cv-77 |
| Plaintiffs | §§ | |
| v. | §§ | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | §§§§§ | |
| Defendants | §§ | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 17
# Still Images from Pilot Surveillance

372



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | |
| | § | Civil Action No. |
| | § | 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| | § | |
| Defendants | § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR**
**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 18
# Still Images from Police SUV Dash Video







UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § | |
| | § | Civil Action No. |
| | § | 2:19-cv-77 |
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| Defendants | § § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 19
# Deposition of City of Stratford

Richard Keith Coborn – 9/17/2020

```
             UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF TEXAS
                  AMARILLO DIVISION


IRA DARLINA BAKER,            )
individually, and as the      )
administratrix of the         )
ESTATE OF DARION DEV'ON       )
BAKER, and MARIO BAKER,       )
individually, and on          )
behalf of all wrongful        )
death beneficiaries of        )
Darion Dev'on Baker           )
                              )  Civil Action No.
          Plaintiffs          )
                              )    2:19-cv-77-D
v.                            )
                              )
                              )
RICHARD KEITH COBORN, and     )
MICHAEL JOSEPH McHUGH, in     )
their individual              )
capacities, and the CITY      )
OF STRATFORD, TEXAS           )
                              )
          Defendants          )


      ******************************************

        ORAL AND VIDEOTAPED DEPOSITION OF

    REPRESENTATIVE OF CITY OF STRATFORD, TEXAS,

               RICHARD KEITH COBORN

               SEPTEMBER 17, 2020

      (REPORTED REMOTELY VIA ZOOM VIDEOCONFERENCE)

      ******************************************

        ORAL AND VIDEOTAPED DEPOSITION OF

  REPRESENTATIVE OF CITY OF STRATFORD, TEXAS, RICHARD

  KEITH COBORN, produced as a witness at the instance of
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

382

Richard Keith Coborn - 9/17/2020

1  PLAINTIFFS, and duly sworn, was taken in the

2  above-styled and numbered cause on September 17, 2020,

3  from 9:33 a.m. to 3:45 p.m., before DELLA M. DUETT,

4  Certified Shorthand Reporter in and for the State of

5  Texas, reported by machine shorthand, with the witness

6  via Zoom videoconference, pursuant to the Federal Rules

7  of Civil Procedure, the Twenty-Second Emergency Order

8  Regarding the COVID-19 State of Disaster, and the

9  provisions stated on the record or attached hereto.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

383

Richard Keith Coborn - 9/17/2020

```
1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFFS:

4            JEFF EDWARDS (VIA ZOOM TELECONFERENCE)
             EDWARDS LAW
5            1101 East 11th Street
             Austin, Texas 78702
6            (512) 623-7727
             jeff@edwards-law.com
7

8

9   FOR THE DEFENDANTS:

10           JOHN F. MASSOUH (VIA ZOOM TELECONFERENCE)
             SPROUSE SHRADER SMITH
11           701 South Taylor Street, Suite 500
             Amarillo, Texas 79101
12           (806) 468-3300
             john.massouh@sprouselaw.com
13
             ROBERT ELLIOTT (VIA ZOOM TELECONFERENCE)
14           City Attorney
             CITY OF STRATFORD
15           501 Denrock
             Dalhart, Texas 79022
16           (806) 244-0055

17

18  ALSO PRESENT:

19       Tim Bishop, Videographer (VIA ZOOM TELECONFERENCE)
         Olivia Land, IT Tech (VIA ZOOM TELECONFERENCE)
20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

384

Richard Keith Coborn - 9/17/2020

```
                           STIPULATIONS

 1

 2

 3       The attorneys for all parties present stipulate and

 4  agree to the following items:

 5

 6       That the deposition of REPRESENTATIVE OF CITY OF

 7  STRATFORD, TEXAS, RICHARD KEITH COBORN, is being taken

 8  pursuant to Notice;

 9

10       That the deposition is being taken pursuant to the

11  Federal Rules of Civil Procedure;

12

13       That pursuant to FRCP Rule 30(e)(1), the signature

14  of the deponent was requested by the deponent or a party

15  before the completion of the deposition;

16

17       That the original transcript will be submitted

18  electronically for signature to the witness's attorney,

19  JOHN MASSOUH, and that the witness or the witness'

20  attorney will return the signed transcript to Wright

21  Watson & Associates within 30 days of the date the

22  electronic transcript is provided to the witness's

23  attorney.  If not returned, the witness may be deemed to

24  have waived the right to make the changes, and an

25  unsigned copy may be used as though signed.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

**385**

Richard Keith Coborn – 9/17/2020

```
 1                            INDEX

 2                                            PAGE

 3    Appearances                               3

 4    Stipulations                              4

 5

 6

 7  REPRESENTATIVE OF CITY OF STRATFORD, TEXAS,
    RICHARD KEITH COBORN
 8
         Examination by Mr. Edwards...................   7
 9

10

11    Changes and Corrections.......................   286

12    Signature.....................................   287

13    Reporter's Certificate........................   288

14

15

16

17

18

19

20

21

22

23

24

25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

386

Richard Keith Coborn – 9/17/2020

| | EXHIBITS | |
|---|---|---|
| NO. | DESCRIPTION | PAGE |
| 1 | Plaintiffs' Amended Notice of Deposition for City of Stratford Pursuant to Rule 30(b)(6) | 77 |
| 2 | Use of Force Spreadsheet | 77 |
| 2-A | Highlighted Copy of Use of Force Spreadsheet | 109 |
| 3 | Notebook of Policies | 109 |
| 4 | Stratford Police Department case report narrative | 165 |

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

387

Richard Keith Coborn - 9/17/2020

1          THE VIDEOGRAPHER:  This is the deposition
2   of Richard Coborn.  The date, September 17th, 2020.  The
3   time, 9:33.
4          THE REPORTER:  All right.  Counsel, my name
5   is Della Duett, certified by the Supreme Court of Texas.
6   My license number is 4377.  We're doing this deposition
7   remotely according to the disaster 22nd order by Zoom
8   and the Federal Rules of Civil Procedure; is that
9   correct?
10          MR. EDWARDS:  Yes.
11          MR. MASSOUH:  That's correct.
12          THE REPORTER:  All right.  Sir, if you
13   would raise your right hand, I'll get you sworn in.
14          REPRESENTATIVE OF CITY OF STRATFORD, TEXAS,
15                 RICHARD KEITH COBORN,
16    having been first duly sworn, testified as follows:
17                      EXAMINATION
18   BY MR. EDWARDS:
19      Q.  Good morning, sir.  My name is Jeff Edwards.
20   Would you kindly state your name for the record?
21      A.  Richard Keith Coborn.
22      Q.  Okay.  And you understand that you are not
23   testifying here today as Richard Keith Coborn, but
24   rather as the City of Stratford.  Do you understand
25   that?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

388

Richard Keith Coborn - 9/17/2020

1      A.  I do.

2      Q.  Okay.

3      A.  Yes.

4      Q.  And you understand that the testimony you give,

5  that that could be played to the jury as if the City of

6  Stratford was testifying?

7      A.  Yes, sir.

8      Q.  Okay.  And I understand that you've done this

9  before, and you've been deposed, I think, by my law

10  partner Scott Medlock earlier as your individual self.

11  So I know that -- I know that this isn't foreign to you

12  like it would be to some other people, but I would like

13  to get some mutual understandings to make sure that

14  we're on the same page.

15          Most important thing I'm concerned about,

16  sir, especially because we're doing it via computer, is

17  that you understand my question, so -- and that we're

18  talking about the same thing.  So if you don't

19  understand my question or you think it's a little bit

20  unfair or slanted or you're just confused in some way,

21  would you please let me know?

22      A.  Yes, sir.

23      Q.  Okay.  On the flip side, if you provide answers

24  to my questions, I'm going to assume that you've

25  understood them.  Does that sound reasonable and fair?

Richard Keith Coborn - 9/17/2020

1  document by your counsel?

2      A.  Yes, sir.

3      Q.  Okay.  And so you understand that the

4  categories that we're going to be discussing today are

5  on Page 3 of that document.

6              MR. EDWARDS:  And Olivia, could you flip to

7  that?  Thanks.

8      Q.  (BY MR. EDWARDS)  And you're here and you're

9  the City's most knowledgeable person with regards to

10  training that Officer Coborn and Officer McHugh received

11  on the topics listed in A through F?

12              MR. MASSOUH:  I'm going to -- Jeff, for

13  your reference, I'm putting the deposition notice in

14  front of him --

15              MR. EDWARDS:  Sure.

16              MR. MASSOUH:  -- so he can look at it

17  versus on the screen.

18              MR. EDWARDS:  Sure.

19      A.  To answer your question, yes, sir.

20      Q.  (BY MR. EDWARDS)  Okay.  And the second

21  category is any investigation the City conducted into

22  the death of Darion Baker?

23      A.  Yes, sir.

24      Q.  And that's a quick one, because you didn't

25  conduct one; right?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

390

Richard Keith Coborn - 9/17/2020

1    A.  The City relied on the Texas Rangers to conduct

2    an investigation.

3    Q.  But another way of answering that is the City

4    did not conduct any investigation into the death of

5    Darion Baker; correct?

6    A.  The City did not, no, sir.

7    Q.  Okay.  The third one is the City's decision to

8    promote Officer Coborn to chief of police, and that's

9    yourself; right?

10   A.  Yes, sir.

11   Q.  Okay.  The fourth one is all incidents from

12   2010 to the present where an officer of the Stratford

13   Police Department fired a firearm while shooting at a

14   human being or moving vehicle; right?

15   A.  Yes, sir.

16   Q.  Okay.  And do you know how many incidents there

17   were in which a Stratford police officer fired at a

18   human being?

19   A.  I would have to look at the use of force

20   report, and I could give you that answer.

21   Q.  Is it more than three?

22   A.  I'm not sure, sir.

23   Q.  So without looking at a report, currently you

24   have no idea how many times City of Stratford officers

25   have shot at people?

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

391

Richard Keith Coborn - 9/17/2020

1  report with you?

2       A.  Yes, sir.

3       Q.  Why don't -- why don't you ask your attorney to

4  provide that?  Do you have it literally with you, sir?

5       A.  Yes, sir, it's right here.

6       Q.  Okay.  What other documents do you have with

7  you?

8       A.  In front of me right now is the -- the -- the

9  deposition hearing that Mr. Massouh just advised you

10 about, and right now I have the use of force

11 spreadsheet.

12      Q.  Who else is in the room with you, sir?

13      A.  City attorney Rob Elliott and John Massouh.

14      Q.  I've got -- I don't mean to be rude, but,

15 you know, you're -- you understand that you're not

16 allowed to get direction or answers from either of those

17 people; right?

18      A.  Yes, sir.

19      Q.  You understand that if they were to pass you

20 notes, that they would be discoverable and they should

21 provide them to -- to me as well.  Do you understand

22 that?

23      A.  Yes, sir.

24      Q.  Okay.  Well, look at the use of force report.

25 Can you answer my question now how many times City of

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

392

Richard Keith Coborn - 9/17/2020

1    Stratford officers have shot at human beings?

2         A.  Three times, sir.

3         Q.  Since 2010?

4         A.  Yes, sir.

5         Q.  When exactly?

6         A.  April 6th, 2018, September 11th, 2018,

7    January 1st of 2018, and the incident that we're here

8    for today.

9         Q.  What day is that?

10        A.  I believe -- I don't know from memory, but I

11   would say February of 2018.

12        Q.  Isn't it on your use of force report?

13        A.  It is not.

14        Q.  Why not?

15        A.  Because the Stratford Police Department did not

16   do a report for it.  That was turned over to the Texas

17   Rangers for investigation.

18        Q.  So as you testify here today, do you know how

19   many times the Texas Rangers did investigations that

20   wouldn't be included on any use of force report from

21   2010 to the present other than the death of Darion

22   Baker?

23        A.  The death of Darion Baker would be the only

24   one.

25        Q.  How do you know that, sir?

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

393

Richard Keith Coborn - 9/17/2020

```
1        Q.  So even if the gun wasn't used with regards to

2   Mr. Baker or Mr. Dees in this case, a use of force

3   report would have been completed?

4        A.  Yes, sir.

5        Q.  Of the three times that deadly -- or that

6   deadly force was utilized -- and I just mean fired the

7   weapon at a human being -- you gave me the -- here's the

8   dates that I had:  4/6/18, 9/11/18, 1/1/18, and then the

9   date of the Baker shooting; right?

10       A.  Yes, sir.

11       Q.  Briefly, what happened with regards to the

12  April 6th, 2018, shooting?

13       A.  A pursuit was started in Oklahoma.  The pursuit

14  came through Stratford, Texas, and the driver of the

15  vehicle began to use his vehicle as a deadly weapon

16  against a Sherman County deputy.

17       Q.  That's your interpretation; right?  It's not --

18  nowhere in a document does it say that a Sherman County

19  deputy used a car as a deadly weapon?  Or does it, like,

20  actually use that word?

21            MR. MASSOUH:  Objection to the extent it

22  mischaracterizes the prior testimony.

23            MR. EDWARDS:  Okay.  It doesn't.

24       Q.  (BY MR. EDWARDS)  But you can answer.

25            MR. MASSOUH:  Well, you switched around his
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

**394**

Richard Keith Coborn – 9/17/2020

1  words, Jeff.

2          MR. EDWARDS:  I did -- he can answer.

3  That's fine.  If you're right, you're right.

4      Q.  (BY MR. EDWARDS)  You can answer.

5      A.  Yes, sir.  You asked me for the brief

6  description, and that was the brief description.

7      Q.  Is it your interpretation or is that literally

8  the description, the words that you chose to utilize?

9      A.  Those are the words that I chose to utilize.

10     Q.  It doesn't say that a car was used as a deadly

11  weapon in that document, does it?

12     A.  Yes, sir, it does, on the reason.  It says

13  driver was using vehicle as deadly weapon.

14     Q.  Okay.  And then what was the use of force?  And

15  we'll get back to this, but I just want to start with

16  that.

17     A.  The use of force was a handgun being fired at

18  the engine block of the vehicle.

19     Q.  Handgun at engine block.  By whom?

20     A.  Myself.

21     Q.  This is after the Darion Baker case?

22     A.  Yes, sir.

23     Q.  So you shot at the engine block?

24     A.  Yes, sir.

25     Q.  Why didn't you shoot at the person?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

395

Richard Keith Coborn - 9/17/2020

1          But again, would -- would you please reread
2     the question to Office Coborn, Chief Coborn?
3               THE REPORTER:  Yes.
4               (Requested portion read by the reporter)
5        A.   That is not correct.  Stratford Police
6     Department cares about all individuals.
7        Q.   (BY MR. EDWARDS)  Okay.  The reason I asked
8     that, sir, was in the earlier answer you neglected to
9     discuss the safety of the individual driving.  Do you
10    recall that?
11       A.   Correct.
12       Q.   Okay.  So from the City's perspective,
13    preserving human life is a fundamental core principle of
14    its policies; is that true?
15       A.   Yes, sir.
16       Q.   And that's everyone's human life, even a
17    potential criminal suspect; right?
18       A.   Yes, sir.
19       Q.   Okay.  And so what you're telling the jury, and
20    we'll get a little bit more into this, is on April 6th,
21    2018, you shot at the engine block of a car in order to
22    disable the car, and the rationale, according to the
23    City and yourself, was to preserve human life?
24       A.   Yes, sir.
25       Q.   Okay.  And that was an alternative to you that

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

396

Richard Keith Coborn - 9/17/2020

1    you felt was better than just shooting the driver.

2    Fair?

3          A.   That were the instructions provided to me by

4    Chief Randy Hooks at the time.

5          Q.   Do you agree with Chief Hooks that it was

6    better to shoot at the vehicle than the human being

7    driving it?

8          A.   For this situation, yes, sir.

9          Q.   Okay.  And I appreciate that.  Not every

10   situation is the same; right?

11         A.   That is correct.

12         Q.   For instance, if in -- if in the -- if in the

13   situation where you shot the vehicle, the vehicle

14   stopped -- stopped being a threat to anyone, it would

15   have been improper and, frankly, unconstitutional to

16   shoot at the driver or the car; right?

17              MR. MASSOUH:  Objection to the extent it

18   calls for a legal conclusion.

19         A.   The situation would dictate.

20         Q.   (BY MR. EDWARDS)  Right.  And I've changed the

21   situation such that there's no longer any danger to any

22   member of the public.  And in that situation, you would

23   no longer shoot at the vehicle; right?

24         A.   If the vehicle was no longer a danger to the

25   public, that is correct.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

397

Richard Keith Coborn - 9/17/2020

1      Q.  Okay.  Why is that?

2      A.  Because the use of force at that time was no

3  longer authorized.

4      Q.  Okay.  So once the danger goes away, according

5  to the City -- or once the immediate danger goes away,

6  according to the City, then the use of force -- deadly

7  force wouldn't be authorized; is that a fair statement,

8  according to the City of Stratford?

9      A.  Yes, sir.

10     Q.  Okay.  All right.  So that was the -- briefly,

11  that was April 6th, 2018.  Then we -- what about

12  September -- oh, and who was the suspect in the 4/6/18

13  shooting?  What was their race or nationality?

14     A.  I don't have that information provided to me

15  right now.

16     Q.  Well, you were there.  What was the person's

17  race?

18     A.  The only thing that I can tell you right now is

19  that one was a male and one was a female.  I would have

20  to look at the report.

21     Q.  As you testify here today, you do not know the

22  racial status of the individual who was driving the

23  vehicle on April 6th, 2018?

24     A.  That is correct.

25     Q.  What are you looking at that gives you some

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

398

Richard Keith Coborn - 9/17/2020

1  happened.

2      A.  I'll have to look at this use of force report

3  and get that information for you.

4      Q.  Without looking at a use of force report,

5  you're incapable of telling me?

6      A.  I want to make sure that I give you the facts.

7      Q.  That's fine.  And I want to -- you understand

8  you're under oath; right?

9      A.  Correct.

10      Q.  And you understand that obligates you to tell

11  the truth; right?

12      A.  Yes.

13      Q.  And you understand that that's no different

14  than if we were in the federal courthouse in Amarillo

15  even though this is much more low key and informal;

16  right?

17      A.  Yes, sir.

18      Q.  Okay.  Without looking at a document, despite

19  preparing for this deposition, you are not capable of

20  telling me the facts and circumstances behind the six

21  uses of force against minority suspects with the

22  possible exception of Mr. Baker; is that a true

23  statement?

24      A.  No, sir.

25      Q.  Okay.  Then let's go through them.  What --

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

399

Richard Keith Coborn - 9/17/2020

1      A.  Correct.  I did.

2      Q.  Okay.  Well, did you not think that the

3  person's name might be relevant?

4              MR. MASSOUH:  Objection.  I mean, he

5  can't --

6              MR. EDWARDS:  Objection what?

7              MR. MASSOUH:  Or he can talk speculation,

8  Jeff.  I mean, he can't recall every name of every

9  suspect.

10              MR. EDWARDS:  Do you want to testify or do

11  you want him to testify?

12      Q.  (BY MR. EDWARDS)  Did you not think the name

13  was relevant, sir?

14      A.  I'm familiar with the individual's last name

15  and that's it.

16      Q.  What's his last name?

17      A.  Xavier.

18      Q.  That's his last name?

19      A.  That's what's indicated on the report.

20      Q.  Okay.  So when you said you're familiar with

21  this -- the individual's name, you're just familiar with

22  reading the report down there; is that what you're

23  saying?

24      A.  Correct, yes, sir.

25      Q.  Did you also in your preparation look at the

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

**400**

Richard Keith Coborn - 9/17/2020

1    actual use of force report or just the spreadsheet?

2        A.  Just the spreadsheet.

3        Q.  Okay.  Let me -- let's talk about the second

4    one.

5        A.  That was --

6        Q.  Oh, was Mr. Xavier killed?

7        A.  No.

8        Q.  Was any -- were any bullets fired?

9        A.  No, sir.

10       Q.  Okay.  All right.  No-knock warrants are

11   dangerous; right?

12       A.  Yes, sir.

13       Q.  Okay.  All right.  What was the second

14   incident?

15       A.  I would have to look at this use of force

16   spreadsheet to get that for you.

17       Q.  Is the sum of your knowledge simply repeating

18   what's on the use of force spreadsheet?

19       A.  Could you rephrase that?  I'm sorry.

20       Q.  Is the sum total of your knowledge repeating

21   what is on this use of force spreadsheet?

22       A.  Yes, sir, that's what I prepared off of.

23       Q.  Right.  But that's your knowledge.  It's not

24   like you know other things with the possible exception

25   of the Baker incident; right?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

**401**

Richard Keith Coborn - 9/17/2020

1          A.   Because I don't have the report in front of me
2    and I was not there.
3          Q.   Do you know what happened?
4          A.   No, sir.
5          Q.   Okay.  Do you -- you are now the chief of
6    police for the City of Stratford; right?
7          A.   Yes, sir.
8          Q.   Okay.  So you would tell the jury that shooting
9    at that vehicle was consistent with Stratford policy --
10   correct? -- that Chief Hooks took?
11         A.   I would rely on Chief Hooks' training and
12   experience to answer that question.
13         Q.   But that's not -- that's not really an answer
14   to the question.  I'm asking you if what Chief Hooks did
15   in this second incident, shooting at a vehicle, that
16   that -- whether that was consistent with City of
17   Stratford policy.  Do you know?
18         A.   I would not know the answer to that, no, sir.
19         Q.   If it were to happen today, would it be
20   consistent with City of Stratford policy?
21         A.   The situation would dictate, sir.
22         Q.   Well, is what you're telling me you don't know
23   enough about that situation to testify?
24         A.   The specific incident, that is correct, I don't
25   know enough about it to testify.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

402

Richard Keith Coborn - 9/17/2020

1    Q.   Which is one of the -- one of the things that
2    you were supposed to testify about today, though.  You
3    understand that; right?
4        A.   I was informed to be familiar with what
5    happened and the numbers provided.
6        Q.   Well, you understand that one of the
7    incidents -- this involved a minority suspect and a use
8    of deadly force; right?
9        A.   Yes, sir.
10       Q.   Okay.  And just so I'm clear in terms of your
11   investigation, you never talked to Chief Hooks about the
12   incident; correct?
13       A.   That is correct.
14       Q.   You never reviewed the underlying report;
15   correct?
16           A.   That is correct.
17       Q.   Okay.  All you did to prepare for this
18   deposition to testify on behalf of the City of Stratford
19   was look at a spreadsheet that you created for
20   discovery; right?
21           A.   That is correct.
22       Q.   Do you know if Chief Hooks had training on
23   whether or not it was permissible to shoot at fleeing
24   vehicles?
25       A.   I'm not familiar with Chief Hooks' training.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

403

Richard Keith Coborn - 9/17/2020

```
1        Q.  Okay.  So you wouldn't know whether or not
2    Chief Hooks had any training about whether or not it was
3    permissible to shoot at moving vehicles; right?
4        A.  I would not know about Chief Hooks' training.
5        Q.  Well, right, but can you do me the courtesy of
6    just answering my specific question, which is kind of
7    like a yes/no question?
8             You have no knowledge and no way of knowing
9    whether or not Chief Hooks had any training whatsoever
10    about whether or not it was permissible to shoot at a
11    moving vehicle, do you?
12        A.  No, sir.
13        Q.  Okay.  How many officers are currently at the
14    Stratford Police Department?
15        A.  Two.
16        Q.  In addition to yourself, sir?
17        A.  No, sir.  That's including myself.
18        Q.  Okay.  Is it still you and Officer McHugh?
19        A.  Yes, sir.
20        Q.  Okay.  That second one is an example of deadly
21    force; right?
22        A.  Correct.
23        Q.  Okay.  What's the third one?
24        A.  Could you specify?  I'm sorry.
25        Q.  Yeah.  We're in the category all uses of force
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

404

Richard Keith Coborn - 9/17/2020

1  possibly four.  Have we gone through all of them?

2       A.  No, sir.  I misunderstood the question.  I said

3  that there were six total uses of force.

4       Q.  Okay.  So six total uses of force.  And so

5  we've got the no-knock warrant.  Then we've got the

6  shooting by Mr. -- Officer Hooks.  And we've got the

7  shooting of Darion Baker and the removal of Mr. Dees.

8  What else?

9       A.  Those would be the only four with minorities

10 out of the six.  The other two were not minority.

11      Q.  Okay.  Are you sure about that?

12      A.  Yes, sir.

13      Q.  And the examples of deadly force, obviously the

14 Chief Hooks shooting is an example of deadly force;

15 right?

16      A.  Yes, sir.

17      Q.  And the Darion Baker is an example of deadly

18 force; right?

19      A.  Yes, sir.

20      Q.  Is there any other instance of deadly force

21 being used?

22      A.  No, sir.

23      Q.  So deadly force, at least in the city of

24 Stratford, has never been used against a white person?

25      A.  No, sir.

Richard Keith Coborn - 9/17/2020

1      Q.  The only time deadly force has been used, it's

2  been against a minority?

3      A.  Yes, sir.

4      Q.  Category 6 are certain policies.  Do you see

5  those?

6      A.  Yes, sir.

7      Q.  Use of force, use of deadly force, shooting at

8  moving vehicles, body-worn cameras, and racial

9  profiling?

10      A.  Yes, sir.

11      Q.  Okay.  Have you -- are you comfortable that

12  you've done enough investigation to talk on behalf of

13  the City and bind the City with your answers?

14      A.  Yes, sir.

15      Q.  Okay.  Then Category 7 is the City's

16  contentions relating to officers who fired shots that

17  struck Darion Baker.  Are you -- you're here to testify

18  about that?

19      A.  Yes, sir.

20      Q.  You've investigated that?

21      A.  Yes, sir.

22      Q.  Okay.  Then the position of each officer where

23  they were standing when they fired each shot, you're

24  comfortable testifying about that on behalf of the City?

25      A.  Yes, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

406

Richard Keith Coborn - 9/17/2020

1    Q.  You've personally investigated that?

2    A.  Rephrase the question.  I'm sorry.

3    Q.  You've personally investigated that such that

4  you're comfortable talking about it?

5    A.  Yes, sir.

6    Q.  Okay.  And then whether the Texas Penal Code

7  applied to Officers McHugh and Coborn at the time of the

8  shooting, you're comfortable talking about that on

9  behalf of the City?

10   A.  Yes, sir.

11   Q.  Okay.  Is that a very short answer, yes, it

12 did?

13   A.  Rephrase the question, sir.  I thought you were

14 just asking if I was comfortable with testifying.

15   Q.  That was my initial question.  Now my next

16 question is:  With regards to 7c on the deposition

17 notice -- do you see that, sir?

18   A.  Yes, sir.

19   Q.  The topic is whether the Texas Penal Code

20 applies to Officers McHugh and Coborn, who in this case

21 is yourself, at the time of the shooting of Darion

22 Baker.  Do you see that?

23   A.  Yes, sir.

24   Q.  What's your answer?

25   A.  Yes, the Texas Penal Code does apply to both

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

407

Richard Keith Coborn - 9/17/2020

```
 1   officers at the time of the shooting.

 2       Q.  Okay.  And what's important about that for me

 3   is you would expect any competent or reasonable officer

 4   to know that; right?

 5       A.  Yes.

 6       Q.  Okay.  And certainly you would agree that the

 7   Texas Penal Code is a clearly established set of laws

 8   that officers are obligated to follow; right?

 9       A.  Yes, sir.

10       Q.  That was true at the time of the Darion Baker

11   shooting from your perspective, it's true today, and it

12   was true ten years ago.  Fair?

13       A.  Yes, sir.

14       Q.  Okay.  And that -- that -- the penal code makes

15   it crystal clear that you're not entitled to use deadly

16   force unless there's an immediate threat of serious

17   bodily injury or death to yourself, a fellow officer, or

18   a member of the public; right?

19            MR. MASSOUH:  Objection to the extent it

20   calls for a legal conclusion.

21            You can answer, if you can.

22       A.  I believe that's the gist of the penal code,

23   yes, sir.

24       Q.  (BY MR. EDWARDS)  It's not the gist of the

25   penal code; it's the penal code.  Right?
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

408

Richard Keith Coborn - 9/17/2020

1          MR. MASSOUH:  Objection to the extent it
2    calls for a legal conclusion.
3          A.  Yes, sir.
4          Q.  (BY MR. EDWARDS)  Okay.  I mean, it --
5    otherwise, police officers would have a license to kill
6    people, and they don't, do they?
7          A.  No, sir, they do not.
8          Q.  And just because there are protections that are
9    given to police officers in terms of qualified immunity
10   or whatnot, it is not permissible for any police officer
11   to violate the Texas Penal Code with regards to when
12   it's permissible to use deadly force, is it?
13         A.  That is correct.
14         Q.  Each time Officer Coborn -- and I know that's
15   yourself, so -- but I'm asking it because you're
16   answering on the -- the reason I'm asking it that odd
17   way is just because you're here on behalf of the City.
18              Each time Officer Coborn fired his weapon
19   in the vicinity of Darion Baker and that vehicle, that
20   was an example of deadly force; correct?
21         A.  Yes, sir.
22         Q.  Each time Officer McHugh fired his weapon at or
23   near Mr. Dees or Mr. Baker, that was an example of
24   deadly force; right?
25         A.  Yes, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

409

Richard Keith Coborn - 9/17/2020

1  society?

2      A.  I would have to know your definition of

3  institutional, sir.

4      Q.  You're a white person.  You have biases that

5  you may not know about that impact black people.  Do you

6  agree with that?

7      A.  No, sir.

8      Q.  Okay.  You don't see color, in other words?

9      A.  No, sir.

10     Q.  Okay.  So let's use my definition, okay, of

11 institutional racial bias, that there are biases that

12 white people have towards black people that they may not

13 even be aware of but that as a statistical matter tend

14 to show up.  There was no training whatsoever at the

15 City of Stratford about that.  Fair?

16               MR. MASSOUH:  Objection, vague.

17     A.  I would need more clarity on the question, sir.

18 I'm sorry.

19     Q.  (BY MR. EDWARDS)  Well, okay.  What do you need

20 me to clear up?

21     A.  I'm confused as to if you're asking if there

22 was any training at all, or if you're stating that we

23 had no training.

24     Q.  Well, you've told me there was some cultural

25 diversity training and some racial profiling training;

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

410

Richard Keith Coborn - 9/17/2020

1  actually instruct you that, hey, there are biases that

2  you're unaware of that you need to be on the lookout for

3  with regards to black people?

4      A.  Yes, sir.

5      Q.  It did?  Huh.  So you are aware that there are

6  institution -- there's institutional racism in society?

7      A.  Yes, sir.

8      Q.  So do you need to change your prior testimony?

9      A.  No, sir.  I was just asking you to clarify what

10  you meant by institutional.

11      Q.  You weren't really asking me to -- I did

12  clarify and you gave me some answers, and I just want to

13  know if you need to change those answers.

14      A.  No, sir.

15      Q.  Okay.  So you're aware that -- that -- you do

16  agree that as a white officer you have -- you may have

17  some biases towards black people that you're not even

18  aware of?

19          A.  I do not agree with that.

20      Q.  So let me ask the question again.  Were you

21  taught -- does the City of Stratford -- despite your

22  belief that it doesn't exist, does the City of Stratford

23  teach its officers that there are biases that its white

24  officers will have towards black people?

25      A.  The City of Stratford provides training for the

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

411

Richard Keith Coborn - 9/17/2020

1     A.  I would say maybe 10 to 15 black individuals
2  that live inside the city limits.
3     Q.  How big is the city?
4     A.  I believe 2100 people.
5     Q.  So less than 1 percent of your population is
6  black -- right? -- under those numbers?
7     A.  I would -- I would have to say yes.
8     Q.  And then, to be fair, in the city you have a
9  fairly sizable Hispanic population; right?
10    A.  That is correct.
11    Q.  About 50/50, Hispanic and white?
12    A.  I would not know, sir.
13    Q.  You really -- so you have no idea what the
14 makeup is, percentages?
15    A.  I don't know the percentages, so I would not
16 agree to 50/50.
17    Q.  What's your general idea?  Is it -- is it
18 weighted more Hispanic than white, or is it more white
19 than Hispanic, or you have no idea?
20    A.  I have no idea, sir.
21    Q.  Okay.  At the time of the Darion Baker
22 shooting, do you also believe that there were about
23 10 or 15 African American people living in Stratford?
24    A.  Yes, sir.
25    Q.  Okay.  With that few number, you would come to

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

412

Richard Keith Coborn - 9/17/2020

1  know them or recognize them; is that a fair statement,

2  as a police officer?

3      A.  No, sir, it is not.

4      Q.  Okay.  Do you as the chief of -- are you aware

5  as the chief of police -- well, how do I say this?  Do

6  you believe that there's a perception that African

7  Americans are treated unfairly, whether intentionally or

8  not, by members of the police department on, you know, a

9  high number of occasions?

10     A.  No, sir, I would not agree to that.

11     Q.  Do you watch the news?

12     A.  Not a whole lot, no, sir.

13     Q.  Do you think as a chief of police that it's

14  your responsibility to be aware of modern issue -- or

15  issues in modern day policing with regards to the

16  African American community?

17          MR. MASSOUH:  Objection.  Jeff, I've kind

18  of let this go on.  Can we get back to the items on the

19  deposition notice as this was not an item on the

20  deposition notice to understand what's going on in the

21  world.

22          MR. EDWARDS:  Well, we disagree, but -- I

23  don't need to belabor it.

24     Q.  (BY MR. EDWARDS)  I mean, do you think it's one

25  of your responsibilities to be familiar with what's

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

413

Richard Keith Coborn - 9/17/2020

```
1  going on in the world with issues relating to policing
2  of the African American community?
3      A.  Yes, sir.
4      Q.  Do you believe that there are any issues that
5  are specific to the African American community?
6              MR. MASSOUH:  Objection, vague.
7      A.  Could you ask that question again, sir?
8      Q.  (BY MR. EDWARDS)  Do you believe that there are
9  any issues that are specific to the African American
10 community with regards to policing?
11     A.  I would not be able to answer that question,
12 sir.
13     Q.  Why not?  It's an opinion.
14     A.  I have no opinion on the matter, sir.
15     Q.  Because you -- well, all right.  So as you
16 testify here today, you are personally unaware of issues
17 relating to the African American community that are
18 being talked about nationwide on -- in the media?  You
19 just don't know about them?
20     A.  No, sir.  I said that I don't watch the news
21 very often, so I don't know exactly what's going on.
22     Q.  Well, you also said you had no opinion as to
23 whether or not there are issues that impact the
24 African American community; right?  That's what --
25     A.  Yes, sir.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

414

Richard Keith Coborn - 9/17/2020

1      Q.  (BY MR. EDWARDS)  Do you know who George Floyd

2 was, sir?

3      A.  No, sir, I did not know who he was.

4      Q.  Now, that's a very cute answer to my question,

5 so I'm going to -- I'm going to listen to your answer.

6 I'm going to ask another one, because I -- I'm -- I just

7 want to give you an opportunity to answer that one

8 again.  Do you know who George Floyd was, sir?

9             MR. MASSOUH:  Objection, beyond the scope

10 of the deposition notice.

11     A.  I am familiar with the name in the news, sir.

12     Q.  (BY MR. EDWARDS)  Okay.  Do you know anything

13 about the situation involving Mr. Floyd?

14     A.  No, sir, I do not.

15     Q.  You're not aware that he was killed by a police

16 officer?

17     A.  That is what the news reports, yes, sir.

18     Q.  You sound somewhat skeptical.

19             MR. MASSOUH:  Objection, beyond the scope

20 of the deposition notice.

21     Q.  (BY MR. EDWARDS)  Are you skeptical?

22     A.  Sir, all I know is what has been reported in

23 the news.  I have no firsthand knowledge of the case or

24 any of the details about it at all.  All I know is about

25 what the news reported.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

415

Richard Keith Coborn – 9/17/2020

1    Q.   Okay.  Did you see the video of what happened?

2              MR. MASSOUH:  Same objection.

3    A.   No, sir, I did not.

4    Q.   (BY MR. EDWARDS)  You made a conscious effort

5    not to see the video of that?

6              MR. MASSOUH:  Same objection.

7    A.   That is correct.

8    Q.   (BY MR. EDWARDS)  Why?

9              MR. MASSOUH:  Same objection.

10   A.   Because I don't want to see it, sir.

11   Q.   (BY MR. EDWARDS)  Why?

12             MR. MASSOUH:  Same objection.

13   A.   I'm not in the business to watch people die,

14   sir.

15   Q.   (BY MR. EDWARDS)  But you are in the business

16   of protecting people from dying; right?

17   A.   Yes, sir.

18   Q.   Wouldn't it be important for you to show that

19   to your officers?

20             MR. MASSOUH:  Same objection.

21   A.   That would be important for a TCOLE instructor

22   that put a class together.  If they chose to show that,

23   it would be.

24   Q.   (BY MR. EDWARDS)  Well, you're the chief of

25   police.  It wouldn't be important for you to know

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

416

Richard Keith Coborn - 9/17/2020

```
1    Stratford Police Department?
2              MR. MASSOUH:  Objection, beyond the scope
3    of the deposition notice.
4         A.  Sir, the City of Stratford doesn't use current
5    events that happened recently for training because there
6    has been no conclusion to those events.  So the
7    Stratford Police Department relies on TCOLE-trained
8    instructors that have events that have had conclusions
9    to them as to how to train cops.
10        Q.  (BY MR. EDWARDS)  Well, have you heard of
11   Breonna Taylor?
12        A.  No, sir, I have not.
13        Q.  So just so I'm clear, City of Stratford,
14   regardless of anything that's in the public news that --
15   that may be perceived as unreasonable or unlawful, it's
16   the policy of the City of Stratford not to consider that
17   but to rely instead on TCOLE and the manner in which
18   they choose to train.  Is that a correct statement?
19        A.  That is a correct statement.
20        Q.  Has anybody in the City of Stratford talked to
21   you about the George Floyd case?
22        A.  No, sir.
23        Q.  Officer McHugh hasn't talked to you about it?
24        A.  No, sir.
25        Q.  And nobody else in Stratford or any of the
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

417

Richard Keith Coburn - 9/17/2020

1      A.  I'm not understanding your question, sir.

2            MR. EDWARDS:  Would you repeat the question

3  for Mr. Coburn so that I can make sure that it's clear

4  enough?  Because you had no trouble answering it the way

5  you wanted to earlier.

6            (Requested portion read by the reporter)

7      A.  I would disagree with that statement, sir.

8      Q.  (BY MR. EDWARDS)  So you don't -- okay.  So you

9  don't think it's reasonable to stick your head in the

10 sand and ignore current events then?

11     A.  That is correct.

12     Q.  Okay.  That's what you're doing with regards to

13 the George Floyd incident; right?

14     A.  No, sir.

15     Q.  You haven't seen the video, sir; right?

16     A.  That is correct.  I have not seen the video.

17     Q.  Okay.  You've made a conscious choice not to

18 look at it; right?

19     A.  Yes, sir.

20     Q.  Okay.  It would only take you a matter of

21 minutes to pull it up on YouTube or any news channel;

22 right?

23     A.  Yes, sir.

24     Q.  Okay.  Yet you -- because it hasn't reached

25 some sort of final criminal conclusion, you don't

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

418

Richard Keith Coborn - 9/17/2020

1   believe that it would be helpful to explain why that was

2   or -- may or may not be permissible to your officers or

3   any members of your community; right?

4       A.  That is correct.

5       Q.  And that would be true of any current events

6   story, even ones that predated Darion Baker's death;

7   right?

8       A.  Yes, sir.

9       Q.  Prior to Darion Baker's death, were you ever

10  made aware that minorities, especially black minorities,

11  were victims of deadly force at a higher rate than

12  whites?

13      A.  No, sir, I was not.

14      Q.  You received no training on that; right?

15      A.  No, sir.

16      Q.  Okay.  And the City of Stratford certainly

17  provided no training to its officers relating to that;

18  right?

19      A.  Provided what kind of training?

20      Q.  That African Americans are shot at a higher

21  rate than whites.

22      A.  That kind of stuff would be covered in the

23  cultural diversity and racial profiling training.

24      Q.  Was it?  Was it covered, Officer Coborn?

25      A.  Yes, sir, it was.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

419

Richard Keith Coborn - 9/17/2020

1    Q.  Okay.  So you do know that African Americans
2  are shot at a disproportionately high rate compared to
3  whites?

4    A.  I don't know where this information is coming
5  from, sir.

6    Q.  Well, you told me it was covered in the
7  training; right?

8    A.  Correct.

9    Q.  Okay.  So are you aware that African Americans
10  are shot -- are victims of deadly force at a higher rate
11  percentage-wise than -- than white people?

12    A.  No, sir.

13    Q.  Okay.  So then you didn't receive training to
14  that effect; correct?

15    A.  No, sir.

16    Q.  Okay.  All right.  You've told me about every
17  example of deadly force.  We'll get more into them, but
18  the highlights; right?

19    A.  Correct.

20    Q.  We've been going for about an hour.  Why don't
21  we take a short break, unless you'd like to keep
22  powering through, but I don't want to have you go longer
23  than is comfortable.  So do you want to take a
24  five-minute break?

25    A.  Yes, sir, that's fine.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

420

Richard Keith Coborn - 9/17/2020

1      A.   This use of force spreadsheet printout.

2      Q.   Okay.

3      A.   Body camera policy, use of force policy, racial

4  profiling policy, and the training rosters for myself

5  and Officer McHugh.

6      Q.   Okay.  What about the video of the shooting?

7      A.   No, sir, I do not have that with me today.

8      Q.   All right.  So you don't intend to rely on the

9  video of your shooting for the City's testimony?

10      A.   That is correct.

11      Q.   Did you review it?

12      A.   No, sir.  It was not on the previous page to

13  review.

14      Q.   Well, okay.  So you don't think it's relevant

15  to the position where every officer was standing when

16  they fired each shot at Darion Baker?

17      A.   I guess I don't understand your question, sir.

18      Q.   You're telling me you didn't review the -- you

19  didn't review the video in preparation for this

20  deposition?

21      A.   That is correct.  I did not review the video.

22      Q.   Have you ever reviewed the video?

23      A.   Yes.

24      Q.   You personally, Officer Coborn?

25      A.   Yes, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

421

Richard Keith Coborn - 9/17/2020

```
1        Q.  Okay.  You would agree that the video is
2   important evidence of what you and Officer McHugh were
3   doing; right?
4        A.  I would agree to that.
5        Q.  How many mistakes did you make that you're
6   aware of -- or let me ask it this way.  How many
7   mistakes did Officer Coborn make in his statement to the
8   rangers with regards to what happened with him and
9   Darion Baker?
10       A.  I guess I'm not understanding what you're
11  asking by mistake.
12       Q.  Well, things that were wrong -- that were told
13  to the ranger that were wrong.
14       A.  I --
15       Q.  Did you tell anything to the ranger that was
16  wrong?
17       A.  Not to my knowledge.
18       Q.  Okay.  Well, all right.  And you've -- you've
19  reviewed the statement from Officer Coborn; right?
20  That's you; right?
21       A.  Yes, sir.
22       Q.  Okay.  And as you testify here today, you
23  believe that it's correct?  That's what you would tell
24  the jury?
25       A.  As to what is correct?
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

422

Richard Keith Coborn - 9/17/2020

1      Q.  The statements that you put in there.

2      A.  Put into the ranger's report?

3      Q.  The ranger report or any statement you made to

4  the rangers.

5      A.  That is correct.

6      Q.  Okay.  In the -- in the heat of the moment, an

7  officer's perceptions are often mistaken.  Do you agree

8  with that?

9      A.  I -- I'm not sure what you're asking, sir.

10      Q.  Well, an officer could think he moved to the

11  right or moved to the left.  An officer could think he

12  fired once when he fired seven times.  In the heat of

13  the -- well, when you're dealing with a situation,

14  sometimes officers have mistaken perceptions.  You

15  understand that; right?

16      A.  I understand that sometimes an officer doesn't

17  know the specific details of everything.

18      Q.  Right.  And some details are understandable,

19  like, you know, did you fire six shots or seven shots.

20  But when you fired and where you went, those are details

21  that you ought to get right; do you agree with that?

22      A.  No, sir.

23      Q.  You think you ought to get details wrong?

24      A.  No, sir, that's not what I'm saying.

25      Q.  What are you saying?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

423

Richard Keith Coborn - 9/17/2020

1     A.  I'm saying that there's so many things that

2  happen at one instance that it's almost impossible to be

3  able to lock down every specific detail that happened at

4  that fast instance.

5     Q.  I think -- okay.  So I hear -- but that's what

6  I'm getting at.  You know, I mean, your perception,

7  you know, sometimes can be off in these situations;

8  right?

9     A.  In that instance, yes, sir.

10    Q.  Okay.  That's why the video may be a better

11 indicator of what really happened; right?

12    A.  Yes, sir.

13    Q.  I kind of call it, like, objective reality

14 versus, like, subjective reality.  Do you think that's

15 fair?

16    A.  Yes, sir.

17    Q.  It is reasonable to -- it's reasonable for you

18 as a policy maker for the City of Stratford to expect

19 your officers to perceive things correctly if they're

20 going to use those perceptions as a basis for deadly

21 force though, don't you think?

22         MR. MASSOUH:  Objection, vague.

23    A.  I'm not really sure what question you're

24 asking, sir.

25    Q.  (BY MR. EDWARDS)  I'll ask it again then.  It

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

424

Richard Keith Coborn - 9/17/2020

1   may be my question.  It very well may be.

2                Firstly, you're the chief of police for the

3   City of Stratford; right?

4        A.  Yes.

5        Q.  Okay.  You're the policy maker when it comes to

6   law enforcement for the City of Stratford; right?

7        A.  Yes.

8        Q.  Okay.  Chief Hooks, prior -- at the time of the

9   Darion Baker shooting Chief Hooks was the policy maker;

10  right?

11       A.  Yes.

12       Q.  It -- you know, you understand that as a

13  policy maker, you have to train officers about when --

14  when deadly force is permissible because there -- you

15  know that they're going to come into situations where

16  they might have to, you know, know if they can use

17  deadly force; right?

18       A.  Yes, sir.

19       Q.  Okay.  And so you understand that the standard

20  when judging an officer's actions, that that is an

21  objective standard.  Do you under- -- do you know that?

22       A.  Yes, sir.

23       Q.  Okay.  In other words, it is not -- it

24  doesn't -- it's not a defense for you to say I thought

25  person X was going to do something if objectively they

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

425

Richard Keith Coborn - 9/17/2020

```
1  weren't doing that?
2              MR. MASSOUH:  Objection --
3      Q.  (BY MR. EDWARDS)  You understand that; right?
4              MR. MASSOUH:  Objection to the extent it
5  calls for a legal conclusion.
6      A.  It would be based off of the training and
7  experience of each officer what they reasonably believed
8  at that time.
9      Q.  (BY MR. EDWARDS)  Yeah, but you understand that
10 that word reasonable belief is -- hinges on objective
11 reality; right?
12             MR. MASSOUH:  Objection to the extent it
13 calls for a legal conclusion.
14     A.  No, sir, I do not know.
15     Q.  (BY MR. EDWARDS)  Okay.  Well, I'll just ask
16 you straight up.  As the policy maker for the City of
17 Stratford, do you believe that if an officer says I
18 thought my life was in danger and objectively it turns
19 out that isn't true, that it's still okay to shoot
20 somebody?
21             MR. MASSOUH:  Objection to the extent it
22 calls for speculation.
23     A.  Each scenario would be -- would be dictated on
24 the circumstances that happened.
25     Q.  (BY MR. EDWARDS)  Okay.  Well, that's not true.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

426

Richard Keith Coborn - 9/17/2020

1    Do you know that what you just said is incorrect?

2         A.  No, sir.

3         Q.  Okay.  Let me -- let me be crystal clear about

4    this.  Do you think there are situations where the

5    objective facts say a shooting should not happen, but

6    the officer says I thought I was in danger, I was really

7    scared, or I thought the -- that the person was doing X,

8    but the objective situation doesn't support that?

9    Which -- which do you evaluate, sir, as a policy maker?

10             MR. MASSOUH:  Objection to the extent it

11   calls for a legal conclusion.  Objection to the extent

12   it calls for the witness to speculate.

13             Answer if you can.

14        A.  It would be based off of what the officer

15   thought was a reasonable use of force or not.

16        Q.  (BY MR. EDWARDS)  So do you believe the

17   standard for judging excessive force is objective --

18             MR. MASSOUH:  Object --

19        Q.  -- in that --

20             MR. EDWARDS:  Hold on a second.

21             MR. MASSOUH:  Go ahead.  Go ahead.

22        Q.  (BY MR. EDWARDS)  -- objective or do you

23   believe it's based on the officer's subjective beliefs?

24             MR. MASSOUH:  Objection to the extent it

25   calls for a legal conclusion.  Go ahead.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

427

Richard Keith Coborn - 9/17/2020

1   A.   It would be based off of what the officer at

2   that time, concluding with all of the totality of the

3   circumstances, believed would be a justifiable reason or

4   not.

5       Q.   (BY MR. EDWARDS)   What a hypothetical

6   reasonable officer would conclude or what that officer

7   would conclude?   Or do you know?

8               MR. MASSOUH:   Same objection.

9       A.   I -- I really don't understand why -- the

10  hypothetical portion of this.

11      Q.   (BY MR. EDWARDS)   There's -- okay.   Well, do

12  you judge examples of excessive or deadly force under a

13  reasonable person standard, a mythical reasonable person

14  standard, or do you judge them according to the

15  subjective beliefs of the shooting officer?

16              MR. MASSOUH:   Objection to the extent it

17  calls for a legal conclusion.

18      A.   It would be to what any reasonable officer

19  would do at that time.

20      Q.   (BY MR. EDWARDS)   Okay.   But -- okay.

21  All right.   Have you provided -- you've told me about

22  the documents that you rely -- you're going to rely on

23  for your testimony.   It's the use of force -- let me

24  know if I'm missing any -- use of force policy, the body

25  cam policy, the use of -- I didn't write this down.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

428

Richard Keith Coborn - 9/17/2020

```
 1  the lettering on it.  I'm sorry.
 2              MR. MASSOUH:  You have it in front of you.
 3              THE WITNESS:  That is correct.  I do have
 4  it in front of me, though.
 5              MR. EDWARDS:  Okay.  Well, if you have any
 6  problems seeing it, just let me know.  I don't know how
 7  to fix this, but can you move the computer closer to
 8  you.
 9              MR. MASSOUH:  Well, the TV is on the wall,
10  and we're at the conference table.  So he has -- we can
11  see it, but he has a copy in front of him for easier
12  reference, if that makes sense.
13              MR. EDWARDS:  Okay.  Great.
14      Q.  (BY MR. EDWARDS)  So we've got -- in that
15  example, we've got one, two, three examples of deadly
16  force on this sheet; right?
17      A.  Yes, sir.
18      Q.  And then obviously we have a fourth, which is
19  the shooting of Darion Baker; right?
20      A.  Correct.
21      Q.  They all involve vehicles; right?
22      A.  Yes, sir.
23      Q.  All right.  The City of Stratford policies,
24  they're to be reviewed and edited by the chief of
25  police; is that correct?
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

429

Richard Keith Coborn - 9/17/2020

1  But yes, the rules of contact, yes, sir.

2      Q.  (BY MR. EDWARDS)  Okay.  It's the code of

3  conduct for the Stratford Police Department; right?

4      A.  Yes, sir.

5      Q.  I mean, it says in no uncertain terms that all

6  officers -- all law enforcement officers are required to

7  respect the constitutional rights of all people, doesn't

8  it?

9      A.  I'm sorry.  Can you say that again?

10     Q.  It says in pretty clear terms that all officers

11  are required to respect the constitutional rights of

12  people that it comes into contact with; is that correct?

13     A.  Where are you seeing that at, sir, in the

14  policies, just so I can make sure?

15     Q.  Let me just ask you:  Do you believe that law

16  enforcement officers are required to respect the

17  constitutional rights of all people?

18     A.  Yes, I do believe that.

19     Q.  Okay.  Why don't you read the first paragraph

20  and confirm that it's in your policies.

21     A.  Are you looking at where the Stratford Police

22  Department and the public expect all personnel to

23  maintain high standards of appearance and conduct?  The

24  mission of the Stratford Police Department is to work

25  with all members of the community to preserve life --

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

430

Richard Keith Coborn - 9/17/2020

1      Q.  I'm not --

2      A.  -- maintain human rights --

3      Q.  I'm not looking at that.  I'm looking at the

4  first paragraph under the code of ethics.

5              MR. MASSOUH:  The code of ethics.

6      A.  Oh, code of ethics.  Okay.

7              MR. MASSOUH:  Yeah.  He wasn't clear on

8  that.

9      A.  The first paragraph, all officers shall display

10  the integrity --

11      Q.  (BY MR. EDWARDS)  I don't want you to read it;

12  okay?  I want you to read it to yourself and just

13  confirm the obvious that of course you have a duty to

14  respect the constitutional rights of the people you come

15  into contact with.  I'm giving you credit.  It's in your

16  policies; isn't it?

17      A.  Yes, sir.

18      Q.  Okay.  Before reading that, did you know it was

19  in your policy?

20      A.  Yes, sir.

21      Q.  Okay.  You -- you would agree that you and all

22  the police officers at the City of Stratford, even

23  though it's a small department, are obligated to know

24  the gist of the policies that govern its law enforcement

25  officers; right?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

431

Richard Keith Coborn - 9/17/2020

1       A.  That is correct.  All officers are to know the
2   policy.
3       Q.  Okay.  All right.  Let's go to -- let's put
4   Tab 24 up.  I didn't see any -- any requirement from the
5   City that requires -- requires training on shooting at
6   moving vehicles.  Is there a policy on that?
7       A.  Is there a policy that requires training on
8   shooting vehicles?  Is that what you're asking?
9       Q.  Well, does the City require training on
10  shooting at moving vehicles?
11      A.  The City requires training on the use of force.
12      Q.  But that's not my question.  My question is:
13  Does the City specifically train about shooting at
14  moving vehicles?
15      A.  There is no training --
16      Q.  And I don't see any -- I don't see any training
17  about that, but if you think you do, I need to know.
18      A.  There's no training to my knowledge that
19  pertains to shooting at moving vehicles.
20      Q.  Okay.  Now, if you -- I'm not saying --
21  ultimately you're the person in charge of what training
22  you provide to the -- to the department; right?
23      A.  Correct.
24      Q.  Okay.  And by you, I mean the chief of police
25  has that responsibility; right?

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

432

Richard Keith Coborn - 9/17/2020

1      A.  Yes, sir.

2      Q.  Okay.  And prior to you, Chief Hooks would have

3  had that responsibility; right?

4      A.  Yes, sir.

5      Q.  Okay.  And prior to Mr. Baker's death and still

6  currently, there's no -- there's no training required

7  about shooting at moving vehicles; correct?

8      A.  All officers are trained on the use of force

9  policy, which covers shooting a moving vehicle.

10      Q.  Okay.  Well, there's not specific training on

11  shooting at moving vehicles, is there?

12      A.  There is train- -- or there is --

13      Q.  And be careful here, because I don't want you

14  to testify incorrectly here, but there's no training --

15          MR. MASSOUH:  Let him answer the question.

16      A.  There is --

17      Q.  (BY MR. EDWARDS)  I will, but I want to be -- I

18  want to be clear about this, because you've given

19  testimony about this, sir.  So I just -- whatever

20  you're -- anyway, there's no specific training about

21  shooting at moving vehicles, is there?

22      A.  There is no TCOLE-specific training that I am

23  aware of that teaches shooting at moving vehicles.

24      Q.  Okay.  Right.  Let's talk about City of

25  Stratford training, okay, as well.  There's no City of

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

433

1  vehicle moved is actually wrong?

2      A.  The City is not aware of any perception.  It's

3  just aware of what facts are in the ranger's report.

4      Q.  You watched the video, didn't you?

5      A.  Yes.

6      Q.  Okay.  So are you aware that the video shows

7  that you shot before the car moved?

8      A.  No, sir.

9      Q.  Okay.  If you're not aware, you're not aware.

10  All right.  Let's move to -- oh, all the training that

11  Officer Coborn and Officer McHugh received relating to

12  self defense under the Texas Penal Code -- well, strike

13  that.

14          All the training that -- that you and

15  Officer McHugh received when -- as to when it's

16  permissible to fire in self defense, do you know what

17  sections of the penal code those relate to?

18      A.  Off the top of my head, without looking at the

19  penal code, sir, I believe it's Chapter 9, but I'd have

20  to look at the penal code.

21      Q.  Well, 9 point -- I'll represent to you that

22  9.31 and 9.32 are self defense and deadly force in

23  defense of a person.  Is that -- as you testify here

24  today, is that the substance of the self-defense

25  language that you were taught -- allegedly taught as a

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

434

Richard Keith Coborn - 9/17/2020

```
1   police officer?
2       A.  I don't understand your question, sir.  It was
3   too broken up.
4       Q.  Well, we've got self defense and deadly force
5   in defense of a person.
6       A.  Okay.
7       Q.  And they're 9.31 and 9.32 in the Texas Penal
8   Code.  Do you recall if that's what you were allegedly
9   taught?
10      A.  Yes, sir.
11      Q.  Okay.  And that's -- we talked about it
12  earlier.  That's basically, you know, if an office- --
13  if someone reasonably believes that force is immediately
14  necessary to protect the actor against the other's use
15  or attempted use of unlawful force, that's what we were
16  talking about before; right?
17      A.  Yes, sir.
18      Q.  Okay.  So in order for deadly force to have
19  been justified against Darion Baker, the officer that
20  shot, you and Officer McHugh, you'd need to be justified
21  in using the force, and it would need to be immediately
22  necessary to protect you, Officer McHugh, or a member of
23  the public; right?
24          MR. MASSOUH:  Objection to the extent it
25  calls for a legal conclusion.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

435

Richard Keith Coborn - 9/17/2020

1      A.  Yes, sir.

2      Q.  (BY MR. EDWARDS)  Okay.  And that -- that's --

3    that's how the City of Stratford trained you; is that

4    correct?

5      A.  That's how Texas peace officers are trained in

6    the basic peace officer academy.

7      Q.  I don't -- you don't -- I don't care about

8    that.  I care about what the City of Stratford trained.

9    That's how the City of Stratford made sure its officers

10   were competent to be officers; right?  That they got

11   that specific training among others; right?

12     A.  City of Stratford is online with TCOLE, which

13   is taught in the basic peace officer academy.

14     Q.  Okay.  And what that -- what that means for the

15   jury is that there's a basic police officer academy

16   where people go and they learn about things.  And are

17   you saying that both Officer McHugh and Officer Coborn

18   had received that prior to the time when they shot

19   Darion Baker?

20     A.  To graduate from the Texas Peace Officer

21   Academy, yes, sir.

22     Q.  Okay.  Did the City of Stratford provide any

23   additional training to its officers -- well, let's start

24   with Officer Coborn -- beyond the basic TCOLE with

25   regards to use of force and deadly force?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

436

Richard Keith Coborn - 9/17/2020

1      A.  Yes, sir.

2      Q.  What?

3      A.  I would have to look at that training roster to

4  be able to tell you that.

5      Q.  So you don't know without looking at a training

6  roster?

7      A.  Correct.

8      Q.  Okay.  What is the -- what is the City's

9  pol- -- does the City have any policy for whether or not

10  it's going to internally investigate examples of deadly

11  force?

12      A.  I would have to look at the use of force policy

13  to see that.

14      Q.  So you don't know as the chief of police?

15      A.  I don't want to misquote something, sir.

16      Q.  I'm not asking you -- I'm not asking you to

17  quote anything.  I'm asking you if you know what your

18  job requires you to do without looking at a book.  Do

19  you?

20      A.  It's in best practices to refer it to a

21  third-party agency for investigation.

22      Q.  Okay.  And that's to determine if any policies

23  were violated?

24      A.  It's to determine if there were any criminal

25  allegations.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

437

Richard Keith Coborn - 9/17/2020

1    Q.  Okay.  So it's the word of the city attorneys
2  and the city that's being sued for millions of -- well,
3  for -- anyway, it's the word of the city attorney that
4  you're relying on.  Fair?
5    A.  It's the information he provided to me is that
6  the Texas Rangers did the investigation.
7    Q.  Okay.  But no document, just what he told you;
8  right?
9    A.  I have no documents in front of me or I've
10  never seen any.
11    Q.  You have -- well, it's the "or I've never seen"
12  part that I really care about.  No documents were
13  provided to you in any way.  You're just relying on
14  what -- and that's fine -- what the city attorney told
15  you; right?
16    A.  I have not seen any documents.
17    Q.  Okay, sir.  In this case, the City's contention
18  is that Officer Coborn and Officer McHugh operated
19  consistently with City of Stratford policies every step
20  of the way with regards to the detention and shooting of
21  Darion Baker; correct?
22    A.  I -- really that's a very vague question, sir.
23  I'm not even sure exactly --
24    Q.  It's not a vague -- it's really not a vague
25  question.  It's a really direct question.  I'm going to

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

438

Richard Keith Coborn - 9/17/2020

1  insist on an answer to it however you wish to answer it.

2          MR. EDWARDS:  But would you please repeat

3  the direct question to Officer Coborn, please.

4          (Requested portion read by the reporter)

5  A.  Yes, sir.

6  Q.  (BY MR. EDWARDS)  Okay.  Did the City make any

7  changes to its policies and practices as a consequence

8  of what happened with regards to the Darion Baker

9  incident?

10  A.  No policies have been changed.

11  Q.  Have any practices been changed?

12  A.  No, sir.

13  Q.  After the shooting of Darion Baker, were any

14  policies reviewed by the chief of police or anyone else

15  because of the shooting?

16  A.  Because of the shooting, not to my knowledge.

17  Q.  Okay.  Well, are you aware -- so you don't

18  know -- no -- to your knowledge, nobody looked to change

19  or modify any policies as a consequence of the Darion

20  Baker shooting; right?

21  A.  To my knowledge, no policy was reviewed because

22  of the shooting, correct.

23  Q.  Okay.  And you certainly didn't review any

24  policies because of the shooting; right?

25  A.  Did I review any policies because of the

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

**439**

Richard Keith Coborn - 9/17/2020

1       A.  All right.

2       Q.  After the April 6, 2000 -- well, after the

3  April 6, 2018, shooting incident or the September 11th,

4  2018, shooting incident or the January 1st, 2018,

5  shooting incident, to your knowledge, nobody at the City

6  ever reviewed its use of force policies with regards to

7  shooting at moving vehicles; right?

8       A.  To my knowledge, no, sir.

9       Q.  Okay.  To your -- to your knowledge -- and to

10 the City's knowledge, following April 6, 2018,

11 9/11/2018, and 1/1/2018, and 2/21/18, nobody -- nobody

12 looked to see if the policies were adequate or needed to

13 be changed with regards to use of force as a consequence

14 of these deadly force incidents?

15      A.  To my knowledge, no, sir.

16      Q.  Okay.  And the City's internal investigation

17 process allows officers who are being investigated to

18 have an attorney with them; is that true?

19      A.  Are you asking if the officers that are under

20 investigation are allowed to have an attorney?

21      Q.  With them during interviews.

22      A.  Correct.

23      Q.  Do you know if Officer Coborn and Officer

24 McHugh were separated following the shooting of Darion

25 Baker prior to -- prior to talking to anybody else?

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

440

Richard Keith Coborn - 9/17/2020

1      A.  Yes, sir.

2      Q.  So to your knowledge, there was no discussion

3 between Officer Coborn and Officer McHugh prior to being

4 interviewed by the -- by the Texas ranger who took their

5 statement?

6      A.  That is correct.

7      Q.  So how long before you -- you did, however,

8 talk with a lawyer prior to giving a statement to the

9 Texas ranger; right?

10      A.  That is correct.

11      Q.  Do you remember the Texas ranger's name?

12      A.  I believe it was Eustacio Galvan.

13      Q.  Okay.  And he works for DPS; right?

14      A.  Yes, for the Texas Rangers.

15      Q.  Well, it's the romantic version of the

16 Department of Public Safety; right?

17      A.  Yes.

18      Q.  Okay.  So you and Officer McHugh, before giving

19 a statement about what happened, talked to lawyers;

20 right?

21      A.  Yes, sir.

22      Q.  And that's the policy of the Stratford Police

23 Department; right?  That's permissible?

24      A.  Yes, it's permissible.

25      Q.  Do you see any problems with that as, you know,

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

441

Richard Keith Coborn - 9/17/2020

```
 1   That's what you're talking about?
 2        A.  Or potential bystanders, correct.
 3        Q.  But there were no potential bystanders in the
 4   area; right?
 5        A.  Not to my knowledge.
 6        Q.  Okay.  So -- so -- okay.  And I -- I don't mean
 7   to belabor this, but what you're saying is that you
 8   would say you -- the City agrees that all of the shots
 9   at the car were -- were necessary because whoever was
10   driving the car remained an immediate threat to those
11   officers?  Is that what the City's contention is?
12        A.  Yes, sir.
13        Q.  Prior to the incident involving Darion Baker,
14   had you -- had Officer Coborn received any training
15   on -- regarding case law that suggested that once a
16   vehicle is no longer a danger to the officers, that it's
17   impermissible to shoot?
18        A.  Not to my knowledge.
19        Q.  Prior to the Darion Baker incident, did any of
20   the police officers that worked for Stratford, in
21   particular you or Officer McHugh, receive any training
22   that went through specific cases that were decided at
23   the Supreme Court or the Fifth Circuit relating to the
24   justifi- -- justifiability of shooting at a moving
25   vehicle?
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

442

Richard Keith Coborn - 9/17/2020

1        A.  Not to my knowledge, no, sir.

2        Q.  Okay.  And certainly with regards to Officer

3   Co- -- Officer Coborn, the answer is just a flat-out no;

4   you were never provided any analysis of any sort of case

5   law from the United States Supreme Court or from the

6   Fifth Circuit as to, you know, certain instances where

7   it's just not justifiable to shoot at a moving vehicle?

8        A.  I was not trained on any specific case law, no,

9   sir.

10       Q.  Okay.  But you understand that each shot has to

11  be just- -- and the City of Stratford understands that

12  every time an officer pulls the trigger, the shot -- the

13  shot needs to be justified; right?

14       A.  Yes, the shot needs to be justified.

15       Q.  So, for instance, shots one, two, and three,

16  there might be an immediate threat that would justify

17  the use of deadly force, but that threat could go away

18  for shots four, five, and six?

19            MR. MASSOUH:  Objection --

20       Q.  (BY MR. EDWARDS)  That's -- that's possible;

21  right?

22            MR. MASSOUH:  Objection to the extent it

23  calls for speculation.

24       A.  I'm not really sure what question you're asking

25  here, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

443

Richard Keith Coborn - 9/17/2020

1      Q.  (BY MR. EDWARDS)  Okay.  Well, I'll -- what do

2  you not understand about that?

3      A.  I don't know if you're referring to shots one,

4  two, three of this incident or if you're

5  hypothetically --

6      Q.  Fair enough.

7      A.  -- asking it --

8      Q.  I'm asking a general hypothetical incident --

9  okay? -- a hypothetical example where theoretically

10  shots one, two, and three could be justified because

11  there's an immediate threat, and then that immediate

12  threat can cease or go away such that if an officer were

13  to continue shooting, four, five, and six, that the

14  fourth, fifth, and sixth shot in that example, that

15  those could be unjustified and in violation of the

16  Constitution.  That's what I'm asking you.

17      A.  Hypothetically, it would relate to the totality

18  of the circumstances of that event.

19      Q.  That's not an answer.  That's just a

20  regurgitation of a legal standard that really, you know,

21  you may or may not know.  So can you answer my specific

22  question, okay?  Again, there's an immediate threat

23  during shots one, two, and three.  You would tell the

24  jury if there's an immediate threat of serious bodily

25  injury or death to me or a member of the public, I'm

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

444

Richard Keith Coborn - 9/17/2020

1      Q.  Okay.  And you're aware that the suit is over

2  the death of a human being; right?

3      A.  Yes, sir.

4      Q.  And you're aware that the pain and suffering

5  that that has caused the Baker family is immense; right?

6              MR. MASSOUH:  Objection to the extent it

7  calls for a legal conclusion.

8      A.  Sir, I'm sorry.  I didn't hear your last word

9  on that.

10     Q.  (BY MR. EDWARDS)  You're aware that the pain

11 and suffering that that has caused the Baker family is

12 immense or a lot; right?

13     A.  I'm not aware of any pain and suffering from

14 them.

15     Q.  Well, are you a parent?

16     A.  Yes, sir.

17     Q.  Do you think that it would cause you a lot of

18 pain and suffering if your child was shot by the police?

19     A.  I'm sure it would be devastating, sir.

20     Q.  Okay.  That's my only point.  Would you

21 acknowledge that for the Baker family, their loss is

22 devastating?

23             MR. MASSOUH:  Objection to the extent it

24 calls for him to speculate as to what's in the mind of

25 the Baker family.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

445

Richard Keith Coborn - 9/17/2020

1      A.  I would not know their mindset, sir.  I would

2  be unable to answer that.

3      Q.  (BY MR. EDWARDS)  Would you expect their loss

4  to be devastating as a parent?

5      A.  I would expect any parent's loss to be

6  devastating.

7      Q.  Now, your policies state that -- and this,

8  again, is prior to Darion Baker's incident -- that

9  firearms shall not be discharged at a moving vehicle in

10  an attempt to disable the vehicle?

11      A.  That is correct.

12      Q.  You're aware of that?

13      A.  Yes, sir.

14      Q.  Well, in the examples -- the use of force

15  examples that you provided earlier, you were trying to

16  disable a vehicle; right?  And I mean you the

17  pejorative, you being the police officers at Stratford.

18      A.  Correct.

19      Q.  Was that a violation of your policies?

20      A.  They were verbally ordered by the chief of

21  police at the time.

22      Q.  Well, that just makes them the responsibility

23  of the City of Stratford.  Were they a violation of the

24  policies?

25      A.  Yes, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

446

Richard Keith Coborn - 9/17/2020

1      Q.   Okay.  So the practice at the City of Stratford

2  prior to the Darion Baker shooting was a little

3  different than what's on paper; right?

4      A.   Yes, sir.  I'm sorry, sir.  I really didn't --

5  I answered that before I really understood the question.

6  Could you ask that again?  I'm sorry.

7      Q.   Nah, that's fine.  Your lawyer can ask you

8  whatever kind of questions you want.  I mean, the jury

9  can decide whether you understood the question.

10          I'm -- let me ask you:  Does the City

11  contend that Officer Coborn or Officer McHugh were

12  trying to disable Darion Baker's vehicle after it drove

13  by Officer Coborn?

14      A.   No, sir.

15      Q.   Does the City -- does the -- so in other words,

16  Offi- -- from your understanding, Officer Coborn was

17  trying to shoot to kill Darion Baker?

18      A.   Yes, sir.

19      Q.   Same -- same understanding as to Officer

20  McHugh?

21      A.   Yes, sir.

22      Q.   Now, a car driving away from a police officer,

23  just based on these use of force examples, that's

24  something that's going to occur and reoccur -- or

25  something that a police officer is going to have to deal

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

447

Richard Keith Coborn - 9/17/2020

1  policy maker for the department, you understand that

2  officers are going to be in this situation where they

3  may have to deal with officers -- or people driving by

4  officers; right?

5      A.  Officers deal with people driving by them every

6  day such as on traffic stops.  I don't really understand

7  what you're -- what you're asking.

8      Q.  Well, but the issue of -- the issue of this

9  claim -- here's your claim.  You're claiming --

10 right? -- that this car is a deadly weapon and that you

11 were in danger because it was going towards you; right?

12     A.  Correct, once Mr. Baker used the vehicle as a

13 deadly weapon, and the officers engaged it.

14     Q.  Well, okay.  I mean, and certainly before he

15 used the car as a deadly weapon, it would have been just

16 off the charts unreasonable to shoot him; right?

17     A.  Had Mr. Baker not used it as a deadly weapon,

18 then the officers would not have shot.

19     Q.  Well, maybe, maybe not.  But it would have been

20 off the charts unreasonable for the officers to shoot if

21 he hadn't used the thing as a deadly weapon; right?

22     A.  Had he not used the vehicle as a deadly weapon,

23 then the officers would not have shot.

24     Q.  That's not my question.  I don't know why

25 you're fighting my question.  Of course it would be

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

448

Richard Keith Coborn - 9/17/2020

```
1        A.  No, sir, this was not considered a traffic
2   stop.
3        Q.  Okay.  So the City of Stratford did not
4   consider this a high-risk traffic stop?
5        A.  No, sir.  I would --
6        Q.  Actually, you just told me that.  I'll withdraw
7   the question.
8             MR. MASSOUH:  Hey, Jeff, when you get to a
9   stopping point, can we take a quick break?
10            MR. EDWARDS:  Yeah.  Give me -- give me a
11  few more minutes if that's all right.
12            MR. MASSOUH:  That would be fine.
13       Q.  (BY MR. EDWARDS)  Okay.  From a tact- -- from a
14  tactical standpoint, does the City contend that Officer
15  McHugh or Officer Coborn did anything wrong with regards
16  to the manner in which it conducted the detention and
17  shooting of Darion Baker?
18       A.  No, sir.  The officers were trying to make a
19  lawful arrest at the time.
20       Q.  So no, the City says they didn't do anything
21  wrong?
22       A.  Correct.
23       Q.  Okay.
24            MR. EDWARDS:  Let's take a five-minute
25  break.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

449

Richard Keith Coborn - 9/17/2020

1  saying that Officer Coborn got training from the City of

2  Stratford about shooting at moving vehicles prior to the

3  Darion Baker incident?  Please listen to my question

4  because I'm not interested in another question.  I'm

5  really just interested in the one I'm asking you, okay?

6  So let me ask it again.

7          Are you now saying -- which, just so we're

8  clear, would be different than the person who testified

9  in the last deposition.  Are you now saying that the

10 City of Stratford provided you specific training about

11 shooting at moving vehicles prior to Darion Baker's

12 death?

13      A.  The officers were trained in department policy.

14 There is a portion of the use of force policy that

15 covers shooting at moving vehicles.

16      Q.  Are you aware of a document that confirms that

17 training, a document?

18      A.  It would be reflected back on the personnel

19 status report, which shows department orientation.

20      Q.  And that department orientation is just read

21 the policy manual; right?

22      A.  It's sit down with the chief of police at the

23 time, whoever that may be, and you go over the policy,

24 or whoever the FTO or field training officer is at that

25 time, and the entire policy is gone over.  Once that's

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

450

Richard Keith Coborn - 9/17/2020

1  complete, then it gets uploaded to the TCOLE training

2  report as department orientation.

3       Q.   That's what Chief Hooks did with you?

4       A.   That is correct.

5       Q.   Chief Hooks read the entire policy manual with

6  you?

7       A.   It was our obligation to read the policy and --

8       Q.   I didn't ask you that, sir.  I asked you:  Did

9  Chief Hooks read the entire policy manual with you?

10      A.   Word for word, no, sir, he did not.

11      Q.   Okay.  Did he provide a formal training session

12 relating to the policies where he stood up or in

13 conversation went over all the policies with you to make

14 sure you understood them?

15      A.   Formal as in a TCOLE formal class?

16      Q.   No.  TCOLE wasn't in my question, sir.  My

17 question was:  Did Chief Hooks ever formally train you

18 about those policies?

19      A.   Yes.

20      Q.   Okay.  Did he test you on them?

21      A.   No.

22      Q.   Did anybody at the City of Stratford ever test

23 any of the officers on their policies?

24      A.   No, sir.

25      Q.   Okay.  And Chief Hooks was violating the

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

451

Richard Keith Coborn - 9/17/2020

1       A.   To think about what, sir?

2       Q.   Whether the officers did anything improper or

3  wrong.

4       A.   The case was referred to the Texas Rangers for

5  investigation, and then it was referred to the chief of

6  police at that time.

7       Q.   Do you at least agree that -- that shooting at

8  or from a motor vehicle raises distinct issues from your

9  general common deadly -- use of deadly force?

10      A.   I would need to know what issues you are

11 referring to, sir.

12      Q.   Well, if you don't agree with me, then that's

13 fine.  But no, you don't need to know the next question

14 that I'm going to ask.  The first one is a general

15 question.  Do you agree, City of Stratford, that

16 shooting at or from a motor vehicle raises distinct

17 issues from general uses of force or deadly force?

18           MR. MASSOUH:  Objection, vague.

19      A.   I would put it in other words, sir, that, yes,

20 shooting from a moving vehicle is dangerous.

21      Q.   (BY MR. EDWARDS)  Shooting at a moving vehicle

22 is dangerous as well; right?

23      A.   Correct, sir.  I misspoke.  That's what I meant

24 to say.

25      Q.   And you would tell the Court, look, that's

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

452

Richard Keith Coborn - 9/17/2020

1   pretty obvious; right?  You may not even need training

2   for that.  Or do you need to be trained on it?

3        A.  I would say that it's -- it's dangerous, sir.

4        Q.  But that wasn't my question.  Would you say

5   that it would be obvious to any officer that shooting at

6   a person in a vehicle that is moving is dangerous?

7        A.  Again, sir, in my own words, I would say that

8   it is dangerous.

9        Q.  I understand -- you're -- the City of Stratford

10  says it's dangerous.  Does the City of Stratford agree

11  that it would be obviously dangerous for all of its

12  officers?

13        A.  The City of Stratford agrees that it's

14  dangerous.

15        Q.  For all of its officers?

16        A.  I stick by my answer, sir.

17        Q.  Okay.  Do you know what shoot/don't shoot

18  training is?

19        A.  I'm familiar with the term, yes, sir.

20        Q.  What is it?

21        A.  It's the civilian-level type training where

22  they put individuals in situations where they have to

23  react.

24        Q.  Is it -- is it the City's understanding that

25  that is training that is solely for civilians as opposed

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

453

Richard Keith Coborn - 9/17/2020

1    Q.  Okay.  But just so we're clear, you haven't

2  asked; right?

3    A.  That is correct.  I have not asked him.

4    Q.  So you're speculating as to whether or not any

5  of these courses that you just described involved any

6  sort of scenarios that are similar to the Baker

7  incident, aren't you?

8         MR. MASSOUH:  Objection, mischaracterizes

9  prior testimony.  He was asked about scenario-based

10  shoot/don't shoot training, not specific Baker -- Baker

11  incident.

12    A.  I was -- I agree, sir, because I answered the

13  question based off of if I had any scenario-based

14  training, which I was answering for myself.

15    Q.  (BY MR. EDWARDS)  Oh, okay.  All right.  So

16  you're totally speculating as to whether or not any of

17  the -- what -- the specific scenarios that anybody

18  received, including Officer McHugh; right?  You have no

19  idea.  Fair?

20    A.  I have no idea what scenarios they used in any

21  of these trainings, no, sir.

22    Q.  And you took no steps to find out what

23  scenarios, if any, you learned about, did you?

24    A.  I did not ask Officer McHugh what scenarios he

25  had.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

454

Richard Keith Coborn - 9/17/2020

1    Q.  Ask your -- well, okay.  Do you trust me to do

2   it?

3    A.  Absolutely.

4    Q.  All right.  Let's do it on a calculator.  I'm

5   probably even doing the percentages wrong.  Would you

6   rather do it yourself?

7         MR. MASSOUH:  For the record, I'm giving

8   him my phone, Jeff, if you want him to look.

9    Q.  (BY MR. EDWARDS)  About 13 percent?

10    A.  12.9 percent, yes, sir.

11    Q.  Is that about 13 percent?

12    A.  That's about 13 percent, yes, sir.  I do

13   remember that, yes, round up at five.

14    Q.  Great.  Okay.  Now -- so about 13 percent of

15   your entire uses of force involve moving vehicles;

16   right?

17    A.  Yes, sir.

18    Q.  Okay.  Now, it just so happens to involve

19   100 percent of your deadly force, though; right?

20    A.  Sir, for the record, I would like to correct

21   that.  You said that 13 percent involved moving

22   vehicles.  That is incorrect.  There are several more on

23   here that use of force would be, such as spike strip

24   being deployed on numerous vehicles, so those would

25   consider being used on vehicles as well.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

455

Richard Keith Coborn - 9/17/2020

1          MR. MASSOUH:  I think we lost him.

2          THE VIDEOGRAPHER:  Let's go off the record

3  at 1:06.

4          (Recess taken 1:06 p.m. - 1:09 p.m.)

5          THE VIDEOGRAPHER:  1:09, on the record.

6     Q.  (BY MR. EDWARDS)  Okay.  Sir, you were about --

7  when I lost you -- and it's totally 100 percent my

8  fault, not yours.  Or not that you would think that, but

9  it's my fault, and I'm sorry.  You were about to say

10 there were maybe more incidents, so maybe I had the

11 percentages off slightly?

12    A.  Yes, sir.  From -- I guess I'm not

13 understanding exactly what you're asking about

14 collecting the percentages.  I don't know if we're

15 looking at -- what time period we're looking at.  Are we

16 looking at a one-year time period where we encountered

17 vehicles, or are we looking at a two- or three-year time

18 period?  That's what my question was.

19    Q.  Well, I mean, your time period here goes from

20 2014 until the present; right?

21    A.  Correct.  And in that time period, there's

22 multiple encounters with vehicles.

23    Q.  Okay.  So how many -- how many encounters with

24 vehicles are there from the time period, as I'm looking

25 at it, from late November 2014 up through, you know,

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

**456**

Richard Keith Coborn - 9/17/2020

1  late 2018 or --

2      A.  Give me one second, and I'll tell you.  There's

3  12 instances on this paper, sir, labeled use of force.

4      Q.  Twelve of the 31?

5      A.  Yes, sir.

6      Q.  Okay.  So of the 31 documented uses of force

7  from the department from 2014 to the present, 12 involve

8  vehicles?

9      A.  Yes, sir.

10     Q.  Okay.  So that would be a much higher

11 percentage of the times that use of force involved

12 vehicles than we had previously thought; right?

13     A.  Yes, sir.  I believe the previous question was

14 how many times had we fired at vehicles, though.

15     Q.  Okay.  Well, maybe it was; maybe it wasn't.

16 But let's start with just -- you've given me a document

17 that reflects 31 instances of use of force over a

18 roughly five-year period.  Is that a fair statement?

19     A.  Yes, sir.

20     Q.  Okay.  And of those 31 uses of force, according

21 to you, 12 involved vehicles; correct?

22     A.  Correct.

23     Q.  So that suggests to me that on a recurring

24 basis, one of the issues that all of your officers

25 always have to deal with, certainly during this time

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

457

Richard Keith Coborn - 9/17/2020

1  period, is potentially using force with regards to a

2  vehicle.  Is that a fair statement?

3      A.  I would say other words of putting it would be

4  that the officers come in contact more with people in

5  vehicles than not.

6      Q.  Do you know what the word recurring means?

7      A.  Over and over.

8      Q.  Yeah.  It happens on a -- you anticipate that

9  it's going to continue to happen on a periodic basis.

10  You with me?

11      A.  Yes, sir.

12      Q.  Okay.  Fair to say here that there are -- if

13  this use of force document is any guide, that you're in

14  a recurring situation where officers -- or you would

15  anticipate officers are going to have to use force with

16  regards to vehicles; correct?

17      A.  Yes, sir.

18      Q.  Okay.  Now, just so the record is clear, would

19  you identify by name and date the 12 instances that

20  involve motor vehicles and uses of force at the City of

21  Stratford Police Department?

22      A.  When you say name, do you mean the suspect's

23  name?

24      Q.  No.  I mean the date and the officer involved's

25  name.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

458

Richard Keith Coborn - 9/17/2020

1    A.  I have 2/7 of '19 on that one.

2    Q.  It says 2/6 on my sheet.

3         MR. EDWARDS:  All right.  Why don't you

4    send -- why don't you send that document to me on the

5    next break with your notes on it, please.  Please scan

6    that to me on the next break.

7         MR. MASSOUH:  Will do, Jeff.

8    Q.  (BY MR. EDWARDS)  Okay.  All right.  Let's --

9    so -- all right.  In any event, we've got numerous

10   examples of the police officers at City of Stratford

11   interacting with suspects and moving vehicles and

12   vehicles; right?

13   A.  Yes, sir.

14   Q.  Okay.  And so because you're placed in

15   recurring situations with them, I hope you would agree

16   or I trust you would agree that you need to have

17   training about how to deal with those situations; right?

18   A.  The officers have training and scenario-based

19   training.

20   Q.  I didn't -- I didn't ask you what they have,

21   okay?  Please, please listen to my question.  Wouldn't

22   you agree that officers need to have training since

23   they're being placed in these recurring situations in

24   which motor vehicles are involved?

25   A.  I would agree.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

459

Richard Keith Coborn - 9/17/2020

1      A.  Yes.

2      Q.  Is that a "yes"?

3      A.  Yes.

4      Q.  Alvarez, Chief Hooks shot at a moving vehicle;

5  right?

6      A.  Yes.

7      Q.  Okay.  You shot at a moving vehicle again in

8  the Caleb Marks incident; right?

9      A.  Yes.

10     Q.  Okay.  Well, that seems like that's happening a

11  fair amount of the time all things considered.  That's

12  in a four-month period.  You're aware of that; right?

13     A.  Yes, sir.

14     Q.  And that's three examples of deadly force

15  involving moving vehicles in a four-month period; right?

16     A.  Yes, sir.

17     Q.  Don't you think you guys need a little bit of

18  training on how and when that's permissible?

19     A.  Your question is:  Do we need training on use

20  of deadly force?

21     Q.  At shooting at moving vehicles.

22     A.  It's covered in our policy, which we go over

23  annually.

24     Q.  Okay.  Well, what training is it that the City

25  contends -- okay.  You've told me about the generalized

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

460

Richard Keith Coborn – 9/17/2020

1  training that you contend covers shooting at moving
2  vehicles; right?
3      A.  By generalized training, do you mean in our
4  policy?
5      Q.  Well, you've told me that you consider that
6  some form of training.  We had a little bit of a debate
7  about that; right?
8      A.  Correct.  The Stratford Police Department
9  officers are trained on the policy.  Inside the policy
10  for use of force, there's a paragraph for vehicles.
11      Q.  Yeah.  And we'll go through that in a second,
12  but I just -- you know, general training on use of
13  deadly force is one thing, but can you point me to any
14  specific example that you can say, hey, we got training
15  about shooting at a moving vehicle, you or Officer
16  McHugh, in any of the TCOLE training, like a specific
17  example where you can say, yes, this involves shooting
18  at a moving vehicle?
19      A.  I believe you already asked this question, sir,
20  and I answered it.
21      Q.  But you gave me a list of topics that you
22  thought were relevant to deadly force.  Can you give me
23  a specific scenario where you remember being trained
24  about shooting at a moving vehicle?
25      A.  No, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

461

Richard Keith Coborn - 9/17/2020

1      Q.  Okay.

2      A.  I did not --

3      Q.  What about -- I'm sorry.  I interrupted.  But

4  what about Officer McHugh?  Can you give me a -- any

5  specific example with regards to Officer McHugh?

6           A.  Again, no, sir, I can't, at which point you

7  told me that I should have investigated those training.

8      Q.  Right.  And you chose not to; right?  Right?

9      A.  I didn't know you were asking a question, sir.

10 I thought that was a statement.

11     Q.  Well, you gave me a -- you said -- you said

12 something like I told you you should have investigated

13 it, as if I was wrong.  That's your opinion; right?

14     A.  No, sir.  I was just stating that you've

15 already asked this question, and I've already answered

16 it.

17     Q.  Right.  I just want to make sure there's -- but

18 there's no specific example you can point me to at all

19 that you remember or that you learned about through

20 investigating of any -- any sort of training that

21 specifically mentions a moving vehicle and shooting at

22 it; right?

23     A.  Again, sir, I stick by my answer of the

24 Stratford Police Department officers have been trained

25 in the policy and use of force which covers shooting at

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

462

Richard Keith Coborn - 9/17/2020

1  speak about it afterwards in what we call an

2  after-action review.  And then the City of Stratford

3  takes any laws that have changed or anything that's come

4  down from the Texas Police Chiefs Association of best

5  practices, and then and only then does the policy

6  change.

7      Q.  Okay.  So you've done nothing to minimize your

8  officers shooting at moving vehicles other than to

9  discuss what you did when you shoot at them?

10     A.  We have reviewed policies, sir, and we keep our

11 policy in line with Texas best practices, and at this

12 time nothing has changed.

13     Q.  Yeah, okay.  Did you do an after-action review

14 after Baker?

15     A.  No, we did not.

16     Q.  So when you earlier just, again, a minute ago,

17 said you do an after-action review after every shooting,

18 that wasn't really true, was it?

19     A.  That is true, sir.  That was an individual

20 separate deal where had we all talked about it, then we

21 would have all been witnesses to everybody's deal.

22 Chief Hooks felt that at that time that we did not need

23 to speak to anybody other than our attorney and the

24 Texas Rangers.

25     Q.  So -- so Chief Hooks made a decision not to do

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

463

Richard Keith Coborn - 9/17/2020

1    any sort of after-action review?

2         A.  I don't know what decision he made afterwards.

3    All I know is that he referred the case to the Texas

4    Rangers.

5         Q.  All right.  He decided not to do an

6    after-action review while he was chief of police;

7    correct?

8         A.  He decided to turn the case over to the Texas

9    Rangers for investigation.

10        Q.  I know that.  He didn't do an after-action

11   review; right?

12        A.  He did not speak to myself or Officer McHugh

13   about the shooting.

14        Q.  Okay.  Did he do an after-action review, which

15   you just testified earlier is the norm?

16        A.  Sir, he did not speak to myself or Officer

17   McHugh about the shooting --

18        Q.  Yeah.

19        A.  -- because he did not want to make himself a

20   witness to this case.

21        Q.  Maybe.  Did he do an after-action review after

22   the shooting in January?

23        A.  Him and Officer McHugh spoke about it, yes,

24   sir.

25        Q.  Did it include you?

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

464

Richard Keith Coborn - 9/17/2020

1  2.01 in the reference tab right there.

2       Q.  I can read it too.  Do you know where it came

3  from?

4       A.  I don't know where it came from, sir.  It looks

5  to me --

6       Q.  All right.

7       A.  -- it's the Texas Best Practices 2.01.

8       Q.  That's fine.  If you don't know, you don't

9  know.  I don't want you to speculate.

10          MR. EDWARDS:  Let's look at Page 3, if you

11  don't mind, Olivia.

12      Q.  (BY MR. EDWARDS)  Do you agree that officers

13  shall document the elements of reasonable suspicion and

14  probable cause in appropriate reports?

15      A.  That is correct.

16      Q.  Do you also agree that all personnel should be

17  held accountable for their actions?

18      A.  Yes, sir.

19      Q.  Okay.  What elements of reasonable suspicion

20  did Officer Coborn and McHugh document for initially

21  looking at the car before they called in to see if it

22  was stolen?

23      A.  Just by going off of my memory, sir --

24      Q.  Well, you understand you're here to testify

25  about this specific issue; right?  So however you want

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

465

Richard Keith Coborn - 9/17/2020

1    to go off of it, but go -- I need an answer.

2         A.   Yes, sir.  As previously testified, myself and

3    Officer McHugh were sitting on U.S. Highway 54.  We

4    observed numerous vehicles traveling by.  This one

5    vehicle traveled by and was driving out of social norms

6    for what we typically observe.  At that time --

7         Q.   What does that mean?

8         A.   At that time the vehicle then made a

9    suspicious --

10        Q.   What does that mean, sir, out of social norms?

11        A.   As I previously testified, sir, I think that

12   the example that I gave was you can watch 100 vehicles

13   go by, and then one vehicle may not be driving the same

14   manner as all the others.

15        Q.   Yeah, one vehicle might have two black kids in

16   it.  Is that out of the social norm?

17        A.   No, sir.

18        Q.   Is that out of the ordinary?

19        A.   No, sir.  As previously testified, myself and

20   Officer McHugh did not know who was in the vehicle until

21   they physically touched it at the gas pumps.

22        Q.   Did you know their race before you went to the

23   gas pumps?

24        A.   I didn't hear your question, sir.  I'm sorry.

25        Q.   Did you know their race?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

466

Richard Keith Coborn - 9/17/2020

1  it out of standby mode.

2       Q.  And Officer McHugh knew how to do that; right?

3       A.  I guess so, yes, sir.

4       Q.  Well, he -- he -- he recorded what happened;

5  right?

6       A.  The camera goes in standby mode by not moving.

7  So had Officer McHugh been moving around a lot in the

8  patrol car, his body camera would not have gone into --

9       Q.  I'm just trying to figure out did -- was

10  Officer McHugh's body camera on or not during this

11  incident?

12       A.  His body camera was on during this incident.

13       Q.  Did it record during this incident?

14       A.  Yes.

15       Q.  Okay.  The entire incident; correct?

16       A.  Yes.

17       Q.  That is consistent with City of Stratford

18  policies in effect at the time; right?

19       A.  Yes, sir.

20       Q.  Yours didn't; right?

21       A.  That is correct.  Mine did not.

22       Q.  You did not do what was -- you, being Officer

23  Coborn, did not do what was required to actually record

24  this incident; right?

25       A.  That is correct.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

467

Richard Keith Coborn – 9/17/2020

1    Q.   Had you received any -- had the City of
2  Stratford provided Officer Coborn any sort of training
3  as to how to use the body-worn cameras?
4       A.   Again, the cameras were fairly new.  As --
5       Q.   That's a yes or no.  Did they provide you
6  training or not?
7       A.   The training was provided.
8       Q.   Okay.  So you didn't follow the training, I
9  take it?
10       A.   I would reword that as that -- followed the
11  training, but the camera itself did not turn on.
12       Q.   Okay.  So your position is you followed the
13  training and the camera just didn't work.  That's what
14  the City is saying about Officer Coborn?
15       A.   That is correct.  The camera was on standby
16  mode requiring an extra push of the button to turn it on
17  to record.
18       Q.   And you had been trained that that was
19  necessary; right?
20       A.   Yes.
21       Q.   Okay.  And you didn't do that; right?
22       A.   Correct.
23       Q.   So you violated your train -- so Officer
24  Coborn, according to the City, violated its training
25  with regards to the body cameras; correct?

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

468

Richard Keith Coborn - 9/17/2020

1  for not using -- Officer Coborn received no discipline

2  whatsoever for not using the body -- body-worn camera

3  correctly; right?

4      A.  That is correct.

5      Q.  Okay.  Remember when I asked you if all

6  personnel should be held accountable for their actions?

7  Your testimony was yes; right?

8      A.  Yes, sir.

9      Q.  Okay.  Would you agree that if the jury finds

10 that you or Officer McHugh used excessive force, that

11 they should be held accountable?

12     A.  I'm sorry.  There was a cough in the room, sir,

13 and I didn't hear your question.

14     Q.  Do you agree that if the jury finds that

15 Officer Coborn or Officer McHugh used excessive force,

16 that they should be held accountable?

17     A.  Sir, I believe the -- the incident was turned

18 over to the grand jury and returned as a no bill.

19     Q.  Yeah.  You -- okay.

20         MR. EDWARDS:  Well, objection,

21 nonresponsive.

22     Q.  (BY MR. EDWARDS)  This is a simple one.  I know

23 you don't want to answer it, because it's so simple and

24 so clear, but yet you have this pension for not wanting

25 to answer it, but I'll ask it again.  And I'll withdraw

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

469

Richard Keith Coborn - 9/17/2020

```
 1  that -- that sidebar.
 2              Do you agree, sir, that if the jury finds
 3  that Officer Coborn or McHugh used excessive force, that
 4  they should be held accountable?
 5              MR. MASSOUH:  Objection, vague, confusing,
 6  calls for a legal conclusion.
 7      A.  I'm not understanding what jury you're talking
 8  about, sir.  Are you talking about --
 9      Q.  (BY MR. EDWARDS)  The jury that's going to be
10  evaluating this case and your -- and Officer Coborn and
11  Officer McHugh's conduct in this case.
12              MR. MASSOUH:  Same objection.
13      Q.  (BY MR. EDWARDS)  You understand you're
14  testifying to a jury right now -- right? -- even though
15  it's not here?
16      A.  Yes, sir, but I was unaware of which jury you
17  were replying to.
18      Q.  That's fine.  Let me ask you again.  It's the
19  sixth time I think I've asked it.  But do you agree that
20  if the jury finds that Officer Coborn or Officer McHugh
21  used excessive force, that they should be held
22  accountable?
23              MR. MASSOUH:  Objection, vague, confusing,
24  calls for a legal conclusion.
25      A.  Sir, I would ask for an appeal at that point.
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

**470**

1  asked that, both officers obtained that training in the

2  Texas Basic Peace Officers Course.

3      Q.  Okay.  All right.  In any event, you don't just

4  go to the car to prevent these kids from getting into

5  it.  You let them get into their car; right?

6      A.  No, sir, we never let them get into their car.

7  We ordered them to get on the ground.

8      Q.  And they didn't comply with that order, and

9  then they got into the car?

10          MR. MASSOUH:  Objection, beyond the scope

11  of the deposition.

12      A.  That is correct.  They refused all of our

13  commands.

14      Q.  (BY MR. EDWARDS)  Okay.  So you were -- where

15  were you and Officer McHugh when -- when these commands

16  were given in the -- in reference to the car that

17  Mr. Baker was driving?

18          MR. MASSOUH:  Objection, beyond the scope

19  of the deposition.

20      A.  The best representation for that, sir, would be

21  in the in-car video and all the videos provided by the

22  Texas Rangers.

23      Q.  Okay.  So the City -- the City would

24  acknowledge that the video from the Pilot gas station is

25  the best evidence of where you were when these -- when

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

471

Richard Keith Coborn - 9/17/2020

1    threats or anything coming from inside the vehicle.

2         Q.  So is that a "yes" it was appropriate to try to

3    smash the window in with your -- with Officer Coborn's

4    gun?

5         A.  In an attempt to get a view inside the vehicle,

6    yes, sir.

7         Q.  Okay.  Does the City understand there were

8    alternative places to view inside the vehicle?

9         A.  Yes, sir.

10        Q.  Yet it -- just so I'm clear, City of Stratford

11   trains its officers that if they can't see in a tinted

12   window, that it's permissible to try to smash the window

13   with a loaded weapon?

14        A.  The officer was unable to see inside the

15   vehicle or smash the window, which is why he moved to a

16   different means to see inside the vehicle.

17        Q.  Does the City contend it is permissible to

18   attempt to smash in or break the window of an automobile

19   because it can't -- because the officer can't see into

20   it?

21        A.  I believe in any instance of life or death,

22   whatever it takes to be able to see that side of the

23   vehicle should be taken.

24        Q.  Okay.  Do you -- does the City contend that

25   there was a life-or-death incident when Officer Coborn

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

472

Richard Keith Coborn - 9/17/2020

1  was attempting to smash the window in?

2      A.  At that point in time, sir, it was unknown.

3      Q.  Which means it wasn't known to be a

4  life-or-death incident, was it?

5      A.  Which means that it was unknown what the

6  intentions of the two individuals were.

7      Q.  Okay.  You didn't -- so Officer Coborn had no

8  idea what the situation was at the time in which he was

9  using his -- was it the butt of his gun?

10      A.  I'm not sure which question you asked right

11  there.  You asked two of them.

12      Q.  Okay.  Well, if I did, I apologize.  Did you

13  hit the window with the butt of your gun?

14      A.  No, sir, with the barrel.

15      Q.  With the barrel.  Is that safe?

16      A.  If the -- if the finger is not on the trigger,

17  there's no reason for the gun to fire at that time.

18      Q.  It seems incredibly dangerous to me, but I'm,

19  you know, just a lawyer.  The City disagrees with that?

20      A.  The entire situation was unsafe, sir.

21      Q.  Well, okay.  But I'm not asking you about the

22  entire situation yet.  I'm asking -- so I'll object as

23  nonresponsive.  I'm asking you:  Does the City contend

24  that hitting the window with the barrel is safe?

25      A.  You would have to take in the totality of the

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

473

Richard Keith Coborn – 9/17/2020

1    circumstances of this entire ordeal.

2        Q.   Take it --

3        A.   We're not going to just walk up to any vehicle

4    and smash the window.

5        Q.   Does the City contend that action by Officer

6    Coborn was safe?

7        A.   Yes.

8        Q.   And Officer Coborn probably agrees with that;

9    right?

10       A.   Yes.

11       Q.   Do you understand that guns can go off and kill

12   people if officers engage in tactics like this?

13            MR. MASSOUH:   Objection, calls for

14   speculation.

15       A.   The officer was aware of all dangers at that

16   time.

17       Q.   (BY MR. EDWARDS)   One of the dangers was that

18   the gun would go off and kill somebody; right?

19       A.   I'm not sure exactly what you're asking or if

20   that was a statement.

21       Q.   Isn't one of the dangers when you take the

22   barrel of a loaded gun with 15 or 16 rounds of

23   ammunition in it, that it will go off?  Isn't that one

24   of the risks?

25       A.   Any time a weapon is outside of its holster,

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

474

Richard Keith Coborn - 9/17/2020

```
 1  sir, is a risk.
 2       Q.  Let me ask it this way.  If -- if -- well, I
 3  don't know why you're fighting me on this.  Did Officer
 4  Coborn receive any training that it was appropriate to
 5  use the barrel of a gun to get a line of sight into a
 6  vehicle ever?
 7       A.  No, sir.
 8       Q.  Okay.  Are you aware of any such training in
 9  law enforcement that would -- that would instruct an
10  officer to take that action?
11       A.  Not to my knowledge.
12       Q.  Okay.  Yet still the City says it was
13  appropriate under the circumstances; correct?
14       A.  Under the totality of the circumstances, yes.
15       Q.  Which is just a --
16            MR. MASSOUH:  Hey, Jeff --
17       Q.  -- kid in a suspected stolen car; right?
18            MR. MASSOUH:  Hey, I don't mean to
19  interrupt, Jeff.  I apologize.  I'm not trying to be
20  difficult, but we've been going five hours.  And I know
21  he has a -- you have a pending question.  I want him to
22  answer that.  But I get -- I get faint -- I don't know
23  about Mr. Coborn, but I get faint if I don't eat.  So I
24  mean, I know you don't --
25            MR. EDWARDS:  John, I've got to teach a
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

475

1    A.  We didn't know the ages of any of the

2  individuals.

3    Q.  (BY MR. EDWARDS)  A young man potential -- or

4  potentially a kid in a stolen car, that's the totality

5  of the circumstances; right?

6    A.  No, sir.  The totality of the circumstances go

7  all the way back to where we first observed it, and it

8  increased by when we told them to -- when we commanded

9  them to get on the ground, and then they decided to

10  disobey our orders and to get inside the vehicle.

11    Q.  Okay.  So we've got a potential -- a potential

12  unsafe lane change, a suspected stolen car, and

13  according to you, some non -- by Darion Baker,

14  noncompliance with an instruction.  That's the totality

15  of the circumstances when you started trying to bang and

16  smash in the window; right?

17    A.  Yes.

18           MR. EDWARDS:  Okay.  Let's take a break for

19  counsel.  And then I just -- I'd appreciate -- the

20  shorter the better, but I totally understand, and we'll

21  get it done.  Thank you.

22           MR. MASSOUH:  I'll get a protein bar and

23  we'll be back in a few minutes.

24           THE VIDEOGRAPHER:  2:32, off.

25           (Recess taken 2:32 p.m. – 2:39 p.m.)

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

476

Richard Keith Coborn - 9/17/2020

```
 1              THE VIDEOGRAPHER:  On the record, 2:39.
 2       Q.  (BY MR. EDWARDS)  All right.  I'll be as fast
 3   as I can.  To be clear, the City approves of the
 4   shooting of Dar- -- the shooting by Officer Coborn --
 5   correct? -- of Darion Baker?
 6       A.  Yes, sir.
 7       Q.  And to be clear, the City also approves of
 8   the -- of the shots fired by Officer McHugh at or around
 9   Darion Baker; correct?
10       A.  Yes, sir.
11       Q.  Okay.  The City also approves -- and I just
12   want to be crystal clear about not just the entire basis
13   and justification that Officer McHugh and Officer Coborn
14   testified about in their depositions.  The City is in
15   agreement and approves of their conduct in their
16   entirety.  Fair?
17       A.  Yes, sir.
18       Q.  Okay.  I assume if the City didn't approve of
19   your conduct, you wouldn't have been promoted to be
20   chief of the police.  Is that a fair assumption or do
21   you just not know?
22       A.  I don't know, sir.
23       Q.  Okay.  Neither you nor Officer McHugh were
24   disciplined in any fashion for your conduct in the -- in
25   regards to the shooting or the incidents leading up to
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

477

1  on the videos; right?

2      A.  No, sir.  You asked at which position was I

3  standing.  My answer was that the City says that -- or

4  the contentions are relevant on the video.

5      Q.  Right.  Okay.  And I'm just -- I'm just making

6  sure.  Like, the City is relying on the video to make

7  its argument that you were in danger; right?

8      A.  The City is relying on the video to prove where

9  each officer was standing.

10      Q.  Okay.  And the City is relying on the video to

11  prove where each officer was standing when they fired

12  their weapons; right?

13      A.  Correct.

14      Q.  Okay.  And you -- do you have an understanding

15  of where Officer Coborn was standing when he first fired

16  his weapon?

17      A.  Yes.

18      Q.  Where was he standing when he first fired his

19  weapon?

20      A.  It's displayed on the video that's been

21  provided to you.

22      Q.  Great.  Where does the City contend?  I want an

23  answer.  Where does the City contend that Officer Coborn

24  was when he first fired his weapon?

25      A.  In front of the vehicle.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

478

Richard Keith Coborn - 9/17/2020

1   his prior testimony.

2        A.  I don't --

3        Q.  (BY MR. EDWARDS)  You've got to answer.

4        A.  I don't understand that question, sir.

5        Q.  Okay.  It's a pretty simple question.  The City

6   contends that Darion Baker was using the car as a deadly

7   weapon before any shots were fired; correct?

8        A.  Again, sir, that's a totality of the

9   circumstances --

10       Q.  No, it's not.  It has anything to do with the

11  totality of the circumstances.  ==Does the City contend==

12  ==that Darion Baker was using the car as a deadly weapon==

13  ==before Officer Coborn fired a single shot?==

14       ==A.  Correct.  Yes, sir, the City does.==

15       Q.  Okay.  Does the City agree with Officer Coborn

16  that if that were incorrect, that if Officer Coborn

17  fired before the car even started moving, that that

18  would be unreasonable?

19       A.  No, sir.  Again, that's a totality of the

20  circumstances on the driver's actions involved inside

21  the car.

22       Q.  So the City disagrees with its -- with Officer

23  Coborn then; correct?

24       A.  Disagrees with Officer Coborn on what?

25       Q.  That if he opened fire into the vehicle before

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

479

Richard Keith Coborn - 9/17/2020

1     Q.  Okay.  Well, you understand you're here to
2  testify about the positioning of everybody; right?
3     A.  Yes, sir.
4     Q.  Okay.  Great.  All right.  So again, why did --
5  what is the City's understanding of -- well, let's see
6  here.  You don't know -- again, you don't know the
7  position -- as you testify here today, you don't know
8  the position of Officer -- of Officer Coborn when he
9  fired his first shot; right?
10          MR. MASSOUH:  Objection, mischaracterizes
11  the prior testimony.
12     A.  Sir, I've answered that already.  The City's
13  contentions are based off of the video.
14     Q.  (BY MR. EDWARDS)  Right.  Same question second
15  shot?
16     A.  The same answer, sir.
17     Q.  Same question third shot?
18     A.  Again, the same answer, sir.
19     Q.  Same question fourth shot?
20     A.  Again, the same answer, sir.
21     Q.  Same question fifth shot?
22     A.  Same answer, sir.
23     Q.  Same question sixth shot?
24     A.  Same answer, sir.
25     Q.  Same question seventh shot?

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

480

1    A.  Same answer.

2    Q.  Same question shots 8 through 15?

3    A.  Same answer, sir.

4    Q.  Would the same be true for Officer McHugh's

5    shots?

6    A.  Yes, sir.

7    Q.  Okay.  You mentioned that you were a reasonably

8    good shot under the circumstances, that you were

9    qualified to use a firearm.  Did I recall that testimony

10   correctly?

11   A.  No, sir.  All I stated was that I was qualified

12   under the Stratford Police Department.

13   Q.  You fired upwards of 15 shots from pretty close

14   to point-blank range.  Is that a fair statement?

15   A.  I'm not sure how many shots I fired, sir.

16   Q.  You avoided the really key part of that

17   question, though.  You fired from point-blank range,

18   didn't you?

19           MR. MASSOUH:  Objection, vague.

20   A.  I'm not really sure what your definition of

21   point-blank range is, sir.

22   Q.  (BY MR. EDWARDS)  Okay.  What's your

23   definition?

24   A.  Point-blank range would be muzzle to somebody's

25   body part.

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

481

Richard Keith Coborn - 9/17/2020

1    Q.  Okay.  So then you didn't fire from point-blank

2 range, according to your definition.  You fired from,

3 what, three to five feet away?  Ten feet away?

4    A.  I'm not sure, sir.  I don't recall.

5    Q.  You have no idea how -- you have no idea how

6 far you were away from the car when you fired any of the

7 shots.  Fair?

8          MR. MASSOUH:  Objection, beyond the scope

9 of the deposition.

10          MR. EDWARDS:  No, it's not.

11    Q.  (BY MR. EDWARDS)  You've got to answer.

12    A.  No, sir, I do not recall.

13    Q.  Does Officer Coborn recall?

14    A.  Do you mean Officer McHugh?

15    Q.  No, I mean you.  Or you answered it, look, you

16 just don't recall, got to rely on the video; right?

17    A.  That's correct.  I don't recall how far I was

18 away from the -- when I fired my first shots.

19    Q.  Okay.  You fired all your shots at Darion

20 Baker?

21    A.  Correct.

22    Q.  Okay.  Is it your -- is it the City's

23 contention that all of the shots you fired were while

24 the car was facing you?

25    A.  No, sir.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

482

Richard Keith Coborn - 9/17/2020

1      Q.  Okay.  Do you know how many of the shots you

2  fired at Darion Baker while the car was facing you?

3      A.  No, sir.

4      Q.  Do you know -- does the City contend that any

5  of the shots were fired at Darion Baker while the car

6  was facing Officer Coborn?

7      A.  Yes, sir.

8      Q.  Okay.  Does the City contend any of those shots

9  hit Darion Baker?

10     A.  No, sir.

11     Q.  Does the City know?

12     A.  The City does not know.

13     Q.  He was shot in the back, though.  The City

14  knows that; right?

15     A.  If that's what's indicated in the ranger

16  report, then yes, sir.

17     Q.  Well, it's what's indicated in the autopsy.

18  Did the City ever review that?

19     A.  Yes, sir.

20     Q.  Did you ever review it?

21     A.  Yes, sir.

22     Q.  Okay.  You know he was shot in the back; right?

23     A.  Correct.

24     Q.  Twice?

25     A.  Correct.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

483

Richard Keith Coborn - 9/17/2020

```
 1      Q.  Okay.  Now, as the car pulled away from you,
 2  you continued shooting; right?
 3      A.  Yes, sir.
 4      Q.  Okay.  You shot through the back rear window;
 5  right?
 6              MR. MASSOUH:  Objection, beyond the scope
 7  of the deposition.
 8      A.  I don't know whose round went through the
 9  window, sir.
10      Q.  (BY MR. EDWARDS)  That's fine.  But you shot as
11  the car was going past you such that you were aiming at
12  him; right?  Him being Darion Baker; right?
13              MR. MASSOUH:  Objection, beyond the scope.
14      A.  I'm sorry.  I didn't hear the last part of your
15  question, sir.
16      Q.  (BY MR. EDWARDS)  As the car was going by you,
17  you testified that you continued to shoot; right?
18              MR. MASSOUH:  Objection, beyond the scope.
19      A.  Yes, sir.
20      Q.  (BY MR. EDWARDS)  Okay.  And the car was going
21  by you.  The passenger, Mr. Dees, on that side -- that's
22  how the car was going by you; right?
23              MR. MASSOUH:  Objection, beyond the scope.
24      A.  Yes, sir.
25      Q.  (BY MR. EDWARDS)  Okay.  So that to me means
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

484

Richard Keith Coborn - 9/17/2020

1    that the right side of the car when Mr. Baker was
2    driving, okay, was going by you; right?
3             MR. MASSOUH:  Objection, beyond the scope.
4        A.  Yes, sir.
5        Q.  (BY MR. EDWARDS)  Okay.  And you shot as the
6    car was going by you and after the car was completely by
7    you; right?
8             MR. MASSOUH:  Objection, beyond the scope.
9        A.  Correct.  Officer McHugh was also on that same
10   side.
11       Q.  (BY MR. EDWARDS)  Yeah, no, I understand that.
12   I understand the game your lawyer's going to play, but
13   I'm really just talking to you right now, okay?  I'm
14   talking to you about, you know, when you fired and where
15   you were.  And what I'm hearing you say, Mr. Coborn, and
16   the City's representative, is other than the video, you
17   have nothing to add to exactly where you were; correct?
18            MR. MASSOUH:  Objection.  Is this a
19   question for Mr. Coborn or for the City?
20            MR. EDWARDS:  Both.
21            MR. MASSOUH:  Well, then I'm going to
22   object to the extent --
23            MR. EDWARDS:  That's fine.  Object.  The
24   judge will rule on that objection.  I understand your
25   objection.

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

485

```
1              MR. MASSOUH:  I'm happy for the judge to
2    rule on it, because this is not a second deposition,
3    Jeff.
4              MR. EDWARDS:  It's not meant to be.
5              MR. MASSOUH:  Well, you're acting like it
6    is.
7         Q.  (BY MR. EDWARDS)  Well, again, can you answer
8    my question, sir?
9              MR. MASSOUH:  You can go ahead and answer.
10             MR. EDWARDS:  Yes.
11             MR. MASSOUH:  Can the reporter read it
12   back, please?
13             (Requested portion read by the reporter)
14             MR. MASSOUH:  Objection, vague, confusing,
15   compound.  To the extent that this question is directed
16   at Mr. Coborn individually, I'm going to instruct him
17   not to answer.  To the extent it's directed at the City
18   from the City's perspective, you can answer that
19   question.
20        Q.  (BY MR. EDWARDS)  Okay.  Do you understand the
21   question, sir?
22        A.  Yes, sir.
23        Q.  From the City's perspective -- let's start with
24   the City's perspective.  You have nothing to add beyond
25   the video as to where the -- where you shot from, the
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

486

Richard Keith Coborn - 9/17/2020

1  "you" being Officer Coborn, or where Officer McHugh shot

2  from; right?

3      A.  That is correct.

4      Q.  Even though as a factual matter you, Officer

5  Coborn, were actually right there and gave a statement

6  about it; right?

7      A.  What do you mean right there and gave a

8  statement about it?

9      Q.  I mean, you were right there shooting at Darion

10  Baker.

11      A.  Correct.

12          MR. MASSOUH:  Objection, vague.

13      Q.  (BY MR. EDWARDS)  And Officer Coborn gave a

14  statement about what -- what happened to the -- to the

15  ranger; right?

16      A.  Correct.

17      Q.  Does the -- and the City believes that

18  statement was true; right?

19      A.  Yes, sir.

20      Q.  The City believes that it doesn't have any

21  factual inconsistencies -- or factual errors; right?

22      A.  Yes, sir.

23      Q.  Okay.  Just because I muddled that, I've got to

24  ask it again.  I apologize.

25          The City believes that Officer Coborn's

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

487

Richard Keith Coborn – 9/17/2020

1    Q.  He was crouched.  Would you describe how he was
2  crouched so that I could understand it?  Just show me.

3    A.  Yes, sir.

4    Q.  Show me.

5    A.  I'll give you an example if you can see.

6    Q.  Got you.

7    A.  He had his left hand on the steering wheel and
8  immediately turned on the ignition.  And as the ignition
9  was going on, he reached down like this, and that was
10  the last position that he was ever seen in.

11    Q.  That's the last position you ever saw him in,
12  with him reaching -- with -- down and his head down;
13  correct?

14    A.  Yes, sir.  It was all a split second.

15    Q.  That's fine.  This whole thing took more than a
16  split second, though.  You're aware of that; right?

17    A.  I'm not aware of how long this whole thing
18  took.

19    Q.  It took five or six seconds, didn't it?

20    A.  Again, sir, I'm not aware of how long it took.

21    Q.  Okay.  Well, the City has no position as to how
22  long the 15 to 20 shots took?

23    A.  It would be indicated on the video, sir.

24    Q.  You defer to -- you defer to the video.  Would
25  you again show me the position of Darion Baker, please,

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

488

Richard Keith Coborn – 9/17/2020

```
 1      Q.   And Officer Coborn said six inches in his
 2   deposition?
 3        A.   As a general- --
 4        Q.   The City understands that that cannot possibly
 5   be true; right?
 6                 MR. MASSOUH:   Objection, calls for
 7   speculation.
 8        A.   Correct.  It's just a generalization about
 9   where the officer was standing.
10        Q.   (BY MR. EDWARDS)  Well, don't you -- doesn't
11   the City -- the City conducts investigations into car
12   accidents and, you know, officer-involved shootings.
13   They conduct investigations; right?
14        A.   That is correct.  The City conducts
15   investigations into car wrecks.
16        Q.   So does Officer Coborn; right?
17        A.   Conducts investigations into car wrecks?
18        Q.   Whatever.  You know, factual details matter
19   when you're giving statements about whether or not
20   someone was killed justifiably.  You understand that;
21   right?
22        A.   Yes, sir.
23        Q.   Okay.  They don't get to be generalizations
24   when yours are pointed out to be preposterous and
25   ludicrous.  Fair?  You've got to live by what you say
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

489

Richard Keith Coborn - 9/17/2020

```
 1  under oath and what you tell other police officers?
 2              MR. MASSOUH:  Objection, compound, vague,
 3  confusing.
 4      A.  Yes, sir.  I was asked in the previous
 5  deposition about how far in front of the vehicle
 6  Officer Coborn was standing, and I'm referencing that as
 7  a generalization.
 8      Q.  (BY MR. EDWARDS)  Yeah.  Well, you're -- okay.
 9  You're testifying as Officer Coborn now or the City?  I
10  just want to be clear.
11      A.  As the City, but you asked about the previous
12  deposition.
13      Q.  Well, no, I just told you about it, because
14  we're playing a game here.  You are Officer Coborn, but
15  in this deposition you're the corporate representative
16  of the City.  You understand that; right?
17      A.  Correct.  I'm aware of who I am.
18      Q.  Yeah.  Well, okay.  Is the City aware that
19  Officer Coborn's testimony, be it a generalization or
20  not, can't possibly be true?
21              MR. MASSOUH:  Objection, asked and
22  answered, calls for the witness to speculate.
23      A.  The City has no opinion on that, sir.
24      Q.  (BY MR. EDWARDS)  Okay.  Does the City agree
25  that objective reality should govern the situation
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

490

Richard Keith Coborn - 9/17/2020

1   rather than the generalized -- the generalizations of an

2   officer who's making perceptions that are wrong?

3                  MR. MASSOUH:  Objection, vague and

4   confusing.

5        A.  Again, sir, I'm not really sure on what's being

6   asked.

7                  MR. EDWARDS:  Would you reask that question

8   so the witness -- and, you know, if I need to reask it,

9   I'll reask it, but I think it's pretty -- pretty direct.

10                 (Requested portion read by the reporter)

11                 MR. MASSOUH:  Same objection.

12       A.  The City agrees that this was based off of

13   whatever -- what any reasonable officer would have done

14   at that time.

15                 MR. EDWARDS:  Objection, nonresponsive.

16                 Would you reask the same question to the

17   City's representative, Chief Coborn, please?

18                 (Requested portion read by the reporter)

19                 MR. MASSOUH:  Same objection.

20       A.  I stand by my answer that I gave previously,

21   sir.

22       Q.  (BY MR. EDWARDS)  All right.  When someone --

23   for the jury's benefit, when someone makes a number of

24   factual errors in a statement they give to a police

25   officer, doesn't it call their credibility into

WRIGHT WATSON & ASSOCIATES
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

491

Richard Keith Coborn - 9/17/2020

1  question?

2      A.  It depends on the totality of the circumstances

3  again, sir.

4      Q.  It can lead someone to call their credibility

5  into question, but there are some situations where it

6  might not.  That's what you're telling me?

7      A.  Correct.  Yes, sir.

8      Q.  All right.  Does the City agree that

9  Officer Coborn continued firing when the car was no

10  longer endangering him?

11      A.  No, sir.

12      Q.  Does the City agree that Officer Coborn kept

13  shooting as he was running behind the car?

14      A.  The City agrees to that, yes, sir.

15      Q.  Has the City in the last six months ever

16  analyzed whether or not Officer Coborn's or

17  Officer McHugh's conduct complies with the self-defense

18  statutes contained in the Texas Penal Code?

19      A.  In the six months to when, sir?  Today's date

20  or the date of the --

21      Q.  Yeah, today's date.

22      A.  No, sir.

23      Q.  Okay.  Nevertheless, you would be the -- does

24  the City acknowledge that police officers don't -- don't

25  get special protections to commit an act of deadly force

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

492

Richard Keith Coborn - 9/17/2020

1  asking about penal code, so...

2      Q.  Well, I'm just saying that the penal code

3  provides a basis for assessing whether or not the

4  shooting is unlawful.  You'd agree with that; right?

5            MR. MASSOUH:  Objection, calls for a legal

6  conclusion.

7      A.  I would agree to -- I would agree to the grand

8  jury being a criminal proceeding, yes, sir.

9            MR. EDWARDS:  That's not -- objection,

10 nonresponsive.

11     Q.  (BY MR. EDWARDS)  You understand that criminal

12 statutes can give people notice as to whether or not

13 their conduct is unlawful or not; right?

14           MR. MASSOUH:  Objection, calls for a legal

15 conclusion.

16     A.  I guess I would need clarification, sir.

17     Q.  (BY MR. EDWARDS)  What could give you greater

18 notice than a criminal statute in the Texas Penal Code

19 that something you're doing may be unlawful?

20     A.  What do you mean by greater notice, sir?

21     Q.  Look, isn't the penal code what lets you know

22 whether or not your conduct is lawful or unlawful?

23     A.  Correct.  I agree to that.

24     Q.  Okay.  And so it's not like -- you don't get --

25 were you ever trained on Lytle v. Bexar County?

279

Richard Keith Coborn - 9/17/2020

1        A.   No, sir.  I'm not familiar with that one.

2        Q.   Has anyone ever discussed to you the facts or

3   circumstances in that case?

4        A.   No, sir.  Again, I'm not familiar with that.

5        Q.   Okay.  Does -- is -- does the City have any

6   understanding as to whether or not that is even relevant

7   to whether or not you could shoot at someone in a moving

8   vehicle?

9        A.   I'm not relevant with that case, sir.  I've

10  never heard of it.

11       Q.   Okay.  Do you understand what the Fifth Circuit

12  is?

13       A.   Yes.  Federal court, yes, sir.

14       Q.   Okay.  You understand that cases that come down

15  from the Fifth Circuit can put you on notice as to

16  whether or not your conduct is -- is unreasonable or

17  potentially unlawful; right?

18       A.   For clarification, are you referring to case

19  law, sir?

20       Q.   Yes.

21       A.   Yes, I'm familiar with case law, sir.

22       Q.   Okay.  Well, case law can put you on notice as

23  to whether or not your conduct is unlawful or

24  unreasonable; right?

25                 MR. MASSOUH:  Objection to the extent it

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

494

Richard Keith Coborn - 9/17/2020

```
1    calls for a legal conclusion.
2         Q.  (BY MR. EDWARDS)  Right?
3         A.  Yes, sir.
4         Q.  Okay.  And one of the things that needs to
5    happen is the City needs to tell you about that case law
6    so that its officers know about it; right?
7         A.  Yes, sir.
8         Q.  Okay.  To be clear, nobody ever at the City at
9    Stratford ever told Officer Coborn or, to your
10   knowledge, any other officer at the City of Stratford
11   about Lytle v. Bexar County from the Fifth Circuit?
12        A.  That is correct.
13        Q.  Okay.  Nevertheless, you guys are well aware of
14   the criminal statutes of murder, deadly force,
15   self-defense, et cetera -- right? -- because they're in
16   the Texas Penal Code?
17        A.  Correct.  The officers are familiar with the
18   Texas Penal Code.
19        Q.  Okay.  So I'm just trying to think if there's
20   anything -- the Texas Penal Code provides you guys with
21   notice as to potential unlawful actions probably better
22   than even some case in the Fifth Circuit; right?
23        A.  I would say that the officers are aware of the
24   statutes inside the Texas Penal Code, correct.
25        Q.  And they have to be aware of them, because
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

495

Richard Keith Coborn – 9/17/2020

```
1                  CHANGES AND CORRECTIONS

2        WITNESS NAME:   REPRESENTATIVE OF CITY OF
              STRATFORD,TEXAS, RICHARD KEITH COBORN
3
                     DATE:  SEPTEMBER 17, 2020
4
     Reason Codes:  (1) to clarify the record; (2) to conform
5    to the facts; (3) to correct a transcription error; (4)
     other (please explain).
6    PAGE/LINE   CHANGE                         REASON CODE

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363

9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

**496**

Richard Keith Coborn – 9/17/2020

```
1                     SIGNATURE
2          I, REPRESENTATIVE OF CITY OF STRATFORD, TEXAS,
3  RICHARD KEITH COBORN, have read the foregoing
4  deposition, or have had it read to me, and hereby affix
5  my signature that the same is true and correct, except
6  as noted on the previous page.
7                     _____
8                     REPRESENTATIVE OF CITY OF STRATFORD,
9                     TEXAS, RICHARD KEITH COBORN
10 THE STATE OF _____)
11 COUNTY OF _____)
12      Before me, _____, on this day
13 personally appeared REPRESENTATIVE OF CITY OF STRATFORD,
14 TEXAS, RICHARD KEITH COBORN, known to me (or proved to
15 me under oath or through _____) (description of
16 identity card or other document) to be the person whose
17 name is subscribed to the foregoing instrument and
18 acknowledged to me that he executed the same for the
19 purposes and consideration therein expressed.
20      Given under my hand and seal of office this _____
21 day of _____, 20____.
22                     _____
23                     NOTARY PUBLIC IN AND FOR
24                     THE STATE OF _____
25                     COMMISSION EXPIRES: _____
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

497

Richard Keith Coborn - 9/17/2020

```
1              REPORTER'S CERTIFICATE
2    STATE OF TEXAS      )
3    COUNTY OF TRAVIS   )
4        I, DELLA M. DUETT, Certified Shorthand Reporter, in
5    and for the State of Texas, certify that the foregoing
6    deposition of REPRESENTATIVE OF CITY OF STRATFORD,
7    TEXAS, RICHARD KEITH COBORN, was reported
8    stenographically REMOTELY VIA ZOOM VIDEOCONFERENCE by me
9    at the time and place indicated, said witness having
10   been placed under oath by me; that review was requested
11   pursuant to Federal Rule of Civil Procedure 30(e)(1);
12   and that the deposition is a true record of the
13   testimony given by the witness.
14       I further certify that I am neither counsel for nor
15   related to any party in this cause and am not
16   financially interested in its outcome.
17       Given under my hand on this the 21st day of
18   September, 2020.
19
20                    _____
21                    DELLA M. DUETT, CSR, RMR, CRR
                      Certified Shorthand Reporter
                      CSR No. 4377 - Expires 10/31/22
22
                      WRIGHT WATSON & ASSOCIATES
23                    Firm Registration No. 225
                      1250 S. Capital of Texas Highway
24                    Building 3, Suite 400
                      Austin, Texas  78746
25                    512-474-4363
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

498

Richard Keith Coborn - 9/17/2020

```
1   Time used by each party:
    JEFF EDWARDS - 5 Hours, 33 Minutes
2   JOHN MASSOUH - 0 Minutes
    ROBERT ELLIOTT - 0 Minutes
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**WRIGHT WATSON & ASSOCIATES**
1250 South Capital of Texas Highway, Building 3, Suite 400  Austin, Texas 78746  (512) 474-4363
9e1fd43e-bfb0-44b8-915e-91a39eab9e2a

**499**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



| IRA DARLINA BAKER, individually, and as the administratrix of the ESTATE OF DARION DEV'ON BAKER, MARIO BAKER, individually, ARLANDRA WILLIFORD, as next friend of her minor child, C.W., and on behalf of all wrongful death beneficiaries of Darion Dev'on Baker | § § § § § § § § § | Civil Action No. 2:19-cv-77 |
|---|---|---|
| Plaintiffs | § § | |
| v. | § § | |
| RICHARD KEITH COBORN, and MICHAEL JOSEPH McHUGH, in their individual capacities, and the CITY OF STRATFORD, TEXAS | § § § § § | |
| Defendants | § § | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit 20
# Stratford Police Department Use of Force Incidents

# Use of Force

| Officer | Date | Weapon | Case Number | Person | Reason |
|---|---|---|---|---|---|
| Richard Coborn | 10/14/2016 10:05:24PM | | 16-00101 | | Spike Strips, in order to end pursuit that was headed into Stratford |
| Richard Coborn | 12/1/2017 5:45:00PM | | 17-00156 | | |
| Michael McHugh | 1/1/2018 11:00:40AM | | 18-00001 | | SPIKE STRIP DEPLOYMENT FOR VEHICLE PURSUIT |
| Michael McHugh | 9/12/2018 12:53:00AM | | 18-00097 | | Spike strips deployed on fleeing vehicle. |
| Michael McHugh | 11/7/2016 9:40:20PM | PHYSICAL CONTACT - HAND STRIKES | 16-00115 | | Attempted to detain subject due to aggressive behavior and subject continued to pull away even after handcuffing. I hip-tossed subject to the ground when she attempted to get away from the area after being cuffed. |
| Michael McHugh | 10/8/2018 6:40:00AM | PHYSICAL CONTACT - EMPTY HAND CONT | 18-00109 | | Suspect refused to turn on her stomach to be handcuffed/detched |
| Richard Coborn | 8/6/2016 2:14:12PM | PHYSICAL CONTACT - EMPTY HAND CON | 16-049 | | In order to gain compliance |
| Richard Coborn | 4/6/2018 2:53:53PM | FIREARM - HANDGUN FIRED | 18-00037 | | Driver was using vehicle as a deadly weapon. Shot was fired into engine block in an attempt to disable the vehicle. |
| Richard Coborn | 9/11/2018 11:55:20PM | FIREARM - SHOTGUN FIRED | 18-00097 | | Suspect was fleeing from law enforcement, continued to travel after being spiked. Shotgun used to preserve life and property of indviudals inside Stratford City Limits |
| Randy Hooks | 1/1/2018 10:35:33AM | FIREARM - SHOTGUN FIRED | 18-00001 | | TO STOP A FLEEING VEHICLE, THAT WAS A DANGER TO THE SAFTEY O THE OFFICERS AND PUBLIC. |
| Richard Coborn | 11/14/2014 5:50:40PM | LESS LETHAL WEAPON - TASER | 14-0000113 | | Suspect was noncompliant. Resiste arrest after threatning the life another Officer and refused t |
| | | | | | |

501

| Officer | Date | | Weapon | Case Number | Person | Reason |
|---|---|---|---|---|---|---|
| Richard Coborn | 11/22/2017 | 2:14:55AM | LESS LETHAL WEAPON - TASER | 17-0154 | | Frittz was cussing and yelling at myself while I was sitting in my patrol unit. Prior Frittz had been arrested where his cell phone was taken as evidence. Frittz wanted the phone back and when I told him no that it was held as evidence he threw a punch towards me, hitting my hand that was outside of the patrol car window. Telling him to come towares me, Frittz then ran off down the alley when I opened my patrol car door. |
| Richard Coborn | 8/2/2015 | 2:23:16PM | LESS LETHAL WEAPON - TASER | 15-0000103 | | Compliance |
| Michael McHugh | 2/6/2019 | 8:35:00PM | FIREARM - HANDGUN | 19-00023 | | Felony stop as a result of vehicle pursuit. |
| Michael McHugh | 2/17/2016 | 10:00:29AM | FIREARM - HANDGUN | 16-020 | | No-knock warrant service. |
| Michael McHugh | 3/25/2016 | 9:07:00PM | FIREARM - HANDGUN | 16-027 | | Agg. assault w/ family violence against smaller individual. Was sole officer on scene at time of use of force. |
| Richard Coborn | 3/21/2016 | 8:35:00PM | FIREARM - HANDGUN | 16-024 | | Suspect reached into his waistband after being told several times keep his hands visible |
| Michael McHugh | 4/9/2016 | 10:52:00PM | FIREARM - HANDGUN | 16-034 | | Felony drug possession. |
| Michael McHugh | 2/3/2016 | 7:22:00PM | FIREARM - RIFLE | 16-011 | | Warrant Service |
| Richard Coborn | 10/13/2016 | 10:05:00PM | FIREARM - HANDGUN REMOVED FROM H | 16-00101 | | Felony Stop |
| Michael McHugh | 2/3/2016 | 7:22:00PM | LESS LETHAL WEAPON - TASER | 16-011 | | Warrant service |
| Michael McHugh | 11/17/2014 | 5:37:00PM | LESS LETHAL WEAPON - TASER | 14-0000113 | | Lermon was threatening to kill one and was behaving very aggressive. Did not have backup on scene at |
| Michael McHugh | 11/17/2014 | 5:40:00PM | LESS LETHAL WEAPON - TASER | 14-0000113 | ANTHONY LERMON | Lermon refused to get into the patrol unit and was locking his knees. Displayed taser and he entered |
| | | | | | | |

502

| Officer | Date | Weapon | Case Number | Person | Reason |
|---|---|---|---|---|---|
| Michael McHugh | 11/17/2014 5:37:00PM | PHYSICAL CONTACT - CHOKE HOLD | 14-0000113 | ANTHONY LERMON | Subject pulled away and began to fight with me when handcuffs touched his arm. Needed to gain contro |
| Randy Hooks | 1/1/2016 1:45:50AM | FIREARM - HANDGUN REMOVED FROM HI | 16-001 | JERRY MCLAUGHLIN | Suspect a weapon on officers. |
| Michael McHugh | 4/10/2016 10:52:00PM | FIREARM - HANDGUN | 16-034 | RYAN GARZA | Felony drug possession. |
| Michael McHugh | 11/6/2016 11:20:40AM | FIREARM - HANDGUN | 16-00113 | JERJES VALERO | Vehicle called in as pursuit. Stopped vehicle and pulled individual out of vehicle at gun point. |
| Richard Coborn | 2/3/2016 8:40:29PM | PHYSICAL CONTACT - EMPTY HAND CONT | 16-011 | JOHNNY COSS | While attempting to place Johnny Coss under arrest on Felony warrants, Coss attempted to use his elbow to hit me in the face. At that time I grabbed Coss and placed him on the ground while another officer placed handcuffs on him. |
| Richard Coborn | 5/22/2016 11:15:18PM | FIREARM - HANDGUN | 16-044 | SHELDON HAMRICK | Suspect appeared out from the alle shouting "Hey!" with his jacket being use as concealment for something that was in his hands. |
| Michael McHugh | 10/8/2018 6:40:00AM | FIREARM - HANDGUN | 18-00109 | KATRINA HARKINS | Suspect refused to exit vehicle with dark tinted windows after being involved in a possible theft. |
| Michael McHugh | 2/7/2019 8:35:00PM | FIREARM - HANDGUN | 19-00023 | BLAKE QUINLAN | Felony stop as a result of vehicle pursuit. |

503